## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JENNIFER ARMISTEAD,

                Plaintiff,

v.

TWG MANAGEMENT, LLC,

                Defendant.

Civil Action File No.:
1:24-cv-02583-MHC

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant TWG Management, LLC, ("Defendant"), and, pursuant to Fed. R. Civ. P. 56, Fed. R. Civ. P. 6, and Local Rule 56.1, hereby timely files Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment, showing this Honorable Court the following:

## I.    INTRODUCTION

This lawsuit arises from a dog bite incident that is alleged to have occurred inside an apartment at Silver Oaks Apartment Complex ("Silver Oaks") in Clarkston, Georgia. Silver Oaks is operated by Defendant. Plaintiff has asserted claims under O.C.G.A. § 51-2-7 (Georgia's dog bite statute), along with negligent hiring, retention, and supervision claims against Defendant. O.C.G.A. § 51-2-7 is not

applicable to out-of-possession landlords or property managers. Moreover, under Georgia law, Defendant is only under a legal duty to protect against any dangerous condition that the Defendant has knowledge of. There is no evidence that Defendant had any knowledge of the dog involved in the incident whatsoever, much less any dangerous propensities. Additionally, Plaintiff's claims of negligence per se based on DeKalb County ordinances are inapplicable to Defendant. Finally, Plaintiff's claims of negligent hiring, training, and supervision, as well as underlying claims of punitive damages, have no legal basis. Therefore, Plaintiff's claims fail as a matter of law and Defendant is entitled to summary judgment in its favor.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant incorporates by reference its Undisputed Statement of Material Facts, which is filed contemporaneously herewith, as if fully set forth herein. Construing the evidence in a light most favorable to non-movant Plaintiff, the undisputed facts are as follows:

On the evening of January 31, 2022, Plaintiff was at home in her apartment at Mirador at Idlewood ("Mirador"). (Deposition Jennifer Armistead, attached hereto as Defendant's Exhibit "A" (hereinafter "Plaintiff's Depo."), P. 20, ll. 1). Mirador is an apartment complex directly across the street from Silver Oaks. (Plaintiff's Depo., P. 23, ll. 14-21). That evening, Plaintiff had been drinking alcohol and smoking

marijuana. (Plaintiff's Depo., P. 37, ll. 1-5; Deposition of Savannah Williamson, attached hereto as Defendants' Exhibit "B" (hereinafter "Williamson Depo."), P. 38, ll. 5-10, 16-18). At around 8:00 P.M., Plaintiff decided to walk from Mirador to an apartment located at Silver Oaks. (Plaintiff's Depo. P. 26, ll. 20-22). Plaintiff was walking over to visit Davin Terrell, who she knew because he worked and lived at Mirador. (Plaintiff's Depo., P. 22, ll. 24-25, P. 23, ll. 1-5).  Plaintiff was going to see Terrell's newborn baby. (Plaintiff's Depo., P. 22, ll. 14-19). She does not know whether Terrell rented any apartment at Silver Oaks at the time of her incident. (Plaintiff's Depo., P. 29, ll. 3-14).

Defendant is the property manager of Silver Oaks.  (Deposition of Kendrel Bretz, attached hereto as Defendant's Exhibit "C" (hereinafter "Bretz Depo."), P. 8, ll. 6-8).  Terrell was not a tenant at Silver Oaks on January 31, 2022. (Bretz Depo., P. 20, ll. 4-8). In fact, Terrell was a former tenant and maintenance technician at Silver Oaks; however, his employment and his lease were both terminated in June 2020. (Bretz Depo, P. 19, ll 18-20).

Plaintiff had been to the Silver Oaks apartment in question at least once before.  (Plaintiff's Depo., P. 25, ll. 2-4).  On the night of January 31, she entered the apartment and sat in the living room with Terrell, his girlfriend and the baby. (Plaintiff's Depo., P. 33, ll. 11-19). Plaintiff knew that Terrell owned a dog and had

seen the dog with him while at Mirador. (Plaintiff's Depo., P. 28, ll. 12-15).

At some point, Terrell opened the door to a fenced-in patio and let the dog into the living room. (Plaintiff's Depo., P. 34, ll. 5-10). Plaintiff then reached down to pet the dog. (Plaintiff's Depo., P. 22, ll. 16-18; Williamson Depo., P. 38, ll. 2-4). The dog bit Plaintiff in the face. (Plaintiff's Depo., P. 38, ll. 3-4). Plaintiff does not remember the immediate aftermath, but at some point she called her daughter, Savannah Williamson, to come get her. (Plaintiff's Depo., P. 38, ll. 5-7; Williamson Depo. P. 25, ll. 8-18). Plaintiff's daughter then drove her mother to the emergency room. (Williamson, Depo, P. 34, ll. 8-10).

## III.   <u>LEGAL STANDARD</u>

Fed. R. Civ. P. 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir.

2004) (*quoting* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted)).

Where the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56 (e); *see also* <u>Celotex</u>, 477 U.S. at 324 – 26, 106 S. Ct. 2548. A fact is material if it is relevant or necessary to the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 255 (1986). This evidence must consist of more than mere conclusory allegations or legal conclusions. *See* <u>Avirgan v. Hull</u>, 932 F.2d. 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." <u>Celotex</u>, 477 U.S. at 323, 106 S.Ct. 2548.

IV.    **ARGUMENT AND CITATION OF AUTHORITY**

    A. **Plaintiff cannot recover against Defendant because Defendant owed her no legal duty.**

It is well established that "the essential elements of a negligence claim are the existence of a legal duty; breach of duty; a sufficient causal connection between the

defendant's conduct and the plaintiff's injury; and damages." <u>Henry v. Atlanta Gas Light Co.</u>, 354 Ga. App. 368, 371 (2020). "Thus, the threshold issue in a negligence action is whether and to what extent the defendant owes a legal duty to the plaintiff," which is a question of law. <u>Id</u>. "A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts." <u>Id</u>. Here, Plaintiff's claim fail because she cannot establish that Defendant owed her any legal duty.

> ### a. <u>Because the bite occurred in an area that was not under the the possession or control of Defendant, Plaintiff's claims may only be analyzed under O.C.G.A. § 44-7-14.</u>

Defendant is the property manager of Silver Oaks apartments. Under Georgia law, when a property manager undertakes control over the premises, as Defendant has with Silver Oaks, the property manager is subject to the same duties as the landlord and is treated as a landlord. *See* <u>O'Connell v. Cora Bett Thomas Realty, Inc.</u>, 254 Ga.App. 311, 313, 563 S.E.2d 167 (2002); <u>Total Equity Mgmt. Corp. v. Demps</u>, 191 Ga. App. 21, 22, 381 S.E.2d 51 (1989). Therefore, while Defendant is not the owner of the property, Defendant is treated as a "landlord" for purposes of legal analysis.

When analyzing what constitutes as "out-of-possession landlord," Georgia courts have consistently held that the area inside the leased apartment is only within the possession of the tenant and not the landlord/property manager. *See* Cham v. ECI Mgmt. Corp., 311 Ga. 170, 176(2)(a), 856 S.E.2d 267 (2021) (". . . .a landlord's plot of land contains both areas that are possessed by the landlord (such as the common areas of an apartment complex) and areas possessed by tenants (i.e., the apartments themselves).").    Apartments themselves—once rented by the tenant—become "area[s] possessed by the tenant." Id.  Plaintiff concedes the bite happened inside an occupied apartment; therefore, Defendant is treated as an out-of-possession landlord.

In a dog-bite case, a plaintiff generally only has two valid theories under which she can recover damages: a dangerous-animal-liability theory under O.C.G.A § 51-2-7[1], or a premises-liability theory.[2]  Here, Plaintiff has not asserted a claim under the premises liability statute, O.C.G.A. § 51-3-1.  Instead, she relies on the

---

[1] O.C.G.A § 51-2-7 provides, in relevant part:

> A person who owns or keeps a vicious or dangerous animal of any kind and who, by careless management or by allowing the animal to go at liberty, causes injury to another person who does not provoke the injury by his own act may be liable in damages to the person so injured. In proving vicious propensity, it shall be sufficient to show that the animal was required to be at heel or on a leash by an ordinance of a city, county, or consolidated government, and the said animal was at the time of the occurrence not at heel or on a leash.

[2] The deadline for Plaintiff to amend her pleadings has since expired.

dangerous-animal-liability theory under O.C.G.A. § 51-2-7. *See* Plaintiff's Complaint, at ¶ 22. However, the dog bite statute is inapplicable to Defendant and therefore Plaintiff's claims under O.C.G.A. § 51-2-7 fail as a matter of law.

Georgia courts have held that, "by its plain terms, O.C.G.A. § 51-2-7 applies only to a person who *owns or keeps* a vicious or dangerous animal. Tyner v. Matta-Troncoso, 305 Ga. 480, 488, 826 S.E.2d 100, 107 (2019). In Tyner, the plaintiff was bitten by pit bulls that escaped from a tenant's backyard. Id. The Georgia Supreme Court held that it was an error for the court to analyze the landlord's summary judgment motion under O.C.G.A. § 51-2-7, because there was no evidence that the defendant, as an out-of-possession landlord, "owned or kept" the dogs. Id. To hold otherwise would "effectively [write] the phrase 'or landlord' into O.C.G.A. § 51-2-7 where no such language exists." Id. (*citing* Conley v. Pate, 305 Ga. 333, 335 (2) n.3, 825 S.E.2d 135 (2019) ("[W]e cannot rewrite a statute that 'almost' fits a case to make it apply where it clearly does not.")). As such, O.C.G.A. § 51-2-7 is flatly inapplicable to Defendant and Plaintiff's claims under this statute fail and must be dismissed as a matter of law.

In cases involving dog bites that occur inside a leased premises, Georgia courts have found that O.C.G.A. § 44-7-14, and not O.C.G.A. §§ 51-3-1 or 51-2-7, applies to assessing a property manager's liability. *See* Younger v. Dunagan, 318

Ga. App. 554, 555, 733 S.E.2d 81, 82 (2012) (upholding the grant of summary judgment in favor of defendant in part because the owner is not liable to plaintiff because he leased the property and there is no evidence that the plaintiff's injuries arose from defective construction or a failure to keep the premises under repair as required by O.C.G.A. § 44-7-14); Webb v. Danforth, 234 Ga. App. 211, 505 S.E.2d 860, 861 (1998) (upholding the grant of summary judgment in favor of defendant in part because defendant was an out of possession landlord who leased the property to the dog owner.). It is undisputed that Plaintiff visited an occupied apartment at Silver Oaks and that Plaintiff's incident occurred *inside* that apartment. Based on longstanding Georgia precedent, Defendant must be treated as out-of-possession landlord who owed no duty to Plaintiff under O.C.G.A. § 51-2-7 (or O.C.G.A. § 51-3-1).

**b. Defendant is not liable under O.C.G.A. § 44-7-14 as there is no evidence that Davin Terrell was a current tenant, nor is there any defective construction or failure to keep the premises in repair.**

Plaintiff has not asserted a claim against Defendant under O.C.G.A. § 44-7-14; however, even it she had done so, that claim would fail as a matter of law.[3]

---

[3] O.C.G.A § 44-7-14 provides, in relevant part:

First, there is no evidence in the record that Davin Terrell was a tenant at Silver Oaks on the date of the dog bite. In fact, the only evidence in the record is that Terrell was a former tenant whose lease was terminated in June 2020, more than 18 months before Plaintiff's incident. (Bretz Depo., P. 20, ll. 4-14).

Even if Terrell had been a Silver Oaks tenant in January 2022, Plaintiff's claims would still fail because there is no evidence of any defective construction or failure to keep the apartment at issue in repair. Georgia courts have held that an out-of-possession landlord is not liable for injuries caused by a tenant's dog because the landlord's liability under O.C.G.A. § 44-7-14 is limited to injuries caused by a defective condition on the property. *See* <u>Younger v. Dunagan</u>, 318 Ga. App. 554, 555, 733 S.E.2d 81, 82 (2012) (affirming the grant of summary judgment in favor of an out of possession landlord against a postal worker who was injured escaping a tenant's dog, and holding "there is no evidence that [plaintiff's] injuries arose from defective construction or a failure to keep the premises under repair."); <u>Griffiths v. Rowe Properties</u>, 271 Ga. App. 344, 345, 609 S.E.2d 690, 691 (2005) (affirming the grant of summary judgement for the landlord in a dog bite case and holding "as an

---

Having fully parted with possession and the right of possession, the landlord is <u>not responsible to third persons for damages</u> resulting from the negligence or illegal use of the premises by the tenant; provided, however, <u>the landlord is responsible for damages arising from defective construction or for damages arising from the failure to keep the premises in repair</u>. (emphasis added).

out-of-possession landlord, Rowe's only liability to third persons is that of O.C.G.A. § 44-7-14.... That liability is premised on defective construction or failure to repair, neither of which has been shown here."). The Complaint does not allege, nor is there any evidence of the existence of, a defect in the apartment's construction or failure to repair that caused or contributed to the dog bite. As such Defendant is entitled to summary judgment as a matter of law.

c. **Even assuming O.C.G.A. § 51-2-7 was the applicable standard, Plaintiff's claims fail because Plaintiff cannot prove that Defendant had superior knowledge of the dog's aggressive tendencies.**

"[I]n a typical dog-bite case, regardless of whether the action is based on the premises-liability statute or the dangerous-animal-liability statute, a plaintiff must produce evidence of the vicious propensity of the dog to show that *the owner of the premises had superior knowledge of the danger*." Swanson v. Tackling, 335 Ga. App. 810, 812 (2016) (quoting Abundant Animal Care, LLC v. Gray, 316 Ga. App. 193, 195 (2012)) (*emphasis added*). Georgia courts have held that to hold out-of-possession landlords liable, they "must therefore present some evidence showing that the landlord had knowledge of the dogs' tendencies or propensities to do harm in order to demonstrate reasonable foreseeability. That means that here, without

some evidence rebutting the presumptive harmlessness of the [tenant's] dogs, the [plaintiff] cannot establish that it was reasonably foreseeable that [plaintiff's] injuries would arise from [the landlord's] failure to repair [the defect]." <u>Tyner</u>, 305 Ga. at 484. "[K]nowledge of a dog's prior aggressiveness is critical[,]" as "mere knowledge that a dog exists – or even that a particular dog exists – is not sufficient to make an attack reasonably foreseeable." <u>Tyner</u>, 305 Ga. at 488 (3). Thus, a plaintiff must show both that (1) the dog had a vicious propensity, and (2) that the premises owner had superior knowledge of the dog's vicious propensity. *See* <u>Stolte v. Hammack</u>, 311 Ga. App. at 712 (1), 716 S.E.2d 796 (2011) (a plaintiff's "equal knowledge of the dog's vicious propensity . . . bars recovery under Georgia's premises liability statute"). Here, there is no competent evidence that Defendant had any knowledge of this dog's dangerous propensity. In fact, there's no evidence that Defendant had knowledge of the presence of the dog in the apartment *at all*.

An incident report was also prepared by then-Property Manager, Theresa Crooks, on March 10, 2022, when Defendant was first notified about Plaintiff's incident. Incident Report, attached hereto as "Exhibit D". In the incident report, the dog was identified as a "big white dog." <u>Id</u>. No white dog was found in Silver Oaks' resident files. <u>Id</u>. Davin Terrell was identified as a "former employee who had white dog" but—when contacted—apparently denied that the bite occurred on Silver Oak

property.  Id. Terrell's "white dog" does not match Plaintiff's description of the dog who bit her.  She described the attacking dog as a "brownish reddish" during her deposition.  *See* Plaintiff's Depo. P. 31, ll. 2-5. She described the dog to her daughter as a "Malinois or like a big dog, black dog, or dark-colored dog" and "dark brown." *See* Williamson Depo., P. 44, ll. 18-23.

Plaintiff cannot point to any evidence that Defendant had any knowledge of Terrell being on the property on the night of her incident, being the owner of a dog that was on the property, or of the dog at issue having an dangerous tendencies.

In fact, the record points overwhelmingly to Plaintiff having superior knowledge of the dog's tendencies—good, bad or otherwise. A plaintiff is not entitled to recover if the undisputed evidence demonstrates that the plaintiff's knowledge of the hazard was equal to or greater than that of the defendant, such as in dog hazard situations. GoldOller Management Services, LLC v. Smith, 366 Ga. App. 326, 329, 882 S.E.2d 644, 647 (2022). Plaintiff testified that she had seen the dog before. Plaintiff's Depo., P. 28, ll. 12-15. In fact, she testified that the only times she had seen the dog were when Terrell was walking the dog *at Mirador*. Plaintiff's Depo., P. 16, ll. 16-25, P. 17, ll. 1-2; Williamson Depo., P. 43, ll. 14-25. Based on Plaintiff's own testimony, she had seen the dog before and interacted with it.  Yet, Plaintiff never reported the dog to Silver Oaks and has no evidence of any person

reporting the dog's presence to Silver Oaks property management. Plaintiff's Depo. P. 32, ll. 14-20. Plaintiff chose to interact with the dog based on her prior encounters and did so while under the influence of alcohol and marijuana. Even after the bite, Plaintiff never reported the dog to Silver Oaks, local Animal Control, or law enforcement. Plaintiff's Depo., P. 63, ll. 8-16. "Georgia law does not presume that dogs are vicious or dangerous." Tyner, 305 Ga. at 487, 826 S.E.2d at 106. In the absence of evidence providing Defendant was aware of the dog's presence in the apartment and of aggressive tendencies.

Plaintiff's Complaint allegations are not supported by Plaintiff's deposition testimony. Even if Plaintiff had evidence that Defendant's employees had seen the dog in common areas of the property, Plaintiff's claims still fail. Under Georgia law, "a landlord's tort liability for a danger on its property is determined by the area where the danger lurks." Cham, 311 Ga. 170, at 176(2)(a).

In Jordan v. H.J. Russell Company, 371 Ga. App. 8, 12, 899 S.E.2d 514, 517 (2024), employees of the property management company had seen a minor with a gun in the common area "in the weeks before" a shooting incident. Id. However, the Court still found that this admission "does not change the analysis," as on the date of the actual shooting, the shooting took place inside his mother's apartment. Id. "Thus, the cause of the injury lay inside the apartment and the Defendants' potential

liability therefore derives from O.C.G.A. § 44-7-14." Id.

The same analysis applies here. Even if Defendant's employees had seen the dog outside in common areas prior to Plaintiff's incident, there is no evidence that Defendant or its employees knew the dog was in someone's apartment on the night of Plaintiff's incident. As such, Plaintiff's claims against Defendant should be dismissed as a matter of law.

**B. Plaintiff cannot prove negligence per se through the DeKalb ordinances and, therefore, her claims fail as a matter of law.**

Despite not being a valid theory of recovery for a dog bite, Plaintiff alleges Defendant violated DeKalb County Animal Control Ordinances.[4] *See* Plaintiff's Complaint, ¶ 23, [Doc. 1-1]. These ordinances broadly impose requirements on the "owners" of animals in DeKalb County, the violation of which Plaintiff argues constitutes negligence *per se.* However, these ordinances plainly do not apply to Defendant, a property manager, who did not own the dog at issue. Courts have held that plaintiffs "cannot proceed under a separate theory of negligence *per se* because [Defendant] is an out-of-possession landlord." Lemontree Properties, LLC v. Samples, 357 Ga. App. 410, 414, 850 S.E.2d 849, 852 (2020). "As an out-of-

---

[4] Plaintiff has broadly cited Code of Dekalb County, revised 1988 (Chapter 5, Sec. 5-2, 5-3, 5-4, 5-5, and 5-10).

possession landlord, [the landlord's] *only* liability to third persons is that of O.C.G.A. § 44-7-14." Id. (quoting Griffiths v. Rowe Properties, 271 Ga. App. 344, 345, 609 S.E.2d 690, 691 (2005). "To allow a negligence *per se* claim premised on [Plaintiff's] expansive definition of an "owner" and against an out-of-possession landlord would effectively eviscerate O.C.G.A. § 44-7-14, and render the limitations imposed therein null and void." Id. As such, Plaintiff's claims of negligence per se under the Code of DeKalb County ordinances should be dismissed as a matter of law.

C. **Plaintiff's claims of negligent hiring, training, and supervision of Davin Terrell fail as a matter of law.**

In her Complaint, Plaintiff makes generic and unsupported claims for negligent hiring, training and supervision of Davin Terrell. *See* Plaintiff's Complaint ¶¶ 31-36, [Doc. 1-1]. These claims all fail because the undisputed evidence is that Davin Terrell was not an employed at Silver Oaks on the date of Plaintiff's incident. He was terminated in June 2020, nearly 18 months earlier. Bretz Depo. P. 17, ll. 3-12. For an employer to be held liable for negligent hiring or supervision, "there must have be sufficient evidence to establish that the employer knew or should have known of an employee's tendences to engage in certain behavior *relevant to the injuries allegedly incurred by the plaintiff.*" Novare Group, Inc. v. Sarif, 290 Ga.

186, 718 S.E.2d 304 (2011) (emphasis added). Here, there has been no evidence produced by Plaintiff that shows a relationship between Terrell's employment, which ended 18 months prior to the date of incident, and the incident itself.

Furthermore, Plaintiff has proven no link between Terrell's prior employment with Defendant and her dog bite incident. The dog bite occurred during a time when Terrell was neither an employee nor a tenant. As such, any claims for negligent hiring, training, and supervision, fail as a matter of law.

### D. **Plaintiff's punitive damages claim fails as a matter of law.**

Because there is no viable claim against Defendant, Plaintiff's claim for punitive damages also fails as a matter of law. Gordon v. Starwood Hotels & Resorts Worldwide, Inc., F. Supp. 2d (N.D. Ga. Sept. 26, 2011)

To the extent this Court finds that summary judgment is not appropriate on a substantive claim, summary judgment is still warranted on Plaintiff's punitive damages claim because Plaintiff cannot meet the high threshold of proof required to recover these damages. O.C.G.A. § 51-12-5.1(b) requires proof, by clear and convincing evidence of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." A claim for punitive damages requires proof of "something more than the mere commission of a tort . . . . [n]egligence alone, even

gross negligence, is insufficient to support punitive damages." <u>Mdc Blackshear v. Littell</u>, 273 Ga. 169, 173 (2000); *see also* <u>Ambling Mgmt. Co. v. Purdy</u>, 283 Ga. App. 21, 33 (2006) (explaining "there must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant"); <u>Tower Fin. Servs. V. Smith</u>, 204 Ga. App. 910, 918 (1992).

There is no evidence whatsoever that any conduct by or on behalf of Defendant rises to the level sufficient to impose punitive damages. Accordingly, Defendant is entitled to summary judgment on Plaintiff's punitive damages claim as a matter of law.

## **CONCLUSION**

For all the reasons outlined above, Defendant respectfully requests that its Motion for Summary Judgment be granted.

This 12th day of December, 2024.

*(signatures on the following page)*

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS

*/s/ Erica L. Morton*

_____

Erica L. Morton, Esq.
Georgia Bar No.: 140869

Austin L. Albertson, Esq.
Georgia Bar No.: 768516
*Attorneys for Defendant*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
erica.morton@swiftcurrie.com
austin.albertson@swiftcurrie.com
nikki.swain@swiftcurrie.com
penny.wofford@swiftcurrie.com

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JENNIFER ARMISTEAD,

        Plaintiff,

v.

TWG MANAGEMENT, LLC,

        Defendant.

Civil Action File No.:
1:24-cv-02583-MHC

## CERTIFICATE OF SERVICE

I certify that I have electronically filed this ***Defendant's Memorandum of Law in Support of Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Joseph A. Zdrilich, Esq.
ZDRILICH INJURY LAW, LLC
3575 Koger Blvd., Suite 125
Duluth, GA 30096
joe@zinjurylaw.com

This 12th day of December, 2024.

*(signatures on the following page)*

Respectfully submitted,
SWIFT, CURRIE, MCGHEE & HIERS
*/s/ Erica L. Morton*

_____

Erica L. Morton, Esq.
Georgia Bar No.: 140869
Austin L. Albertson, Esq.
Georgia Bar No.: 768516
*Attorneys for Defendant*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
Phone: (404) 874-8800
erica.morton@swiftcurrie.com
austin.albertson@swiftcurrie.com
nikki.swain@swiftcurrie.com
penny.wofford@swiftcurrie.com

# Exhibit A



Transcript of **Jennifer Armistead**

Thursday, May 23, 2024

*Jennifer Armistead v. TWG Development, et al.*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 141767

1          IN THE SUPERIOR COURT OF FULTON COUNTY

2                    STATE OF GEORGIA

3     _____

4     JENNIFER ARMISTEAD,                 )
                                          )
5          Plaintiff,                     )
                                          )
6     VS.                                 )No. 23-C-04399-S1
                                          )
7     DAVIN R. TERRELL and TWG            )
      MANAGEMENT, LLC,                    )
8                                         )
           Defendants.                    )
9     _____

10

11                 DEPOSITION BY ZOOM

12                        OF

13                 JENNIFER ARMISTEAD

14

15                   MAY 23, 2024

16

17

18

19

20

21

22

23

24

25

Page 2

STIPULATIONS

1

2

3      The deposition by Zoom of Jennifer

4  Armistead is taken on this, the 23rd day of May,

5  2024 on behalf of the Defendant, pursuant to notice

6  and consent of counsel, beginning at approximately

7  11:07 a.m. in the law office of Zdrilich Injury Law,

8  LLC, 3575 Koger Boulevard, Suite 125, Duluth,

9  Georgia 30096.

10      This deposition is taken pursuant to the

11  terms and provisions of the Georgia Rules of Civil

12  Procedure.

13      The signature of the witness was waived.

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

E X A M I N A T I O N   I N D E X

1

2

3  JENNIFER ARMISTEAD,

4  EXAMINATION BY MR. ALBERTSON                    5

5

6

7          E X H I B I T S

8

9  Exhibit No. 1      Photograph         20

10  Exhibit No. 2      Photograph         23

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

A P P E A R A N C E S

1

2

3

4  ON BEHALF OF THE PLAINTIFF:

5          JOSEPH A. ZDIRILICH, ESQ.
           ZDRILICH INJURY LAW, LLC
6          3575 Koger Boulevard
           Suite 125
7          Duluth, Georgia 30096
           Phone: (770) 931-9604
8          joe@zinjurylaw.com

9

10  ON BEHALF OF THE DEFENDANTS:

11          AUSTIN ALBERTSON, ESQ.
           SWIFT, CURRIE, MCGHEE & HIERS
12          1420 Peachtree Street, N.E.
           Suite 800
13          Atlanta, Georgia 30309
           Phone: (404) 888-6289
14          austin.albertson@swiftcurrie.com

15

16

17

18

19

20

21

22

23

24

25

Page 5

1      MR. ALBERTSON:  Okay.  This will be the

2  deposition of Jennifer Armistead taken pursuant

3  to notice and agreement of counsel for purposes

4  of discovery and all other purposes permitted

5  under the Civil Practice Act.

6      If agreeable with counsel, we can waive

7  all formalities as to the method and manner of

8  taking the deposition and agree to reserve

9  objections until time of first use except to

10  form and responsiveness.

11      MR. ZDIRILICH:  It is so agreeable.

12      MR. ALBERTSON:  All right.  Have you guys

13  discussed signature, or you are just going to

14  wait until the end?

15      MR. ZDIRILICH:  Wait until the end.

16      MR. ALBERTSON:  Okay.

17          JENNIFER ARMISTEAD,

18  having been first duly sworn, was examined and

19  testified as follows:

20          EXAMINATION

21  BY MR. ALBERTSON:

22      Q    All right.  So, Ms. Armistead, we met

23  briefly before this deposition.  My name is Austin

24  Albertson.  I represent TWG Management in this

25  pending suit.

Page 6

1    Have you given a deposition before?
2    A    No.
3    Q    Okay.  So I'm just going to go over a few
4 ground rules.  I'm sure your attorney has already
5 talked to you about some of these.  But, you know,
6 just to save some time here, if I ask you a question
7 and you answer it, I'm going to assume that you have
8 understood it.
9         If you don't understand a question,
10 that is fine.  Just tell me.  I can rephrase,
11 reword.  I talk a little quickly.  I can mumble a
12 little bit.  Sometimes I am hard to hear.
13        If you don't understand something,
14 just let me know.  And sometimes I will ask a bad
15 question.  Just ask me to rephrase, and I will do
16 so.  Make sure you give verbal responses.
17        The court reporter is going to take
18 everything down.  So uh-huhs, unh-unhs, or shaking
19 your head -- she is not going to be able to get.  So
20 make sure you answer everything yes or no or
21 whatever you are going to say.  Just make sure that
22 they are all verbal responses.
23        Because there is a court reporter
24 here taking everything down, we are going to try not
25 to talk over each other.  You know, even if --

Page 7

1 sometimes you can kind of predict my questions and
2 kind of know where I'm going.
3        Just let me get the whole question
4 out for the record, and I will let you get your
5 whole answer out.
6    A    Okay.
7    Q    We won't cut each other off.  And we
8 talked about this briefly before we got started
9 here.  But if you need a break at any point, just
10 let me know.  This isn't a marathon.  It is not an
11 interrogation.
12        You know, if you need to get up and
13 go to the restroom, I would just ask that you finish
14 the question I ask.  And then we can take a break at
15 any time.
16    A    Okay.
17    Q    All right.  With that being said, what is
18 your full name?
19    A    Jennifer Armistead.
20    Q    Okay.  Do you have a middle name?
21    A    I do not.
22    Q    All right.  Do you have any aliases or
23 nicknames?
24    A    Williamson.  But that was just my
25 husband's name.  I never took his legally.

Page 8

1    Q    Got you.  But you just go by Jennifer?
2    A    Or Jen.
3    Q    And what is your date of birth?
4    A    7-26-68.
5    Q    Where were you born?
6    A    Atlanta, Georgia.
7    Q    All right.  Now, my understanding is we
8 are here for an incident that occurred on January
9 31, 2022.  Is that right?
10    A    Yes.
11    Q    Okay.  Are you currently taking any
12 medications?
13    A    No.
14    Q    All right.
15    A    Allergy.  It is over the counter.
16    Q    I don't think -- I have not taken an
17 allergy pill in the morning for, like, 10 years.  I
18 struggled down here in the south.  And I am from
19 here and struggle down here in the south.
20    A    Yes.  It is brutal.
21    Q    Okay.  Did you meet with your attorney
22 before this deposition today?
23    A    Yes.
24    Q    Okay.  Did you review any documents in
25 preparation for this deposition?

Page 9

1    A    No.
2    Q    Okay.
3    A    Except the one I signed.
4    Q    Okay.  Any photographs?
5    A    No.
6    Q    So you said you signed a document, a
7 verification form.  Right?
8    A    Yes.
9    Q    That was for discovery responses?
10    A    Yes.
11    Q    Did you review those discovery responses
12 or go over them with your attorney?
13    A    No.
14    Q    Okay.  And what is your current address?
15    A    1261 Oakland Terrace Southwest, Atlanta,
16 30310.
17        MR. ZDIRILICH:  And just to be clear, you
18    are talking about this morning.  You have
19    reviewed your discovery responses, just not
20    this morning.
21        THE WITNESS:  Oh, of course.  Yes.  Not
22    this morning.
23        MR. ZDIRILICH:  I just wanted to make sure
24    I think the question was --
25        MR. ALBERTSON:  Got you.

Page 10

1 BY MR. ALBERTSON:
2   Q   Okay.  So you said 1261 Oakland Terrace
3 Southwest.
4   A   Correct.
5   Q   How long have you lived there?
6   A   About a month and a half.
7   Q   Okay.  Where were you before that?
8   A   Grant Park.  465 Robinson Avenue 30315.
9   Q   And how long were you at Robinson Avenue?
10  A   A couple of months.
11  Q   All right.  And where did you live before
12 Robinson Avenue?
13  A   Lawrenceville.  365 Foxcroft Road 30043.
14  Q   I think that is -- I have you lived there
15 starting in August 2022.  Does that sound right?
16  A   That is correct.
17  Q   Okay.  And before that, you were at the
18 818 Brockett Way in Clarkston, Georgia?
19  A   Correct.
20  Q   Perfect.  All right.  So at 1261 Oakland
21 Terrace Southwest -- does anyone else live there
22 with you?
23  A   My daughter.
24  Q   And what is her name?
25  A   Savannah Williamson.

Page 11

1   Q   And how old is she?
2   A   Twenty-five.
3   Q   And did she also live with you at Robinson
4 Avenue?
5   A   No.
6   Q   No.  Okay.
7   A   Oh, yes.  Yes.  Sorry.
8   Q   She did.  Okay.
9       And did she live with you at
10 Foxcroft?
11  A   No.
12  Q   And what about 818 Brockett Way?
13  A   Yes.
14  Q   Okay.  That is the only person that lives
15 with you at Oakland Terrace?
16  A   No.  Hayden Rucker.
17  Q   And who is Hayden Rucker?
18  A   My daughter's friend.
19  Q   And how old is Hayden?
20  A   Thirty.
21  Q   Did Hayden live with you at 818 Brockett
22 Way?
23  A   No.
24  Q   Okay.  So on January 31, 2022, the only
25 person living with you was Savannah Williamson?

Page 12

1   A   Correct.
2   Q   Okay.  So if my math is right, she would
3 have been 22 at the time?
4   A   She would have just turned -- because she
5 was born in '99.  So --
6   Q   Okay.
7   A   In January of '99.
8   Q   Perfect.  All right.  So other than
9 Savannah, do you have any other children?
10  A   I do not.
11  Q   Okay.  Do you have any grandchildren?
12  A   No.  No.
13  Q   What is the highest grade you have
14 completed in school?
15  A   Three years of college.
16  Q   And where was that?
17  A   University of Georgia.
18  Q   Did you graduate?
19  A   I did not.
20  Q   Okay.  What were you going to school for?
21  A   Social work.
22  Q   All right.  And where did you graduate
23 high school?
24  A   Crestwood High School, Dunwoody.
25  Q   Have you ever served in the military?

Page 13

1   A   No.
2   Q   All right.  Do you have any criminal
3 history?
4   A   Traffic.  No felonies or anything like
5 that.
6   Q   Like, speeding tickets?
7   A   Uh-huh.  DUI.
8   Q   Was the DUI in Georgia.
9   A   Yes.
10  Q   Do you know what county it was in?
11  A   Forsyth.
12  Q   Okay.  Have you ever filed a lawsuit
13 before other than this one?
14  A   Yes.
15  Q   Okay.  Can you tell me about that one?
16  A   My husband and I were on the way to work,
17 and a woman rear-ended us.  He had major cervical --
18  Q   He did?
19  A   Yes.  I had minimal.
20  Q   And where was that accident?
21  A   It was in Roswell.
22  Q   And about how long ago was it?
23  A   27, 28 years ago.
24  Q   Okay.
25  A   Or longer.  Something like that.

Page 14

1  Q  Have you ever filed for bankruptcy?
2  A  Yes.
3  Q  When?
4  A  20 years ago probably.
5  Q  And just the one time?
6  A  Yes.
7  Q  Okay.  Have you ever filed for disability?
8  A  No.
9  Q  All right.  Easy enough.  All right.
10    And are you currently employed?
11  A  Yes.
12  Q  And where do you work?
13  A  Wylie and Rum.  W-Y-L-I-E and Rum.
14  Q  And where is that?
15  A  Atlanta.
16  Q  Okay.  And what do you do there?
17  A  Manager.  Assistant manager.
18  Q  And what do they sell?
19  A  Food.  Beverage.  It is a restaurant.
20  Q  Got you.  And how long have you been
21 working there?
22  A  Since mid February.
23  Q  Who is your supervisor?
24  A  Marcus Merit and David Lewis.  He is the
25 owner.

Page 15

1  Q  Before Wylie and Rum, where did you work
2 before that?
3  A  I worked at Warby Parker, but I have been
4 out of work since the incident.
5  Q  So Warby Parker.  You were -- were you
6 working at Warby when the incident occurred?
7  A  Yes.
8  Q  Okay.  And then you left shortly
9 thereafter?
10  A  Yes.
11  Q  Okay.  What were you doing at Warby
12 Parker?
13  A  A licensed dispensing optician.  Glasses.
14  Q  Everything has got such an official title
15 now.
16  A  Well, it is a state license.  You have to
17 have a license in order to dispense glasses.
18  Q  Got you.  And how long were you at Warby
19 Parker?
20  A  Just seven months.
21  Q  Okay.  And so that ended -- so January 31,
22 2022 -- that is the last time you worked there?
23  A  Yes.
24  Q  Okay.  This part is always the fun part
25 going through all the introductory questions.  I'm

Page 16

1 sure your attorneys love hearing all of these
2 questions 27 times in a row.
3    Okay.  So just some general
4 questions.  Are you wearing any makeup today?
5  A  No.
6  Q  Okay.  So you are not wearing any makeup
7 anywhere on your face?
8  A  I have lip stuff.
9  Q  Just on your lips.  Okay.  But no light
10 foundation or anything like that?
11  A  No.
12  Q  Okay.  So since the accident happened,
13 have you used any over-the-counter, like, cream or
14 ointment on your face of any kind?
15  A  Aquaphor and moisturizer.
16  Q  When did you start using Aquaphor?
17  A  After the accident, after I discontinued
18 the Bacitracin, or the antibiotic ointment.
19  Q  Okay.  Are you still using Aquaphor every
20 day?
21  A  Not every day.  I use moisturizer, heavy
22 duty moisturizer, every day.
23  Q  Okay.  Have you used any, like, scar cream
24 or scar removal cream?
25  A  Just the Aquaphor.

Page 17

1  Q  Just Aquaphor.  Okay.
2    Have you ever used scar remover -- or
3 scar removal cream of any kind anywhere other than
4 your face?
5  A  Unh-unh.
6  Q  Have you ever gone to a dermatologist or a
7 spa for, like, a facial or anything since the
8 accident?
9  A  I have gone -- since, no.
10  Q  Okay.  All right.
11  A  Except consult for the plastic surgery.
12  Q  Right.  Right.  Okay.  But no, like, spa
13 treatment or anything like that?
14  A  Unh-unh.
15  Q  Okay.  Well, I'm going to jump into what
16 we are actually here for today.
17    So on January 31, 2022, I guess my
18 first question is:  Do you remember what you were
19 doing that day, like, in the morning?
20  A  No.
21  Q  Do you remember what day of the week it
22 was?
23  A  I do not.
24  Q  Okay.  Do you remember if it was -- let's
25 say what a typical day would look like normally

Page 18

1 during that time period.
2    A   I was off.  I got up, probably had a
3 smoothie.
4    Q   This is wholly unrelated, but what kind of
5 smoothie?
6    A   Usually strawberry and banana and
7 chocolate with Greek yogurt.
8    Q   That is what I put in mine; so I feel less
9 bad about calling it a healthy smoothy.
10       MR. ZDIRILICH:  Off the record.
11          (Whereupon, there was a
12          discussion off the record, and
13          the deposition continued as
14          follows:)
15 BY MR. ALBERTSON:
16    Q   All right.  So you get up in the morning.
17 So what time did this accident happen?  Was it
18 morning?  Afternoon?  Night?
19    A   It was evening, night.
20    Q   Okay.  So it is in the evening time.
21       Would you normally have anything,
22 like, to drink at night?
23    A   An occasional glass of wine.
24    Q   Are you a smoker of any kind?
25    A   Yes.

Page 19

1    Q   So a typical night you would have, like, a
2 smoke or something?
3    A   Cigarettes.  Yes.
4    Q   Okay.  Cigarettes?
5    A   Uh-huh.
6    Q   That is the only thing you smoke?
7    A   Marijuana.
8    Q   Okay.  And the only one that would be
9 there with you if you were smoking is your daughter?
10    A   Correct.
11    Q   Okay.  On a typical night, would you --
12 would you have a glass of wine?
13    A   Not every night.
14    Q   Okay.  What about smoking, either
15 cigarettes or marijuana?
16    A   Cigarettes definitely.
17    Q   Okay.  Were you -- was the marijuana use
18 -- was it medically authorized by a doctor or
19 anything?
20    A   No.
21    Q   Okay.  So what was the -- were you living
22 in a house or an apartment?
23    A   Apartment.
24    Q   Okay.  What was the name of that apartment
25 complex?

Page 20

1    A   Mirador at Idlewood.
2          (Whereupon, Exhibit No. 1 was
3          marked for identification and is
4          attached hereto.)
5 BY MR. ALBERTSON:
6    Q   So I have put this in as Exhibit 1.  And
7 these might be tough to see.  So if they are, please
8 let me know.  But I have a Google image of what I
9 believe to be Mirador's complex layout.
10       So I have -- it might be hard to see.
11 But where this red dot is here -- to my
12 understanding, this is the entrance of Mirador.
13    A   Correct.
14    Q   So can you kind of tell me what it is --
15 when you first come in here, what is this area over
16 here?
17    A   The pool and the leasing office.
18    Q   Okay.  Are these buildings over here too
19 on your right?
20    A   These are more apartments.  Those are the
21 same apartments.
22    Q   So those are just apartments?
23    A   Correct.
24    Q   Okay.  So is there, like, a -- like, a
25 mail room or, like, a central gathering spot?

Page 21

1    A   There is a mailbox here, which was mine.
2 And then there is, I think, another one over here.
3    Q   Can you circle those on that for me if you
4 don't mind?
5    A   Sure.  (Witness complies.)
6    Q   It doesn't have to be exact.  It is just
7 so I can get an idea of the layout.
8    A   Right here.
9    Q   And then the other ones --
10    A   I think there is another one here.
11    Q   Okay.
12    A   But I -- I mean, this one is not --
13    Q   So the complex goes very far back.
14    A   It does.  Yes.
15    Q   Okay.  So if you could -- did you know
16 about where your apartment would be in this complex?
17    A   Here.
18    Q   Okay.  So that would be -- if I am looking
19 at it on my end over here, it is somewhere in this
20 area right here.
21    A   Correct.
22    Q   Okay.  If you don't mind --
23    A   If I am looking at it correctly, yes.
24    Q   I hate aerial view.
25       But if you could, will you just kind

Page 22

1  of draw an arrow to that and just write "apartment"
2  on that? That way I can distinguish it.
3  A  Like here?
4  Q  Yeah. Just somewhere I can --
5  A  I don't know if you can see the pen.
6  Actually, can I get another one?
7  Q  Yeah. Mine is probably not that great.
8  A  (Witness complies.)
9  Q  Perfect. All right. So you are at your
10  apartment. So just kind of that evening, do you
11  remember -- did you leave your apartment at some
12  point that evening?
13  A  Yes.
14  Q  Okay. Can you kind of walk me through
15  that? So you leave your apartment. What was the
16  purpose of leaving the apartment that night?
17  A  To go see the baby.
18  Q  And that is whose baby?
19  A  Davin.
20  Q  D-E-V-I-N?
21  A  A-N, I believe.
22  Q  And what is Davin's last name?
23  A  Terrell.
24  Q  And how did you know Davin Terrell?
25  A  He was a maintenance man in my complex

Page 23

1  when I first met him.
2  Q  In Mirador?
3  A  Correct.
4  Q  Did he live in Mirador?
5  A  When I first met him, yes.
6  Q  Okay. And when did you first meet him
7  roughly?
8  A  Maybe a year and a half before the
9  incident.
10  Q  Okay. So back at, let's say, 2020-ish?
11  A  Uh-huh.
12  Q  Okay. So it was Davin's baby. You were
13  walking over to see Davin's baby.
14      Where did Davin live at the time?
15  A  At the time of the incident, across the
16  street.
17  Q  Across the street.
18  A  Uh-huh.
19  Q  And that would have been Silver Oaks
20  apartment complex.
21  A  I believe so.
22  Q  Okay. Let me shift through all of my
23  other things here. Okay.
24      (Whereupon, Exhibit No. 2 was
25      marked for identification and is

Page 24

1      attached hereto.)
2  BY MR. ALBERTSON:
3  Q  I'm going to show you Exhibit 2, which as
4  I'm sure you can get is an overhead of Silver Oaks.
5      So the same kind of thing. To my
6  understanding, this dot right here is the entrance
7  to Silver Oaks. So that right there is Mirador.
8  Right?
9  A  Uh-huh.
10  Q  Okay. So if you could, can you kind of
11  show me where that apartment would have been that
12  you were walking towards?
13  A  It would have been right about here, I
14  think.
15  Q  Okay.
16  A  I think.
17  Q  If you could draw an arrow to that and
18  just write "Davin's apartment."
19  A  (Witness complies.)
20  Q  Okay. So you are walking -- so you are
21  coming from your apartment over here -- or here.
22  Right? This is your apartment.
23      So you would walk from down Brockett
24  Way and then cross the street over, and that is
25  where he -- at the time you believe he was living.

Page 25

1  A  Correct. Correct. It is hard to tell --
2  Q  Okay. So how often would you make that
3  trip over to see Davin?
4  A  Maybe once before.
5  Q  Okay. So you had maybe been over there
6  just one other time?
7  A  Uh-huh.
8  Q  Who did Davin live with in that apartment?
9  A  I don't -- I think it was Erica. I'm not
10  one hundred percent sure.
11  Q  Erica. Do you know Erica's last name?
12  A  I do not.
13  Q  Had you met Erica before?
14  A  No.
15  Q  So how did you find out that Davin had
16  just had a baby?
17  A  He told me. A text message, I believe.
18  Q  So you guys would text frequently?
19  A  Not real -- not real frequently, but yes.
20  Q  Right. But just letting you know, "Hey, I
21  just had a baby"?
22  A  Uh-huh.
23  Q  Okay. Did he ask you to come over to see
24  the baby?
25  A  I probably wanted to see the baby.

Page 26

1    Q    Okay.  Silver Oaks apartments -- had you
2    ever spoken with anyone who worked for Silver Oaks
3    apartments?
4    A    No.  Not except him.
5    Q    Had you ever seen someone that worked in,
6    like, the leasing office --
7    A    No.
8    Q    -- or, like, a maintenance person?
9    A    Personally, no.
10   Q    Okay.  How often would you visit Silver
11   Oaks?
12   A    Just that one time and maybe one time
13   before that.
14   Q    Okay.  So when he tells you to come over
15   to see the baby, did he send you the address to it
16   to get over there, or you had been there?
17   A    I had been there once before.
18   Q    Okay.  And just knew where it was?
19   A    Uh-huh.
20   Q    And so you walked over to the property.
21   Right?
22   A    Correct.
23   Q    Did you walk over alone?
24   A    Yes.
25   Q    Do you remember which apartment it was?

Page 27

1    A    No.
2    Q    You don't remember the number or anything?
3    A    I do not.
4    Q    Okay.  So you said it was in the evening.
5         If you had to estimate around a time
6    you walk over, is it closer to, like, 7:00 or closer
7    to, like, midnight?
8    A    Oh, closer to, like, 8:00.
9    Q    8:00-ish?
10   A    Uh-huh.
11   Q    Okay.  So when you get over to the
12   apartment, who was there when you got there?
13   A    His girlfriend, the baby, and him.
14   Q    The girlfriend being Erica?
15   A    I think, yes.  I mean, I know she was
16   there.  I think that is her name.
17   Q    Right.  Now, you had been over there
18   before.  Is that typically who had been in the
19   apartment, is the girlfriend and him?
20   A    Uh-huh.  I don't think she was there the
21   first time.  I'm not sure.
22   Q    Okay.  But it was just the two of them.
23   There were no other children or anything like that?
24   A    Correct.
25   Q    Okay.  So you had been in the apartment

Page 28

1    maybe one other time.  How many times had you been
2    with Mr. Terrell?
3    A    Just a couple of times.  Mostly just --
4    when he did work for my complex, he would come and
5    fix stuff.
6    Q    Is that how you ended up with his cell
7    phone number, is he had done work there?
8    A    Yeah.
9    Q    Okay.  And so you had maybe been around
10   Mr. Terrell a handful of times?
11   A    Yes.
12   Q    Okay.  So as you get over there, at some
13   point you see this dog that he has.  Had you ever
14   seen the dog before?
15   A    Yes.
16   Q    Okay.  How many times had you seen the dog
17   before?
18   A    In passing, I used to walk -- because he
19   lived, I would say, here.  And they had patios, and
20   my dog would look at his dog.
21   Q    Okay.  Can you do me a favor?  Can you
22   draw a line to that and put Davin's former apartment
23   or something there.  That way I can delineate it.
24   A    (Witness complies.)
25   Q    Okay.  So he had had the dog when he lived

Page 29

1    at Mirador?
2    A    Uh-huh.
3    Q    Okay.  But you don't know -- as we sit
4    here today, you don't actually know whether or not
5    it was actually Davin's apartment you were going to
6    as in -- if his name was on the lease or not.
7    A    No.
8    Q    Okay.  And you have no way of knowing if
9    anyone at Silver Oaks actually knew that Davin lived
10   on the property or was on the property?
11   A    I have no idea.
12   Q    Okay.  You never saw him speak with anyone
13   in the leasing office at Silver Oaks or --
14   A    I did not.  No.
15   Q    Okay.  So you knew that he owned the dog
16   when you went over that night.  Had you seen it in
17   passing?
18   A    I had seen it in passing.
19   Q    Did you expect the dog to be there when
20   you got there?
21   A    I didn't think about it, to be honest.
22   Q    Okay.  Do you have any idea how long
23   Mr. Terrell had owned this dog?
24   A    I do not.
25   Q    Okay.  You don't know if he rescued it or

Page 30

1 bought it or --

2    A   I don't know.

3    Q   He is a mysterious guy, is what I have

4 gathered: Mr. Terrell.

5        Okay.  Do you know what an Akita dog

6 breed is?

7    A   Yes.

8    Q   Okay.  Do you know or believe Akitas have

9 any traits of any specific kind?

10   A   I do.  I had -- when I was growing up, we

11 had a St. Bernard, and there was an Akita in our

12 neighborhood.  And it was -- my St. Bernard did not

13 like that Akita, but I didn't really have --

14   Q   Right.  So what type of traits would you

15 attribute to an Akita based on that?  You said the

16 dog didn't like it.  Did you have any issue with

17 that Akita?

18   A   Not personally.  But my dog was always

19 there.  So that dog was not -- would not be able to

20 get anywhere near me because my dog --

21   Q   Right.  Did that Akita get aggressive with

22 you at all?

23   A   No.

24   Q   Okay.  In terms of Mr. Terrell's Akita,

25 can you sort of describe it to me, what it looked

Page 31

1 like?

2    A   Rust colored, big head.

3    Q   When you say "rust," like a brownish

4 white?

5    A   Brownish reddish.

6    Q   Brownish reddish.  Okay.

7    A   I just remember a very large head.

8    Q   Do you know about how tall it would have

9 been?

10   A   (Demonstrating.)

11   Q   About the height of the table?

12   A   Maybe not that -- yeah.  No.  Oh, I am

13 sorry.  I would say -- I don't -- about like that.

14 Like the size of a shepherd.

15   Q   Okay.  That will work.

16       And you said -- so had you ever heard

17 the dog's name before the incident?

18   A   Not that I recall.

19   Q   So the name -- you found out the name

20 after the incident happened?

21   A   I found out the name when I got a copy of

22 the rabies report to make sure he wasn't rabid.

23   Q   Now, where did that -- you said you got a

24 copy of the rabies report.  How did you get a copy

25 of that?

Page 32

1    A   From Davin.

2    Q   Okay.  Did you text him and ask him for

3 it?

4    A   Yes.  Yes.

5    Q   And he just sent you a picture or

6 something?

7    A   No.  He physically brought it to the

8 apartment.

9        THE WITNESS:  I think I gave you a copy.

10 BY MR. ALBERTSON:

11   Q   And we will come back to that a little bit

12 more -- we will try to move in order here to the

13 best that I can.

14       So do you have any knowledge of

15 anyone in the leasing office ever seeing this dog or

16 someone from Silver Oaks?

17   A   I do not.

18   Q   Okay.  So you don't know if they knew it

19 was on the property at all?

20   A   I have no way -- no.  I don't know.

21   Q   Okay.  All right.  So in terms of that

22 night, where were you that night when you first

23 encountered the dog?

24   A   Sitting on the couch in the den.

25   Q   How long had you been there?

Page 33

1    A   Maybe a half hour.

2    Q   So the dog wasn't inside when you got

3 there?

4    A   Correct.

5    Q   Now, so for his apartment, was there,

6 like, a fenced-in yard or anything attached?

7    A   No.  There was a fenced in patio.

8    Q   Okay.  So the dog might have been out on

9 the patio or something.

10   A   (Witness nods head.)

11   Q   Okay.  So you get there.  You see

12 Mr. Terrell and the baby.  And you are just kind of

13 sitting inside for 30 minutes.

14   A   Yeah.  Just sitting and talking, looking

15 at the baby.

16   Q   Was his girlfriend or whoever -- Ms. Erica

17 -- was she there?

18   A   Uh-huh.  She was sitting on the other

19 couch.

20   Q   In the time that you were there, did

21 Mr. Terrell say anything about the dog before you

22 saw it?

23   A   No.  Because they had two French bulldogs

24 in cages there as well.

25   Q   Okay.  They were inside?

Page 34

1  A   Correct.
2  Q   So as you were sitting there, you didn't
3  think that the dog would be there?
4  A   Unh-unh.
5  Q   So when did you first have an interaction
6  with the dog?
7  A   He opened the door, let the dog in.  And
8  the sliding glass door was probably that distance,
9  you know, from where I was sitting.  And the dog
10 immediately walked up to me.
11 Q   So you said the sliding glass door.  So
12 let's say -- is 10, 15 feet fair?
13 A   Yeah.  Max.
14 Q   Okay.  Did the sliding glass door have
15 any, like, shades over it or curtain or anything?
16 A   It is -- I'm not one hundred percent sure.
17 But it seems like it had those, you know, lever
18 blinds.
19 Q   Little swing dividers?
20 A   Well, the vertical blinds.
21 Q   Yeah.  Yeah.  Yeah.  Okay.  Could you see
22 out through it?
23 A   Unh-unh.
24 Q   Okay.  So he opens up the patio door.  The
25 dog comes inside.  Does the dog make any immediate

Page 35

1  movements or anything?
2  A   He headed straight towards me.
3  Q   Okay.  Did you attempt to pet the dog?
4  A   I did.
5  Q   Okay.  Had you pet the dog before?
6  A   Not that I recall but -- no.
7  Q   So is it fair to say that you weren't very
8  familiar with this dog?
9  A   That is correct.
10 Q   Do you own a dog?
11 A   Yes.
12 Q   Okay.  What kind of dog do you own?
13 A   Mixed pit.
14 Q   And how long have you had this mixed pit?
15 A   Ten years.
16 Q   Wow.  Did you get it as a puppy?
17 A   Got her at nine months.  She was at Cobb
18 County Shelter.
19 Q   I have a pit too, and she is stubborn.
20 A   Mine was abused.
21 Q   Oh, so she is a little bit more skittish?
22 A   Yes.
23 Q   Mine is a little more pampered and has --
24 A   Well, don't get me wrong.  She is
25 pampered.

Page 36

1  Q   Yeah.  I got him at six months.  I wish I
2  had got him when he was a full puppy because there
3  are some tendencies that I cannot break him of.  But
4  it is fine.
5      Okay.  Can you think of an incident
6  anytime before January 2022 where a dog actually
7  attempted to, like, lunge at you or attack you in
8  any way but wasn't successful?
9  A   No.
10 Q   Have you ever been bit at or snapped at by
11 a dog?
12 A   No.
13 Q   Okay.  So would you agree with me that it
14 is not safe to reach down and pet an animal that you
15 are not familiar with?
16     MR. ZDIRILICH:  I'm just going to object
17 to form, but go ahead.
18     THE WITNESS:  Yes.  But --
19 BY MR. ALBERTSON:
20 Q   And -- I'm sorry.  I didn't mean to cut
21 you off.
22 A   Yes.  In most circumstances, absolutely.
23 Q   And you said -- well, I got to ask you:
24 That night do you remember whether you had smoked?
25 A   Cigarettes?

Page 37

1  Q   Or marijuana.
2  A   Absolutely.  Yes, I had.
3  Q   Okay.  Had you had anything to drink?
4  A   I had had a glass of wine, I think.
5  Somewhere around there.
6  Q   So would you agree with me that
7  interacting with a dog you are unfamiliar with while
8  under the influence of drugs or alcohol is not safe?
9  A   Yes.
10 Q   Okay.  So the dog comes in.  It heads
11 straight for you.
12     So did you attempt to reach down and,
13 like, pet it?  Did you notice anything wrong with
14 the dog or anything when it came in?
15 A   I did not.
16 Q   Okay.  So you reached down, and the dog
17 just keeps coming at you?
18 A   Correct.
19 Q   Okay.  Well, then to the best of your
20 recollection, can you kind of -- how did the bite
21 happen?  Did the dog just jump up on you?
22 A   To the best my recollection, the couch was
23 lower than this chair.
24 Q   Okay.
25 A   So it was -- he didn't -- I don't recall

Page 38

1  him putting his paws on me.  I just -- his snout
2  coming at my face.
3      Q    Just immediately went to bite you?
4      A    Uh-huh.
5      Q    Okay.  Do you remember if you -- if you
6  had lost consciousness or anything?
7      A    No.  I don't remember.  It is very fuzzy.
8  I went into shock.
9      Q    Right.  Understandable.
10          So as that happens, do you remember
11  who would have pulled the dog off of you, or did you
12  force the dog off?
13     A    I don't recall.
14     Q    Okay.  Okay.  But somehow the dog gets off
15  of you?
16     A    (The witness nodded.)
17     Q    And do you remember whether it was let
18  outside or pulled away or --
19     A    I don't -- I don't recall.
20     Q    Okay.  So you wouldn't remember any --
21  Mr. Terrell saying anything to you in the immediate
22  aftermath or Erica?
23     A    The only thing I recall is her being in
24  shock.  I mean, her -- the look on her face.  But I
25  don't know.

Page 39

1      Q    So immediately after the bite happens, do
2  you recall -- did you get up from the couch?  Did
3  you go into the next room?  Grab your face?
4      A    I stayed on the couch as far as I can
5  recall.
6      Q    And you just don't remember any of the
7  actions that Erica or Davin were doing outside of
8  the apartment as this was going on?
9      A    Correct.
10     Q    Okay.  So the only witnesses to the actual
11  bite were Erica and Davin?
12     A    Correct.
13     Q    Okay.  Well, I guess the baby.  But I
14  don't know that we can depose the baby.
15          So have you ever spoken to Erica
16  since?
17     A    Afterwards, when Davin brought me the
18  rabies report, she Facetimed because she wanted to
19  check on me while Davin was there on his phone.
20     Q    On his phone.
21     A    Correct.
22     Q    So you never had Erica's number directly.
23     A    Not that I recall.
24     Q    Okay.  Do you know -- so after the
25  Facetime, you and Erica never spoke again?

Page 40

1      A    Not that I recall.
2      Q    Okay.
3      A    She may have called to check on me one
4  more time.  But no.  I guess not because I don't
5  have her number.
6      Q    Okay.
7      A    I am not sure.
8      Q    That was my next question.  So you saved
9  me one.
10          So what is your first memory after
11  the bite then?
12     A    My daughter, I guess, came to get me.  And
13  I remember talking to her.  I had no idea how bad it
14  was.  She is like, "We got to go to the hospital."
15     Q    So your daughter comes over.  Did she come
16  over by herself?
17     A    No.  She brought her -- her boyfriend was
18  with her and her boyfriend's uncle.
19     Q    And what is the boyfriend's name?
20     A    Josh Martin.  Joshua Martin.
21     Q    And do you know his uncle's name?
22     A    That is all I know.
23     Q    Did Josh live at Mirador?
24     A    Yes.
25     Q    Okay.  But not with you.

Page 41

1      A    No.
2      Q    Okay.  Do you know how they knew to come
3  over?
4      A    I think I must have called her.  Again, it
5  is very, very fuzzy.  I don't know.
6      Q    Okay.  So she -- did they walk over or
7  drive over?
8      A    They drove over.
9      Q    Okay.  Do you know if your daughter, Josh
10  Martin, or his uncle -- if they took any photos at
11  the scene?
12     A    I don't know.
13     Q    Okay.
14     A    I mean, Josh and his uncle were in the
15  car.  They never came --
16     Q    Okay.  They never came inside the
17  apartment?
18     A    No.  Savannah came inside.
19     Q    Okay.  Got you.  Do you know if Savannah
20  spoke to Davin or Erica when she got inside the
21  apartment?
22     A    I do not know.
23     Q    Okay.  So there were no photos taken of,
24  like, the dog or anything while you guys were there?
25     A    Not to my knowledge.

Page 42

1  Q   Okay.  About how quick would you say your
2  daughter arrived after the bite?
3  A   I don't know.  Maybe 10 minutes.  Maybe.
4  I don't know.
5  Q   Did anyone call 911 while you were there?
6  A   I don't know.
7  Q   Okay.  And you said -- so your daughter
8  takes you to the ER?
9  A   Correct.
10  Q   With -- so did Josh Martin and his uncle
11  go with you guys?
12  A   Yeah.
13  Q   Okay.  Do you know why an ambulance wasn't
14  called or anything?
15  A   I don't know.
16  Q   Okay.
17  A   My guess is because we were close to the
18  hospital.  I don't know.  You would have to ask
19  Savannah that.
20  Q   And that is Emory Decatur.  Right?
21  A   Correct.
22  Q   So your daughter takes you to Emory
23  Decatur.  Did her -- did she come inside with you?
24  A   Yes.
25  Q   Okay.  Did the boyfriend or the uncle?

Page 43

1  A   No.
2  Q   Okay.  When you get to Emory Decatur -- by
3  the way, we are -- do you need a break of any kind?
4  A   I'm okay.
5  Q   Okay.  Did you speak with the ER staff
6  when you got to Emory Decatur?
7  A   I'm sure I did.
8  Q   Okay.  Did your daughter?
9  A   Probably.
10  Q   Okay.  Do you remember what you told ER
11  staff when you first got admitted?
12  A   I do not.  They asked what happened, and
13  then I said I was attacked by a dog.  I don't know.
14  Q   Okay.  So when they asked what happened,
15  did you talk to the physicians and the nurses there,
16  or did your daughter?
17  A   A combination of both, I would say.
18  Q   But you don't remember what you or your
19  daughter told the ER staff?
20  A   I do not.
21  Q   Okay.  So if the admitting nurse taking
22  you in was kind of asking for a synopsis of what
23  happened, would you say it was mostly or mostly
24  your daughter describing the incident?
25  A   Again, I don't know.  I -- I don't know.

Page 44

1  Q   Do you remember anything you told them
2  about the incident?
3  A   Beyond attacked by a dog, I don't.
4  Q   You don't remember telling them where it
5  would have happened or --
6  A   I don't recall.
7  Q   -- the nature of it?  Okay.
8        Would you have any reason to doubt
9  your medical records?
10  A   Having worked for a doctor for a long
11  time, yes.  But I don't know.
12  Q   What do you mean by that?
13  A   Well, sometimes doctors go -- you know,
14  they have forms.  And they --
15  Q   So if a doctor were to write down a
16  narrative of what he believes you are communicating
17  happened, you would have no reason to doubt the
18  notes he takes?
19  A   I would have no reason to doubt.  I can't
20  say I wouldn't doubt it, but I have no reason to
21  doubt it.
22  Q   So you are at Emory Decatur, which you
23  said is relatively close to your house.  Right?
24  A   Yes.
25  Q   So at some point, they make the decision

Page 45

1  to transfer you to Grady?
2  A   Correct.
3  Q   Okay.  Did they communicate to you the
4  reason for that?
5  A   They did not have a surgeon on staff that
6  could handle it.
7  Q   Okay.
8  A   That is about when things start to get a
9  little bit more clear for me.
10  Q   Okay.  So you are transported by EMS?
11  A   By ambulance.  Uh-huh.
12  Q   Do you remember saying anything to the EMS
13  providers?
14  A   He just asked what happened, and I said it
15  was a dog bite.  And he said it is the worst one he
16  had ever seen in 20 years.
17  Q   The EMS worker did?
18  A   Yes.
19  Q   Okay.  And at this point, you said it gets
20  a little bit more clear for you.
21  A   A little bit.
22  Q   At this point -- so it is mostly -- at
23  this point, it is you telling the providers what
24  happened?
25  A   Correct.

Page 46

1  Q   Okay.  Not -- your daughter is not --
2  A   She is not there.
3  Q   Okay.  So at that point, your daughter is
4  not there.
5  A   (No audible response.)
6  Q   Okay.  So you get to Grady.  They admit
7  you.
8      Do you remember anything you told
9  those providers when they first admitted you?
10 A   No.  The only thing I remember is being
11 wheeled on a gurney, and there were some nurses
12 sitting over to the left.
13     And they asked EMT what happened.
14 And he said, again, "It is the worst dog bite I have
15 ever seen."
16     And my response was, "I can hear
17 y'all."
18 Q   So you were hearing what the EMS was
19 saying?
20 A   I was right there.  Yes.
21 Q   Yeah.  And before, the EMS had asked you
22 specifically what had happened.  Right?  He was just
23 communicating what you had said?
24 A   Exactly.
25 Q   And so at this point -- so your daughter

Page 47

1  is not with you at Grady.
2  A   Correct.
3  Q   So at what point in the night did you -- I
4  will ask you a better question.  Strike that.
5      When the bite first happens, you
6  don't know the dog's vaccination status.
7  A   Correct.
8  Q   Okay.  At what point did you become aware
9  of the dog's vaccination?
10 A   A day or two after when I asked him for
11 his vet records.
12 Q   So at no point in that evening while you
13 were at Grady or Emory do you remember ever seeing
14 whether or not the dog had a rabies vaccine or
15 anything like that?
16 A   Absolutely not.  I would have no way of
17 knowing.
18 Q   Do you know if your daughter reached out
19 to Mr. Terrell?
20 A   I do not know.
21 Q   Okay.  So the person -- so the vaccination
22 history that was produced with your discovery
23 responses from North Hills Animal Hospital -- that
24 came from you reaching out to Mr. Terrell and him
25 sending you a copy?

Page 48

1  A   Him bringing a copy.
2  Q   Bringing you a copy over.  Got you.  Okay.
3  Which was going to be my next point on this.
4      So after you leave the ER that night
5  -- well, I guess it would have been that next
6  morning.  Right?
7  A   Uh-huh.
8  Q   Do you remember what you did immediately
9  after leaving the ER?
10 A   My sister picked me up and took me back to
11 the apartment.  She went and filled the medication
12 and got the antibiotic ointment, and I went to bed.
13 Q   Okay.  So that next morning you don't --
14 you don't talk to Mr. Terrell.
15 A   I -- I don't -- I don't think -- I don't
16 recall.
17 Q   Okay.  And so the next time you get
18 contact from Mr. Terrell -- did he reach out to you,
19 or did you reach out to him?  If you can remember.
20 A   I do know he reached out to check on me.
21 I don't know if I reached out first asking for the
22 rabies history or if he reached out to see how I was
23 doing.
24 Q   Okay.  Did he reach out to you or your
25 daughter?

Page 49

1  A   It -- to me.
2  Q   It would have been you.  Okay.
3      So he didn't have your daughter's
4  number or anything like that.
5  A   I don't know.
6  Q   Okay.  But in general, you wouldn't think
7  that he would have --
8  A   I don't know.  I mean, she knew him from
9  the apartment as well but --
10 Q   Got you.
11 A   -- I don't know.
12 Q   So you next speak to him and get the
13 rabies vaccination information.  And, at some point,
14 you Facetime -- or his girlfriend Facetimes you on
15 his phone.
16 A   When he brought the rabies vaccination
17 over --
18 Q   On the same day?
19 A   -- he wanted -- she wanted to see how I
20 was doing.
21 Q   Okay.  Do you remember talking to
22 Mr. Terrell after that conversation at any point?
23 A   Maybe one or two other times with him
24 checking on me.
25 Q   Was that in person or via text?

Page 50

1    A    Text, I believe.
2    Q    And to the best of your recollection, how
3    long has it been since you had contact with Mr.
4    Terrell?
5    A    What month is it?  May.  So two years and
6    three months.
7    Q    So after he stopped checking a couple of
8    more times, he just never reaches out again?
9    A    Correct.
10    Q    So you don't know whether he was
11    continuing to stay at Silver Oaks or what happened
12    to him?
13    A    I do not know.
14    Q    Okay.  Did you -- have you -- obviously
15    before this lawsuit or anything in the immediate
16    aftermath, did you attempt to locate Mr. Terrell?
17    A    No.
18    Q    All right.  So I have that you follow up
19    with Grady two weeks after.  So around February 14
20    of 2022.
21    A    Correct.
22    Q    Does that sound right?
23    A    Yes.
24    Q    And, you know, I will represent to you,
25    based on review of those records, that they had at

Page 51

1    that point, discontinued your prescriptions.  Does
2    that sound right?
3    A    Yes.  I mean, the only prescription they
4    gave me was, you know, the antibiotics.  They gave
5    me pain meds, which make me sick.  So I don't -- I
6    could only take them, you know, when it got
7    unbearable.
8        But other than that, there weren't
9    any other -- I think maybe Motrin but --
10    Q    Okay.  So, at this point, do you remember
11    any guidance the doctor gave to you in terms of how
12    to treat your wound?
13    A    Antibiotic ointment --
14    Q    Okay.
15    A    -- two or three times a day.
16    Q    Was that a prescribed antibiotic or just,
17    like, something over the counter?
18    A    Over the counter.
19    Q    Okay.
20    A    It may have been prescribed.  No.  I think
21    was just the over-the-counter Bacitracin.
22    Q    You said Bacitracin?
23    A    I think.
24    Q    So that antibiotic three times a day.  Did
25    you following that --

Page 52

1    A    Absolutely.
2    Q    Okay.  Do you know about how long you did
3    that?  Or did he give you a range?
4    A    I would say around two weeks until it
5    closed up.  Maybe a little bit longer.
6    Q    Okay.
7    A    And then he wanted me to -- or she --
8    excuse me -- wanted me to use Aquaphor.
9    Q    Okay.  And then you switched to Aquaphor?
10    A    Uh-huh.
11    Q    Okay.
12    A    May have been longer.
13    Q    Did they give you any tips on -- or sorry.
14        Did she give you any tips on, you
15    know, kind of scar management to kind of reduce
16    scarring?
17    A    Just the Aquaphor.
18    Q    Okay.  I have it noted here that they said
19    something about avoiding direct sunlight.  Do you
20    remember that?
21    A    Oh, yes.  Sorry.
22    Q    Okay.  So avoiding direct sunlight.  Did
23    you follow that advice?
24    A    Yes.  I wore -- any time -- if I was able
25    to go outside, I wore a hat.

Page 53

1    Q    Okay.  They also recommended applying
2    sunscreen after your scab dislodged.  It looks like
3    for every 60 to 90 minutes you are exposed to the
4    sun.  Do you remember that?
5    A    I remember it, but I also -- my
6    moisturizer that I would put on underneath the
7    Aquaphor had sunscreen in it.
8    Q    Like an SPF or something.  Okay.
9    A    I typically try to keep sunscreen on.
10    Q    Okay.  So did they give you any doctor to
11    follow up with or anything after that?
12    A    No.
13    Q    Okay.  Do you have a primary care doctor?
14    A    I do not at this time.
15    Q    Did you have one in January 2022?
16    A    No.  Because I use a doctor in Duluth if I
17    get sick.
18    Q    Dr. Duluth?
19    A    No.  A doctor in Duluth.
20    Q    A doctor in Duluth.  Okay.
21    A    Dr. Dugal.  He was a patient of mine for
22    years.
23    Q    So that is just who you go to if you get,
24    like, a cold or something?
25    A    Correct.

Page 54

1  Q   Okay.  All right.  So I have that is in
2  February of 2022.  The next thing I have is
3  September of 2022 where you go to North Atlanta
4  Plastic Surgery Group.  Is that --
5  A   Yes.
6  Q   Okay.  How did you hear about North
7  Atlanta Plastic Surgery Group?
8  A   Joe.
9  Q   Okay.  Were you having any pain at that
10  time?
11  A   Yes.
12  Q   Okay.  Kind of -- can you kind of describe
13  that pain to me?
14  A   Constant tingling in my lip, numbness, and
15  then also pain in my lip.
16  Q   So you go to North Atlanta just to try to
17  get some relief for that?
18  A   Yes.
19  Q   Do you remember what you told the provider
20  about what happened in terms of the dog bite?
21  A   Again, I just said it was a dog bite.  A
22  dog attack.
23  Q   Were you the only one to provide
24  information to this provider?  Like, was your
25  daughter there?

Page 55

1  A   No.
2  Q   So you were the only one that provided
3  information to them?
4  A   Yes.
5  Q   Okay.  Do you remember what they
6  recommended for you?
7  A   Extensive surgery.
8  Q   Okay.
9  A   There were certain things they couldn't do
10  such as where -- he put a hole here.  He didn't know
11  if he could do much fixing on that.
12  Q   Okay.
13  A   But I believe it was to reopen this wound
14  and try to get rid of the scarring here and down
15  here.  That is about all I can recall.
16  Q   Do you remember them giving you any sort
17  of tips or anything to do in terms of reducing your
18  scarring or maintenance in the meantime?
19  A   Again, reiterated the Aquaphor.
20  Q   Okay.
21  A   Probably sunscreen, which I try to always
22  use.
23  Q   So with the Aquaphor and the sunscreen,
24  about how often would you say that you apply it?
25  A   Sunscreen during the day, which is

Page 56

1  moisturizer that -- moisturizer that has sunscreen
2  in it.
3       And then I use the Aquaphor more at
4  night and a heavier moisturizer because it is
5  difficult with hair to use the Aquaphor out and
6  about because it gets all stuck in it.
7  Q   So the Aquaphor you use at night?
8  A   Mostly.
9  Q   And do you know what that sunscreen
10  moisturizer is?
11  A   It is just over the counter, I think.
12  Q   Do you know the brand?
13  A   I will go with L'Oreal.  That is what I
14  know I am using right now.
15  Q   You just put it on every morning, and that
16  is your SPF and moisturizer.
17  A   Correct.
18  Q   Okay.  Do you remember them telling you to
19  use scar gel?
20  A   I do not recall that.
21  Q   But you haven't used any scar gel?
22  A   No.
23  Q   Okay.  Do you remember them giving you any
24  massage techniques for your scarring?
25  A   No.

Page 57

1  Q   Okay.  Or them asking you to do that three
2  times a day, showing you a technique?
3  A   No.  Not at all.
4  Q   Okay.  So it is safe to say you weren't
5  doing a massage -- any massage techniques on your
6  scarring?
7  A   No.
8  Q   Okay.  I also have a note that says
9  something about silicone ointment.
10       Do you remember them saying anything
11  to you about that?
12  A   No.
13  Q   Okay.  And then ultimately they tell you
14  -- at least it seems they say to wait 6 to 12 months
15  for revision surgery consideration.
16  A   That is correct.
17  Q   That sounds right?  Okay.
18  A   Uh-huh.  Because of the tightening and
19  loosening of the skin.
20  Q   Okay.  So what was your understanding of
21  why they wanted you to wait 6 to 12 months?
22  A   Because they said it would either loosen
23  and then tighten back up or tighten and then loosen
24  back up.  It was one of those two.  I'm not --
25  Q   Okay.  So then in November of 2022, you



Page 58

1  meet with a Dr. Sanjiv Khalil (phonetic).  Does that
2  sound right?
3      A   Uh-huh.
4      Q   How did you hear about Dr. Sanjiv?
5      A   Joe.
6      Q   Okay.  Do you remember telling him
7  anything about how the incident happened?
8      A   Nothing in detail that I remember.
9      Q   Okay.  But essentially -- so with any of
10 these providers, I know it is hard to remember.  But
11 you -- you don't believe you have told any of your
12 providers anything different than the way you have
13 described the incident to me today?
14     A   I don't recall.
15     Q   Okay.  So you don't believe your account
16 to anyone else would be any different than what you
17 are saying right now?
18        MR. ZDIRILICH:  I'm going to object to
19     form before you go ahead and answer that.  If
20     you could be specific as to incident?  Or are
21     you citing a specific example?
22        MR. ALBERTSON:  Sure.
23 BY MR. ALBERTSON:
24     Q   So in your communications with Dr. Sanjiv
25 about how this incident would have occurred, it

Page 59

1  would match up with -- to your knowledge, it would
2  match up to how you described it today?
3      A   It should.
4      Q   Okay.
5      A   I mean, I was attacked by a dog.  I can't
6  -- I don't know if --
7      Q   But you don't recall telling Dr. Sanjiv or
8  North Atlanta Plastic Surgery or Grady that this
9  incident happened anywhere other than inside
10 Mr. Terrell's apartment?
11     A   I don't recall.  I may -- I don't know.  I
12 might have said I was outside.  But I was so
13 discombobulated I don't know.
14     Q   So you --
15     A   I mean, I don't think I -- Emory and Grady
16 are such a blur to me.  I don't know.
17     Q   Okay.  So you don't remember what you
18 would have said to Grady or Emory about where you
19 were?
20     A   No.  I do not.
21     Q   Okay.  But in terms of Dr. Sanjiv and
22 North Atlanta, you wouldn't have told any of those
23 providers that this incident would have happened
24 outside?
25     A   Told them that?  I don't think so.

Page 60

1      Q   Okay.  Or --
2      A   But I don't remember getting into any
3  detail about those doctors.
4      Q   Okay.  Would you have any reason to doubt
5  your medical records from North Atlanta Plastic
6  Surgery or with Dr. Sanjiv?
7      A   I would have to see them.  I don't know.
8      Q   So if they had a narrative account of what
9  happened, you don't know if you would be able to
10 trust their accounting?
11     A   I would have to see it.
12     Q   Okay.  So Dr. Sanjiv recommended Botox
13 every three months for life.  Do you remember that?
14     A   Yes.
15     Q   Do you remember him recommending stem wave
16 therapy?
17     A   Yes.  I thought it was stem cell but --
18     Q   Do you remember a recommendation for a
19 chemical peel?
20     A   I don't recall that, but it is possible.
21     Q   And then ultimately the surgical scar
22 revision?
23     A   Correct.
24     Q   Okay.  Have you had any of these
25 procedures as we sit here today?

Page 61

1      A   No.
2      Q   Okay.  And why haven't you had any of that
3  treatment?
4      A   Mostly financial.
5      Q   So you don't believe you could afford to
6  go through with the surgery as you sit here today?
7      A   (No audible response.)
8         MR. ZDIRILICH:  Was that a question?
9         MR. ALBERTSON:  Yeah.
10        THE WITNESS:  I didn't --
11 BY MR. ALBERTSON:
12     Q   You don't believe you could afford to pay
13 for any of the stuff financially currently?
14     A   No.
15     Q   So you haven't seen a provider since
16 November of 2022 related to this incident?
17     A   That is correct.
18     Q   Okay.  So did you have health insurance
19 when this incident occurred?
20     A   Not yet.  Or it hadn't started yet.  I had
21 signed up actually I think that month.  But it
22 hadn't kicked in yet.
23     Q   January of 2022?
24     A   Yeah.
25     Q   Okay.  So when you go to North Atlanta,

Page 62

1 you believe you would have had health insurance?
2     A    No.  No.  No.  No.
3     Q    No.  So none of these providers -- you had
4 health insurance?
5     A    Correct.
6     Q    Okay.  Do you know what you have paid out
7 of pocket for your medical expenses?
8     A    No.  Not off the top of my head.
9     Q    Have you made any payments out of pocket?
10     A    I have not --
11     Q    Okay.
12     A    -- yet.
13     Q    Are they in collections?  Are you
14 receiving letters about them?
15     A    When they -- Grady has called, I have
16 referred them to Joe.
17     Q    Okay.  Have you received any itemized
18 billing from any of them?
19     A    From Grady I have.
20     Q    Okay.  But not from North Atlanta or
21 Dr. Sanjiv?
22     A    I received their estimate that day.
23     Q    Okay.  That was the estimate in November.
24 Right?
25     A    Correct.

Page 63

1     Q    Right.
2     A    Yes.  It was a free consultation; so I
3 didn't pay anything.  But they gave me, you know,
4 the breakdown.
5     Q    Okay.  So you stayed at the Mirador
6 Apartments through August of 2022?
7     A    Correct.
8     Q    Okay.  In that timeframe -- well, since --
9 since the incident happened, you never contacted
10 Silver Oaks about this incident?
11     A    I have not.
12     Q    Okay.  You never contacted animal control?
13     A    I did not.
14     Q    Or 911?
15     A    I did not, not to my knowledge as far as
16 the 911.  I know I didn't do it.
17     Q    Okay.  So do you know why you would have
18 never contacted animal control or Silver Oaks?
19     A    Davin told me that he had the dog put down
20 first, and then he said he had it sent away.  I was
21 -- and that was the last -- you know, one of the
22 last conversations he and I had.  And I thought he
23 was lying.
24     Q    So he tells you he put the dog down.  That
25 was that first -- that would have been around when

Page 64

1 he gives you the vaccination records?
2     A    Yes.
3     Q    And then at some time in the future he
4 tells you that it was sent away.
5     A    Yes.
6     Q    In both of these instances, you believe he
7 wasn't being truthful with you.
8     A    Yes.  Correct.
9     Q    Okay.  So if you didn't believe he was
10 being truthful with you, did you consider contacting
11 animal control and reporting the dog or Silver Oaks
12 for that matter?
13     A    Honestly, I did not because I was not in
14 the -- I just wanted it to go away.
15     Q    So your last contact with Mr. Terrell
16 would have been in February 2022?
17     A    Correct.
18     Q    Okay.  Do you remember when you first
19 would have consulted with an attorney after this
20 incident?
21     A    I spoke with Michael Hagan, who had helped
22 a friend out with a divorce.  And him and I had
23 become friends, acquaintances, or whatever.  And he
24 referred me to Joe.
25     Q    Okay.

Page 65

1     A    Other people had given me attorneys'
2 names.
3     Q    Do you remember when that would have been?
4     A    End of February, beginning of March maybe.
5 Maybe not that long.  I'm not sure.
6     Q    But after or before you had lost contact
7 with Mr. Terrell?
8     A    After, I think.
9     Q    Okay.  Do you have any physical
10 limitations today as a result of what happened?
11     A    Chewing.  If I am -- my lip swells up.  I
12 have trouble speaking, constant tingling.
13     Q    So you said your lip -- so your lip
14 swells?
15     A    Yes.  It is always uneven now, but it will
16 tingle.  And if it is hurting, it will swell up.
17 And I -- when chewing food, I bite it, which, you
18 know, causes it more pain.  And then that messes up
19 my speech as well.
20     Q    Right.  So eating is something that would
21 cause you pain currently?
22     A    Uh-huh.
23     Q    Is there any other activity that would
24 cause you pain?
25     A    Just eating and talking.  I mean --

Page 66

1    Q    As we sit here today, is the scar revision
2  surgery something that you want to go forward with
3  getting?
4    A    Yes.
5    Q    In your own words, why is that?
6    A    Because my face will never be the same.  I
7  know, even after the surgery, it will never be the
8  same.  But I would love some help getting it back to
9  where it was before I was attacked.
10    Q    In the immediate aftermath of what
11  happened, did you miss out on any, like, scheduled
12  events or, like, vacation, concert, dinner plans, or
13  something like that?
14    A    I missed out on everything because I was
15  -- I was afraid to leave the house.
16    Q    We can take a quick second if you would
17  rather.
18    A    I missed out on a lot.  I apologize.
19    Q    No.  You are fine.
20        I know this incident had to be beyond
21  traumatic, and this process is not -- does not make
22  it easier.  Take all the time you need.
23    A    Okay.
24    Q    So it is my understanding, based on your
25  discovery responses, that you are not claiming any

Page 67

1  type of lost income or anything from this --
2    A    Well, I was unable to get up and out of
3  the house in order to get another job because I just
4  -- because I was scared.  So I obviously have lost
5  income.
6    Q    So -- and this is my own ignorance.  I
7  might have ran right over it.
8        You were at Warby Parker.  When did
9  you stop working at Warby Parker?
10    A    I stopped; as I couldn't leave the house.
11    Q    So --
12    A    It was the only time I have never given
13  notice.  I just couldn't leave the house.
14    Q    Okay.  And about how long did it take you
15  to get to the point where you could?
16    A    That would be February of this year when I
17  went to Wylie.
18    Q    So we have talked about Erica, Mr.
19  Terrell, your daughter, Joshua Martin, his uncle.
20        Is there anyone else that you believe
21  would have any information about what happened that
22  night in terms of maybe a maintenance person or
23  something at Silver Oaks or a neighbor you talked
24  to?
25    A    I have no way of knowing.

Page 68

1    Q    So this case is pending in Gwinnett
2  County.
3        Are you a member of any churches or
4  civic groups in Gwinnett?
5    A    No.
6    Q    Do you have any relatives that live in
7  Gwinnett?
8    A    No.  My parents both did, but they are
9  deceased.
10    Q    Okay.
11    A    Oh, wait.  My cousin, but she is a
12  step-cousin; so no.
13    Q    What is your step-cousin's name?
14    A    Leanne Harwell.
15    Q    Do you have a Facebook account?
16    A    I do.
17    Q    Is it just the name Jennifer Armistead?
18    A    Correct.
19    Q    Have you ever posted on Facebook about
20  this doctor incident?
21    A    No.  Absolutely not.
22    Q    Do you have any other social media account
23  like an X or Twitter or whatever?
24    A    I got an Instagram.
25    Q    Instagram.  Same name?

Page 69

1    A    Yes.  I very rarely use any of them
2  anymore.
3    Q    Have you ever posted on Instagram about
4  this incident?
5    A    No.
6    Q    And you said you -- so you don't believe
7  you had health insurance at any point during --
8    A    No.
9    Q    -- the treatment.  Okay.
10        Do you currently have health?
11    A    I do not.
12    Q    Have you ever been on Medicaid?
13    A    No.
14    Q    Or Medicare?
15    A    No.
16    Q    Okay.  All right.
17        MR. ALBERTSON:  If we can take -- we can
18  go off the record just briefly.  I think I
19  might be wrapping up.  I just want to make sure
20  I didn't miss anything.
21        (A recess was taken, and the
22        deposition continued as
23        follows:)
24  BY MR. ALBERTSON:
25    Q    Okay.  Ms. Armistead, while we were off

Page 70

1  record briefly, I asked if it would be possible to
2  take a couple of pictures of your scarring.  I'm
3  going to do that before we wrap up.  I just have a
4  couple of other questions here for my own
5  clarification purposes.
6          So we talked about your treatment.
7  Your daughter was there with you at Emory Decatur
8  Hospital.  After that, all conversations at Grady,
9  North Atlanta, and with Dr. Sanjiv all were just
10  with you in the room with a provider?
11      A    Correct.
12      Q    Okay.  So other than getting a couple of
13  quick pictures, I think that is all I have.  I'm
14  going to do that very quickly if you guys don't
15  mind.
16      MR. ALBERTSON:  We can go off the record.
17      COURT REPORTER:  Sir, do you need the
18  original?
19      MR. ALBERTSON:  I will take an email copy.
20      COURT REPORTER:  Sir, do you need a copy?
21      MR. ZDIRILICH:  I do.
22          * * * * * *
23  (The deposition adjourned at 12:18 p.m.)
24
25

1        C E R T I F I C A T E
2
3  STATE OF GEORGIA:
4  COUNTY OF FULTON:
5
6      I hereby certify that the foregoing
7  transcript was taken down, as stated in the caption,
8  and the questions and answers thereto were reduced
9  to typewriting under my direction; that the
10  foregoing Pages 1 through 70 represent a true and
11  correct transcript of the evidence given upon said
12  hearing.
13      And I further certify that I am not of kin
14  or counsel to the parties in the case; am not in the
15  regular employ of counsel for any of said parties;
16  nor am I in any ways interested in the result of
17  said case.  The witness waived the right to read and
18  sign the transcript.
19      This, the 7th day of June 2024.
20
21
22  _____
23  Takiyah Sanders, RPR
    License No. 6500-8326-1480-9600
24  Certified Court Reporter
25

## WORD INDEX

**< 1 >**
**1** 4:*9* 20:*2, 6*
71:*10*
**10** 8:*17* 34:*12*
42:*3*
**11:07** 2:*7*
**12** 57:*14, 21*
**12:18** 70:*23*
**125** 2:*8* 3:*6*
**1261** 9:*15* 10:*2,*
*20*
**14** 50:*19*
**1420** 3:*12*
**15** 34:*12*

**< 2 >**
**2** 4:*10* 23:*24*
24:*3*
**20** 4:*9* 14:*4*
45:*16*
**2020-ish** 23:*10*
**2022** 8:*9* 10:*15*
11:*24* 15:*22*
17:*17* 36:*6*
50:*20* 53:*15*
54:*2, 3* 57:*25*
61:*16, 23* 63:*6*
64:*16*
**2024** 1:*15* 2:*5*
71:*19*
**22** 12:*3*
**23** 1:*15* 4:*10*
**23-C-04399-S1**
1:*6*
**23rd** 2:*4*
**27** 13:*23* 16:*2*
**28** 13:*23*

**< 3 >**
**30** 33:*13*
**30043** 10:*13*
**30096** 2:*9* 3:*7*
**30309** 3:*13*
**30310** 9:*16*
**30315** 10:*8*
**31** 8:*9* 11:*24*
15:*21* 17:*17*
**3575** 2:*8* 3:*6*
**365** 10:*13*

**< 4 >**
**404** 3:*13*
**465** 10:*8*

**< 5 >**
**5** 4:*4*

**< 6 >**
**6** 57:*14, 21*
**60** 53:*3*
**6500-8326-1480-**
**9600** 71:*23*

**< 7 >**
**7:00** 27:*6*
**70** 71:*10*
**7-26-68** 8:*4*
**770** 3:*7*
**7th** 71:*19*

**< 8 >**
**8:00** 27:*8*
**8:00-ish** 27:*9*
**800** 3:*12*
**818** 10:*18*
11:*12, 21*
**888-6289** 3:*13*

**< 9 >**
**90** 53:*3*
**911** 42:*5* 63:*14,*
*16*
**931-9604** 3:*7*
**99** 12:*5, 7*

**< A >**
**a.m** 2:*7*
**able** 6:*19* 30:*19*
52:*24* 60:*9*
**absolutely** 36:*22*
37:*2* 47:*16*
52:*1* 68:*21*
**abused** 35:*20*
**accident** 13:*20*
16:*12, 17* 17:*8*
18:*17*
**account** 58:*15*
60:*8* 68:*15, 22*
**accounting**
60:*10*
**acquaintances**
64:*23*
**Act** 5:*5*
**actions** 39:*7*
**activity** 65:*23*
**actual** 39:*10*
**address** 9:*14*
26:*15*
**adjourned** 70:*23*
**admit** 46:*6*
**admitted** 43:*11*
46:*9*
**admitting** 43:*21*
**advice** 52:*23*
**aerial** 21:*24*
**afford** 61:*5, 12*
**afraid** 66:*15*
**aftermath** 38:*22*

50:*16* 66:*10*
**Afternoon** 18:*18*
**aggressive** 30:*21*
**ago** 13:*22, 23*
14:*4*
**agree** 5:*8*
36:*13* 37:*6*
**agreeable** 5:*6,*
*11*
**agreement** 5:*3*
**ahead** 36:*17*
58:*19*
**Akita** 30:*5, 11,*
*13, 15, 17, 21, 24*
**Akitas** 30:*8*
**ALBERTSON**
3:*11* 4:*4* 5:*1,*
*12, 16, 21, 24*
9:*25* 10:*1*
18:*15* 20:*5*
24:*2* 32:*10*
36:*19* 58:*22, 23*
61:*9, 11* 69:*17,*
*24* 70:*16, 19*
**alcohol** 37:*8*
**aliases** 7:*22*
**Allergy** 8:*15, 17*
**ambulance**
42:*13* 45:*11*
**A-N** 22:*21*
**animal** 36:*14*
47:*23* 63:*12, 18*
64:*11*
**answer** 6:*7, 20*
7:*5* 58:*19*
**answers** 71:*8*
**antibiotic** 16:*18*
48:*12* 51:*13, 16,*
*24*
**antibiotics** 51:*4*

**anymore** 69:*2*
**anytime** 36:*6*
**apartment**
 19:*22, 23, 24*
 21:*16* 22:*1, 10,*
 *11, 15, 16* 23:*20*
 24:*11, 18, 21, 22*
 25:*8* 26:*25*
 27:*12, 19, 25*
 28:*22* 29:*5*
 32:*8* 33:*5* 39:*8*
 41:*17, 21* 48:*11*
 49:*9* 59:*10*
**apartments**
 20:*20, 21, 22*
 26:*1, 3* 63:*6*
**apologize** 66:*18*
**apply** 55:*24*
**applying** 53:*1*
**approximately**
 2:*6*
**Aquaphor**
 16:*15, 16, 19, 25*
 17:*1* 52:*8, 9, 17*
 53:*7* 55:*19, 23*
 56:*3, 5, 7*
**area** 20:*15*
 21:*20*
**ARMISTEAD**
 1:*4, 13* 2:*4* 4:*3*
 5:*2, 17, 22* 7:*19*
 68:*17* 69:*25*
**arrived** 42:*2*
**arrow** 22:*1*
 24:*17*
**asked** 43:*12, 14*
 45:*14* 46:*13, 21*
 47:*10* 70:*1*
**asking** 43:*22*
 48:*21* 57:*1*

**Assistant** 14:*17*
**assume** 6:*7*
**Atlanta** 3:*13*
 8:*6* 9:*15* 14:*15*
 54:*3, 7, 16* 59:*8,*
 *22* 60:*5* 61:*25*
 62:*20* 70:*9*
**attached** 20:*4*
 24:*1* 33:*6*
**attack** 36:*7*
 54:*22*
**attacked** 43:*13*
 44:*3* 59:*5* 66:*9*
**attempt** 35:*3*
 37:*12* 50:*16*
**attempted** 36:*7*
**attorney** 6:*4*
 8:*21* 9:*12* 64:*19*
**attorneys** 16:*1*
 65:*1*
**attribute** 30:*15*
**audible** 46:*5*
 61:*7*
**August** 10:*15*
 63:*6*
**AUSTIN** 3:*11*
 5:*23*
**austin.albertson**
 
**@swiftcurrie.com**
 3:*14*
**authorized**
 19:*18*
**Avenue** 10:*8, 9,*
 *12* 11:*4*
**avoiding** 52:*19,*
 *22*
**aware** 47:*8*

**< B >**

**baby** 22:*17, 18*
 23:*12, 13* 25:*16,*
 *21, 24, 25* 26:*15*
 27:*13* 33:*12, 15*
 39:*13, 14*
**Bacitracin**
 16:*18* 51:*21, 22*
**back** 21:*13*
 23:*10* 32:*11*
 48:*10* 57:*23, 24*
 66:*8*
**bad** 6:*14* 18:*9*
 40:*13*
**banana** 18:*6*
**bankruptcy** 14:*1*
**based** 30:*15*
 50:*25* 66:*24*
**bed** 48:*12*
**beginning** 2:*6*
 65:*4*
**behalf** 2:*5* 3:*4,*
 *10*
**believe** 20:*9*
 22:*21* 23:*21*
 24:*25* 25:*17*
 30:*8* 50:*1*
 55:*13* 58:*11, 15*
 61:*5, 12* 62:*1*
 64:*6, 9* 67:*20*
 69:*6*
**believes** 44:*16*
**Bernard** 30:*11,*
 *12*
**best** 32:*13*
 37:*19, 22* 50:*2*
**better** 47:*4*
**Beverage** 14:*19*
**Beyond** 44:*3*
 66:*20*
**big** 31:*2*

**billing** 62:*18*
**birth** 8:*3*
**bit** 6:*12* 32:*11*
 35:*21* 36:*10*
 45:*9, 20, 21* 52:*5*
**bite** 37:*20* 38:*3*
 39:*1, 11* 40:*11*
 42:*2* 45:*15*
 46:*14* 47:*5*
 54:*20, 21* 65:*17*
**blinds** 34:*18, 20*
**blur** 59:*16*
**born** 8:*5* 12:*5*
**Botox** 60:*12*
**bought** 30:*1*
**Boulevard** 2:*8*
 3:*6*
**boyfriend** 40:*17*
 42:*25*
**boyfriend's**
 40:*18, 19*
**brand** 56:*12*
**break** 7:*9, 14*
 36:*3* 43:*3*
**breakdown** 63:*4*
**breed** 30:*6*
**briefly** 5:*23*
 7:*8* 69:*18* 70:*1*
**bringing** 48:*1, 2*
**Brockett** 10:*18*
 11:*12, 21* 24:*23*
**brought** 32:*7*
 39:*17* 40:*17*
 49:*16*
**brownish** 31:*3,*
 *5, 6*
**brutal** 8:*20*
**buildings** 20:*18*
**bulldogs** 33:*23*

**< C >**
**cages**  33:*24*
**call**  42:*5*
**called**  40:*3*
41:*4*  42:*14*
62:*15*
**calling**  18:*9*
**caption**  71:*7*
**car**  41:*15*
**care**  53:*13*
**case**  68:*1*  71:*14*,
*17*
**cause**  65:*21*, *24*
**causes**  65:*18*
**cell**  28:*6*  60:*17*
**central**  20:*25*
**certain**  55:*9*
**Certified**  71:*23*
**certify**  71:*6*, *13*
**cervical**  13:*17*
**chair**  37:*23*
**check**  39:*19*
40:*3*  48:*20*
**checking**  49:*24*
50:*7*
**chemical**  60:*19*
**Chewing**  65:*11*,
*17*
**children**  12:*9*
27:*23*
**chocolate**  18:*7*
**churches**  68:*3*
**Cigarettes**  19:*3*,
*4*, *15*, *16*  36:*25*
**circle**  21:*3*
**circumstances**
36:*22*
**citing**  58:*21*
**civic**  68:*4*
**Civil**  2:*11*  5:*5*
**claiming**  66:*25*

**clarification**
70:*5*
**Clarkston**  10:*18*
**clear**  9:*17*  45:*9*,
*20*
**close**  42:*17*
44:*23*
**closed**  52:*5*
**closer**  27:*6*, *8*
**Cobb**  35:*17*
**cold**  53:*24*
**collections**  62:*13*
**college**  12:*15*
**colored**  31:*2*
**combination**
43:*17*
**come**  20:*15*
25:*23*  26:*14*
28:*4*  32:*11*
40:*15*  41:*2*
42:*23*
**comes**  34:*25*
37:*10*  40:*15*
**coming**  24:*21*
37:*17*  38:*2*
**communicate**
45:*3*
**communicating**
44:*16*  46:*23*
**communications**
58:*24*
**completed**  12:*14*
**complex**  19:*25*
20:*9*  21:*13*, *16*
22:*25*  23:*20*
28:*4*
**complies**  21:*5*
22:*8*  24:*19*
28:*24*
**concert**  66:*12*

**consciousness**
38:*6*
**consent**  2:*6*
**consider**  64:*10*
**consideration**
57:*15*
**Constant**  54:*14*
65:*12*
**consult**  17:*11*
**consultation**
63:*2*
**consulted**  64:*19*
**contact**  48:*18*
50:*3*  64:*15*  65:*6*
**contacted**  63:*9*,
*12*, *18*
**contacting**  64:*10*
**continued**  18:*13*
69:*22*
**continuing**  50:*11*
**control**  63:*12*,
*18*  64:*11*
**conversation**
49:*22*
**conversations**
63:*22*  70:*8*
**copy**  31:*21*, *24*
32:*9*  47:*25*
48:*1*, *2*  70:*19*, *20*
**Correct**  10:*4*, *16*,
*19*  12:*1*  19:*10*
20:*13*, *23*  21:*21*
23:*3*  25:*1*
26:*22*  27:*24*
33:*4*  34:*1*  35:*9*
37:*18*  39:*9*, *12*,
*21*  42:*9*, *21*
45:*2*, *25*  47:*2*, *7*
50:*9*, *21*  53:*25*
56:*17*  57:*16*
60:*23*  61:*17*

62:*5*, *25*  63:*7*
64:*8*, *17*  68:*18*
70:*11*  71:*11*
**correctly**  21:*23*
**couch**  32:*24*
33:*19*  37:*22*
39:*2*, *4*
**counsel**  2:*6*  5:*3*,
*6*  71:*14*, *15*
**counter**  8:*15*
51:*17*, *18*  56:*11*
**COUNTY**  1:*1*
13:*10*  35:*18*
68:*2*  71:*4*
**couple**  10:*10*
28:*3*  50:*7*  70:*2*,
*4*, *12*
**course**  9:*21*
**COURT**  1:*1*
6:*17*, *23*  70:*17*,
*20*  71:*23*
**cousin**  68:*11*
**cream**  16:*13*, *23*,
*24*  17:*3*
**Crestwood**
12:*24*
**criminal**  13:*2*
**cross**  24:*24*
**current**  9:*14*
**currently**  8:*11*
14:*10*  61:*13*
65:*21*  69:*10*
**CURRIE**  3:*11*
**curtain**  34:*15*
**cut**  7:*7*  36:*20*

**< D >**
**date**  8:*3*
**daughter**  10:*23*
19:*9*  40:*12*, *15*
41:*9*  42:*2*, *7*, *22*

43:*8*, *16*, *19*, *24*
46:*1*, *3*, 25
47:*18*  48:*25*
54:*25*  67:*19*
70:*7*
**daughter's**
11:*18*  49:*3*
**David**  14:*24*
**DAVIN**  1:7
22:*19*, *24*  23:*14*
25:*3*, *8*, *15*  29:9
32:*1*  39:*7*, *11*,
*17*, *19*  41:*20*
63:*19*
**Davin's**  22:*22*
23:*12*, *13*  24:*18*
28:*22*  29:*5*
**day**  2:*4*  16:*20*,
*21*, *22*  17:*19*, *21*,
*25*  47:*10*  49:*18*
51:*15*, *24*  55:*25*
57:*2*  62:*22*
71:*19*
**Decatur**  42:*20*,
*23*  43:*2*, *6*
44:*22*  70:*7*
**deceased**  68:*9*
**decision**  44:*25*
**Defendant**  2:*5*
**Defendants**  1:*8*
*3*:*10*
**definitely**  19:*16*
**delineate**  28:*23*
**Demonstrating**
31:*10*
**den**  32:*24*
**depose**  39:*14*
**DEPOSITION**
1:*11*  2:*3*, *10*
5:*2*, *8*, *23*  6:*1*

8:*22*, *25*  18:*13*
69:*22*  70:*23*
**dermatologist**
17:*6*
**describe**  30:*25*
54:*12*
**described**  58:*13*
59:*2*
**describing**  43:*24*
**detail**  58:*8*  60:*3*
**D-E-V-I-N**  22:*20*
**different**  58:*12*,
*16*
**difficult**  56:*5*
**dinner**  66:*12*
**direct**  52:*19*, *22*
**direction**  71:*9*
**directly**  39:*22*
**disability**  14:*7*
**discombobulated**
59:*13*
**discontinued**
16:*17*  51:*1*
**discovery**  5:*4*
9:*9*, *11*, *19*
47:*22*  66:*25*
**discussed**  5:*13*
**discussion**  18:*12*
**dislodged**  53:*2*
**dispense**  15:*17*
**dispensing**  15:*13*
**distance**  34:*8*
**distinguish**  22:*2*
**dividers**  34:*19*
**divorce**  64:*22*
**doctor**  19:*18*
44:*10*, *15*  51:*11*
53:*10*, *13*, *16*, *19*,
*20*  68:*20*
**doctors**  44:*13*

60:*3*
**document**  9:*6*
**documents**  8:*24*
**dog**  28:*13*, *14*,
*16*, *20*, *25*  29:*15*,
*19*, *23*  30:*5*, *16*,
*18*, *19*, *20*  32:*15*,
*23*  33:*2*, *8*, *21*
34:*3*, *6*, *7*, *9*, *25*
35:*3*, *5*, *8*, *10*, *12*
36:*6*, *11*  37:*7*,
*10*, *14*, *16*, *21*
38:*11*, *12*, *14*
41:*24*  43:*13*
44:*3*  45:*15*
46:*14*  47:*14*
54:*20*, *21*, *22*
59:*5*  63:*19*, *24*
64:*11*
**dog's**  31:*17*
47:*6*, *9*
**doing**  15:*11*
17:*19*  39:*7*
48:*23*  49:*20*
57:*5*
**door**  34:*7*, *8*, *11*,
*14*, *24*
**dot**  20:*11*  24:*6*
**doubt**  44:*8*, *17*,
*19*, *20*, *21*  60:*4*
**Dr**  53:*18*, *21*
58:*1*, *4*, *24*  59:*7*,
*21*  60:*6*, *12*
62:*21*  70:*9*
**draw**  22:*1*
24:*17*  28:*22*
**drink**  18:*22*
37:*3*
**drive**  41:*7*
**drove**  41:*8*

**drugs**  37:*8*
**Dugal**  53:*21*
**DUI**  13:*7*, *8*
**Duluth**  2:*8*  3:*7*
53:*16*, *18*, *19*, *20*
**duly**  5:*18*
**Dunwoody**
12:*24*
**duty**  16:*22*

**< E >**
**easier**  66:*22*
**Easy**  14:*9*
**eating**  65:*20*, *25*
**either**  19:*14*
57:*22*
**email**  70:*19*
**Emory**  42:*20*,
*22*  43:*2*, *6*
44:*22*  47:*13*
59:*15*, *18*  70:*7*
**employ**  71:*15*
**employed**  14:*10*
**EMS**  45:*10*, *12*,
*17*  46:*18*, *21*
**EMT**  46:*13*
**encountered**
32:*23*
**ended**  15:*21*
28:*6*
**entrance**  20:*12*
24:*6*
**ER**  42:*8*  43:*5*,
*10*, *19*  48:*4*, *9*
**Erica**  25:*9*, *11*,
*13*  27:*14*  33:*16*
38:*22*  39:*7*, *11*,
*15*, *25*  41:*20*
67:*18*
**Erica's**  25:*11*

39:*22*

**ESQ**  3:*5*, *11*

**essentially**  58:*9*

**estimate**  27:*5*
62:*22*, *23*

**evening**  18:*19*,
*20*  22:*10*, *12*
27:*4*  47:*12*

**events**  66:*12*

**evidence**  71:*11*

**exact**  21:*6*

**Exactly**  46:*24*

**EXAMINATION**
4:*4*  5:*20*

**examined**  5:*18*

**example**  58:*21*

**excuse**  52:*8*

**Exhibit**  4:*9*, *10*
20:*2*, *6*  23:*24*
24:*3*

**expect**  29:*19*

**expenses**  62:*7*

**exposed**  53:*3*

**Extensive**  55:*7*

**< F >**

**face**  16:*7*, *14*
17:*4*  38:*2*, *24*
39:*3*  66:*6*

**Facebook**  68:*15*,
*19*

**Facetime**  39:*25*
49:*14*

**Facetimed**  39:*18*

**Facetimes**  49:*14*

**facial**  17:*7*

**fair**  34:*12*  35:*7*

**familiar**  35:*8*
36:*15*

**far**  21:*13*  39:*4*
63:*15*

**favor**  28:*21*

**February**  14:*22*
50:*19*  54:*2*
64:*16*  65:*4*
67:*16*

**feel**  18:*8*

**feet**  34:*12*

**felonies**  13:*4*

**fenced**  33:*7*

**fenced-in**  33:*6*

**filed**  13:*12*
14:*1*, *7*

**filled**  48:*11*

**financial**  61:*4*

**financially**  61:*13*

**find**  25:*15*

**fine**  6:*10*  36:*4*
66:*19*

**finish**  7:*13*

**first**  5:*9*, *18*
17:*18*  20:*15*
23:*1*, *5*, *6*  27:*21*
32:22  34:*5*
40:*10*  43:*11*
46:*9*  47:*5*
48:*21*  63:*20*, *25*
64:*18*

**fix**  28:*5*

**fixing**  55:*11*

**follow**  50:*18*
52:*23*  53:*11*

**following**  51:*25*

**follows**  5:*19*
18:*14*  69:*23*

**Food**  14:*19*
65:*17*

**force**  38:*12*

**foregoing**  71:*6*,
*10*

**form**  5:*10*  9:*7*
36:*17*  58:*19*

**formalities**  5:*7*

**former**  28:*22*

**forms**  44:*14*

**Forsyth**  13:*11*

**forward**  66:*2*

**found**  31:*19*, *21*

**foundation**
16:*10*

**Foxcroft**  10:*13*
11:*10*

**free**  63:*2*

**French**  33:*23*

**frequently**
25:*18*, *19*

**friend**  11:*18*
64:*22*

**friends**  64:*23*

**full**  7:*18*  36:*2*

**FULTON**  1:*1*
71:*4*

**fun**  15:*24*

**further**  71:*13*

**future**  64:*3*

**fuzzy**  38:7  41:*5*

**< G >**

**gathered**  30:*4*

**gathering**  20:*25*

**gel**  56:*19*, *21*

**general**  16:*3*
49:*6*

**GEORGIA**  1:*2*
2:*9*, *11*  3:*7*, *13*
8:*6*  10:*18*
12:*17*  13:*8*  71:*3*

**getting**  60:*2*
66:*3*, *8*  70:*12*

**girlfriend**  27:*13*,
*14*, *19*  33:*16*
49:*14*

**give**  6:*16*  52:*3*,
*13*, *14*  53:*10*

**given**  6:*1*  65:*1*
67:*12*  71:*11*

**gives**  64:*1*

**giving**  55:*16*
56:*23*

**glass**  18:*23*
19:*12*  34:*8*, *11*,
*14*  37:*4*

**Glasses**  15:*13*,
*17*

**go**  6:*3*  7:*13*
8:*1*  9:*12*  22:*17*
36:*17*  39:*3*
40:*14*  42:*11*
44:*13*  52:*25*
53:*23*  54:*3*, *16*
56:*13*  58:*19*
61:*6*, *25*  64:*14*
66:*2*  69:*18*
70:*16*

**goes**  21:*13*

**going**  5:*13*  6:*3*,
*7*, *17*, *19*, *21*, *24*
7:*2*  12:*20*
15:*25*  17:*15*
24:*3*  29:*5*
36:*16*  39:*8*
48:*3*  58:*18*
70:*3*, *14*

**Google**  20:*8*

**Grab**  39:*3*

**grade**  12:*13*

**graduate**  12:*18*,
*22*

**Grady**  45:*1*
46:*6*  47:*1*, *13*

50:*19*  59:*8*, *15*, *18*  62:*15*, *19*  70:*8*
**grandchildren** 12:*11*
**Grant** 10:*8*
**great** 22:7
**Greek** 18:7
**ground** 6:*4*
**Group** 54:*4*, 7
**groups** 68:*4*
**growing** 30:*10*
**guess** 17:*17*  39:*13*  40:*4*, *12*  42:*17*  48:*5*
**guidance** 51:*11*
**gurney** 46:*11*
**guy** 30:*3*
**guys** 5:*12*  25:*18*  41:*24*  42:*11*  70:*14*
**Gwinnett** 68:*1*, *4*, 7

**< H >**
**Hagan** 64:*21*
**hair** 56:5
**half** 10:*6*  23:*8*  33:*1*
**handful** 28:*10*
**handle** 45:*6*
**happen** 18:*17*  37:*21*
**happened** 16:*12*  31:*20*  43:*12*, *14*, *23*  44:*5*, *17*  45:*14*, *24*  46:*13*, *22*  50:*11*  54:*20*  58:*7*  59:*9*, *23*  60:*9*  63:*9*

65:*10*  66:*11*  67:*21*
**happens** 38:*10*  39:*1*  47:*5*
**hard** 6:*12*  20:*10*  25:*1*  58:*10*
**Harwell** 68:*14*
**hat** 52:*25*
**hate** 21:*24*
**Hayden** 11:*16*, *17*, *19*, *21*
**head** 6:*19*  31:*2*, 7  33:*10*  62:*8*
**headed** 35:*2*
**heads** 37:*10*
**health** 61:*18*  62:*1*, *4*  69:*7*, *10*
**healthy** 18:*9*
**hear** 6:*12*  46:*16*  54:*6*  58:*4*
**heard** 31:*16*
**hearing** 16:*1*  46:*18*  71:*12*
**heavier** 56:*4*
**heavy** 16:*21*
**height** 31:*11*
**help** 66:*8*
**helped** 64:*21*
**hereto** 20:*4*  24:*1*
**Hey** 25:*20*
**HIERS** 3:*11*
**high** 12:*23*, *24*
**highest** 12:*13*
**Hills** 47:*23*
**history** 13:*3*  47:*22*  48:*22*
**hole** 55:*10*
**honest** 29:*21*
**Honestly** 64:*13*

**hospital** 40:*14*  42:*18*  47:*23*  70:*8*
**hour** 33:*1*
**house** 19:*22*  44:*23*  66:*15*  67:*3*, *10*, *13*
**hundred** 25:*10*  34:*16*
**hurting** 65:*16*
**husband** 13:*16*
**husband's** 7:*25*

**< I >**
**idea** 21:7  29:*11*, *22*  40:*13*
**identification** 20:*3*  23:*25*
**Idlewood** 20:*1*
**ignorance** 67:*6*
**image** 20:*8*
**immediate** 34:*25*  38:*21*  50:*15*  66:*10*
**immediately** 34:*10*  38:*3*  39:*1*  48:*8*
**incident** 8:*8*  15:*4*, *6*  23:*9*, *15*  31:*17*, *20*  36:*5*  43:*24*  44:*2*  58:*7*, *13*, *20*, *25*  59:*9*, *23*  61:*16*, *19*  63:*9*, *10*  64:*20*  66:*20*  68:*20*  69:*4*
**income** 67:*1*, 5
**influence** 37:*8*
**information** 49:*13*  54:*24*

55:*3*  67:*21*
**Injury** 2:*7*  3:*5*
**inside** 33:*2*, *13*, *25*  34:*25*  41:*16*, *18*, *20*  42:*23*  59:*9*
**Instagram** 68:*24*, *25*  69:*3*
**instances** 64:*6*
**insurance** 61:*18*  62:*1*, *4*  69:*7*
**interacting** 37:*7*
**interaction** 34:*5*
**interested** 71:*16*
**interrogation** 7:*11*
**introductory** 15:*25*
**issue** 30:*16*
**itemized** 62:*17*

**< J >**
**January** 8:*8*  11:*24*  12:*7*  15:*21*  17:*17*  36:*6*  53:*15*  61:*23*
**Jen** 8:*2*
**JENNIFER** 1:*4*, *13*  2:*3*  4:*3*  5:*2*, *17*  7:*19*  8:*1*  68:*17*
**job** 67:*3*
**Joe** 54:*8*  58:*5*  62:*16*  64:*24*
**joe@zinjurylaw.com** 3:*8*
**JOSEPH** 3:*5*
**Josh** 40:*20*, *23*  41:*9*, *14*  42:*10*

**Joshua** 40:*20*
 67:*19*
**jump** 17:*15*
 37:*21*
**June** 71:*19*

**< K >**
**keep** 53:*9*
**keeps** 37:*17*
**Khalil** 58:*1*
**kicked** 61:*22*
**kin** 71:*13*
**kind** 7:*1, 2*
 16:*14* 17:*3*
 18:*4, 24* 20:*14*
 21:*25* 22:*10, 14*
 24:*5, 10* 30:*9*
 33:*12* 35:*12*
 37:*20* 43:*3, 22*
 52:*15* 54:*12*
**knew** 26:*18*
 29:*9, 15* 32:*18*
 41:*2* 49:*8*
**know** 6:*5, 14, 25*
 7:*2, 10, 12*
 13:*10* 20:*8*
 21:*15* 22:*5, 24*
 25:*11, 20* 27:*15*
 29:*3, 4, 25* 30:*2,*
 *5, 8* 31:*8* 32:*18,*
 *20* 34:*9, 17*
 38:*25* 39:*14, 24*
 40:*21, 22* 41:*2,*
 *5, 9, 12, 19, 22*
 42:*3, 4, 6, 13, 15,*
 *18* 43:*13, 25*
 44:*11, 13* 47:*6,*
 *18, 20* 48:*20, 21*
 49:*5, 8, 11*
 50:*10, 13, 24*
 51:*4, 6* 52:*2, 15*

 55:*10* 56:*9, 12,*
 *14* 58:*10* 59:*6,*
 *11, 13, 16* 60:*7,*
 *9* 62:*6* 63:*3, 16,*
 *17, 21* 65:*18*
 66:*7, 20*
**knowing** 29:*8*
 47:*17* 67:*25*
**knowledge**
 32:*14* 41:*25*
 59:*1* 63:*15*
**Koger** 2:*8* 3:*6*

**< L >**
**large** 31:*7*
**law** 2:*7* 3:*5*
**Lawrenceville**
 10:*13*
**lawsuit** 13:*12*
 50:*15*
**layout** 20:*9*
 21:*7*
**Leanne** 68:*14*
**lease** 29:*6*
**leasing** 20:*17*
 26:*6* 29:*13*
 32:*15*
**leave** 22:*11, 15*
 48:*4* 66:*15*
 67:*10, 13*
**leaving** 22:*16*
 48:*9*
**left** 15:*8* 46:*12*
**legally** 7:*25*
**letters** 62:*14*
**letting** 25:*20*
**lever** 34:*17*
**Lewis** 14:*24*
**license** 15:*16, 17*
 71:*23*

**licensed** 15:*13*
**life** 60:*13*
**light** 16:*9*
**limitations** 65:*10*
**line** 28:*22*
**lip** 16:*8* 54:*14,*
 *15* 65:*11, 13*
**lips** 16:*9*
**little** 6:*11, 12*
 32:*11* 34:*19*
 35:*21, 23* 45:*9,*
 *20, 21* 52:*5*
**live** 10:*11, 21*
 11:*3, 9, 21* 23:*4,*
 *14* 25:*8* 40:*23*
 68:*6*
**lived** 10:*5, 14*
 28:*19, 25* 29:*9*
**lives** 11:*14*
**living** 11:*25*
 19:*21* 24:*25*
**LLC** 1:*7* 2:*8*
 3:*5*
**locate** 50:*16*
**long** 10:*5, 9*
 13:*22* 14:*20*
 15:*18* 29:*22*
 32:*25* 35:*14*
 44:*10* 50:*3*
 52:*2* 65:*5* 67:*14*
**longer** 13:*25*
 52:*5, 12*
**look** 17:*25*
 28:*20* 38:*24*
**looked** 30:*25*
**looking** 21:*18,*
 *23* 33:*14*
**looks** 53:*2*
**loosen** 57:*22, 23*
**loosening** 57:*19*
**L'Oreal** 56:*13*

**lost** 38:*6* 65:*6*
 67:*1, 4*
**lot** 66:*18*
**love** 16:*1*
**lower** 37:*23*
**lunge** 36:*7*
**lying** 63:*23*

**< M >**
**mail** 20:*25*
**mailbox** 21:*1*
**maintenance**
 22:*25* 26:*8*
 55:*18* 67:*22*
**major** 13:*17*
**makeup** 16:*4, 6*
**man** 22:*25*

**MANAGEMENT**
 1:*7* 5:*24* 52:*15*
**Manager** 14:*17*
**manner** 5:*7*
**marathon** 7:*10*
**March** 65:*4*
**Marcus** 14:*24*
**Marijuana** 19:*7,*
 *15, 17* 37:*1*
**marked** 20:*3*
 23:*25*
**Martin** 40:*20*
 41:*10* 42:*10*
 67:*19*
**massage** 56:*24*
 57:*5*
**match** 59:*1, 2*
**math** 12:*2*
**matter** 64:*12*
**Max** 34:*13*
**MCGHEE** 3:*11*
**mean** 21:*12*
 27:*15* 36:*20*

38:*24*  41:*14*
44:*12*  49:*8*
51:*3*  59:*5*, *15*
65:*25*
**media**  68:*22*
**Medicaid**  69:*12*
**medical**  44:*9*
60:*5*  62:*7*
**medically**  19:*18*
**Medicare**  69:*14*
**medication**
48:*11*
**medications**
8:*12*
**meds**  51:*5*
**meet**  8:*21*  23:*6*
58:*1*
**member**  68:*3*
**memory**  40:*10*
**Merit**  14:*24*
**message**  25:*17*
**messes**  65:*18*
**met**  5:*22*  23:*1*,
*5*  25:*13*
**method**  5:*7*
**Michael**  64:*21*
**mid**  14:*22*
**middle**  7:*20*
**midnight**  27:*7*
**military**  12:*25*
**mind**  21:*4*, *22*
70:*15*
**mine**  18:*8*  21:*1*
22:*7*  35:*20*, *23*
53:*21*
**minimal**  13:*19*
**minutes**  33:*13*
42:*3*  53:*3*
**Mirador**  20:*1*,
*12*  23:*2*, *4*  24:*7*

29:*1*  40:*23*  63:*5*
**Mirador's**  20:*9*
**missed**  66:*14*, *18*
**Mixed**  35:*13*, *14*
**moisturizer**
16:*15*, *21*, *22*
53:*6*  56:*1*, *4*, *10*,
*16*
**month**  10:*6*
50:*5*  61:*21*
**months**  10:*10*
15:*20*  35:*17*
36:*1*  50:*6*
57:*14*, *21*  60:*13*
**morning**  8:*17*
9:*18*, *20*, *22*
17:*19*  18:*16*, *18*
48:*6*, *13*  56:*15*
**Motrin**  51:*9*
**move**  32:*12*
**movements**  35:*1*
**mumble**  6:*11*
**mysterious**  30:*3*

**< N >**
**N.E**  3:*12*
**name**  5:*23*
7:*18*, *20*, *25*
10:*24*  19:*24*
22:*22*  25:*11*
27:*16*  29:*6*
31:*17*, *19*, *21*
40:*19*, *21*  68:*13*,
*17*, *25*
**names**  65:*2*
**narrative**  44:*16*
60:*8*
**nature**  44:*7*
**near**  30:*20*

**need**  7:*9*, *12*
43:*3*  66:*22*
70:*17*, *20*
**neighbor**  67:*23*
**neighborhood**
30:*12*
**never**  7:*25*
29:*12*  39:*22*, *25*
41:*15*, *16*  50:*8*
63:*9*, *12*, *18*
66:*6*, *7*  67:*12*
**nicknames**  7:*23*
**Night**  18:*18*, *19*,
*22*  19:*1*, *11*, *13*
22:*16*  29:*16*
32:*22*  36:*24*
47:*3*  48:*4*  56:*4*,
*7*  67:*22*
**nine**  35:*17*
**nodded**  38:*16*
**nods**  33:*10*
**normally**  17:*25*
18:*21*
**North**  47:*23*
54:*3*, *6*, *16*  59:*8*,
*22*  60:*5*  61:*25*
62:*20*  70:*9*
**note**  57:*8*
**noted**  52:*18*
**notes**  44:*18*
**notice**  2:*5*  5:*3*
37:*13*  67:*13*
**November**
57:*25*  61:*16*
62:*23*
**number**  27:*2*
28:*7*  39:*22*
40:*5*  49:*4*
**numbness**  54:*14*
**nurse**  43:*21*

**nurses**  43:*15*
46:*11*

**< O >**
**Oakland**  9:*15*
10:*2*, *20*  11:*15*
**Oaks**  23:*19*
24:*4*, *7*  26:*1*, *2*,
*11*  29:*9*, *13*
32:*16*  50:*11*
63:*10*, *18*  64:*11*
67:*23*
**object**  36:*16*
58:*18*
**objections**  5:*9*
**obviously**  50:*14*
67:*4*
**occasional**  18:*23*
**occurred**  8:*8*
15:*6*  58:*25*
61:*19*
**office**  2:*7*
20:*17*  26:*6*
29:*13*  32:*15*
**official**  15:*14*
**Oh**  9:*21*  11:*7*
27:*8*  31:*12*
35:*21*  52:*21*
68:*11*
**ointment**  16:*14*,
*18*  48:*12*  51:*13*
57:*9*
**Okay**  5:*1*, *16*
6:*3*  7:*6*, *16*, *20*
8:*11*, *21*, *24*  9:*2*,
*4*, *14*  10:*2*, *7*, *17*
11:*6*, *8*, *14*, *24*
12:*2*, *6*, *11*, *20*
13:*12*, *15*, *24*
14:*7*, *16*  15:*8*,
*11*, *21*, *24*  16:*3*,

6, 9, 12, 19, 23
17:1, 10, 12, 15,
24  18:20  19:4,
8, 11, 14, 17, 21,
24  20:18, 24
21:11, 15, 18, 22
22:14  23:6, 10,
12, 22, 23  24:10,
15, 20  25:2, 5,
23  26:1, 10, 14,
18  27:4, 11, 22,
25  28:9, 12, 16,
21, 25  29:3, 8,
12, 15, 22, 25
30:5, 8, 24  31:6,
15  32:2, 18, 21
33:8, 11, 25
34:14, 21, 24
35:3, 5, 12  36:5,
13  37:3, 10, 16,
19, 24  38:5, 14,
20  39:10, 13, 24
40:2, 6, 25  41:2,
6, 9, 13, 16, 19,
23  42:1, 7, 13,
16, 25  43:2, 4, 5,
8, 10, 14, 21
44:7  45:3, 7, 10,
19  46:1, 3, 6
47:8, 21  48:2,
13, 17, 24  49:2,
6, 21  50:14
51:10, 14, 19
52:2, 6, 9, 11, 18,
22  53:1, 8, 10,
13, 20  54:1, 6, 9,
12  55:5, 8, 12,
20  56:18, 23
57:1, 4, 8, 13, 17,
20, 25  58:6, 9,
15  59:4, 17, 21

60:1, 4, 12, 24
61:2, 18, 25
62:6, 11, 17, 20,
23  63:5, 8, 12,
17  64:9, 18, 25
65:9  66:23
67:14  68:10
69:9, 16, 25
70:12
**old**  11:1, 19
**once**  25:4  26:17
**ones**  21:9
**opened**  34:7
**opens**  34:24
**optician**  15:13
**order**  15:17
32:12  67:3
**original**  70:18
**outside**  38:18
39:7  52:25
59:12, 24
**overhead**  24:4
**over-the-counter**
16:13  51:21
**owned**  29:15, 23
**owner**  14:25

**< P >**
**p.m**  70:23
**Pages**  71:10
**paid**  62:6
**pain**  51:5  54:9,
13, 15  65:18, 21,
24
**pampered**  35:23,
25
**parents**  68:8
**Park**  10:8
**Parker**  15:3, 5,
12, 19  67:8, 9

**part**  15:24
**parties**  71:14, 15
**passing**  28:18
29:17, 18
**patient**  53:21
**patio**  33:7, 9
34:24
**patios**  28:19
**paws**  38:1
**pay**  61:12  63:3
**payments**  62:9
**Peachtree**  3:12
**peel**  60:19
**pen**  22:5
**pending**  5:25
68:1
**people**  65:1
**percent**  25:10
34:16
**Perfect**  10:20
12:8  22:9
**period**  18:1
**permitted**  5:4
**person**  11:14,
25  26:8  47:21
49:25  67:22
**Personally**  26:9
30:18
**pet**  35:3, 5
36:14  37:13
**Phone**  3:7, 13
28:7  39:19, 20
49:15
**phonetic**  58:1
**Photograph**  4:9,
10
**photographs**  9:4
**photos**  41:10, 23
**physical**  65:9
**physically**  32:7

**physicians**  43:15
**picked**  48:10
**picture**  32:5
**pictures**  70:2, 13
**pill**  8:17
**pit**  35:13, 14, 19
**Plaintiff**  1:5  3:4
**plans**  66:12
**plastic**  17:11
54:4, 7  59:8
60:5
**please**  20:7
**pocket**  62:7, 9
**point**  7:9  22:12
28:13  44:25
45:19, 22, 23
46:3, 25  47:3, 8,
12  48:3  49:13,
22  51:1, 10
67:15  69:7
**pool**  20:17
**possible**  60:20
70:1
**posted**  68:19
69:3
**Practice**  5:5
**predict**  7:1
**preparation**
8:25
**prescribed**
51:16, 20
**prescription**
51:3
**prescriptions**
51:1
**primary**  53:13
**probably**  14:4
18:2  22:7
25:25  34:8
43:9  55:21
**Procedure**  2:12

**procedures**
60:*25*
**process** 66:*21*
**produced** 47:*22*
**property** 26:*20*
29:*10* 32:*19*
**provide** 54:*23*
**provided** 55:*2*
**provider** 54:*19*,
*24* 61:*15* 70:*10*
**providers** 45:*13*,
*23* 46:*9* 58:*10*,
*12* 59:*23* 62:*3*
**provisions** 2:*11*
**pulled** 38:*11, 18*
**puppy** 35:*16*
36:*2*
**purpose** 22:*16*
**purposes** 5:*3, 4*
70:*5*
**pursuant** 2:*5*,
*10* 5:*2*
**put** 18:*8* 20:*6*
28:*22* 53:*6*
55:*10* 56:*15*
63:*19, 24*
**putting** 38:*1*

**< Q >**
**question** 6:*6, 9*,
*15* 7:*3, 14* 9:*24*
17:*18* 40:*8*
47:*4* 61:*8*
**questions** 7:*1*
15:*25* 16:*2, 4*
70:*4* 71:*8*
**quick** 42:*1*
66:*16* 70:*13*
**quickly** 6:*11*
70:*14*

**< R >**
**rabid** 31:*22*
**rabies** 31:*22, 24*
39:*18* 47:*14*
48:*22* 49:*13, 16*
**ran** 67:*7*
**range** 52:*3*
**rarely** 69:*1*
**reach** 36:*14*
37:*12* 48:*18, 19*,
*24*
**reached** 37:*16*
47:*18* 48:*20, 21*,
*22*
**reaches** 50:*8*
**reaching** 47:*24*
**read** 71:*17*
**real** 25:*19*
**really** 30:*13*
**rear-ended**
13:*17*
**reason** 44:*8, 17*,
*19, 20* 45:*4* 60:*4*
**recall** 31:*18*
35:*6* 37:*25*
38:*13, 19, 23*
39:*2, 5, 23* 40:*1*
44:*6* 48:*16*
55:*15* 56:*20*
58:*14* 59:*7, 11*
60:*20*
**received** 62:*17*,
*22*
**receiving** 62:*14*
**recess** 69:*21*
**recollection**
37:*20, 22* 50:*2*
**recommendation**
60:*18*

**recommended**
53:*1* 55:*6* 60:*12*
**recommending**
60:*15*
**record** 7:*4*
18:*10, 12* 69:*18*
70:*1, 16*
**records** 44:*9*
47:*11* 50:*25*
60:*5* 64:*1*
**red** 20:*11*
**reddish** 31:*5, 6*
**reduce** 52:*15*
**reduced** 71:*8*
**reducing** 55:*17*
**referred** 62:*16*
64:*24*
**regular** 71:*15*
**reiterated** 55:*19*
**related** 61:*16*
**relatively** 44:*23*
**relatives** 68:*6*
**relief** 54:*17*
**remember**
17:*18, 21, 24*
22:*11* 26:*25*
27:*2* 31:*7*
36:*24* 38:*5, 7*,
*10, 17, 20* 39:*6*
40:*13* 43:*10, 18*
44:*1, 4* 45:*12*
46:*8, 10* 47:*13*
48:*8, 19* 49:*21*
51:*10* 52:*20*
53:*4, 5* 54:*19*
55:*5, 16* 56:*18*,
*23* 57:*10* 58:*6*,
*8, 10* 59:*17*
60:*2, 13, 15, 18*
64:*18* 65:*3*

**removal** 16:*24*
17:*3*
**remover** 17:*2*
**reopen** 55:*13*
**rephrase** 6:*10*,
*15*
**report** 31:*22, 24*
39:*18*
**reporter** 6:*17*,
*23* 70:*17, 20*
71:*23*
**reporting** 64:*11*
**represent** 5:*24*
50:*24* 71:*10*
**rescued** 29:*25*
**reserve** 5:*8*
**response** 46:*5*,
*16* 61:*7*
**responses** 6:*16*,
*22* 9:*9, 11, 19*
47:*23* 66:*25*
**responsiveness**
5:*10*
**restaurant** 14:*19*
**restroom** 7:*13*
**result** 65:*10*
71:*16*
**review** 8:*24*
9:*11* 50:*25*
**reviewed** 9:*19*
**revision** 57:*15*
60:*22* 66:*1*
**reword** 6:*11*
**rid** 55:*14*
**right** 5:*12, 22*
7:*17, 22* 8:*7, 9*,
*14* 9:*7* 10:*11*,
*15, 20* 12:*2, 8*,
*22* 13:*2* 14:*9*
17:*10, 12* 18:*16*
20:*19* 21:*8, 20*

22:9   24:6, 7, 8,
13, 22   25:20
26:21   27:17
30:14, 21   32:21
38:9   42:20
44:23   46:20, 22
48:6   50:18, 22
51:2   54:1
56:14   57:17
58:2, 17   62:24
63:1   65:20
67:7   69:16
71:17
**Road**   10:13
**Robinson**   10:8,
9, 12   11:3
**room**   20:25
39:3   70:10
**Roswell**   13:21
**roughly**   23:7
**row**   16:2
**RPR**   71:22
**Rucker**   11:16,
17
**Rules**   2:11   6:4
**Rum**   14:13
15:1
**Rust**   31:2, 3

**< S >**
**safe**   36:14   37:8
57:4
**Sanders**   71:22
**Sanjiv**   58:1, 4,
24   59:7, 21
60:6, 12   62:21
70:9
**Savannah**   10:25
11:25   12:9
41:18, 19   42:19

**save**   6:6
**saved**   40:8
**saw**   29:12
33:22
**saying**   38:21
45:12   46:19
57:10   58:17
**says**   57:8
**scab**   53:2
**scar**   16:23, 24
17:2, 3   52:15
56:19, 21   60:21
66:1
**scared**   67:4
**scarring**   52:16
55:14, 18   56:24
57:6   70:2
**scene**   41:11
**scheduled**   66:11
**school**   12:14, 20,
23, 24
**second**   66:16
**see**   20:7, 10
22:5, 17   23:13
25:3, 23, 25
26:15   28:13
33:11   34:21
48:22   49:19
60:7, 11
**seeing**   32:15
47:13
**seen**   26:5
28:14, 16   29:16,
18   45:16   46:15
61:15
**sell**   14:18
**send**   26:15
**sending**   47:25
**sent**   32:5   63:20
64:4

**September**   54:3
**served**   12:25
**seven**   15:20
**shades**   34:15
**shaking**   6:18
**Shelter**   35:18
**shepherd**   31:14
**shift**   23:22
**shock**   38:8, 24
**shortly**   15:8
**show**   24:3, 11
**showing**   57:2
**sick**   51:5   53:17
**sign**   71:18
**signature**   2:13
5:13
**signed**   9:3, 6
61:21
**silicone**   57:9
**Silver**   23:19
24:4, 7   26:1, 2,
10   29:9, 13
32:16   50:11
63:10, 18   64:11
67:23
**Sir**   70:17, 20
**sister**   48:10
**sit**   29:3   60:25
61:6   66:1
**Sitting**   32:24
33:13, 14, 18
34:2, 9   46:12
**six**   36:1
**size**   31:14
**skin**   57:19
**skittish**   35:21
**sliding**   34:8, 11,
14
**smoke**   19:2, 6
**smoked**   36:24
**smoker**   18:24

**smoking**   19:9,
14
**smoothie**   18:3, 5
**smoothy**   18:9
**snapped**   36:10
**snout**   38:1
**Social**   12:21
68:22
**Sorry**   11:7
31:13   36:20
52:13, 21
**sort**   30:25
55:16
**sound**   10:15
50:22   51:2   58:2
**sounds**   57:17
**south**   8:18, 19
**Southwest**   9:15
10:3, 21
**spa**   17:7, 12
**speak**   29:12
43:5   49:12
**speaking**   65:12
**specific**   30:9
58:20, 21
**specifically**
46:22
**speech**   65:19
**speeding**   13:6
**SPF**   53:8   56:16
**spoke**   39:25
41:20   64:21
**spoken**   26:2
39:15
**spot**   20:25
**St**   30:11, 12
**staff**   43:5, 11,
19   45:5
**start**   16:16   45:8
**started**   7:8

61:*20*
**starting** 10:*15*
**STATE** 1:*2*
15:*16* 71:*3*
**stated** 71:*7*
**status** 47:*6*
**stay** 50:*11*
**stayed** 39:*4*
63:*5*
**stem** 60:*15, 17*
**step-cousin**
68:*12*
**step-cousin's**
68:*13*

**STIPULATIONS**
2:*1*
**stop** 67:*9*
**stopped** 50:*7*
67:*10*
**straight** 35:*2*
37:*11*
**strawberry** 18:*6*
**Street** 3:*12*
23:*16, 17* 24:*24*
**Strike** 47:*4*
**struggle** 8:*19*
**struggled** 8:*18*
**stubborn** 35:*19*
**stuck** 56:*6*
**stuff** 16:*8* 28:*5*
61:*13*
**successful** 36:*8*
**suit** 5:*25*
**Suite** 2:*8* 3:*6,
12*
**sun** 53:*4*
**sunlight** 52:*19,
22*

**sunscreen** 53:*2,
7, 9* 55:*21, 23,
25* 56:*1, 9*
**SUPERIOR** 1:*1*
**supervisor** 14:*23*
**sure** 6:*4, 16, 20,
21* 9:*23* 16:*1*
21:*5* 24:*4*
25:*10* 27:*21*
31:*22* 34:*16*
40:*7* 43:*7*
58:*22* 65:*5*
69:*19*
**surgeon** 45:*5*
**surgery** 17:*11*
54:*4, 7* 55:*7*
57:*15* 59:*8*
60:*6* 61:*6* 66:*2,
7*
**surgical** 60:*21*
**swell** 65:*16*
**swells** 65:*11, 14*
**SWIFT** 3:*11*
**swing** 34:*19*
**switched** 52:*9*
**sworn** 5:*18*
**synopsis** 43:*22*

**< T >**
**table** 31:*11*
**take** 6:*17* 7:*14*
51:*6* 66:*16, 22*
67:*14* 69:*17*
70:*2, 19*
**taken** 2:*4, 10*
5:*2* 8:*16* 41:*23*
69:*21* 71:*7*
**takes** 42:*8, 22*
44:*18*
**Takiyah** 71:*22*

**talk** 6:*11, 25*
43:*15* 48:*14*
**talked** 6:*5* 7:*8*
67:*18, 23* 70:*6*
**talking** 9:*18*
33:*14* 40:*13*
49:*21* 65:*25*
**tall** 31:*8*
**technique** 57:*2*
**techniques**
56:*24* 57:*5*
**tell** 6:*10* 13:*15*
20:*14* 25:*1*
57:*13*
**telling** 44:*4*
45:*23* 56:*18*
58:*6* 59:*7*
**tells** 26:*14*
63:*24* 64:*4*
**Ten** 35:*15*
**tendencies** 36:*3*
**terms** 2:*11*
30:*24* 32:*21*
51:*11* 54:*20*
55:*17* 59:*21*
67:*22*
**Terrace** 9:*15*
10:2, *21* 11:*15*
**TERRELL** 1:*7*
22:*23, 24* 28:*2,
10* 29:*23* 30:*4*
33:*12, 21* 38:*21*
47:*19, 24* 48:*14,
18* 49:*22* 50:*4,
16* 64:*15* 65:*7*
67:*19*
**Terrell's** 30:*24*
59:*10*
**testified** 5:*19*
**text** 25:*17, 18*

32:2 49:*25* 50:*1*
**therapy** 60:*16*
**thereto** 71:*8*
**thing** 19:*6* 24:*5*
38:*23* 46:*10*
54:*2*
**things** 23:*23*
45:*8* 55:*9*
**think** 8:*16* 9:*24*
10:*14* 21:2, *10*
24:*14, 16* 25:*9*
27:*15, 16, 20*
29:*21* 32:*9*
34:*3* 36:*5* 37:*4*
41:*4* 48:*15*
49:*6* 51:*9, 20,
23* 56:*11* 59:*15,
25* 61:*21* 65:*8*
69:*18* 70:*13*
**Thirty** 11:*20*
**thought** 60:*17*
63:*22*
**Three** 12:*15*
50:*6* 51:*15, 24*
57:*1* 60:*13*
**tickets** 13:*6*
**tighten** 57:*23*
**tightening** 57:*18*
**time** 5:*9* 6:*6*
7:*15* 12:*3* 14:*5*
15:*22* 18:*1, 17,
20* 23:*14, 15*
24:*25* 25:*6*
26:*12* 27:*5, 21*
28:*1* 33:*20*
40:*4* 44:*11*
48:*17* 52:*24*
53:*14* 54:*10*
64:*3* 66:*22*
67:*12*
**timeframe** 63:*8*

times 16:2 28:*1, 3, 10, 16* 49:*23* 50:8 51:*15, 24* 57:2
tingle 65:*16*
tingling 54:*14* 65:*12*
tips 52:13, *14* 55:*17*
title 15:*14*
today 8:22 16:*4* 17:*16* 29:4 58:*13* 59:2 60:*25* 61:*6* 65:*10* 66:*1*
told 25:*17* 43:*10, 19* 44:*1* 46:8 54:*19* 58:*11* 59:*22, 25* 63:*19*
top 62:8
tough 20:7
Traffic 13:*4*
traits 30:9, *14*
transcript 71:*7, 11, 18*
transfer 45:*1*
transported 45:*10*
traumatic 66:*21*
treat 51:*12*
treatment 17:*13* 61:*3* 69:9 70:6
trip 25:*3*
trouble 65:*12*
true 71:*10*
trust 60:*10*
truthful 64:7, *10*
try 6:*24* 32:*12* 53:9 54:*16*

55:*14, 21*
turned 12:*4*
Twenty-five 11:2
TWG 1:*7* 5:*24*
Twitter 68:*23*
two 27:22 33:*23* 47:*10* 49:*23* 50:*5, 19* 51:*15* 52:*4* 57:*24*
type 30:*14* 67:*1*
typewriting 71:*9*
typical 17:*25* 19:*1, 11*
typically 27:*18* 53:9

< U >
Uh-huh 13:*7* 19:*5* 23:*11, 18* 24:*9* 25:*7, 22* 26:*19* 27:*10, 20* 29:2 33:*18* 38:*4* 45:*11* 48:*7* 52:*10* 57:*18* 58:*3* 65:*22*
uh-huhs 6:*18*
ultimately 57:*13* 60:*21*
unable 67:*2*
unbearable 51:*7*
uncle 40:*18* 41:*10, 14* 42:*10, 25* 67:*19*
uncle's 40:*21*
underneath 53:*6*
understand 6:*9, 13*

Understandable 38:*9*
understanding 8:*7* 20:*12* 24:*6* 57:*20* 66:*24*
understood 6:*8*
uneven 65:*15*
unfamiliar 37:*7*
Unh-unh 17:*5, 14* 34:*4, 23*
unh-unhs 6:*18*
University 12:*17*
unrelated 18:*4*
use 5:*9* 16:*21* 19:*17* 52:*8* 53:*16* 55:*22* 56:*3, 5, 7, 19* 69:*1*
Usually 18:*6*

< V >
vacation 66:*12*
vaccination 47:*6, 9, 21* 49:*13, 16* 64:*1*
vaccine 47:*14*
verbal 6:*16, 22*
verification 9:*7*
vertical 34:*20*
vet 47:*11*
view 21:*24*
visit 26:*10*
VS 1:*6*

< W >
wait 5:*14, 15* 57:*14, 21* 68:*11*
waive 5:*6*
waived 2:*13* 71:*17*

walk 22:*14* 24:*23* 26:*23* 27:*6* 28:*18* 41:*6*
walked 26:*20* 34:*10*
walking 23:*13* 24:*12, 20*
want 66:*2* 69:*19*
wanted 9:*23* 25:*25* 39:*18* 49:*19* 52:*7, 8* 57:*21* 64:*14*
Warby 15:*3, 5, 6, 11, 18* 67:*8, 9*
wave 60:*15*
Way 10:*18* 11:*12, 22* 13:*16* 22:2 24:*24* 28:*23* 29:*8* 32:*20* 36:8 43:*3* 47:*16* 58:*12* 67:*25*
ways 71:*16*
wearing 16:*4, 6*
week 17:*21*
weeks 50:*19* 52:*4*
Well 15:*16* 17:*15* 33:*24* 34:*20* 35:*24* 36:*23* 37:*19* 39:*13* 44:*13* 48:*5* 49:*9* 63:*8* 65:*19* 67:*2*
went 29:*16* 38:*3, 8* 48:*11, 12* 67:*17*
wheeled 46:*11*
white 31:*4*
wholly 18:*4*

**Williamson**
7:*24*  10:*25*
11:*25*
**wine**  18:*23*
19:*12*  37:*4*
**wish**  36:*1*
**witness**  2:*13*
9:*21*  21:5  22:8
24:*19*  28:*24*
32:9  33:*10*
36:*18*  38:*16*
61:*10*  71:*17*
**witnesses**  39:*10*
**woman**  13:*17*
**words**  66:*5*
**wore**  52:*24, 25*
**work**  12:*21*
13:*16*  14:*12*
15:*1, 4*  28:*4, 7*
31:*15*
**worked**  15:*3, 22*
26:2, 5  44:*10*
**worker**  45:*17*
**working**  14:*21*
15:6  67:9
**worst**  45:*15*
46:*14*
**wound**  51:*12*
55:*13*
**Wow**  35:*16*
**wrap**  70:*3*
**wrapping**  69:*19*
**write**  22:*1*
24:*18*  44:*15*
**wrong**  35:*24*
37:*13*
**Wylie**  14:*13*
15:*1*  67:*17*
**W-Y-L-I-E**
14:*13*

**< Y >**
**y'all**  46:*17*
**yard**  33:6
**Yeah**  22:*4, 7*
28:8  31:*12*
33:*14*  34:*13, 21*
36:*1*  42:*12*
46:*21*  61:9, *24*
**year**  23:8  67:*16*
**years**  8:*17*
12:*15*  13:*23*
14:*4*  35:*15*
45:*16*  50:5
53:22
**yogurt**  18:7

**< Z >**
**ZDIRILICH**
3:5  5:*11, 15*
9:*17, 23*  18:*10*
36:*16*  58:*18*
61:8  70:2*1*
**Zdrilich**  2:7  3:5
**ZOOM**  1:*11*
2:3



# Exhibit B

In the Matter of:

**Jennifer Armistead v.**

**TWG Management, LLC**

---

**SAVANNAH PAIGE WILLIAMSON**

*November 8, 2024*

---



# WSG Reporting, LLC

## Certified Court Reporting & Video

wsgreporting.com
3430 Heartwood Lane  •  Atlanta, GA 30340
office@WSGreporting.com  •  (678) 770-3151

Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

Page 2

1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF GEORGIA
               ATLANTA DIVISION
3
4   JENNIFER ARMISTEAD,
5        Plaintiff,            CIVIL ACTION
6   vs.                       FILE NO.
7                             1:24-cv-02583-MHC
    TWG MANAGEMENT, LLC,
8
        Defendant.          **CERTIFIED TRANSCRIPT**
9
10  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11
12          REMOTE DEPOSITION OF
13        SAVANNAH PAIGE WILLIAMSON
14
15            November 8, 2024
16              10:46 a.m.
17
18       (All attendees appeared remotely via
19    teleconferencing and/or videoconferencing.)
20
21      Reporter Phillip M. Lane, CCR, CVR
22  ********************************************
23            WSG REPORTING, LLC
               3430 Heartwood Lane
24            Atlanta, Georgia 30340
                (678) 770-3151
25           office@wsgreporting.com

Page 2

1              APPEARANCES OF COUNSEL
2
3   ON BEHALF OF THE PLAINTIFF:
4   JEREMY A. FREIMAN, Esquire
    Zdrilich Injury Law, LLC
5   3575 Koger Boulevard
    Suite 125
6   Duluth, Georgia 30096
    (404) 881-1111
7   jeremy@zinjurylaw.com
8
9
10  ON BEHALF OF THE DEFENDANT:
11  AUSTIN L. ALBERTSON, Esquire
    Swift Currie McGhee & Hiers, LLP
12  1420 Peachtree Street, NE
    Suite 800
13  Atlanta, Georgia 30309
    (404) 874-8800
14  austin.albertson@swiftcurrie.com
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX TO EXAMINATIONS
2   WITNESS: SAVANNAH PAIGE WILLIAMSON
3   Examination                           Page
4   By Mr. Albertson.........................8
5   By Mr. Freiman..........................58
6   By Mr. Albertson........................60
7
8
9
10             INDEX TO EXHIBITS
11  Exhibit        Description            Page
12               (None marked.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   REMOTE DEPOSITION OF SAVANNAH PAIGE WILLIAMSON
2            November 8, 2024
3       Proceedings commenced at 10:46 a.m.
4       MR. ALBERTSON:  This will be the deposition of
5   Savannah Williamson taken pursuant to notice and
6   agreement of counsel for purposes of discovery and
7   all other purposes permitted under the Civil Practice
8   Act.
9       If it's agreeable with counsel today, we can
10  waive all formalities as to the method and manner of
11  taking the deposition and agree to reserve objections
12  until time of first use of the deposition, except to
13  form of question or responsiveness of answer?
14      MR. FREIMAN:  Agreed.
15      MR. ALBERTSON:  Okay.
16      You can swear in the witness.
17  (Whereupon, the witness is duly sworn by the
18  reporter.)
19      MR. ALBERTSON:  First, Jeremy, I'd imagine --
20  have you guys discussed signature or is it something
21  we can talk about at the end?
22      MR. FREIMAN:  We haven't.  That would have been
23  something I would have discussed with her right
24  before but I wanted to get things going as quick as
25  possible.  I guess I could just do it briefly right

Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

5..8

---

Page 5

1  now.
2      So what will happen here is that they're going
3  to generate a formal transcript of this. You have
4  the right to review that transcript and make sure
5  everything's correct. It's something that we'll
6  probably want to wait and just kind of see how things
7  go, if there are tech issues or anything like that.
8      THE WITNESS: Okay.
9      MR. FREIMAN: But it's something we'll discuss
10  at the end. I guess for now we'll wait and I'll just
11  bring that up with her again at the end.
12      MR. ALBERTSON: That works for me. Okay.
13      Ms. Williamson, so have you given a deposition
14  before?
15      THE WITNESS: No.
16      MR. ALBERTSON: I imagine that's not something
17  that's in everyone's skillset. So I'm just going to
18  go over some basic ground rules. I don't know if you
19  and either Jeremy or Joe have met before today or
20  anything. If so, you've probably heard these before.
21  But I'm just going to go over them just to establish
22  some ground rules.
23      So hopefully this will not take a ton of time.
24  This will not be a police interrogation or anything
25  like that you've seen on television. So -- but to

---

Page 6

1  the extent that you need a break at any point -- I
2  understand that we kind of rushed into this thing
3  here. If you need to grab a water, go to the
4  restroom, anything over the course of any point
5  during this process, feel free. You know, we're on
6  Zoom; it's relatively easy.
7      The only thing I would ask is, if there's a
8  question pending, something that I've asked you, just
9  give me an answer to that question and then we can
10  take a break as many times as you need to. I had a
11  deposition a couple weeks ago with a guy with some
12  stomach issues, that we took three or four
13  throughout. Whatever happens, happens.
14      THE WITNESS: Okay.
15      MR. ALBERTSON: If you answer a question that I
16  ask you, I'm going to assume that you understood what
17  I asked. Other than that, if you don't understand a
18  question I've asked, if the internet breaks up, if
19  you can't hear me, if I just ask a bad question,
20  which happens from time to time, just let me know. I
21  can rephrase, ask something else. Just let me know
22  if you don't get it and I can -- I'm happy to ask
23  another question. I do ask bad questions from time
24  to time.
25      Make sure you give verbal responses. We're on

---

Page 7

1  Zoom. So what that means is, you know, no yes
2  (nodding head) or no (shaking head). I'll know what
3  that means as I'm sitting here looking at you but --
4  the court reporter's going to try to keep a
5  transcript for us that we can look back on. But we
6  won't necessarily have this ability to look back and
7  see, well, did she shake her head like that (nodding
8  head) or did she shake her head like that (shaking
9  head)?
10      So make sure you give verbal answers of a yes or
11  no. No uh-huhs, uh-uhs, or anything like that,
12  because we want to make sure we have a clean record.
13  Does that make sense?
14      THE WITNESS: Yeah.
15      MR. ALBERTSON: Okay. And on Zoom, sometimes it
16  can be a little bit of an issue. I'll try not to
17  talk over you or you talk over me. Sometimes, you
18  know, you can get a question in a deposition where
19  you can sort of know where things are going.
20      You know, an example I like to use is, you know,
21  if I ask you what shoes you had on that day, then I
22  ask what socks you had on that day, and then, you
23  know, your expectation will be, well, he's going to
24  ask about pants or shirt or something.
25      And it's human nature to predict what's coming

---

Page 8

1  next. It's for a clean record. So just let me get
2  out all of my questions even if you kind of know
3  what's coming. That's not really how human
4  conversation works, which, you know, we lawyers can
5  sometimes can not be human. But it's for the
6  purposes of the deposition. Just let me get it out
7  so we can have it on the transcript and make sure we
8  have a clean record.
9      So with that, we can -- does all that make sense
10  to you?
11      THE WITNESS: Yes.
12      MR. ALBERTSON: Okay. Perfect. So with that,
13  we can sort of get into it.
14  Whereupon,
15      SAVANNAH PAIGE WILLIAMSON,
16      after having been first duly sworn, was
17      examined and testified as follows:
18      EXAMINATION
19  BY MR. ALBERTSON:
20      Q.  So what is your full legal name?
21      A.  Savannah Paige Williamson.
22      Q.  Okay. Is Williamson your maiden name?
23      A.  It's my dad's last name.
24      Q.  Got you. Do you have any nicknames or aliases?
25      A.  No.

---

Page 9

1    Q.  Okay.  What's your date of birth?
2    A.  January 7, 1999.
3    Q.  And where were you born?
4    A.  Northside Hospital, in Atlanta.
5    Q.  In Atlanta?  Okay.
6        So it's my understanding and -- you know, I'm
7    sure you're aware of this.  It's my understanding we're
8    here for an incident that occurred on January 31, 2022.
9    Does that sound right to you?
10   A.  Yes.  I don't know the exact date, but yes.
11   Q.  Sounds about right?
12   A.  Yeah.
13   Q.  Okay.  Are you currently taking any type of
14   prescription medication?
15   A.  No.
16   Q.  Okay.  Are you on any type of drug, narcotic,
17   medication, supplement, anything that would affect your
18   ability to understand the questions that I'm asking, or
19   answer in a coherent way?
20   A.  No.
21   Q.  Okay.  Have you done anything to prepare for
22   this deposition today?
23   A.  No.
24   Q.  Have you met with, have you met with any
25   attorneys?

Page 10

1    A.  No.
2    Q.  Have you reviewed any, like, photographs?
3    A.  Yes.
4    Q.  And what photographs would those be?
5    A.  Just the pictures from the hospital visit with
6    my mom, after.
7    Q.  So in that same vein, have you talked about your
8    testimony today with your mom?
9    A.  Not recently.
10   Q.  Okay.  When you say not recently, when was the
11   last time you would have talked with her about it?
12   A.  Probably about a month ago.
13   Q.  Okay.  Have you been able to review -- well,
14   strike that.  Let me ask you this.
15       Are you aware that your mother gave testimony in
16   this case already?
17   A.  No.
18   Q.  Okay so you wouldn't have talked to her about
19   her testimony in this case?
20   A.  No.
21   Q.  Okay.  Were you aware that she had filed an
22   action in this case?
23   A.  No.  What is that?
24   Q.  That she had filed a lawsuit?
25   A.  Oh.  Yes.

Page 11

1    Q.  But you weren't aware that she had already
2    testified?
3    A.  No.
4    Q.  Okay.  So you haven't talked with your mother
5    about your testimony today in terms of the substance of
6    it?
7    A.  No.
8    Q.  Okay.  So where do you live currently?
9    A.  I live in Oakland City.
10   Q.  Do you know your address?
11   A.  Yes.
12   Q.  And what is that?
13   A.  1261 Oakland Terrace Southwest, Atlanta, Georgia
14   30310.
15   Q.  And how long have you lived at Oakland Terrace?
16   A.  Probably about six months.
17   Q.  Okay.  And where were you -- so six months would
18   take us back to around Mayish.  Where were you, where were
19   you before that?
20   A.  I was in Marietta.
21   Q.  Do you know your address in Marietta?
22   A.  Yes:  It's 570 Saint Annes Road.  I don't
23   remember the zip code though.
24   Q.  That's okay.  But the city's Marietta?
25   A.  Yes.

Page 12

1    Q.  How long were you at that address at
2    Saint Annes?
3    A.  About three months.
4    Q.  Okay so that gets us around to the start of
5    2024.  Where were you living right before Saint Annes?
6    A.  Sandy Springs.
7    Q.  All right.  And what was the address there?
8    A.  2304 The Valley, Sandy Springs 30328.
9    Q.  And how long were you there?
10   A.  Two years, I believe.
11   Q.  So that would have been roughly January of 2022?
12   A.  I believe so, yes.
13   Q.  Okay.  So before that, were you living at
14   Mirador?
15   A.  I was living at another apartment right before
16   that, and then I lived -- before that, I lived at Mirador.
17   Q.  So what was the apartment right before that one?
18   A.  It was Glen Lake.  I could not recall the
19   address but it was Glen Lake Apartments, in Sandy Springs.
20   Q.  Weirdly enough, I think I know where that's at.
21   A.  It's right next to the highway.
22   Q.  I know exactly where that's at.  I have traveled
23   too much for these depositions.
24       Okay so Glen Lake, how long were you at
25   Glen Lake?

Page 13

1    A.  I think maybe eight months.
2    Q.  So you would have been living at Glen -- if my
3  math's right -- and I went to law school so it very much
4  might not be -- that would have been throughout most of
5  2021?
6    A.  I believe so, yeah.
7    Q.  Okay.  And so Mirador -- do you remember, do you
8  remember when you moved in to Mirador?
9    A.  I want to say 2019 or early 2020, maybe.  No, it
10  was definitely 2019.
11    Q.  Okay so you moved to Mirador in 2019, and do you
12  remember around when you moved out?
13    A.  I want to say like mid-2020.
14    Q.  So after, after 2020, when you move out of
15  Mirador, you go to Glen Lake Apartments?
16    A.  Yes.
17    Q.  Okay.  All right.  Let's do this a better way.
18      At Mirador, who were you living with at Mirador?
19    A.  My mother.
20    Q.  That's Ms. Jennifer Armistead?
21    A.  Yes.
22    Q.  Okay.  And so when you moved out of Mirador in
23  2020, did your mom move out with you?
24    A.  No.
25    Q.  So she stayed behind at Mirador?

Page 14

1    A.  Yes.
2    Q.  Okay.  So at Glen Lake Apartments, who did you
3  live with?
4    A.  Laura McArdle.
5    Q.  Is that just a friend?
6    A.  Yeah.  Yes.
7    Q.  All right.  And so Laura lived with you the
8  entire time you were at Glen Lake?
9    A.  Yes.
10    Q.  Okay.  So at Mirador, you said you lived with
11  your mother.  Did you live with anybody else?
12    A.  No.
13    Q.  Okay.  Who is -- do you know a Lisa Armistead?
14    A.  That's my mom's sister.
15    Q.  Okay.  Did she live at Mirador?
16    A.  She did not live there, but her name was on the
17  lease.
18    Q.  Okay.  You might not know this but do you have
19  any idea as to why?
20    A.  I -- my mom couldn't get an apartment by
21  herself.
22    Q.  Where does Ms. Lisa Armistead live?
23    A.  She lives in Decatur.
24    Q.  Okay so she never lived at Mirador?
25    A.  No.  She never lived there.

Page 15

1    Q.  Okay.  So essentially, you know, Lisa helped
2  your mom get an apartment, and that's where you and your
3  mom lived?
4    A.  Yeah.
5    Q.  Okay so prior to Mirador, had you lived with
6  your mom most of your life?
7    A.  Most of my life, yeah.
8    Q.  Okay.  Were you living anywhere before you lived
9  at Mirador that wasn't with your mother?
10    A.  No.
11    Q.  Okay.  If my math is correct, you would have
12  been like 19 or 20 around that time anyway, right?
13    A.  Yeah.
14    Q.  Okay.  It's always so crazy to me to see people
15  born in like '99 and 2000, and that's normal, even though
16  that's, you know, older by now.  Okay.
17      So you're living at Mirador through sometime in
18  2020; you're at Glen Lake Apartments in 2021.  So do you
19  remember where you were living on January 31, 2022?
20    A.  I believe I was at the Valley address.  I
21  believe I was already moved into that second apartment.
22    Q.  And just because I don't know Atlanta at all,
23  how far is The Valley from Mirador?  Like --
24    A.  It's probably about 25 minutes.
25    Q.  Okay so relatively close?

Page 16

1    A.  Yeah.
2    Q.  Okay.  Would you visit Mirador somewhat
3  frequently?
4    A.  Yes.  So I would visit my mom, or my boyfriend
5  also lived in the apartment complex.
6    Q.  Okay.  Your boyfriend.  What's your boyfriend's
7  name?
8    A.  Josh Martin.
9    Q.  When did you start dating Mr. Martin?
10    A.  2020.
11    Q.  While you were living at Mirador?
12    A.  Yes.
13    Q.  And so he just remained living at Mirador?
14    A.  Yes.
15    Q.  So in January of 2022, would he have still been
16  living at Mirador?
17    A.  Yes.
18    Q.  Okay.  How far was Mr. Martin's apartment from
19  your mother's?
20    A.  Just a few buildings down.
21    Q.  Did Mr. Martin and your mother know each other?
22    A.  Yes.
23    Q.  Did he live alone?
24    A.  He lived with his parents.
25    Q.  Okay.  His parents also lived at Mirador.  What

Page 17

1   were his parents' names?
2        A.   Carolyn and Steve.
3        Q.   Are you still with Mr. Martin?
4        A.   Yes.
5        Q.   Is he still at Mirador?
6        A.   No.
7        Q.   Okay.  Does he live with you?
8        A.   No.
9        Q.   Okay.  We might come back to some of that.
10  Sorry we've jumped around a little bit; I apologize.  A
11  lot of names and addresses I'm trying to get ahold of.
12        Do you remember what your phone number would
13  have been on the -- in January of 2022?
14        A.   My phone number hasn't changed.  It's the same.
15  Do you --
16        Q.   Okay.  What's that number?
17        A.   It's (678)907-7123.
18        Q.   And who would have been your carrier in January
19  of 2022?
20        A.   I believe Xfinity.
21        Q.   Do you have any children?
22        A.   No.
23        Q.   What's the highest level of school you
24  completed -- well, scratch that.  That's such a terrible
25  way of asking that.

Page 18

1        Did you graduate high school?
2        A.   No.
3        Q.   Okay.  What's the highest level you got to in
4   school?
5        A.   Twelfth grade.
6        Q.   Twelfth grade?  Okay.  And what high school were
7   you going to?
8        A.   Walton High School, in Marietta.
9        Q.   Have you ever served in the military?
10        A.   No.
11        Q.   I don't mean any offense by this; I ask this to
12  everyone, I promise.
13        But do you have any criminal arrests or --
14        A.   No.
15        Q.   -- any prior charges or convictions?
16        A.   No.  I have a traffic violation but that's it.
17        Q.   Anything more than a speeding ticket?
18        A.   I was driving without -- well, with a -- without
19  a license.  But I don't have any charges or anything else.
20        Q.   Okay.  No DUIs or anything like that?
21        A.   No.
22        Q.   Okay.  Have you ever been a party to a lawsuit
23  before?
24        A.   No.
25        Q.   Are you currently employed?

Page 19

1        A.   Yes.
2        Q.   And where do you work?
3        A.   Firepit Pizza Tavern.
4        Q.   And where is that at?
5        A.   It's in Grant Park.
6        Q.   Firepit Pizza Tavern.  Never heard of that.  How
7   long have you been at Firepit?
8        A.   Since May.
9        Q.   Okay so I kind of want to get in a little more
10  as to why we're actually here.  I promise most of the
11  background information is done.
12        So I know you said you didn't quite remember the
13  date specifically.  But the date that I have for this
14  incident taking place is January 31, 2022.  Does that seem
15  familiar to you?
16        A.   Yes.
17        Q.   Okay.  So back in 2022 -- let me ask you this.
18  Were you working anywhere in 2022?
19        A.   Yes.
20        Q.   Where would you have been working?
21        A.   I was working in Marietta, at a wholesale
22  lighting company.
23        Q.   Do you remember if you were working that day?
24        A.   Yes.
25        Q.   And what hours would you work?

Page 20

1        A.   I worked 9:00 to 5:00.
2        Q.   So you get off at five o'clock.  Can you kind of
3   tell me, to the best that you can remember, what happened
4   after you got off work?
5        A.   Yeah.
6        I got off work, and I went to go see my
7   boyfriend.  So I went to Mirador to go and spend some time
8   with him.
9        And, and I get a call from my mom that she is in
10  a bad situation; I need to come see her, I need to --
11  something's going on.  So I drive over to the person's
12  house that she was at, and saw her, how she was.
13        Q.   Okay.  And we're going to kind of break that
14  down a little bit.  But I kind of want to go back to the
15  beginning.
16        A.   Okay.
17        Q.   So you're hanging out with your boyfriend.  Do
18  you remember about how long you had been at your
19  boyfriend's house?
20        A.   A few hours, because I got off around 5:00.  It
21  probably took me about an hour.  I was there at like 6:00.
22  So I was there for at least three or four hours.
23        Q.   Okay so by the time you get the call, if I'm
24  understanding you correctly, it would have been around
25  nine or ten o'clock at night?

Page 21

1    A.   I think something like that, yeah.
2    Q.   The sun would have been down?
3    A.   Yeah, def- -- it was nighttime.
4    Q.   Got you.
5         Okay so had you -- so you went and saw your
6    boyfriend, but you had not been to your mother's house?
7    A.   No.  I hadn't seen her yet.
8    Q.   Was it fairly typical for you to see your mother
9    when you were visiting your boyfriend?
10   A.   Yeah.  I would usually come by and see her, but
11   it would usually be on my way out.
12   Q.   Got you.
13   A.   So I hadn't gone to see her yet.
14   Q.   Were you -- so would it be fair to say that you
15   were somewhat familiar with her nighttime routine?
16   A.   Yeah.  Yeah.
17   Q.   So is it typical, in your understanding of your
18   mom, the typical night, would she have, you know,
19   something to drink?
20   A.   Yeah.
21   Q.   What does she normally drink?
22   A.   Well, she doesn't drink anymore.  But she used
23   to drink vodka.
24   Q.   Got you.  So a typical night, it wouldn't be
25   uncommon for her to have a vodka drink or something?

Page 22

1    A.   Right.  Yeah.
2    Q.   Would she smoke anything, typically?
3    A.   I mean, cigarettes but . . .
4    Q.   Would she -- any marijuana usage at all?
5    A.   Not that I know of.  We don't really talk about
6    it, but not that I know of.
7    Q.   Got you.  Was it common for your mom to -- I
8    guess -- let me ask you a better question.
9         The neighborhood in Mirador, was it a walkable
10   community?
11   A.   Somewhat.
12   Q.   Like, were the residents active?  Were people
13   outside a lot?
14   A.   Yeah.  Yeah.  There was a lot of kids, and there
15   was pretty -- like, if you knew the people, then you would
16   be out and talking with them and being social.
17   Q.   Would you and your boyfriend walk around the
18   property at all?
19   A.   Yeah.
20   Q.   Got you.  Did you know people on the property?
21   A.   Yeah.  I knew a lot of neighbors and people.
22   Q.   Was it common for your mom to walk around the
23   property?
24   A.   Yeah.  She knew a lot of people in the area.
25   Q.   So that night, hanging out with your boyfriend,

Page 23

1    you're there for a few hours.  Were his parents home?
2    A.   I think his mom was home, yeah.
3    Q.   Got you.  So, you know, without -- again, I
4    don't need to know the itinerary, necessarily.  But
5    generally, what would you guys do hanging out over that
6    period of time?  Do you remember anything you guys were
7    doing?
8    A.   Watching TV and just relaxing after work.  Not
9    really doing anything.
10   Q.   Would you guys drink anything?
11   A.   Not really.  No.  I don't -- I'm not a drinker.
12   Q.   Okay.  Smoke anything?
13   A.   Cigarettes.  That's about it.
14   Q.   This is wholly unrelated but what type of
15   cigarettes do you smoke?
16   A.   I smoke Camels.
17   Q.   Got you.  There is a generational divide.  I was
18   more of a light smoker when I was growing up.  But every
19   person I know, it feels now is Camel.  Well, people that
20   don't do vapes.  But anyway --
21   A.   I don't do vapes at all; I can't do them.
22   Q.   Yeah.
23   A.   But Camels for sure.
24   Q.   Okay so you're hanging out with your boyfriend
25   till around 9:00 or so.  So kind of going back from a --

Page 24

1    instead of just talking about that night, just kind of
2    generally, so it's my understanding that Mirador -- that
3    Silver Oaks is across the street, across a major road from
4    Mirador?
5    A.   Yeah.  Yeah.
6    Q.   Had you ever been over to Silver Oaks before?
7    A.   Yeah, I've been over there before.  I knew a
8    couple people in the neighborhood.
9    Q.   Okay so you had some friends over at Silver
10   Oaks?
11   A.   Yeah.
12   Q.   When you went over to Silver Oaks, would you
13   walk over?
14   A.   No.  I would drive, because --
15   Q.   Was it common for people to walk from Mirador to
16   Silver Oaks?
17   A.   Yeah.  People would walk in that area a lot.
18   The gas stations were right there, liquor stores.  Like,
19   it was all within walking distance so it was pretty
20   common.
21   Q.   Is there a crosswalk between the two?
22   A.   You just have to go up a little bit, but yeah.
23   Q.   Got you.  Had you ever seen an employee from
24   Silver Oaks before?
25   A.   No.

Page 25

1    Q.  So you didn't know anyone that worked in the
2  office?
3    A.  No.
4    Q.  Like a groundskeeper, security guard, you never
5  interacted with any of those people?
6    A.  Not that I know -- no.  Not that I know of.
7    Q.  Okay.
8        So you get a call from your mom at some point,
9  so she calls you?
10    A.  Yeah.
11    Q.  Do you remember what she told you?
12    A.  She wasn't -- like, I couldn't understand her.
13  She was just kind of like not making any sense, kind of
14  sounded a little delirious.  Her words weren't, like,
15  there.
16        And then, people that she was with got on the
17  phone and just told me to come over right now, and
18  wouldn't give me any other information.
19    Q.  Did you recognize any of the other voices?
20    A.  Yes.  I had met them or I had met the man like
21  once or twice before.
22    Q.  And who's that man?
23    A.  I don't know his name.  I still don't know his
24  name.  I just called him the groundskeeper for Mirador.
25    Q.  Groundskeeper for Mirador?  So is that how you

Page 26

1  met him?
2    A.  Yeah.  That's how I knew him.
3    Q.  So he had been a groundskeeper at Mirador?
4    A.  Yeah.
5    Q.  Was he currently the groundskeeper at Mirador in
6  January --
7    A.  I'm not sure.  I'm not sure.  I think, but I'm
8  not sure.
9    Q.  So had you met him with your mother or just in
10  passing?
11    A.  In passing.  He knew my boyfriend.
12    Q.  Got you.  Okay so was he -- were him and your
13  boyfriend -- like, they would speak when they saw each
14  other?
15    A.  Yeah.  It was more just like a hi, like,
16  greeting.  But it was never like we hung out with him or
17  anything like that.
18    Q.  Got you.  Did he have you or your boyfriend's
19  number?
20    A.  No.  Not that I know of.
21    Q.  Did you know anything about him?
22    A.  No.
23    Q.  Like, where he lived or anything like that?
24    A.  No.  I had no idea he lived that close.
25    Q.  Okay so they get on the phone, tell you to come

Page 27

1  over.  So can you kind of tell me what, what you do?
2    A.  Yeah, so I got -- me and my boyfriend drove over
3  there, like, immediately.  And he was standing outside
4  because he lived over where he lived at in Silver Lake
5  [sic].  So he was standing outside and, like, directing me
6  to go inside the apartment.  And --
7    Q.  Okay so you -- did you or your boyfriend drive
8  over?
9    A.  He drove.  I was in the passenger.
10    Q.  Okay so you guys drive over, and to my
11  understanding, the man's outside?
12    A.  Yeah.
13    Q.  He gets y'all's attention?
14    A.  Uh-huh.
15    Q.  And then did you and your boyfriend both get out
16  of the car?
17    A.  He -- my boyfriend stayed in the car.
18    Q.  Okay so you get out --
19    A.  I just went out --
20    Q.  -- and you go inside the apartment?
21    A.  Yes.
22    Q.  Okay.  Can you kind of describe what you see,
23  what's going on?
24    A.  So I walk in, and there's, like, a couch.  And I
25  see my mom on the floor in front of the couch.  Like,

Page 28

1  she's continuing to pass out.  She has maul marks all over
2  her face.  I don't see a dog anywhere.  And she's trying
3  to, like, tell me what happened.  And then she's passing
4  out.  And I'm trying to pick her up and get her to the
5  bathroom or get her to a sink or something.
6        And the guy had fled.  As soon as I walked into
7  the apartment, he fled because he assumed I was going to
8  call the police is what he said, because I guess he had a
9  warrant.  And so he fled, and I didn't see him after that.
10        And then the lady that was there -- I was trying
11  to get my mom so I could, like, rinse off her face, see
12  what's going on.  There was just so much blood.  So I was
13  trying to get to the bathroom or to the sink or something.
14  And she was just trying to push us out of the door, like,
15  wouldn't let me take her to the bathroom, wouldn't let me
16  take her anywhere; was just getting us out, basically.
17        So I had to, like, carry my mom while she just
18  was, like, passing out in my arms, out of the apartment.
19        And then my boyfriend saw me struggling, and he
20  got out and helped me get her to the car.  And then we
21  immediately took her to the hospital.
22    Q.  Okay.  First and foremost, I want to state that
23  I know this is a little bit difficult to talk about.  And,
24  you know, I want to kind of break it into pieces.  I'm
25  very sorry you had to deal with this to begin with.

Page 29

1   A.   Yeah.
2   Q.   But just for my understanding, I want to kind of
3   piece it out so that I can kind of get a better picture of
4   what's going on.
5   A.   Yeah.
6   Q.   So he waves you into the apartment.  This is the
7   same man?
8   A.   Yeah.
9   Q.   So you get into the apartment.  You obviously
10  see your mother.  You said there was a lady there?
11  A.   Yeah.
12  Q.   Can you tell me about her?  Had you ever met her
13  before?
14  A.   I'd never met her before.  And from my
15  understanding, that was his, like, baby mother or
16  girlfriend or whoever.  But I had never met her before.
17  Q.   But you don't know whether it was his place, her
18  place, any of that?  You didn't --
19  A.   I have no idea.
20  Q.   So the -- you said -- so the woman is inside.
21  Is she -- where is she when you get into the apartment?
22  A.   She's standing in the kitchen, just, like,
23  watching my mom from a distance.
24  Q.   Got you.  Is there anybody else in the house?
25  A.   Not -- no.  Not that I saw.

Page 30

1   Q.   Okay so the guy's outside; he waves you in.  Did
2   he follow you inside?
3   A.   No.
4   Q.   He just -- so he just took off from --
5   A.   Like, he got me to the door and then he just
6   took off.
7   Q.   Took off?  Okay.
8        And you said that he had warrants, but you said
9   that he told you that at some point.  Would that -- he
10  told you that after the fact?
11  A.   Yeah, so he told me as I was, like, walking
12  to -- like, as he was walking with me to the door, he was
13  like, I know you're going to call the cops.  Like, I can't
14  be here; I've got to go.  Like, I have a warrant; like,
15  I've got to go, and then ran off.
16  Q.   Got you.  Okay.
17       So you don't see a dog anywhere?
18  A.   No, I didn't see the dog.
19  Q.   Okay.  Was the -- so the room itself, you said
20  there was a couch.  Did you see any other door or anything
21  inside that room?
22  A.   Yeah, so there was a door.  I was told that the
23  dog was put behind that door; it was in that room.  And I
24  could hear a dog but I didn't see it.
25  Q.   Got you.  So you could hear, like, you heard

Page 31

1   barking or something?
2   A.   Yeah.  I heard barking and, like, scratching.
3   Q.   Had you ever seen this groundskeeper at Mirador,
4   had you ever seen him with a dog?
5   A.   No.
6   Q.   Okay.  So --
7   A.   I have seen him, not with a large dog.  I've
8   seen him with smaller dogs.
9   Q.   Like, just --
10  A.   Like, they were Frenchies.
11  Q.   Okay so, like, walking them or something?
12  A.   Yeah.
13       So he -- when I walked in, there were -- the
14  Frenchies were in a cage in the -- in that room.  And then
15  there was a door closed with a dog behind it that I didn't
16  see.
17  Q.   And so other than that night, you had seen him
18  with the Frenchies before?
19  A.   Yeah.
20  Q.   Where had you seen him with the Frenchies?
21  A.   Just walking around, like, on the street.  Not
22  necessarily in Mirador but just walking around.
23  Q.   Just walking around?  Had you ever seen him at
24  Mirador with those dogs?
25  A.   I think so.  Like, at the dog park at Mirador.

Page 32

1   Q.   But in January of 2022, like, around that time
2   period, it was perfectly normal to see him around
3   Mirador --
4   A.   Yeah.
5   Q.   -- walking dogs or doing whatever he was doing?
6   A.   Definitely.
7   Q.   Would you say he behaved like a tenant at
8   Mirador?  (Audio interference.)
9   A.   I didn't know that he was even like a
10  groundskeeper or that he worked there.  I thought he just
11  lived there until, like, I found out more.
12  Q.   So -- all right so you never saw the dog?
13  A.   I do, I do recall his name now:  Devin.  I think
14  it's Devin.
15  Q.   Devin?
16  A.   Yeah.  Yeah.
17  Q.   But the name, is the name something you learned
18  after all this took place or something you would have
19  gotten somewhere --
20  A.   No.  No, it's like who I knew him as.
21  Q.   As Devin?  Okay.
22  A.   Yeah.
23  Q.   So he leaves while you're helping your mother.
24  You said that the lady was sort of trying to get you out
25  of the apartment?

Page 33

1    A.   Yeah.  She was not helping my mom at all.  She
2  was just, like, trying to brush us out.  I was like, I
3  need to go to the bathroom; I need something, like,
4  anything to get this blood off of her.  Like, she's
5  passing out.  Like, I can't carry her by myself.  Like,
6  anything.
7         And she just was like, no, you've got to leave;
8  you've got to get out.  Like, leave right now.
9    Q.   So she was telling you guys to leave?
10   A.   Yeah.
11   Q.   Do you remember anything else she would have
12 sent to y'all while you were inside that apartment?
13   A.   She just kept asking if we were going to call
14 the police.
15   Q.   Got you.  So you said, as you're talking to your
16 mom, she's kind of going in and out of it?
17   A.   Yeah.
18   Q.   Is that, you know -- had your mom ever done that
19 before or was it because of the --
20   A.   No, it was because of the attack.  She was,
21 like, losing a lot of blood.
22   Q.   So you get her outside.  Your boyfriend's
23 helping you.  You guys just -- well, let me ask you this.
24 He -- what kind of a car was your boyfriend driving?
25   A.   A Range Rover.

Page 34

1    Q.   Okay so it had a back seat?
2    A.   Yeah.
3    Q.   Did you just put her in the back seat?
4    A.   Yeah.  So I sat in the back seat with her.
5    Q.   So you guys didn't call the police that night?
6    A.   No.  We immediately just went -- took her to the
7  hospital.
8    Q.   Did you guys ever talk about calling the police?
9    A.   No.  I think I was just so focused on getting
10 her to a hospital that I didn't, like, think about it.
11   Q.   In terms of time to the hospital, is that why
12 ultimately you guys just took her as opposed to, like,
13 calling an ambulance or something?
14   A.   Yeah.  It was --
15   Q.   How were you -- if -- how were you guys stopping
16 the blood?
17   A.   I had, like, rags that I was just pressing up
18 against her face.
19   Q.   Got you.  Okay.
20        How far was the hospital from where you were?
21   A.   Probably about ten minutes.
22   Q.   Okay.  So as you're on the way to the hospital,
23 are you -- is your mom saying anything to you or --
24   A.   She's, like, trying to talk.  But her lip is so,
25 like, just destroyed, that she couldn't -- like, I

Page 35

1  couldn't understand anything she was saying.
2    Q.   So when you guys get to the hospital, did you
3  help her inside?
4    A.   Yeah.  I sat with her the entire time.
5    Q.   Okay.  As she was being treated in the hospital,
6  at some point were you able to have a conversation with
7  her?
8    A.   Yeah.  I spoke to her somewhat.  She was still
9  just kind of delirious, and it was hard for her to speak.
10 But I spoke to her a little bit, trying to figure out why
11 she was there, what was going on, like, all that so . . .
12   Q.   So would you have been the one that was talking
13 to the doctors and nurses --
14   A.   Yes.
15   Q.   -- when you guys first arrived?
16   A.   Yes.
17   Q.   Okay.  Do you remember what you would have told
18 the doctors and nurses when you arrived at the hospital?
19   A.   I told them that she was attacked by a dog.
20   Q.   Did you tell them anything about where it would
21 have happened, the type of dog, anything like that?
22   A.   No.  I just said it was a large dog.  But I
23 didn't see the dog so I didn't know.
24   Q.   Okay so you -- and you stayed by her side the
25 whole time she was in the hospital?

Page 36

1    A.   Yes.
2    Q.   Okay.  So once they got your mom sufficiently
3  treated enough that you guys could even have somewhat of a
4  conversation with her, do you remember some of the things she told
5  you that night?
6    A.   She just kept saying, like, a baby -- like, that
7  was her biggest thing was like, I was trying to see a
8  baby.  I was trying to see their new dogs.  I was trying
9  to just visit.  And, like, all this happened.  She was
10 just very, like, distraught and just like, I think more
11 confused.  Like, she was a little confused so --
12   Q.   Understandably so, I could say.
13        When you got to the apartment -- so she
14 mentioned a baby.  Did you see a baby when you were in
15 there?
16   A.   I didn't.  But I, like, heard a baby.  There
17 was another, like, room in the way-way back.  Like, a lot
18 of baby stuff.  But I didn't actually see the baby.
19   Q.   By that point, to the extent there was one, it
20 had been put in another room or something?
21   A.   Yeah.  Yeah.
22   Q.   Okay.
23        So while you're in the hospital, did the doctors
24 at any point ask you or her about the status of the dog,
25 whether, you know, there was a risk for rabies or anything

Page 37

1    like that?
2        A.   Yeah, they did.  They asked me.
3        Q.   And do you remember what you told them?
4        A.   I told them I didn't know.
5        Q.   Did you make an effort to find out?
6        A.   I tried to reach out with my mom's phone to
7    Devin and ask him, like, about the dog and all that kind
8    of stuff, and didn't get a response.
9        Q.   So your mom had Devin's number?
10       A.   Yes.
11       Q.   So when you say you tried to reach out to him,
12   you said you called the number?
13       A.   Yeah, I called him.
14       Q.   And, and texted him?
15       A.   Yeah.  I texted him, like, just call me back,
16   and he never did.
17       Q.   And at least that night, you never got a
18   response?
19       A.   Yeah, no.  And I didn't, I didn't speak to him
20   at all after that.  Like, I haven't spoken to him.
21       Q.   So at no point that night did y'all get any,
22   like, proof of vaccination or anything like that?
23       A.   No.
24       Q.   Okay.  Did your mom -- so let me ask you
25   specifically, that night, did your mom tell you anything

Page 38

1    about the bite itself as to how it happened?
2        A.   She said that she was trying to, like, pet the
3    dog and cuddle the dog.  And, like, she got, like, close
4    to the dog.  And then it just attacked her out of nowhere.
5        Q.   Did you think that your mom, in talking with
6    her -- were you able to notice or see that she had been
7    drinking that evening?
8        A.   Yeah, she was.
9        Q.   And how did you know that?
10       A.   Just -- I've known her so long, I can just tell.
11       Q.   Can you kind of talk about that a little bit?
12   Like, when you say you can tell, like, what types of
13   things were you able to tell?
14       A.   It's just, like, her mannerisms and, like, just
15   certain -- I don't know.  I can just pick up on it, like
16   how she speaks or, like -- because I'd talked to her on
17   the phone previously that night, and she just sounded
18   intoxicated.
19       Q.   So, like, why -- to clarify, just for my own
20   memory, you're saying you had talked to her while you
21   were, like, visiting with your boyfriend?
22       A.   I called her, telling her I was going to
23   be over there.
24       Q.   So, like, when you got off around 5:00ish?
25       A.   Yeah.  I let her know that I'd be over there,

Page 39

1    and that's it.
2        Q.   And so you, like, give her a call saying hey, by
3    the way, I'm in the area --
4        A.   Yeah.
5        Q.   -- which I'm sure was normal for you guys?
6        A.   Yeah, or, like, to see if she needed anything
7    before I got over there.
8        Q.   And so when you called her around like 5:00 or
9    6:00, at that point she sounded intoxicated?
10       A.   I would -- yeah.  I wouldn't say like she was
11   drunk.  But she -- like, I could just tell she had maybe
12   one drink, you know?
13       Q.   Like, slurring her words or something?
14       A.   It's more just like a more upbeat, like, she's a
15   little bit more happy.
16       Q.   Do you know her generally to, if she was going
17   to have a drink, that she would have one around 5:00 or
18   6:00?
19       A.   Yeah.
20       Q.   Would she continue to drink until she went to
21   bed?
22       A.   Probably, yeah.  Usually.
23       Q.   Okay.  So it's fair to say she probably kept
24   drinking after that?
25       A.   Yeah.

Page 40

1        Q.   So when you were at the hospital, you said that
2    you could kind of tell by her mannerisms.  And is it the
3    same kind of thing, you could notice slurring?
4        A.   Yeah.  Definitely.  I mean, maybe it was
5    amplified because of the attack and everything, but
6    definitely.
7        Q.   So when you say amplified, she appeared more
8    drunk than she was or -- sorry -- she appeared more
9    intoxicated than she did hours earlier?
10       A.   I think it's not necessarily that.  I think it
11   was more that the, like, situation had amplified, like,
12   those feelings.  And, like, her slurring, because of her
13   lip and everything, it just made it seem like it was more.
14   But I don't think it was much more; I think it was just
15   the situation.
16       Q.   Is it fair to say, you know, based on her
17   mannerisms in terms of your experience with her, like, she
18   wouldn't have been okay to -- like, taking the bite out of
19   it, she probably wouldn't have been okay to drive a car at
20   her level of intoxication?
21       A.   I wouldn't say drive a car.  But she could,
22   like, walk anywhere.
23       Q.   So do you remember about how long you guys had
24   been at the hospital at that point?
25       A.   They took her back immediately, because of the

Page 41

1  severity.  I probably was there with her for two or three
2  hours before I went home.  And then my aunt came to be
3  with her.
4      Q.   That's Ms. Lisa Armistead?
5      A.   Yeah.
6      Q.   So at that -- like, middle of the night at some
7  point?
8      A.   Yeah, because I just -- I needed to go to sleep.
9  And so my aunt came to be with her.
10     Q.   So by the time you leave, you guys had had a
11 little bit of a conversation and at that point had been
12 unsuccessful in terms of getting ahold of Devin?
13     A.   Yeah.  Yeah.
14     Q.   Okay.  So was she -- she was released that
15 morning, right?
16     A.   Yes.
17     Q.   Did you speak with her after she got back home?
18     A.   Yeah.
19     Q.   Did -- was it your aunt that took her home?
20     A.   Yes.
21     Q.   Okay.  When did you speak -- when is the first
22 time you remember speaking to her after she got home?
23     A.   I think she called me immediately.  Like, on the
24 way, she called me.
25     Q.   Do you remember your conversation with her?

Page 42

1      A.   It was more just making sure she was all right,
2  what she needed me to bring her.  It was pretty brief
3  because I was going to come visit her once I got off work.
4      Q.   Which would have been around 5:00 the next day?
5      A.   Yeah.
6      Q.   And did you end up visiting her?
7      A.   I did.
8      Q.   I assume at that point y'all talked a little
9  more in depth about what had happened?
10     A.   Yeah.  Yeah.
11     Q.   Do you remember what she told you?
12     A.   She told me that she had gone over there to see
13 the new baby and to visit Devin and meet his baby mom and
14 just see them.  And she said that she was sitting on the
15 couch with them.  Everything was fine.
16          And they brought the dog out, and it was like --
17 my mom was petting the dog, and it seemed fine.  It was
18 cool.  And she -- I guess the dog, like, had gotten up on
19 her lap, like, while she was petting.  And then it just
20 fully mauled her out of, like, out of nowhere is what she
21 said.
22     Q.   Do you remember your mom saying whether she had
23 ever been to that apartment before?
24     A.   No.
25     Q.   Did she talk to you at all about her

Page 43

1  relationship with Devin?
2      A.   I mean, briefly.  It was just more they -- she
3  had a lot of issues with her apartment.  And he fixed --
4  like, he was a maintenance guy, so he fixed a lot in her
5  apartment.  And they were just -- I guess got along
6  decently.
7          My mom's pretty social; she, like, makes friends
8  with everyone.
9      Q.   So it's not abnormal for her to, you know, if
10 someone has a new baby, that she goes and sees them?
11     A.   Yeah.  Especially, like, in that community, it's
12 just kind of close knit so --
13     Q.   Yeah.
14          So she had stated that they were inside the
15 apartment.  She's visiting.  The dog comes in.  She goes
16 to pet the dog, and the dog attacks her.
17          Had she mentioned that she had ever seen the dog
18 before?
19     A.   She had, I think.  Yeah.
20     Q.   Did she mention where she had seen it?
21     A.   I think she said she saw him, like, walking it.
22 She'd, like, just seen him with the dog before.
23     Q.   But did she mention where he would have been
24 walking it?
25     A.   Mirador.

Page 44

1      Q.   Mirador.  Okay.
2          Did your mom -- so did your mom know him as
3  someone who lived at Mirador?
4      A.   She knew him as the maintenance or groundskeeper
5  for Mirador.
6      Q.   So she had seen him walking the dog at Mirador
7  and around Mirador.
8          Was it her -- like, was it the baby mom that
9  lived at Silver Oaks?
10     A.   I guess.  I mean, I'm not sure.
11     Q.   Do you know whether or not Mister -- or do you
12 know whether or not Devin would have had -- whether he had
13 an apartment at Mirador?
14     A.   I don't know if he did or not.  I'm not sure
15 what his living situation was.
16     Q.   But she had seen him walking the dog at Mirador?
17     A.   Yeah.  So --
18     Q.   Okay.  Did she describe, did she describe the
19 dog to you?
20     A.   She said it was like a Malinois or like a big
21 dog, black dog or dark-colored dog.  But . . .
22     Q.   Dark-colored dog?  Like a black or a brown?
23     A.   Yeah.  Like a -- yeah.  Yeah.  Dark brown.
24     Q.   I'm sorry, this is just because I can't hear
25 you.  Did you say a Malinois?

Page 45

1    A.   Yeah.  That's what she kept saying.  But I don't
2  know how accurate that is.
3    Q.   Right.  Had -- did she or you, did you guys ever
4  see the dog ever again?
5    A.   No.  I didn't.  I don't know if she did.
6    Q.   When you come visit her the next day, did you
7  guys talk about calling the police?
8    A.   No.  She, she did, I think.  And I was like, do
9  whatever you think you need to do.
10         And she just kept trying to contact Devin, like,
11  reach out to him first and get information on vaccines and
12  stuff like that for the dog and, like, where the dog's at
13  and all that.  And he was responsive to her at first; he
14  even came and checked on her afterwards.  And then he
15  just, like, stopped responding and stopped everything, all
16  communication.
17    Q.   So when you say that he was responsive at first,
18  were you privy to some of those conversations?  Did you
19  see some of those texts?
20    A.   No.  It was just what my mom was telling me.
21    Q.   Got you.  Were you there when he came and
22  checked on her?
23    A.   No.
24    Q.   Did she tell you about that?
25    A.   Yes.

Page 46

1    Q.   What did she -- can you kind of describe to
2  me -- he just showed up to see how she was?
3    A.   Yeah, so he showed up to make sure that she was
4  okay.  He brought her, like, a blanket and some food and
5  whatever.
6    Q.   And at some point I guess would have given her
7  the vaccine records or something?
8    A.   Yeah, that's what he said -- she said he was
9  trying to get them to her.  And then he was also saying
10  that he was going to send the dog off and get it out and,
11  like, get rid of it, basically.  That's what he was trying
12  to explain to her.
13    Q.   But at some point he stopped responding?
14    A.   Yeah.
15    Q.   Do you know about how long it would have been
16  after all this that he stopped responding?
17    A.   I think it was like a few days.
18    Q.   Okay.  So once he stopped responding -- well,
19  let me ask you this.
20         Do you know what would have prompted him to stop
21  responding to your mom?
22    A.   I think my mom was just very adamant on wanting
23  proof of everything and, like, are you actually getting
24  rid of this dog?  What's the vaccine look like?  Like, all
25  that kind of stuff.  And I think he just got, like -- I

Page 47

1  don't know.  He couldn't provide any of that.  So he just
2  stopped responding.
3    Q.   So you don't know whether or not a vaccine
4  record was ever produced?
5    A.   I'm not sure, yeah.  I can't remember.  Like, I
6  think -- I thought he gave it to her but I just -- I can't
7  remember.
8    Q.   Sure.  But you yourself never had any
9  conversation with Devin --
10    A.   No.
11    Q.   -- or the, the baby mama?
12    A.   No.
13    Q.   And you never saw them after this?
14    A.   No.
15    Q.   Did you or your mother or your boyfriend ever,
16  you know, contemplate reporting this to Silver Oaks?
17    A.   No.  No.
18    Q.   Did you ever talk about it?
19    A.   No.
20         I mean, I think my mom did.  My mom was very
21  adamant about, like, talking to the police, talking with
22  people and, like, doing that kind of stuff.  But not me or
23  my boyfriend, never.  I felt like that was more her.
24    Q.   So you don't know if your mom ever contacted the
25  police?

Page 48

1    A.   I don't believe she did.
2    Q.   Or animal control?
3    A.   I think she might have called animal control but
4  I'm not, like, certain, no.
5    Q.   You don't know if she ever talked to Silver
6  Oaks?
7    A.   No.
8         I mean, she said a lot of things.  She said she
9  wanted to do a lot of things.  I just don't know if she
10  actually followed through with any of it.
11    Q.   When you say she said she wanted to do a lot of
12  things, do you remember some of the things she was talking
13  about wanting to do?
14    A.   Just calling the police, calling Silver Oaks,
15  calling animal control, calling a lawyer, doing all that
16  kind of stuff.
17    Q.   How early on -- so is this all happening the day
18  she gets back from the hospital?
19    A.   I would say like within the next, like, the
20  following couple weeks.  She had, like, a debate in her
21  mind on whether she wanted to, like, take action or not.
22    Q.   Do you know whether or not she ended up
23  contacting a lawyer over those couple weeks?
24    A.   I don't know when she actually did end up
25  contacting a lawyer.

Page 49

1    Q.   Okay.  So would you generally agree with me
2    that -- well, let me ask you this.
3         Do you own dogs?
4    A.   Yes.
5    Q.   What kind of dogs do you have?
6    A.   I have a pit bull Dalmatian.
7    Q.   Oh, a mix?
8    A.   Yeah.
9    Q.   I bet that is a funky-looking dog, in a good
10   way.
11   A.   No, she's the best.  She's very unique.
12   Q.   That has to be a big dog.
13   A.   Yeah.  She's pretty big.
14   Q.   Man, a pit bull Dal- -- I'm trying to, like,
15   conceptualize that in my brain.
16   A.   She's almost all white and then has spotted ears
17   and a spotted tail.
18   Q.   Man.  How long have you had that dog?
19   A.   Eight years.
20   Q.   Wow.
21   A.   That's my baby.
22   Q.   Did you get her as a puppy?
23   A.   Yeah.
24   Q.   Man.
25   A.   Yeah, so she's ten now but -- so I had her when

Page 50

1    she was two.
2    Q.   Man oh man.  How much does a dog like that
3    weigh?
4    A.   She's at 85 pounds.
5    Q.   Good Lord.  Okay.
6    A.   And she's a grumpy old lady.
7    Q.   Has she always been grumpy?
8    A.   Yeah.  Yeah.
9    Q.   So you know generally -- so you know what it's
10   like to be around bigger dogs?
11   A.   Yeah.  Yeah.  Very much so.
12   Q.   Do you know -- does your -- has your mom ever
13   had dogs?
14   A.   Yeah.  She's -- we've always had dogs.  I mean,
15   that was -- Kali, my dog, she's -- my mom's been around
16   her forever, like, since I got her.  And then we had a dog
17   previously to that; we had a dog before that.  So . . .
18   Q.   Would you, would you generally agree with me
19   that, you know, if you're unfamiliar with an animal, that
20   reaching down to, like, pet it or get in its face is
21   generally, probably unsafe?
22   A.   Yeah.  Absolutely.
23        And my mom was very cautious about that.  She
24   had a Saint Bernard growing up.  Like, she's very used to
25   big dogs.

Page 51

1         And from my understanding, she was petting it
2    for a minute before it even attacked her.
3    Q.   Would you, you know, in that same vein,
4    generally agree that, you know, interacting with a dog
5.   that you're unfamiliar with in that way, while under the
6    influence of either alcohol or drugs or something, is also
7    unsafe?
8    A.   Yeah.
9    Q.   So your mom obviously is upset.  And the couple
10   weeks after everything happened, she's unable to get in
11   contact with Devin.  Was she still treating?  Like, was
12   she still going to a doctor?
13   A.   I believe so.  She had follow-up visits with
14   Grady and stuff like that.
15   Q.   Was she working before the bite?
16   A.   I'm not sure.  I know -- I think so.  I think --
17   yes, she was.  She was working at Kroger, I believe, at
18   the time.
19   Q.   Do you know if she kept working?
20   A.   She had to stop working.
21   Q.   How long was she out of work?
22   A.   Out of work?
23   Q.   Yeah.  To your knowledge.
24   A.   It was a long time.  She didn't have a job up
25   until recently.

Page 52

1    Q.   Was that due to the bite?
2    A.   Yes.
3         She was a little -- she was very traumatized,
4    and she didn't really want to be seen by anyone.  So --
5    and she -- it was just hard for her to, like, go out in
6    general.
7         So she ended up moving in, after Mirador, she
8    ended up moving into a friend's house where she didn't
9    have to pay any bills, so that she could get back on her
10   feet without needing a job.
11   Q.   And you might not know this but how was she
12   collecting an income -- was she collecting any income
13   while she was out of work?
14   A.   No.
15   Q.   No unemployment, disability, anything like that?
16   A.   Not that I -- I think she was on, like, EBT.
17   She'd get EBT, like, food stamps.  But --
18   Q.   So how was she paying for Mirador?
19   A.   My aunt was helping her.
20   Q.   So you said she ended up moving into a house
21   with a friend?
22   A.   Yeah.
23   Q.   Do you know about how long after this incident
24   it would have been when she moved out of Mirador?
25   A.   At least six months, I think.  Like, at least.

Case 1:24-cv-02583-TRJ    Document 18-2    Filed 12/12/24    Page 72 of 120
Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

53..56

Page 53

1    Q.  Was it fair to say sometime in 2022 she moves
2    out of Mirador?
3    A.  Yeah, something like that.
4    Q.  Okay.  So is it fair to say that it was at least
5    your and her understanding, in January of '22, when this
6    whole thing happens, that either Mister -- Devin was
7    either working or living at Mirador?
8    A.  Yeah.
9    Q.  But you guys never saw him again after this
10   whole thing happened?
11   A.  Yeah, so I don't -- like, I don't think that he
12   was still working there.  It didn't seem like it.
13   Q.  So did you or your mom ever talk about reporting
14   him to Mirador?
15   A.  No.
16   Q.  Was your mom familiar with the employees at
17   Mirador, like the groundskeepers, the office, any of those
18   people?
19   A.  Yeah, relatively.
20   Q.  Did she talk to them somewhat regularly?
21   A.  Yeah.  I think she, like, let them know what was
22   going on to an extent.  But -- because, I mean, you see
23   her and you ask so that kind of (audio interference).
24   Q.  But to your knowledge, she never, like, reported
25   that she believed it was like a -- potentially an employee

Page 54

1    of Mirador?
2    A.  No, because I think at that point he didn't work
3    there.
4    Q.  Okay.  But she didn't know that one way or the
5    other?
6    A.  Yeah.  Not for certain.
7    Q.  And as we sit here today, you know, do you know
8    Devin's last name?
9    A.  No.
10   Q.  You never talked to Devin again?
11   A.  No.
12   Q.  Your boyfriend's never talked to Devin again?
13   A.  No.
14   Q.  You have no knowledge of whether Mr. Terrell --
15   sorry, that -- for clarification's sake, it's our
16   understanding his last name is Terrell.  Does that ring a
17   bell?
18   A.  No.  I had no idea what his last name was.
19   Q.  You'd never heard that?
20       So it's your understanding that Mr. Terrell, or
21   Devin, or whoever this person is, you have no knowledge of
22   whether he was living at Mirador or living at Silver Oaks?
23   A.  Yeah, I have no idea.
24   Q.  You just believed that the bite itself, the
25   aftermath at least, took place inside an apartment at

Page 55

1    Mirador or -- sorry -- at Silver Oaks?
2    A.  At Silver Oaks, yes.
3    Q.  Yeah.  So -- sorry, one second.  I'm going
4    through my notes here.  I'm sorry I've been a little
5    disjointed here.
6        So other than you and your boyfriend, was there
7    anyone else that was around, standing outside, you know,
8    sort of observing what was going on when this -- in the
9    aftermath of the incident?
10   A.  I didn't see anyone that I know of.  No.  I
11   didn't see anyone, no.
12   Q.  And you never got the baby mama or girlfriend's
13   name?
14   A.  No.
15   Q.  So, to your knowledge, there would be no other
16   witnesses to this other than potentially your boyfriend?
17   A.  Yeah.
18   Q.  So, to the best of your knowledge, obviously,
19   based on what you're saying today, it would make no sense
20   to you if this bite would have been described to have
21   happened at a mailbox?
22   A.  What -- I -- what do you mean?
23   Q.  Well, like, if, you know, someone were to
24   describe this bite as having happened at a mailbox, that
25   wouldn't be accurate?

Page 56

1    A.  No.
2    Q.  Or, you know, on the sidewalk?
3    A.  No.
4    Q.  Or outside, generally?
5    A.  No.  It was inside.
6    Q.  Okay.
7        And other than our conversation today, you
8    haven't been contacted by anybody else to discuss what
9    went on that day?
10   A.  No.
11   Q.  Okay.  And the last time you and your mother
12   talked about this whole thing would have been about a
13   month ago?
14   A.  Yeah.
15   Q.  Do you remember what that conversation would
16   have been about?
17   A.  It was just more along the lines, her asking me
18   to do this.
19   Q.  Did she say anything to describe what this was?
20   A.  Just to talk about, like, the case and to talk
21   about the dogbite that happened.
22   Q.  Did you guys talk about what happened at that
23   time?
24   A.  Somewhat.  But it wasn't like -- we had already
25   been through it so we just didn't really need to, like, go

Page 57

1  in depth.
2      Q.  So you -- it's fair to say you and your mother
3  don't talk about this case regularly?
4      A.  No.  No.
5      Q.  Okay.  And you have no knowledge as to what's
6  going on with this case?
7      A.  No.
8      Q.  Okay.
9      MR. ALBERTSON:  Jeremy, I'm going to go through
10  my notes.  I think I might be done here.  So if we
11  want to go off the record for a couple minutes?
12      MR. FREIMAN:  Yeah.  That's fine.  I had a
13  couple follow-ups that I would --
14      MR. ALBERTSON:  Oh, yeah.  Sorry, Jeremy.
15      MR. FREIMAN:  If you want to let me do that
16  while you review your notes and then we can --
17      MR. ALBERTSON:  Yeah, yeah.  Let's do that.
18  Let's do that.
19      MR. FREIMAN:  Got you.
20      Savannah, just a couple follow-up questions.
21  Can you guys hear me there all right?  Because I know
22  the microphone's going kind of towards her.
23      MR. ALBERTSON:  You're coming in great for me.
24      MR. FREIMAN:  All right.  Perfect.  Just a
25  couple follow-up questions here.  Just want to

Page 58

1  confirm.
2              EXAMINATION
3  BY MR. FREIMAN:
4      Q.  You didn't actually see this incident take
5  place, right?
6      A.  No.
7      Q.  And so all the questions that defense counsel
8  has asked you so far in which he alludes to your
9  understanding of the incident, your understanding of the
10  incident really comes from the people who were there,
11  including your mother, right?
12      A.  Yeah.  And, and the context clues that I had
13  from being there.
14      Q.  Got you.  You -- give me a second here.  I'm
15  just trying to organize my thoughts.
16      You mentioned earlier that you suspected that
17  your mother may have been under the influence of alcohol
18  at the time; is that right?
19      A.  Yes.
20      Q.  And was that something that was clear to you
21  walking in there by anything other than the way she was
22  talking?  Was there a smell of alcohol or anything like
23  that?  Did you see any alcohol?
24      A.  No, I did not see any alcohol.  And I --
25  honestly, the only thing I could smell was blood.

Page 59

1      Q.  Got you.  And so your impression that she may
2  have been under the influence comes from either, one, the
3  fact that you know that she tended to have a drink around
4  that time of day --
5      A.  Yeah.
6      Q.  -- or two, how she was acting following the
7  incident?
8      A.  Yeah.  I think it was more the conversation I
9  had with her prior.
10      Q.  Got you.
11      A.  And just my -- the patterns, like, because I
12  just assumed.
13      Q.  Do you think, in trying to gauge her level of
14  intoxication, the injuries she sustained in the attack may
15  have interfered with your ability to adequately understand
16  the level of intoxication she maybe had?
17      A.  So you're asking, like, do you think her
18  injuries -- like, could you just clarify?
19      Q.  Yeah, so let me -- to put it more simply, do you
20  think that the fact that her mouth or lip or tongue may
21  have been damaged may have made it seem like she was much
22  drunker than she actually was?
23      A.  Yeah.  Absolutely.
24      I don't think she was that intoxicated.  I think
25  she maybe had one or two or three drinks, at most.  But I

Page 60

1  think that because of her injuries and her, like, trauma
2  in that moment, that just made it seem maybe more or --
3  so . . .
4      Q.  And just one last thing here, it kind of goes
5  back to what I was mentioning before.
6      Defense counsel asked you, you know, was this
7  incident more or less inside or outside.  Your
8  understanding of where it took place again comes from your
9  mother and just the context of when you got there rather
10  than any direct witnessing of the event?
11      A.  Yeah.
12      Q.  Okay.  Great.
13      MR. FREIMAN:  That's all I've got.
14      MR. ALBERTSON:  Ms. Williamson, unless you need
15  a comfort break, I just have a couple questions and
16  we can wrap it up here.  Are you okay right now?
17      THE WITNESS:  I'm good.
18      MR. ALBERTSON:  Okay.
19              REEXAMINATION
20  BY MR. ALBERTSON:
21      Q.  So, just briefly, so if any vaccination records
22  or records about this dog whatsoever were to have been
23  produced, they weren't ever given to you?
24      A.  No.  I never saw them.
25      Q.  Okay.  That would have been something that

Page 61

1  either your mom -- however they got it, it was not from
2  you?
3      A.  Yeah, no.  I never saw it.
4      Q.  And you never had any direct conversation at any
5  point with, with Devin?
6      A.  No.
7      Q.  Okay.  And speaking of Devin, you yourself, you
8  had only ever seen him at Mirador?
9      A.  I've seen him at Mirador or, like, on the street
10  by Silver Oaks, Silver Oak, or, like, in the area.  Like,
11  it was never a specific spot, I guess; it was more like
12  walking around on the street or, like, around both
13  apartments, or at Mirador.
14      Q.  Got you.  But you had only ever seen him with
15  dogs before the night that this happened?  In terms of
16  seeing him with dogs, that had only ever been when he was
17  walking at Mirador?
18      A.  Yeah, or outside of Mirador, like, on the
19  street.
20      Q.  And in fact, I think you said you never actually
21  saw the dog that was involved in this incident?
22      A.  Yeah, no.
23      Q.  But the only description you'd ever heard of the
24  dog, in terms of someone seeing the dog, was when he was
25  walking at Mirador?

Page 62

1      A.  Yeah.
2      Q.  Okay.  Do you know if your boyfriend -- did you
3  and your boyfriend ever discuss this incident?
4      A.  No.
5      Q.  So he was just sort of a support?
6      A.  Yeah.
7      Q.  Did he ever make any comments to you about Devin
8  after the incident?
9      A.  No.
10      Q.  Do you know if he ever saw this dog?
11      A.  He didn't, because I -- he -- I asked -- I did
12  ask him if he knew the dog, if he had seen it, and he said
13  no.  That was really the only conversation we had about
14  it, though.
15      Q.  Okay.  So neither you nor him had ever seen this
16  dog, but you'd only ever seen him walking dogs while he
17  was either working or living at Mirador?
18      A.  Yeah.
19      Q.  But you don't know whether he lived at Mirador?
20      A.  I'm not sure.
21      Q.  And you don't know whether he ever lived at
22  Silver Oak?
23      A.  No.  I'm not sure.  It seemed like it, but I
24  couldn't say for sure.  Like, that seemed like his home,
25  the way he was, like, acting and, like, how it was set up.

Page 63

1  There was pictures of him there.  But, like, I couldn't
2  say he lived there; I didn't know for sure.
3      Q.  But did he also behave like he was a resident at
4  Mirador walking around the grounds?
5      A.  Yeah, because Silver Oak, like, was just
6  apartments whereas Mirador had, like, a dog park.  It had
7  a playground.  It had a pool.  So maybe he just, because
8  he was in maintenance, he took advantage of the perks at
9  Mirador.  But -- yeah.
10      Q.  And to this day, you've never spoken with any
11  person that works at Silver Oaks?
12      A.  No.
13          MR. ALBERTSON:  Okay.  I think I'm done.  Well,
14  my last question.
15  BY MR. ALBERTSON:
16      Q.  Is there anything that you feel that I or Jeremy
17  need -- that would be good information for us to have in
18  this case, that you haven't gotten to say today?
19      A.  I don't think so, no.
20      Q.  All right.
21          MR. ALBERTSON:  Well, then I don't have anything
22  else, Jeremy, unless you have some follow-ups?
23          MR. FREIMAN:  I think I'm set.
24          And that reminds me, we need to go back and talk
25  about reading and signing.  Like I said before, I

Page 64

1  think we got a pretty clean record here is my general
2  impression.  So it's, again, it's up to you if you
3  want to have to go back and read or review this, or
4  if you're good with just waiving signature.
5          THE WITNESS:  I'm good.
6          MR. FREIMAN:  All right.  She'll go ahead and
7  waive.  Okay.
8          (Proceedings concluded at 11:52 a.m.)
9      (Pursuant to Rule 30(e) of the Federal Rules of Civil
10  Procedure and/or O.C.G.A. 9-11-30(e), the signature
11  of the witness has been waived.)

Case 1:24-cv-02583-TRJ    Document 18-2    Filed 12/12/24    Page 75 of 120
Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

65..67

Page 65

DISCLOSURE OF NO CONTRACT

1

2

3    I, Phillip M. Lane, do hereby disclose pursuant to

4  Article 10.B of the Rules and Regulations of the Board of Court

5  Reporting of the Judicial Council of Georgia, that WSG

6  Reporting, LLC was contacted by the party taking the deposition

7  to provide court reporting services for this deposition and

8  there is no contract that is prohibited by O.C.G.A. 15-14-37(a)

9  and (b) or Article 7.C of the Rules and Regulations of the

10  Board for the taking of this deposition.

11    There is no contract to provide court reporting services

12  between WSG Reporting, LLC or any person with whom WSG

13  Reporting, LLC has a principal and agency relationship nor any

14  attorney at law in this action, party to this action, party

15  having a financial interest in this action, or agent for an

16  attorney at law in this action, party to this action, or party

17  having a financial interest in this action.  Any and all

18  financial arrangements beyond our usual and customary rates

19  have been disclosed and offered to all parties.

20    This 18th day of November 2024.

21

22

23    PHILLIP M. LANE, CVR, CCR 4956-9977-6870-8096

24

25

Page 66

1              C E R T I F I C A T E

2  STATE OF GEORGIA:

3  COUNTY OF DEKALB:

4

5    I hereby certify that the foregoing deposition was taken

6  down as stated in the caption and the proceedings were reduced

7  to writing by me.

8    I further certify that the transcript is a true and

9  correct record of the evidence given at the said proceedings.

10    I further certify that I am neither a relative or employee

11  or attorney or counsel to any of the parties, nor financially

12  or otherwise interested in this matter.

13    This the 18th day of November 2024.

14

15

16  PHILLIP M. LANE

Certified Court Reporter

17  Certification No. 4956-9977-6870-8096

18

19

20

21

22

23

24

25

Page 67

FIRM DISCLOSURE

1

2

3

Pursuant to Article 10B of the Rules and Regulations of
4  the Board of Court Reporting of the Judicial Council of
Georgia, I make the following disclosures:
5
6  WSG Reporting, LLC is not disqualified for a
relationship of interest under the provisions of
7  O.C.G.A. Section 9-11-28(c)
8
WSG Reporting, LLC will not be taking this deposition
9  under any contract that is prohibited by O.C.G.A.
Section 15-14-37(a) and (b)
10
11  WSG Reporting LLC has no exclusive contract to provide
reporting services with any party to the case, any
12  counsel in the case, or any reporter or reporting agency
from whom a referral might have been made to cover this
13  deposition.
14
WSG Reporting, LLC will charge its usual and customary
15  rate to all parties in the case and a financial discount
will not be given to any party to this litigation.
16  Date:  November 18, 2024
17
18
19
20
22  WHITNEY S. GUYNES, CCR
WSG REPORTING
23
24
25

---

**1**

10:46  4:3
11:52  64:8
1261  11:13
19  15:12
1999  9:2

---

**2**

20  15:12
2000  15:15
2019  13:9,10,11
2020  13:9,14,23 15:18
  16:10
2021  13:5 15:18
2022  9:8 12:11 15:19
  16:15 17:13,19 19:14,17,
  18 32:1 53:1
2024  4:2 12:5
22  53:5
2304  12:8
25  15:24

---

**3**

30(e)  64:9
30310  11:14
30328  12:8
31  9:8 15:19 19:14

---

**5**

570  11:22
5:00  20:1,20 39:8,17
  42:4
5:00ish  38:24

---

**6**

678 907-7123  17:17
6:00  20:21 39:9,18

---

**7**

7  9:2

---

**8**

8  4:2
85  50:4

---

**9**

9-11-30(e)  64:10
99  15:15
9:00  20:1 23:25

---

**A**

a.m.  4:3 64:8
ability  7:6 9:18 59:15
abnormal  43:9
Absolutely  50:22 59:23
accurate  45:2 55:25
Act  4:8
acting  59:6 62:25
action  10:22 48:21
active  22:12
adamant  46:22 47:21
address  11:10,21 12:1,7,
  19 15:20
addresses  17:11
adequately  59:15
advantage  63:8
affect  9:17
aftermath  54:25 55:9
agree  4:11 49:1 50:18
  51:4
agreeable  4:9
Agreed  4:14
agreement  4:6
ahead  64:6
ahold  17:11 41:12
ALBERTSON  4:4,15,
  19 5:12,16 6:15 7:15
  8:12,19 57:9,14,17,23
  60:14,18,20 63:13,15,21
alcohol  51:6 58:17,22,
  23,24
aliases  8:24
alludes  58:8
ambulance  34:13
amplified  40:5,7,11
and/or  64:10

---

animal  48:2,3,15 50:19
Annes  11:22 12:2,5
answers  7:10
anymore  21:22
apartment  12:15,17
  14:20 15:2,21 16:5,18
  27:6,20 28:7,18 29:6,9,
  21 32:25 33:12 36:13
  42:23 43:3,5,15 44:13
  54:25
apartments  12:19 13:15
  14:2 15:18 61:13 63:6
apologize  17:10
appeared  40:7,8
area  22:24 24:17 39:3
  61:10
Armistead  13:20 14:13,
  22 41:4
arms  28:18
arrests  18:13
arrived  35:15,18
assume  6:16 42:8
assumed  28:7 59:12
Atlanta  9:4,5 11:13
  15:22
attack  33:20 40:5 59:14
attacked  35:19 38:4
  51:2
attacks  43:16
attention  27:13
attorneys  9:25
audio  32:8 53:23
aunt  41:2,9,19 52:19
aware  9:7 10:15,21 11:1

---

**B**

baby  29:15 36:6,8,14,16,
  18 42:13 43:10 44:8
  47:11 49:21 55:12
back  7:5,6 11:18 17:9
  19:17 20:14 23:25 34:1,
  3,4 36:17 37:15 40:25
  41:17 48:18 52:9 60:5
  63:24 64:3
background  19:11
bad  6:19,23 20:10
barking  31:1,2
based  40:16 55:19
basic  5:18

---

basically  28:16 46:11
bathroom  28:5,13,15
  33:3
bed  39:21
begin  28:25
beginning  20:15
behave  63:3
behaved  32:7
believed  53:25 54:24
bell  54:17
Bernard  50:24
bet  49:9
big  44:20 49:12,13 50:25
bigger  50:10
biggest  36:7
bills  52:9
birth  9:1
bit  7:16 17:10 20:14
  24:22 28:23 35:10 38:11
  39:15 41:11
bite  38:1 40:18 51:15
  52:1 54:24 55:20,24
black  44:21,22
blanket  46:4
blood  28:12 33:4,21
  34:16 58:25
born  9:3 15:15
boyfriend  16:4,6 20:7,
  17 21:6,9 22:17,25 23:24
  26:11,13 27:2,7,15,17
  28:19 33:24 38:21 47:15,
  23 55:6,16 62:2,3
boyfriend's  16:6 20:19
  26:18 33:22 54:12
brain  49:15
break  6:1,10 20:13
  28:24 60:15
breaks  6:18
briefly  4:25 43:2 60:21
bring  5:11 42:2
brought  42:16 46:4
brown  44:22,23
brush  33:2
buildings  16:20
bull  49:6,14

---

**C**

cage  31:14

---

call  20:9,23 25:8 28:8
  30:13 33:13 34:5 37:15
  39:2
called  25:24 37:12,13
  38:22 39:8 41:23,24 48:3
calling  34:8,13 45:7
  48:14,15
calls  25:9
Camel  23:19
Camels  23:16,23
car  27:16,17 28:20 33:24
  40:19,21
Carolyn  17:2
carrier  17:18
carry  28:17 33:5
case  10:16,19,22 56:20
  57:3,6 63:18
cautious  50:23
changed  17:14
charges  18:15,19
checked  45:14,22
children  17:21
cigarettes  22:3 23:13,15
City  11:9
city's  11:24
Civil  4:7 64:9
clarification's  54:15
clarify  38:19 59:18
clean  7:12 8:1,8 64:1
clear  58:20
close  15:25 26:24 38:3
  43:12
closed  31:15
clues  58:12
code  11:23
coherent  9:19
collecting  52:12
comfort  60:15
commenced  4:3
comments  62:7
common  22:7,22 24:15,
  20
communication  45:16
community  22:10 43:11
company  19:22
completed  17:24
complex  16:5
conceptualize  49:15

Case 1:24-cv-02583-TRJ    Document 18-2    Filed 12/12/24    Page 77 of 120
Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

2

concluded 64:8
confirm 58:1
confused 36:11
contact 45:10 51:11
contacted 47:24 56:8
contacting 48:23,25
contemplate 47:16
context 58:12 60:9
continue 39:20
continuing 28:1
control 48:2,3,15
conversation 8:4 35:6
36:4 41:11,25 47:9 56:7,
15 59:8 61:4 62:13
conversations 45:18
convictions 18:15
cool 42:18
cops 30:13
correct 5:5 15:11
correctly 20:24
couch 27:24,25 30:20
42:15
counsel 4:6,9 58:7 60:6
couple 6:11 24:8 48:20,
23 51:9 57:11,13,20,25
60:15
court 7:4
crazy 15:14
criminal 18:13
crosswalk 24:21
cuddle 38:3

D

dad's 8:23
Dal- 49:14
Dalmatian 49:6
damaged 59:21
Dark 44:23
dark-colored 44:21,22
date 9:1,10 19:13
dating 16:9
day 7:21,22 19:23 42:4
45:6 48:17 56:9 59:4
63:10
days 46:17
deal 28:25
debate 48:20
Decatur 14:23

decently 43:6
def- 21:3
defense 58:7 60:6
delirious 25:14 35:9
deposition 4:1,4,11,12
5:13 6:11 7:18 8:6 9:22
depositions 12:23
depth 42:9 57:1
describe 27:22 44:18
46:1 55:24 56:19
description 61:23
destroyed 34:25
Devin 32:13,14,15,21
37:7 41:12 42:13 43:1
44:12 45:10 47:9 51:11
53:6 54:10,12,21 61:5,7
62:7
Devin's 37:9 54:8
difficult 28:23
direct 60:10 61:4
directing 27:5
disability 52:15
discovery 4:6
discuss 5:9 56:8 62:3
discussed 4:20,23
disjointed 55:5
distance 24:19 29:23
distraught 36:10
divide 23:17
doctor 51:12
doctors 35:13,18 36:23
dog 28:2 30:17,18,23,24
31:4,7,15,25 32:12
35:19,21,22,23 36:24
37:7 38:3,4 42:16,17,18
43:15,16,17,22 44:6,16,
19,21,22 45:4,12 46:10,
24 49:9,12,18 50:2,15,
16,17 51:4 60:22 61:21,
24 62:10,12,16 63:6
dog's 45:12
dogbite 56:21
dogs 31:8,24 32:5 36:8
49:3,5 50:10,13,14,25
61:15,16 62:16
door 28:14 30:5,12,20,
22,23 31:15
drink 21:19,21,22,23,25
23:10 39:12,17,20 59:3
drinker 23:11

drinking 38:7 39:24
drinks 59:25
drive 20:11 24:14 27:7,
10 40:19,21
driving 18:18 33:24
drove 27:2,9
drug 9:16
drugs 51:6
drunk 39:11 40:8
drunker 59:22
due 52:1
DUIS 18:20
duly 4:17 8:16

E

earlier 40:9 58:16
early 13:9 48:17
ears 49:16
easy 6:6
EBT 52:16,17
effort 37:5
employed 18:25
employee 24:23 53:25
employees 53:16
end 4:21 5:10,11 42:6
48:24
ended 48:22 52:7,8,20
entire 14:8 35:4
essentially 15:1
establish 5:21
evening 38:7
event 60:10
everyone's 5:17
everything's 5:5
exact 9:10
EXAMINATION 8:18
58:2
examined 8:17
expectation 7:23
experience 40:17
explain 46:12
extent 6:1 36:19 53:22

F

face 28:2,11 34:18 50:20
fact 30:10 59:3,20 61:20

fair 21:14 39:23 40:16
53:1,4 57:2
fairly 21:8
familiar 19:15 21:15
53:16
Federal 64:9
feel 6:5 63:16
feelings 40:12
feels 23:19
feet 52:10
felt 47:23
figure 35:10
filed 10:21,24
find 37:5
fine 42:15,17 57:12
Firepit 19:3,6,7
fixed 43:3,4
fled 28:6,7,9
floor 27:25
focused 34:9
follow 30:2
follow-up 51:13 57:20,
25
follow-ups 57:13 63:22
food 46:4 52:17
foremost 28:22
forever 50:16
form 4:13
formal 5:3
formalities 4:10
found 32:11
free 6:5
FREIMAN 4:14,22 5:9
57:12,15,19,24 58:3
60:13 63:23 64:6
Frenchies 31:10,14,18,
20
frequently 16:3
friend 14:5 52:21
friend's 52:8
friends 24:9 43:7
front 27:25
full 8:20
fully 42:20
funky-looking 49:9

G

gas 24:18

gauge 59:13
gave 10:15 47:6
general 52:6 64:1
generally 23:5 24:2
39:16 49:1 50:9,18,21
51:4 56:4
generate 5:3
generational 23:17
Georgia 11:13
girlfriend 29:16
girlfriend's 55:12
give 6:9,25 7:10 25:18
39:2 58:14
Glen 12:18,19,24,25
13:2,15 14:2,8 15:18
good 49:9 50:5 60:17
63:17 64:4,5
grab 6:3
grade 18:5,6
graduate 18:1
Grady 51:14
Grant 19:5
great 57:23 60:12
greeting 26:16
ground 5:18,22
grounds 63:4
groundskeeper 25:4,
24,25 26:3,5 31:3 32:10
44:4
groundskeepers 53:17
growing 23:18 50:24
grumpy 50:6,7
guard 25:4
guess 4:25 5:10 22:8
28:8 42:18 43:5 44:10
46:6 61:11
guy 6:11 28:6 43:4
guy's 30:1
guys 4:20 23:5,6,10
27:10 33:9,23 34:5,8,12,
15 35:2,15 36:3 39:5
40:23 41:10 45:3,7 53:9
56:22 57:21

H

hanging 20:17 22:25
23:5,24
happen 5:2
happened 20:3 28:3
35:21 36:9 38:1 42:9

51:10 53:10 55:21,24
56:21,22 61:15
**happening** 48:17
**happy** 6:22 39:15
**hard** 35:9 52:5
**head** 7:2,7,8,9
**hear** 6:19 30:24,25 44:24
57:21
**heard** 5:20 19:6 30:25
31:2 36:16 54:19 61:23
**helped** 15:1 28:20
**helping** 32:23 33:1,23
52:19
**hey** 39:2
**high** 18:1,6,8
**highest** 17:23 18:3
**highway** 12:21
**home** 23:1,2 41:2,17,19,
22 62:24
**honestly** 58:25
**hospital** 9:4 10:5 28:21
34:7,10,11,20,22 35:2,5,
18,25 36:23 40:1,24
48:18
**hour** 20:21
**hours** 19:25 20:20,22
23:1 40:9 41:2
**house** 20:12,19 21:6
29:24 52:8,20
**human** 7:25 8:3,5
**hung** 26:16

### I

**idea** 14:19 26:24 29:19
54:18,23
**imagine** 4:19 5:16
**immediately** 27:3 28:21
34:6 40:25 41:23
**impression** 59:1 64:2
**incident** 9:8 19:14 52:23
55:9 58:4,9,10 59:7 60:7
61:21 62:3,8
**including** 58:11
**income** 52:12
**influence** 51:6 58:17
59:2
**information** 19:11
25:18 45:11 63:17
**injuries** 59:14,18 60:1

**inside** 27:6,20 29:20
30:2,21 33:12 35:3 43:14
54:25 56:5 60:7
**interacted** 25:5
**interacting** 51:4
**interfered** 59:15
**interference** 32:8 53:23
**internet** 6:18
**interrogation** 5:24
**intoxicated** 38:18 39:9
40:9 59:24
**intoxication** 40:20
59:14,16
**involved** 61:21
**issue** 7:16
**issues** 5:7 6:12 43:3
**itinerary** 23:4

### J

**January** 9:2,8 12:11
15:19 16:15 17:13,18
19:14 26:6 32:1 53:5
**Jennifer** 13:20
**Jeremy** 4:19 5:19 57:9,
14 63:16,22
**job** 51:24 52:10
**Joe** 5:19
**Josh** 16:8
**jumped** 17:10

### K

**Kali** 50:15
**kids** 22:14
**kind** 5:6 6:2 8:2 19:9
20:2,13,14 23:25 24:1
25:13 27:1,22 28:24
29:2,3 33:16,24 35:9
37:7 38:11 40:2,3 43:12
46:1,25 47:22 48:16 49:5
53:23 57:22 60:4
**kitchen** 29:22
**knew** 22:15,21,24 24:7
26:2,11 32:20 44:4 62:12
**knit** 43:12
**knowledge** 51:23 53:24
54:14,21 55:15,18 57:5
**Kroger** 51:17

### L

**lady** 28:10 29:10 32:24
50:6
**Lake** 12:18,19,24,25
13:15 14:2,8 15:18 27:4
**lap** 42:19
**large** 31:7 35:22
**Laura** 14:4,7
**law** 13:3
**lawsuit** 10:24 18:22
**lawyer** 48:15,23,25
**lawyers** 8:4
**learned** 32:17
**lease** 14:17
**leave** 33:7,8,9 41:10
**leaves** 32:23
**legal** 8:20
**level** 17:23 18:3 40:20
59:13,16
**license** 18:19
**life** 15:6,7
**light** 23:18
**lighting** 19:22
**lines** 56:17
**lip** 34:24 40:13 59:20
**liquor** 24:18
**Lisa** 14:13,22 15:1 41:4
**live** 11:8,9 14:3,11,15,16,
22 16:23 17:7
**lived** 11:15 12:16 14:7,
10,24,25 15:3,5,8 16:5,
24,25 26:23,24 27:4
32:11 44:3,9 62:19,21
63:2
**lives** 14:23
**living** 12:5,13,15 13:2,18
15:8,17,19 16:11,13,16
44:15 53:7 54:22 62:17
**long** 11:15 12:1,9,24
19:7 20:18 38:10 40:23
46:15 49:18 51:21,24
52:23
**Lord** 50:5
**losing** 33:21
**lot** 17:11 22:13,14,21,24
24:17 33:21 36:17 43:3,4
48:8,9,11

### M

**made** 40:13 59:21 60:2
**maiden** 8:22
**mailbox** 55:21,24
**maintenance** 43:4 44:4
63:8
**major** 24:3
**make** 5:4 6:25 7:10,12,
13 8:7,9 37:5 46:3 55:19
62:7
**makes** 43:7
**making** 25:13 42:1
**Malinois** 44:20,25
**mama** 47:11 55:12
**man** 25:20,22 29:7
49:14,18,24 50:2
**man's** 27:11
**manner** 4:10
**mannerisms** 38:14
40:2,17
**Marietta** 11:20,21,24
18:8 19:21
**marijuana** 22:4
**marks** 28:1
**Martin** 16:8,9,21 17:3
**Martin's** 16:18
**math** 15:11
**math's** 13:3
**maul** 28:1
**mauled** 42:20
**Mayish** 11:18
**Mcardle** 14:4
**means** 7:1,3
**medication** 9:14,17
**meet** 42:13
**memory** 38:20
**mention** 43:20,23
**mentioned** 36:14 43:17
58:16
**mentioning** 60:5
**met** 5:19 9:24 25:20
26:1,9 29:12,14,16
**method** 4:10
**microphone's** 57:22
**mid-2020** 13:13
**middle** 41:6
**military** 18:9

**mind** 48:21
**minute** 51:2
**minutes** 15:24 34:21
57:11
**Mirador** 12:14,16 13:7,
8,11,15,18,22,25 14:10,
15,24 15:5,9,17,23 16:2,
11,13,16,25 17:5 20:7
22:9 24:2,4,15 25:24,25
26:3,5 31:3,22,24,25
32:3,8 43:25 44:1,3,5,6,
7,13,16 52:7,18,24 53:2,
7,14,17 54:1,22 55:1
61:8,9,13,17,18,25
62:17,19 63:4,6,9
**Mister** 44:11 53:6
**mix** 49:7
**mom** 10:6,8 13:23 14:20
15:2,3,6 16:4 20:9 21:18
22:7,22 23:2 25:8 27:25
28:11,17 29:23 33:1,16,
18 34:23 36:2 37:9,24,25
38:5 42:13,17,22 44:2,8
45:20 46:21,22 47:20,24
50:12,23 51:9 53:13,16
61:1
**mom's** 14:14 37:6 43:7
50:15
**moment** 60:2
**month** 10:12 56:13
**months** 11:16,17 12:3
13:1 52:25
**morning** 41:15
**mother** 10:15 11:4
13:19 14:11 15:9 16:21
21:8 26:9 29:10,15 32:23
47:15 56:11 57:2 58:11,
17 60:9
**mother's** 16:19 21:6
**mouth** 59:20
**move** 13:14,23
**moved** 13:8,11,12,22
15:21 52:24
**moves** 53:1
**moving** 52:7,8,20

### N

**names** 17:1,11
**narcotic** 9:16
**nature** 7:25
**necessarily** 7:6 23:4
31:22 40:10

Case 1:24-cv-02583-TRJ    Document 18-2    Filed 12/12/24    Page 79 of 120
Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

4

needed 39:6 41:8 42:2
needing 52:10
neighborhood 22:9 24:8
neighbors 22:21
nicknames 8:24
night 20:25 21:18,24 22:25 24:1 31:17 34:5 36:5 37:17,21,25 38:17 41:6 61:15
nighttime 21:3,15
nodding 7:2,7
normal 15:15 32:2 39:5
Northside 9:4
notes 55:4 57:10,16
notice 4:5 38:6 40:3
November 4:2
number 17:12,14,16 26:19 37:9,12
nurses 35:13,18

**O**

O.C.G.A. 64:10
Oak 61:10 62:22 63:5
Oakland 11:9,13,15
Oaks 24:3,6,10,12,16,24 44:9 47:16 48:6,14 54:22 55:1,2 61:10 63:11
objections 4:11
observing 55:8
occurred 9:8
offense 18:11
office 25:2 53:17
older 15:16
opposed 34:12
organize 58:15

**P**

Paige 4:1 8:15,21
pants 7:24
parents 16:24,25 23:1
parents' 17:1
park 19:5 31:25 63:6
party 18:22
pass 28:1
passenger 27:9
passing 26:10,11 28:3, 18 33:5

patterns 59:11
pay 52:9
paying 52:18
pending 6:8
people 15:14 22:12,15, 20,21,24 23:19 24:8,15, 17 25:5,16 47:22 53:18 58:10
Perfect 8:12 57:24
perfectly 32:2
period 23:6 32:2
perks 63:8
permitted 4:7
person 23:19 54:21 63:11
person's 20:11
pet 38:2 43:16 50:20
petting 42:17,19 51:1
phone 17:12,14 25:17 26:25 37:6 38:17
photographs 10:2,4
pick 28:4 38:15
picture 29:3
pictures 10:5 63:1
piece 29:3
pieces 28:24
pit 49:6,14
Pizza 19:3,6
place 19:14 29:17,18 32:18 54:25 58:5 60:8
playground 63:7
point 6:1,4 25:8 30:9 35:6 36:19,24 37:21 39:9 40:24 41:7,11 42:8 46:6, 13 54:2 61:5
police 5:24 28:8 33:14 34:5,8 45:7 47:21,25 48:14
pool 63:7
potentially 53:25 55:16
pounds 50:4
Practice 4:7
predict 7:25
prepare 9:21
prescription 9:14
pressing 34:17
pretty 22:15 24:19 42:2 43:7 49:13 64:1
previously 38:17 50:17

prior 15:5 18:15 59:9
privy 45:18
Procedure 64:10
proceedings 4:3 64:8
process 6:5
produced 47:4 60:23
promise 18:12 19:10
prompted 46:20
proof 37:22 46:23
property 22:18,20,23
provide 47:1
puppy 49:22
purposes 4:6,7 8:6
pursuant 4:5 64:9
push 28:14
put 30:23 34:3 36:20 59:19

**Q**

question 4:13 6:8,9,15, 18,19,23 7:18 22:8 63:14
questions 6:23 8:2 9:18 57:20,25 58:7 60:15
quick 4:24

**R**

rabies 36:25
rags 34:17
ran 30:15
Range 33:25
reach 37:6,11 45:11
reaching 50:20
read 64:3
reading 63:25
recall 12:18 32:13
recently 10:9,10 51:25
recognize 25:19
record 7:12 8:1,8 47:4 57:11 64:1
records 46:7 60:21,22
REEXAMINATION 60:19
regularly 53:20 57:3
relationship 43:1
relaxing 23:8
released 41:14
remained 16:13

remember 11:23 13:7,8, 12 15:19 17:12 19:12,23 20:3,18 23:6 25:11 33:11 35:17 36:4 37:3 40:23 41:22,25 42:11,22 47:5,7 48:12 56:15
reminds 63:24
REMOTE 4:1
rephrase 6:21
reported 53:24
reporter 4:18
reporter's 7:4
reporting 47:16 53:13
reserve 4:11
resident 63:3
residents 22:12
responding 45:15 46:13,16,18,21 47:2
response 37:8,18
responses 6:25
responsive 45:13,17
responsiveness 4:13
restroom 6:4
review 5:4 10:13 57:16 64:3
reviewed 10:2
rid 46:11,24
ring 54:16
rinse 28:11
risk 36:25
road 11:22 24:3
room 30:19,21,23 31:14 36:17,20
roughly 12:11
routine 21:15
Rover 33:25
Rule 64:9
rules 5:18,22 64:9
rushed 6:2

**S**

Saint 11:22 12:2,5 50:24
sake 54:15
Sandy 12:6,8,19
sat 34:4 35:4
Savannah 4:1,5 8:15,21 57:20
school 13:3 17:23 18:1, 4,6,8

scratch 17:24
scratching 31:2
seat 34:1,3,4
security 25:4
sees 43:10
send 46:10
sense 7:13 8:9 25:13 55:19
served 18:9
set 62:25 63:23
severity 41:1
shake 7:7,8
shaking 7:2,8
She'd 43:22 52:17
She'll 64:6
shirt 7:24
shoes 7:21
showed 46:2,3
sic 27:5
side 35:24
sidewalk 56:2
signature 4:20 64:4,10
signing 63:25
Silver 24:3,6,9,12,16,24 27:4 44:9 47:16 48:5,14 54:22 55:1,2 61:10 62:22 63:5,11
simply 59:19
sink 28:5,13
sister 14:14
sit 54:7
sitting 7:3 42:14
situation 20:10 40:11,15 44:15
skillset 5:17
sleep 41:8
slurring 39:13 40:3,12
smaller 31:8
smell 58:22,25
smoke 22:2 23:12,15,16
smoker 23:18
social 22:16 43:7
socks 7:22
something's 20:11
sort 7:19 8:13 32:24 55:8 62:5
sound 9:9
sounded 25:14 38:17 39:9

Jennifer Armistead vs TWG Management, LLC
Savannah Paige Williamson - November 8, 2024

5

Sounds 9:11
Southwest 11:13
speak 26:13 35:9 37:19
  41:17,21
speaking 41:22 61:7
speaks 38:16
specific 61:11
specifically 19:13 37:25
speeding 18:17
spend 20:7
spoke 35:8,10
spoken 37:20 63:10
spot 61:11
spotted 49:16,17
Springs 12:6,8,19
stamps 52:17
standing 27:3,5 29:22
  55:7
start 12:4 16:9
state 28:22
stated 43:14
stations 24:18
status 36:24
stayed 13:25 27:17
  35:24
Steve 17:2
stomach 6:12
stop 46:20 51:20
stopped 45:15 46:13,16,
  18 47:2
stopping 34:15
stores 24:18
street 24:3 31:21 61:9,
  12,19
strike 10:14
struggling 28:19
stuff 36:18 37:8 45:12
  46:25 47:22 48:16 51:14
substance 11:5
sufficiently 36:2
sun 21:2
supplement 9:17
support 62:5
suspected 58:16
sustained 59:14
swear 4:16
sworn 4:17 8:16

T

tail 49:17
taking 4:11 9:13 19:14
  40:18
talk 4:21 7:17 22:5 28:23
  34:8,24 38:11 42:25 45:7
  47:18 53:13,20 56:20,22
  57:3 63:24
talked 10:7,11,18 11:4
  38:16,20 42:8 48:5
  54:10,12 56:12
talking 22:16 24:1 33:15
  35:12 38:5 47:21 48:12
  58:22
Tavern 19:3,6
tech 5:7
television 5:25
telling 33:9 38:22 45:20
ten 20:25 34:21 49:25
tenant 32:7
tended 59:3
terms 11:5 34:11 40:17
  41:12 61:15,24
Terrace 11:13,15
Terrell 54:14,16,20
terrible 17:24
testified 8:17 11:2
testimony 10:8,15,19
  11:5
texted 37:14,15
texts 45:19
thing 6:2,7 36:7 40:3
  53:6,10 56:12 58:25 60:4
things 4:24 5:6 7:19 36:4
  38:13 48:8,9,12
thought 32:10 47:6
thoughts 58:15
ticket 18:17
till 23:25
time 4:12 5:23 6:20,23,
  24 10:11 14:8 15:12
  20:7,23 23:6 32:1 34:11
  35:4,25 41:10,22 51:18,
  24 56:11,23 58:18 59:4
times 6:10
today 4:9 5:19 9:22 10:8
  11:5 54:7 55:19 56:7
  63:18

told 25:11,17 30:9,10,11,
  22 35:17,19 36:4 37:3,4
  42:11,12
ton 5:23
tongue 59:20
traffic 18:16
transcript 5:3,4 7:5 8:7
trauma 60:1
traumatized 52:3
traveled 12:22
treated 35:5 36:3
treating 51:11
TV 23:8
Twelfth 18:5,6
type 9:13,16 23:14 35:21
types 38:12
typical 21:8,17,18,24
typically 22:2

U

Uh-huh 27:14
uh-huhs 7:11
uh-uhs 7:11
ultimately 34:12
unable 51:10
uncommon 21:25
understand 6:2,17 9:18
  25:12 35:1 59:15
Understandably 36:12
understanding 9:6,7
  20:24 21:17 24:2 27:11
  29:2,15 51:1 53:5 54:16,
  20 58:9 60:8
understood 6:16
unemployment 52:15
unfamiliar 50:19 51:5
unique 49:11
unrelated 23:14
unsafe 50:21 51:7
unsuccessful 41:12
upbeat 39:14
upset 51:9
usage 22:4

V

vaccination 37:22 60:21
vaccine 46:7,24 47:3

vaccines 45:11
Valley 12:8 15:20,23
vapes 23:20,21
vein 10:7 51:3
verbal 6:25 7:10
violation 18:16
visit 10:5 16:2,4 36:9
  42:3,13 45:6
visiting 21:9 38:21 42:6
  43:15
visits 51:13
vodka 21:23,25
voices 25:19

W

wait 5:6,10
waive 4:10 64:7
waived 64:11
waiving 64:4
walk 22:17,22 24:13,15,
  17 27:24 40:22
walkable 22:9
walked 28:6 31:13
walking 24:19 30:11,12
  31:11,21,22,23 32:5
  43:21,24 44:6,16 58:21
  61:12,17,25 62:16 63:4
Walton 18:8
wanted 4:24 48:9,11,21
wanting 46:22 48:13
warrant 28:9 30:14
warrants 30:8
watching 23:8 29:23
water 6:3
waves 29:6 30:1
way-way 36:17
weeks 6:11 48:20,23
  51:10
weigh 50:3
Weirdly 12:20
whatsoever 60:22
white 49:16
wholesale 19:21
wholly 23:14
Williamson 4:1,5 5:13
  8:15,21,22 60:14
witnesses 55:16
witnessing 60:10

woman 29:20
words 25:14 39:13
work 19:2,25 20:4,6
  23:8 42:3 51:21,22 52:13
  54:2
worked 20:1 25:1 32:10
working 19:18,20,21,23
  51:15,17,19,20 53:7,12
  62:17
works 5:12 8:4 63:11
Wow 49:20
wrap 60:16

X

Xfinity 17:20

Y

y'all 33:12 37:21 42:8
y'all's 27:13
years 12:10 49:19

Z

zip 11:23
Zoom 6:6 7:1,15

# Exhibit C

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3        Civil Action File No.: 1:24-cv-02583-MHC
4
    JENNIFER ARMISTEAD,              )
5                                    )
              Plaintiff,             )
6                                    )
                -vs-                 )
7                                    )
    TWG MANAGEMENT, LLC,             )
8                                    )
              Defendant.             )
9
10
11
12         30(b)(6) DEPOSITION OF KENDREL BRETZ
            ON BEHALF OF TWG MANAGEMENT, LLC
13
14        The 30(b)(6) deposition upon oral examination
    of KENDREL BRETZ, on behalf of TWG Management, LLC,
15   a witness produced and sworn before me, Craig
    Williams, RPR, CMRS, a Notary Public in and for the
16   County of Marion, State of Indiana, taken on behalf
    of the Plaintiff, at the offices of TWG Management,
17   LLC, 1301 East Washington Street, Suite 100,
    Indianapolis, Marion County, Indiana, on the
18   17th day of September 2024, scheduled to start at
    10:00 a.m. EST, pursuant to the Federal Rules of
19   Civil Procedure with written notice as to time and
    place thereof.
20
21
22
23
24
25

30(b)(6) Kendrel Bretz
September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 2

1          APPEARANCES
2
3   FOR THE PLAINTIFF:
4       Joseph A. Zdrilich
          ZDRILICH INJURY LAW, LLC
5       3575 Koger Boulevard, Suite 125
          Duluth, GA  30096
6       404.888.1111
          joe@zinjurylaw.com
7
    FOR THE DEFENDANT:
8
          Austin L. Albertson
9       SWIFT, CURRIE, McGHEE & HIERS, LLP
          1420 Peachtree Street, NE
10       Suite 800
          Atlanta, GA  30309-3231
11       404.874.8800
          austin.albertson@swiftcurrie.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          INDEX OF EXAMINATION
2   DIRECT EXAMINATION . . . . . . . . . . . . . . . . . 4
        Questions by Joseph A. Zdrilich
3   CROSS-EXAMINATION . . . . . . . . . . . . . . . . . .51
        Questions by Austin L. Albertson
4
5
6
7
8          INDEX OF EXHIBITS
9   Plaintiff's Deposition Exhibit No.:
10   Exhibit 1 - Notice of Deposition . . . . . . . . . . 7
      Exhibit 2 - Investigator Report of 3/10/22 . . . . .38
11   Exhibit 3 - Investigator Report of 3/22/22 . . . . .25
      Exhibit 4 - Davin Terrell Personnel Records . . . . .14
12   Exhibit 5 - Incident Report Form . . . . . . . . . .32
      Exhibit 6 - Interrogatories . . . . . . . . . . . . .43
13
    Defendant's Deposition Exhibit No.:
14
      Exhibit D1 - Site Plan for Silver Oak . . . . . . . .50
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          (Time noted:  10:28 a.m.)
2              KENDREL BRETZ,
3   having been duly sworn to tell the truth, the whole
4   truth, and nothing but the truth relating to said
5   matter was examined and testified as follows:
6   DIRECT EXAMINATION,
7     QUESTIONS BY JOSEPH A. ZDRILICH:
8   Q   This will be the Federal Rule of Civil Procedure
9       30(b)(6) deposition of TWG Management, LLC.  I'm
10       sorry, we made the deposition notice out before
11       the defendant had identified you as its witness.
12          Can you state your name.
13   A   Ken Bretz.
14   Q   Can you spell that.
15   A   K-E-N, B-R-E-T-Z.
16       MR. ZDRILICH:  We're here in Indianapolis,
17   Indiana today at the offices of defendant TWG
18   Management, LLC, and with their counsel, Austin
19   Albertson, from Swift Currie.
20       Austin, I propose that we waive all
21   objections except as to form, responsive answer
22   to the form of the question until first use.
23       MR. ALBERTSON:  That's agreeable with me.
24       MR. ZDRILICH:  And you'll probably wait
25   until the end for signature?

Page 5

1       MR. ALBERTSON:  Yes.
2   Q   Mr. Bretz, have you ever given a deposition
3       before?
4   A   I have not.
5   Q   I'd just ask you to answer yes or no to any
6       yes-or-no-type question, and then take as much
7       time as you need to expand on that answer.  I
8       won't interrupt you.
9          If you need to take a break for any reason,
10       the only ground rule is you do have to answer
11       the last question asked, and then we'll take as
12       much time or as little time as you might need.
13       I have worked pretty efficiently in these
14       depositions, so I can't imagine you'll need too
15       many breaks, but if you do, we're here to
16       accommodate, and we have plenty of time today to
17       work through anything.
18          I do hear some background noise, so I'm
19       going to do my best to be as loud as I can to
20       speak up over it, and if you ever need me to ask
21       a better question or clarify something, please
22       feel free to do that.  We all ask plenty of
23       questions that we could phrase better.  Having
24       dispensed with all that, I can just jump right
25       in.

2 (Pages 2 - 5)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 6

1      Do you have a middle name?
2  A  Lamar.
3  Q  Could you spell that, please.
4  A  L-A-M-A-R.
5  Q  What's your home address?
6  A  14763 Legacy Oaks Drive.
7  Q  Is that here in Indianapolis?
8  A  It's in Carmel, Indiana.
9  Q  Do you have a work phone number separate from
10    your personal phone number?
11  A  I do not.
12  Q  What's your cell phone number?
13  A  (317)607-6832.
14  Q  I think that might have an extra number in it.
15  A  I can repeat.  (317)607-6832.
16     MR. ZDRILICH:  My apologies.  Let's go off
17    the record.
18     (Off-the-record discussion.)
19  Q  Do you work for TWG Management?
20  A  I do.
21  Q  What is your job title?
22  A  Chief people officer and president of property
23    management.
24  Q  President of property management?
25  A  Yes.

Page 7

1  Q  How long have you been with TWG?
2  A  11 years.
3     (Plaintiff's Deposition Exhibit 1 was
4    marked for identification.)
5  Q  I've put in front of you what I have marked as
6    Exhibit 1.  It is a copy of the deposition
7    notice for today's deposition.  Have you
8    received a copy of this in advance of today's
9    deposition?
10  A  Yes.
11  Q  You understand that you're here in your capacity
12    today on behalf of the corporation and not in
13    your individual capacity?
14  A  Yes.
15  Q  Are you the person most familiar with or with
16    the most knowledge of practices set forth in
17    this deposition notice?
18  A  Yes.
19  Q  What is the relationship between TWG Management
20    and TWG Development?  I know we've substituted
21    in a party in this case.  But what is the
22    relationship between the two companies?
23  A  TWG Management is the property management entity
24    for TWG Development, which is the development
25    arm of the company.

Page 8

1  Q  For instance, with the Silver Oak property where
2    the events giving rise to this action occurred,
3    who owns that property?
4  A  TWG Development and the other members of the LP
5    are the owners.
6  Q  But TWG Management is responsible for
7    administering or managing the property?
8  A  That's correct.
9  Q  Do you receive pay from TWG or from any other
10    entity?
11  A  Only from TWG.
12  Q  How long have you been in the role of president
13    of property management?
14  A  Since October of 2023.
15  Q  As of the date of this deposition, and we're
16    here in Indianapolis today, how many units does
17    TWG Management have under management?
18  A  It's over 5500.  I don't have the exact number.
19  Q  In what states do you all operate?
20  A  Would you like me to list them?
21  Q  Yes.
22  A  We operate in Indiana, Iowa, Ohio, Illinois,
23    Michigan, Georgia, Tennessee, Colorado,
24    Oklahoma, Utah, Wisconsin.  I believe I have
25    identified them all.

Page 9

1  Q  If you think of something else later, let me
2    know, but that sounds pretty exhaustive.
3     How many complexes are under management?
4  A  It's roughly over 60 communities managed.
5  Q  And Silver Oak Apartments is the one apartment
6    complex in Clarkston, DeKalb County, Georgia
7    where this incident occurred, that's one of
8    those 60?
9  A  That's correct.
10  Q  Is it still under management?
11  A  Yes.
12  Q  These events occurred over two years ago.
13     What would you say your job duties include
14    at TWG?
15  A  They are many and exhaustive.  I oversee and
16    provide strategic oversight for all of our
17    policies, development, site team and personnel
18    management, anything related to lease-up and
19    stabilization strategies.
20  Q  You say site team personnel management.  Does
21    that include the hiring of persons in those site
22    teams?
23  A  Indirectly.  So I oversee the directors who
24    oversee the regional managers who oversee the
25    property managers.

3 (Pages 6 - 9)

30(b)(6) Kendrel Bretz                        September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 10

1  Q   You oversee directors who oversee regional
2      managers who oversee the property managers?
3  A   That's correct.
4  Q   At the time this incident occurred in late
5      January of 2022, can you identify who the
6      regional manager was for the region where the
7      Silver Oak property is located?
8  A   That would have been the acting president of
9      that time, which is Chasity Sadowy.
10 Q   Can you spell that?
11 A   First name is C-H-A-S-I-T-Y, last name
12     S-A-D-O-W-Y.  She was the acting regional.
13     There was not a regional manager at that time.
14 Q   Do you know who the property manager was for
15     Silver Oak on January 31st, 2022?
16 A   I believe it was Aushiana Robinson.
17 Q   Can you spell that name?
18 A   A-U-S-H-I-A-N-A, R-O-B-I-N-S-O-N.
19 Q   She would have been the manager at Silver Oak.
20     Is she still the manager at Silver Oak?
21 A   She is not.
22 Q   When did she leave TWG?
23 A   I do not have the exact dates of separation, but
24     it was in 2023.  I believe it was October of
25     2023.  I can get that information.

Page 11

1  Q   Do you know if she was terminated or if she left
2      on her own?
3  A   She left on her own accord.
4  Q   She left for a different job opportunity or
5      something?
6  A   She did not state her reasons for leaving.
7  Q   Do you know how many employees TWG had at the
8      Silver Oak property on January 31st, 2022?
9  A   I do not recall the number of staff members that
10     were on site at that date.
11 Q   Do you know how many units there are at the
12     Silver Oak property?
13 A   488, I believe.
14 Q   Are you the person at TWG designated to speak on
15     behalf of TWG with regard to hiring and
16     screening of employees at the Silver Oak
17     complex?
18 A   Yes.
19 Q   How about employee supervision at the Silver Oak
20     complex?
21 A   Yes.
22 Q   Are you the person designated to speak with
23     regard to implementation of policies and
24     procedures involving video cameras or video
25     recordings at the Silver Oak complex?

Page 12

1  A   Yes.
2  Q   How about incident reports?
3  A   Yes.
4  Q   And you have some of those incident reports with
5      you today related to this incident?
6  A   Yes.
7  Q   How about policies and procedures dealing with
8      pets at the premises?
9  A   Yes.
10 Q   Does TWG have a pet policy?
11 A   We do.
12 Q   Do you have a copy of that pet policy with you
13     today?
14 A   I believe it's reflected in the lease.
15 Q   Are you the person designated to speak with
16     regard to any reports, statements, informal
17     complaints or formal complaints regarding any
18     dog bites on the premises from January 31st,
19     2021, a year before this incident?
20 A   Yes.
21 Q   How about policies at Silver Oak Apartments
22     regarding obtaining or rendering aid and care,
23     including medical treatment, to anyone injured
24     by dog bites at the premises?
25 A   Yes.

Page 13

1  Q   How about policies keeping the premises safe and
2      hazard free to residents or visitors?
3  A   Yes.
4  Q   Do you have any records associated with the
5      hiring or firing of Davin R. Terrell?
6  A   Yes.
7  Q   Was Mr. Terrell an employee of TWG?
8  A   He was at one point, yes.
9  Q   What were his dates of employment, if you have
10     them?  And again, I don't have these records
11     yet, but if you want us to refer to the record,
12     we can do that and we'll just mark it as an
13     exhibit.
14     MR. ALBERTSON:  For recordkeeping purposes,
15     I'm giving to plaintiff's counsel what is
16     identified in our initial disclosures, which is
17     the termination notice for Mr. Terrell, final
18     account statement, his job offer acceptance, and
19     then his original lease agreement and
20     application at Silver Oak.
21     MR. ZDRILICH:  And this might clarify some
22     of my questions and streamline things just a bit
23     to have these, so thank you.
24     MR. ALBERTSON:  They are separated there,
25     Joe.

4 (Pages 10 - 13)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 14

1    (Plaintiff's Deposition Exhibit 4 was
2  marked for identification.)
3      MR. ZDRILICH:  I have premarked a few of my
4  exhibits, so I will call this collectively
5  Exhibit 4 just to kind of streamline things.
6  I'll refer to Plaintiff's Exhibit 4.  We'll come
7  back to that.
8  Q  Who designated you today to speak on behalf of
9    TWG?
10  A  TWG ownership and general counsel.
11  Q  Do you have in-house counsel?  And we don't want
12    to know anything you discussed with your lawyer,
13    of course, but do you have in-house counsel?
14  A  We do.
15  Q  As separate from your counsel today from Swift
16    Currie?
17  A  Yes.
18  Q  Are you the person most knowledgable with regard
19    to hiring and screening employees at the Silver
20    Oak complex?
21  A  Yes.
22  Q  How about employee supervision?
23  A  Yes.
24  Q  Implementation of policies and procedures
25    regarding video cameras and video recordings?

Page 15

1  A  Yes.
2  Q  Pet policies?
3  A  Yes.
4  Q  Complaints or lawsuits regarding dog bites at
5    TWG's Silver Oak complex?
6  A  Yes.
7  Q  On that point, have there been any other
8    lawsuits arising from dog bites that occurred at
9    the Silver Oak complex in the last five years?
10  A  Not that I'm aware of.
11  Q  Had there been any other complaints regarding
12    the animal in question, which is an Akita dog,
13    owned by your now former employee Davin Terrell?
14  A  No.
15  Q  Are you the person with the most knowledge
16    regarding policies at Silver Oak involving dog
17    bites and treatment thereof of the bites that
18    occurred on site?
19  A  Yes.
20  Q  Of course, the records are here, so are you the
21    person with the most knowledge regarding the
22    hiring or firing of Davin Terrell?
23  A  Yes.
24  Q  Do you have full authority to speak today on
25    behalf of defendant TWG with regard to the

Page 16

1    topics we've discussed?
2  A  Yes.
3  Q  Take a look here at the job offer, and I've
4    collectively marked these --
5      MR. ZDRILICH:  Are these all the documents
6  or are these just the ones related to Davin
7  Terrell?
8      MR. ALBERTSON:  Can we go off the record
9  just briefly.
10    (Off-the-record discussion.)
11  Q  It says here in these records that Mr. Terrell
12    was terminated on or about June 24th, 2020; is
13    that correct?
14  A  That is correct.
15  Q  What was his job title when he worked for the
16    TWG Silver Oak complex?
17  A  Maintenance technician.
18  Q  Was he in a senior role, did he supervise the
19    maintenance of the whole complex?
20  A  He provided maintenance for the whole complex
21    but he was not a supervisor.
22  Q  What were his job duties?
23  A  His job duties included service requests as they
24    were reported by residents and/or assigned by
25    the property manager.  It could include grounds

Page 17

1    and preventative maintenance in and outside of
2    the units and the buildings on site.
3  Q  It looks from these records, at least
4    correspondence in here, reflects a job offer to
5    Mr. Terrell on January 7th, 2019.  So
6    approximately 18 months before his termination.
7    That would appear to reflect that he was
8    employed by TWG for a period of approximately
9    18 months between January 20, 2019 and it looks
10    like June of 2020.  Does that sound
11    approximately correct?
12  A  Yes.
13  Q  And this could be a simple typo, so I'm just
14    going to reference this, in the first document,
15    the termination document, we'll call it that's
16    part of Exhibit 4, it says, "Reason for
17    Separation:  Voluntary Job Abandonment," then it
18    lists the dates July 23rd and July 24th.  I'm
19    going to presume from this they meant June 23rd
20    and June 24th when he was terminated, because
21    those other dates occur a month in the future.
22    It would seem to follow that that's when he was
23    terminated, June 24th, and that maybe he missed
24    a couple of days of work and that's why.
25  A  Yes, that sounds that would be correct, that's a

5 (Pages 14 - 17)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 18

1    typo.
2  Q  Do you know when this document was prepared?  I
3     mean, I see the date at the top, but do you know
4     it to be a different day?
5  A  I do not know it to be a different day.
6  Q  Were there other reasons in his personnel file
7     for terminating Mr. Terrell?
8  A  Not to my knowledge.
9  Q  As part of his compensation -- I do see his
10    compensation listed here in the second document,
11    which is the job offer, it's part of Exhibit 4,
12    it says he's paid $17 per hour on an every
13    two-week basis and that his scheduled work hours
14    are 8:00 a.m. to 5:00 p.m.  It also says it
15    provides him insurance, a 401(k) plan.  Was he
16    ever subsidized or given a discount for his rent
17    at the Silver Oak complex?
18  A  No, not to my knowledge.
19  Q  Do you all offer an employee discount for rent
20    if they live on site?
21  A  No.
22  Q  Did you know him to live on site at the
23    premises?
24  A  I did know that he was a resident.
25  Q  Did you know that he was a resident at the time

Page 19

1     this incident occurred?
2  A  Yes.
3  Q  Turning now to the third document that your
4     counsel has provided us today, this is the lease
5     agreement with Silver Oak Apartments, it appears
6     to be the lease agreement for Davin Terrell.
7     And it lists three other people living there; a
8     Devin Taylor, Jr., a Davin Terrell, Jr. and a
9     Denise Terrell.
10       It sets forth his rent, and it looks like
11    this lease ran through December 31st of 2021.
12    I'll ask, the incident in question occurred
13    about 30 days past the end date of this lease
14    that's been provided.  Do you know if he was
15    staying on as a month-to-month tenant or if
16    there is a lease extension that's going to be in
17    here?
18  A  No, he abandoned his apartment in June of 2020,
19    and we ended the lease because he was no longer
20    present.
21  Q  June of 2020.  But the events giving rise to
22    this action occurred in January of 2022.
23  A  Correct.
24  Q  In the apartment?
25  A  Yes.

Page 20

1  Q  So you said that he abandoned the residence in
2     June of 2020?
3  A  Yes.
4  Q  But he was living there in January of 2022.
5  A  No, he was not.
6  Q  Are you just not aware that he was living in the
7     site?
8  A  We don't have record that he was on site.
9  Q  So you're saying that this lease was terminated
10    early and he was not at the site.  Do you know
11    who was occupying the apartment where this event
12    occurred?
13  A  Someone else occupied and a new lease was
14    initiated after he vacated his apartment.
15  Q  You are aware that my client visited with him at
16    this apartment the day that this incident
17    occurred; she was his guest in the apartment
18    and, by all appearances, he resided at that
19    apartment with the dog in question?
20  A  We do not have record that he was a leaseholder
21    at that time.
22  Q  Do you have a record of who was the leaseholder
23    in the apartment that was, per your testimony,
24    formerly occupied by Davin Terrell?
25  A  Which apartment number are you referring to?

Page 21

1  Q  It looks like 16G.
2  A  I do not have the name of the person who
3     occupied after he left, but I can certainly get
4     it.
5  Q  And we'll give you all time to supplement that,
6     that's fine.
7  A  Okay.
8  Q  The incident giving rise to this action,
9     according to the complaint, occurred in
10    Apartment 12F.  Do you know who resided in
11    Apartment 12F?
12  A  I do not know the name of the person, but I can
13    get it.
14  Q  Okay.  As you may know from the complaint,
15    Mr. Terrell held himself out as a resident of
16    Apartment 12F where my client was injured.
17  A  No, I do not.
18  Q  You're aware that that's in the complaint?
19  A  I'm aware that it was cited, but I do not have
20    record of that.
21  Q  But you can find out who was the official
22    occupant of Apartment 12F?
23  A  Yes.
24  Q  And again, pardon any pregnant pauses as I pour
25    over the documents that are furnished here today

6 (Pages 18 - 21)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 22

1  so we can review them hopefully thoroughly and
2  not have to revisit too many issues in the
3  future.
4        I'm looking through here, and it appears
5  that on page 7 of his lease, it does reference
6  that, "No animals, including mammals, reptiles,
7  bird, fish, rodents and insects are allowed,
8  even temporarily, anywhere in the apartment or
9  apartment community unless we so authorize in
10  writing.  If we allow an animal, you must sign a
11  separate animal addendum which may require
12  additional deposits, rents, fees or other
13  charges.  You must remove an illegal animal
14  within 24 hours of notice from us or you will be
15  considered in default of the lease contract.  We
16  will authorize an ADA-certified service animal.
17  We may require a written statement from a
18  qualified professional verifying the need for a
19  support animal."
20        I'm continuing to pour over the lease
21  addenda here, but did Mr. Terrell sign such an
22  addendum with regard to a pet?
23  A  He signed the lease agreement itself stating
24    that he would need to sign an animal addendum if
25    he had a pet.

Page 23

1  Q  Did he ever disclose that he had a pet?
2  A  No.
3  Q  Do you all have a handbook that you give to TWG
4    employees at the Silver Oak complex with regard
5    how to deal with pets that are in apartments in
6    violation of this standing policy, meaning that
7    they haven't disclosed the existence of the pet,
8    it's not an ADA support animal, and then you
9    find out that the tenant is in violation of this
10    term of the lease?
11  A  No, we direct them to the covenants of the lease
12    that specifically tells them what they need to
13    do if an animal is brought to our attention
14    that's not documented as a pet for the
15    leaseholder.
16  Q  And what steps are TWG staff, at this instance
17    the Silver Oak property, but at TWG properties
18    broadly, what are they supposed to do when they
19    find out that the tenant has a noncompliant
20    animal on premises?
21  A  When it is brought to their attention, they are
22    supposed to serve the resident a notice, letting
23    them know that we are aware that there is an
24    unauthorized pet.  If the resident wants the pet
25    to remain, they have to come in compliance,

Page 24

1  which means signing the animal addendum, paying
2  the pet fee and paying the pet rent.  If they do
3  not comply, then within 24 hours the pet must be
4  removed.
5  Q  If they do not comply within 24 hours, then --
6    pardon the noise, a bit of an interruption, but
7    go ahead, can you repeat that.
8  A  If they do not comply, the animal has to be
9    removed within 24 hours.
10  Q  Do you know if written notice was ever served on
11    Mr. Terrell with regard to a pet that he had on
12    premises?  And I understand again that he is not
13    on a lease at the time this incident occurred,
14    the time in question.  But was notice ever
15    served on either Mr. Terrell or the resident of
16    Apartment 12F with regard to a pet on premises?
17  A  No, not to my knowledge.
18  Q  Are the apartments regularly inspected for the
19    presence of pets, or how do you all get wind if
20    someone has an unauthorized pet on premises?
21  A  Typically it is brought to our attention either
22    because there is a complaint by a resident or it
23    is noticed during a routine service request.
24  Q  And service requests are administered by
25    maintenance employees of the premises; yes?

Page 25

1  A  Can you repeat, please.
2  Q  If someone makes a service request -- the
3    maintenance person goes on property in the
4    apartment for a service request and they see a
5    dog there, then they're supposed to report it to
6    the property manager?
7  A  That's correct.
8  Q  In this case, at the time this incident
9    occurred, that would have been Aushiana
10    Robinson?
11  A  Aushiana.
12  Q  Aushiana, I apologize.  It would have been
13    Aushiana?
14  A  Yes.
15        (Plaintiff's Deposition Exhibit 3 was
16    marked for identification.)
17  Q  I'm going to go a little bit out of order in my
18    exhibits.  I'm going to you show you what I
19    marked here as Exhibit 3.  I'll put this in
20    front of you.  This is a statement from our
21    private investigator regarding a Rex Zaragoza.
22        MR. ALBERTSON:  I apologize, could we
23    briefly go off the record and use this as an
24    opportunity to get our stuff, and I need to take
25    a quick restroom break.

7 (Pages 22 - 25)

30(b)(6) Kendrel Bretz                            September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 26

1    MR. ZDRILICH:  Absolutely.
2    (A recess was taken between 10:58 a.m. and
3    11:21 a.m.)
4  BY MR. ZDRILICH:
5  Q  I put in front of you what I've marked as
6    Plaintiff's Exhibit 3.  This is a report by one
7    of the private investigators we had at the
8    Silver Oak Apartments speaking with a Rex
9    Zaragoza.  Do you know who Mr. Zaragoza was?
10 A  I do.
11 Q  Who was he?
12 A  He was a former employee.  He left as a
13    maintenance supervisor.
14 Q  He was maintenance supervisor.  Was that the job
15    that Mr. Terrell used to have?
16 A  No.
17 Q  Is that a higher-up job than Mr. Terrell used to
18    have?
19 A  That's correct.
20 Q  What were Mr. Zaragoza's dates of employment?
21 A  I believe he was employed February 2021 to June
22    2023.
23 Q  And under what circumstances did Mr. Zaragoza
24    leave TWG?
25 A  I believe he left voluntarily.

Page 27

1  Q  Had he been at any point disciplined or had any
2    disciplinary action taken against Mr. Zaragoza
3    for any deficiencies in his job performance?
4  A  Not to my knowledge.
5  Q  Did he hold any other job titles during his
6    employment between approximately February 2021
7    and June 2023?
8  A  He was a maintenance technician before he was a
9    supervisor.
10 Q  I think this report reflects that he said in
11    here that he was a tech, and that's short for
12    technician?
13 A  Yes.
14 Q  And he went on to become the supervisor for the
15    complex, the maintenance supervisor.  He still
16    answered to, is it Ms. Robinson?  He still
17    answered to Ms. Robinson at that time; is that
18    correct?
19 A  That's correct.
20 Q  She was there until later in 2023.  So the
21    entire time he worked there, he would have
22    answered to Ms. Robinson; yes?
23 A  That's correct.
24 Q  And if he saw something, I would assume you have
25    a see something, say something policy.  So if he

Page 28

1    saw something that he thought needed reporting,
2    he would have reported to Ms. Robinson; correct?
3  A  Yes, that's what we advise.
4  Q  Here the dog in question, Ms. Campo, the
5    investigator, shows Zaragoza a picture of the
6    Akita dog and asked Zaragoza Tuesday, March 22nd
7    of 2022, less than two months after the incident
8    had occurred, and he said that he recognized
9    that dog and that he had, "seen that dog plenty
10    of times running free."
11    Had TWG received complaints from its
12    employees about dogs roaming the premises
13    unleashed and unsupervised prior to this
14    incident?
15 A  No, not that I have record of.
16 Q  Have you discussed or anyone from TWG discussed
17    with Ms. Robinson the issue of dogs roaming
18    around the complex unsupervised?
19 A  No, not that I'm aware of.
20 Q  It says here that Zaragoza had been working for
21    the complex for approximately a year, which
22    lines up with the dates of employment that you
23    gave, because you said February of 2021 and this
24    was done in March of 2022, so he had been there
25    a little over a year at the time of this

Page 29

1    interview; correct?
2  A  That's correct.
3  Q  He said that as the dog "got older, he
4    started" -- pardon the expletive here --
5    "fucking with people and other dogs and got
6    aggressive.  He's big as hell too."  And that he
7    was "running free."
8    What steps would you have expected TWG
9    Management to have taken, given the situation
10    that he describes in this interview?
11 A  What situation, I'm sorry?
12 Q  This very large dog, and you'll hear another
13    supervisor here describe as 130 plus pounds,
14    walking around the premises unsupervised,
15    unchecked, and harassing other people and other
16    dogs.
17 A  Well, if a dog is brought to our attention that
18    is unleashed and not with a person, we would do
19    our best to try to see if we can identify the
20    location, the resident or resident's guest that
21    the pet belonged to.  If it weren't able to
22    determine that, we would contact animal control.
23 Q  It says here, "Before Zaragoza was management,
24    he was a 'tech,'" which we just discussed, "and
25    while he was a tech, he did tell his supervisors

8 (Pages 26 - 29)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 30

1    about the Akita."  And that's the Akita in
2    question that bit my client.
3        "The only thing that his supervisors did
4    was call animal control," he said, "because
5    that's the 'only thing they can do.'  Zaragoza
6    never called animal control.  Animal control was
7    called a 'couple of times,' but when they
8    finally got to the complex, the Akita would be
9    gone."
10       Are there any records of employees from TWG
11   at the Silver Oak complex calling animal
12   control?
13   A   Not that I'm aware of.
14   Q   Are there any reports about this or other dogs
15   on premises that you have in your present
16   custody, access or control?
17   A   No.
18   Q   Do you believe that this constitutes an unsafe
19   condition at the Silver Oak premises to have
20   large unsupervised dogs roaming the premises,
21   apparently?  You have the report in front of
22   you, so you can references it at any time.  And
23   this is your head of maintenance discussing,
24   this isn't my witness, this is your head of
25   maintenance describing the condition.

Page 31

1    A   Yeah.  I deem this as something that requires
2    attention, and based off of what we were made
3    aware of after the fact, that's something I
4    would advise that they would contact animal
5    control about.
6    Q   Are there any other steps that you would
7    recommend that they take other than call animal
8    control?
9    A   Not if we could not identify the person that the
10   animal belonged to.
11   Q   What would you describe as reasonable steps to
12   ascertain the owner of the dog if you'd see it
13   running around the premises repeatedly over the
14   course of a year?
15   A   We would canvass the area to the best of our
16   ability, see if the pet went somewhere or if a
17   resident neighbor or such would have any
18   knowledge of where it came from.  It would be,
19   to a certain extent, up to what we were able to
20   find out from other people nearby, witnesses, if
21   we were able to identify it.
22   Q   Do you have any records that the complex was
23   canvassed for the whereabouts of this Akita?
24   A   I do not have records.
25   Q   Do you have any knowledge that it was canvassed

Page 32

1    to try to ascertain the ownership of the Akita?
2    A   No, I do not.
3        (Plaintiff's Deposition Exhibit 5 was
4        marked for identification.)
5    Q   Have you investigated this incident, aside from
6    the incident report that I have in front of me
7    that we're going to mark Exhibit 5 today, has
8    TWG conducted any investigation about this
9    incident?
10   A   The only investigation I was aware of since that
11   information was brought to us after the fact was
12   asking if anyone was aware or had knowledge of a
13   dog that met that description, which I believe
14   is what Theresa Crooks did when she thought that
15   it belonged to someone who was no longer
16   employed.
17   Q   And it's your position -- and again, you said
18   you will get us a copy of the lease for the
19   apartment at issue here.
20   A   12F?
21   Q   12F.  So we can ascertain who was living there.
22   A   Yes.
23   Q   But to your knowledge, Mr. Terrell was neither
24   the signer of a lease for that premises nor a
25   resident at that premises?

Page 33

1    A   That's correct, we do not have knowledge that he
2    was a resident.
3    Q   You're not saying he wasn't a resident, you're
4    saying you just had no knowledge that he was a
5    resident?
6    A   Correct, he was not a lessor at that time.
7    Q   Not to hop around too much, I'll come back to
8    that Exhibit 5 in a moment.
9        But Exhibit 3 that I have in front you, it
10   appears our investigator talked to another
11   maintenance personnel member who joined the
12   interview, "One employee asked Zaragoza, 'that
13   dog be free?'  Zaragoza replied, 'Hell yeah,
14   that big mother fucker'" -- pardon again my
15   French, I'm just quoting from the report --
16   "that's the one I be telling I will shoot that
17   MF'er sometime."  I'll leave some of the other
18   expletives out of it.  "He's about 130 to 140
19   pounds."
20       Zaragoza also describes it as an
21   "intimidating dog."
22       Of some interest in this report, he
23   mentions that, "Tenants have come up to Zaragoza
24   stating that the Akita attacked their dog and
25   Zaragoza has seen those attacked dogs.  Zaragoza

9 (Pages 30 - 33)

Page 34

1    has heard 'a lot' of people state that Akita has
2    bitten people and other dogs."
3        Do you have any incident reports regarding
4    any other dog bites at the premises, and we'll
5    just say from the year before this incident of
6    January 31st, 2021, to the present?
7  A  No.
8  Q  You would admit here that Mr. Zaragoza appears
9    to have documented other dog bites of persons on
10   premises by this dog?  That's his -- it's not
11   testimony, but that's his statement?
12 A  I do know that that is his statement.
13 Q  Has he given a separate statement to TWG as part
14   of any investigation into these events?
15 A  No, not that I'm aware of.
16 Q  Has TWG any investigative report about this
17   incident?
18 A  Not outside of the incident report.
19 Q  Has TWG ever retained a private investigator to
20   conduct an investigation about this incident?
21 A  No.
22 Q  I'm going to turn now to the report here.  This
23   is the incident report form, Exhibit 5.  It
24   says, "Date of Incident," March 10th, 2022,
25   "when we first heard of the incident."

Page 35

1        So before when this incident occurred on
2    January 31st, you didn't know about it until our
3    investigator was on premises asking residents
4    about it; correct?
5  A  That is correct.
6  Q  In the summary here it states that, "A resident
7    stated a lady who appeared to be an investigator
8    was looking for someone who have may have a big
9    white dog.  She said the woman was walking the
10   property asking people if they had saw the dog.
11   The investigator never came to the leasing
12   office.  No large white dog is on file for any
13   resident on property.  However a previous
14   employee who had a white dog and is known to
15   visit people on property was contacted to see
16   if the dog was his.  It was discovered that the
17   dog did belong to Davin Terrell," and that's
18   presumably the former employee whoever wrote
19   this report is talking about here; correct?
20 A  That's correct.
21 Q  "He stated that the dog did belong to Davin
22   Terrell.  He stated that the woman was bit by
23   the dog but she reported that it did not take
24   place on Silver Oak property."
25       And that's Davin Terrell who asserted that?

Page 36

1  A  That is my understanding.
2  Q  He's the owner of the dog.
3        "He stated he did not have the dog
4    anymore."  And his contact is listed here.
5        And it looks like it's signed by a T.
6    Crooks.  Do you know who T. Crooks is?
7  A  Theresa Crooks, yes, I do.
8  Q  That's the property manager?
9  A  She was a property manager in 2023.
10 Q  And that's a different job than Ms. Robinson?
11 A  It is a different job.  At some point she was
12   promoted, she was assistant property manager,
13   and then she moved into property manager.
14 Q  Do any of these employees live on premises?
15 A  No.
16 Q  Did Rex Zaragoza live on premises?
17 A  Not to my knowledge.
18 Q  Do you have personnel files for Aushiana
19   Robinson?
20 A  I have access to them.
21       MR. ZDRILICH:  We'll send over a separate
22   request for those, because they're not part of
23   the notice, but we'll send a separate production
24   request for that.
25       MR. ALBERTSON:  We can also get you

Page 37

1    Zaragoza's.
2        MR. ZDRILICH:  Okay, that would be great.
3  Q  Is there a formal complaint process where --
4    Mr. Zaragoza, he says he reported this dog or
5    incidents with this dog.  Would he have written
6    that up, or would it just be something he comes
7    into the management office and goes, hey,
8    there's this dog I saw on premises scaring
9    people?
10 A  I don't have a record of what he did, but we
11   would advise they do it in writing.
12 Q  But you have no written reports based on his
13   alleged complaints?
14 A  That's correct.
15 Q  Or anyone's alleged complaints about this dog?
16 A  That's correct.
17 Q  Would other residents have made formal written
18   complaints about dog incidents, dog bites,
19   either of their person or of their dogs?
20 A  I don't have record that they did.
21 Q  Do you have a regular form that they would use
22   for that, like an incident report form like this
23   one?
24 A  We don't publish our incident report to our
25   residents, it's an internal tool, but we would

10 (Pages 34 - 37)

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 38

1    just instruct them to let us know via email or
2    through our resident portal.
3  Q   So it's your testimony that no other
4    investigation took place beyond this one page?
5  A   Not to my knowledge, no.
6        (Plaintiff's Deposition Exhibit 2 was
7    marked for identification.)
8  Q   Do you have Exhibit 2 in front of you?
9  A   Yes.
10 Q   This is a statement given by an Alexia Duru, who
11   was a resident of Apartment 13E, which would
12   appear to be adjacent to Apartment 12F where
13   this incident occurred.  They were a resident
14   and they knew of the Akita dog because it had
15   bitten her dog on two different occasions and
16   that it was freely roaming the property.
17       Do you have any complaints on file from
18   Ms. Duru about the Akita dog in question?  I
19   know we've talked about did any other person,
20   but hopefully this might refresh your
21   recollection about it.  Any complaints by Ms.
22   Duru other than complaints to our investigator
23   about this Akita roaming the property and biting
24   her dog on two occasions?
25 A   No, nothing more.

Page 39

1  Q   You've testified about this, but you said that
2    there's no documented pet policy outside of what
3    you reference in the lease agreements with the
4    tenants?
5  A   That's correct.
6  Q   Presumably there are people with pets on the
7    premises, though; right?
8  A   Presumably.
9  Q   And they would have to disclose them to you
10   officially or they'd be in default of their
11   lease?
12 A   Correct.
13 Q   Do you have any other incident reports on file
14   regarding the employment of Davin Terrell?
15 A   Not to my knowledge.
16 Q   Other than what's in the Exhibit 4 here?
17 A   No.
18 Q   Who would have been the person in charge of
19   firing him?  It says here Holly MacDougall.
20 A   Holly MacDougall was the director of human
21   resources, so she would be a part of the
22   administration of the firing, but she herself
23   would not start a recommendation.  Typically it
24   would come from a supervisor.
25 Q   And Ms. MacDougall is here in Indianapolis?

Page 40

1  A   Yes.
2  Q   So this decision came from corporate, but
3    presumably at the request of someone in the
4    Silver Oak office?
5  A   That is correct.
6  Q   Do you know who in the Silver Oak office
7    complained of Mr. Terrell to fire him?
8  A   I do not know who initiated that termination
9    request to HR.
10 Q   There hadn't been any events preceding this
11   firing other than the missing the two days of
12   work?
13 A   Not to my knowledge.
14 Q   Do you all conduct background checks on your
15   hires?
16 A   We do.
17 Q   Have you conducted a background check of
18   Mr. Zaragoza?
19 A   All employees, yes.
20 Q   You presumably will produce that copy with
21   Mr. Zaragoza's file; correct?
22 A   Yeah, we can provide that.
23 Q   Presumably you have a background check of Davin
24   Terrell?
25 A   Yes.

Page 41

1  Q   And you'll produce a copy of that as well?
2  A   Yes.
3  Q   Do you have forwarding addresses for Aushiana
4    Robinson?
5  A   I'm not sure.  I certainly can check.
6  Q   Do you have a forwarding address for Theresa
7    Crooks?
8  A   I'm not sure but I can check.
9        MR. ALBERTSON:  Just quickly, Joe, those
10   are identified in our initial disclosures.
11       MR. ZDRILICH:  For the addresses?  Thank
12   you.
13       MR. ALBERTSON:  Yes.  I think Robinson is
14   in there, but I know Crooks is.
15 Q   Do you have any incidents involving 911 calls or
16   CAD reports from the Silver Oak premises for the
17   one-year period before this incident?
18 A   I do not have them, but I'm pretty sure they can
19   be produced.
20 Q   Have there been any incident reports of violent
21   crime on premises from January 31st, 2021 to the
22   present?
23 A   Yes.
24 Q   Do you have copies of those that you can
25   produce?

11 (Pages 38 - 41)

30(b)(6) Kendrel Bretz                                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 42

1  A  I believe so.
2  Q  Of course, other than discussing specifics of
3     what you've told your counsel in preparation for
4     today's deposition, did anyone help you prepare
5     for your testimony?  We don't want to know
6     anything you discussed with your lawyer, but did
7     anyone else help you prepare for today's
8     testimony?
9  A  No.
10 Q  When did you receive the documents that we had
11    produced to us today and that we've marked as
12    Exhibits 4 and 5, when did you receive those
13    documents in preparation for today's deposition?
14 A  What exhibit are you identifying as 4 and 5?
15 Q  I've called them 4 and 5.  These are the
16    personnel records for Davin Terrell and the
17    incident report is Exhibit 5.
18 A  I do not know the date that they were produced
19    to me.
20 Q  You're aware this action was removed by your
21    counsel to the Northern District Federal Court
22    in Georgia?
23 A  I don't understand.
24 Q  Where this is pending in U.S. District Court,
25    it's in Federal Court.

Page 43

1  A  I'm not aware.
2  Q  Okay.  But before that it was pending in the
3     State Court of Gwinnett County.  And we
4     submitted some discovery requests in that matter
5     and, Austin, tell me if I'm wrong, but I don't
6     think we have responses to those.  And I'll ask
7     some follow-up questions, but those were first
8     issued in June of 2023.
9        MR. ALBERTSON:  Correct.
10 Q  And we don't have any responses on file.
11       Do you intend to answer the discovery
12    request from State Court or, to your knowledge,
13    will your counsel insist on us refiling them in
14    the District Court?  And we will if we have to.
15    But you've had these now for over a year, so I'm
16    just wondering if you've composed answers to
17    them yet?  And I'll put them in front of you and
18    I'll mark them as Exhibit 6.
19       (Plaintiff's Deposition Exhibit 6 was
20    marked for identification.)
21       MR. ALBERTSON:  That's a question for us,
22    we can answer the State questions.  We'll answer
23    those.
24       MR. ZDRILICH:  Very good.
25 Q  Besides the documents you've produced today that

Page 44

1     we've discussed and I referenced as Exhibits 4
2     and 5, where were they kept?  Were they kept in
3     the hard drive or iCloud, a cloud-based
4     software?
5  A  Which specific exhibits are you referring to?
6  Q  Exhibits 4 and 5.  Those are the Davin Terrell
7     personnel records to date that you've produced
8     as of today and then the incident report, that
9     one-page report we have.
10 A  Our employee files are in Paylocity, which is
11    our human resources platform, HRIS.
12 Q  Did you say Paylocity?
13 A  That's correct.
14 Q  P-A-Y-L-O-S-I-T-Y?
15 A  P-A-Y-L-O-C-I-T-Y.
16 Q  Is that also where the background checks would
17    be on the various employees we've discussed?
18 A  That's correct.
19 Q  Who do you conduct those through?  Do you use
20    HireRight?
21 A  We've used different background check companies.
22    I believe most recently we use Checkr, but I
23    can't speak to what was used at the time of hire
24    for the individuals in question.
25 Q  Does TWG have a policy to not hire individuals

Page 45

1     who have been convicted of a felony?
2  A  We have a screening model that checks different
3     crimes, as well as severity.  Felonies in and of
4     themselves are not disqualifiers, but it is
5     somewhat dependent.
6  Q  How about drug-related crimes, are they
7     disqualifiers?
8  A  Not in and of themselves, no.  It depends upon
9     severity, as well as dates.
10 Q  How about drug charges with intent to
11    distribute?
12 A  I do not know specifically as it relates to that
13    one.
14 Q  Who would know specifically?
15 A  I can get access to them, I just don't know off
16    the top of my head.
17 Q  And you can supplement today's production and
18    you can find out what are or are not no hire
19    offenses for TWG?
20 A  Sure.
21 Q  Very good.
22       As part of preparation for today's
23    deposition and investigation into this matter,
24    have any employees at the Silver Oak property
25    given statements to any insurance adjuster?

12 (Pages 42 - 45)

30(b)(6) Kendrel Bretz                           September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 46

1   A   I am not sure.
2   Q   Do you know if they've given statements -- of
3       course, I don't want to know the content of
4       those statements, that content is work product.
5       But do you know if they have given any
6       statements to your in-house counsel that you
7       referenced at the beginning of the deposition?
8   A   I'm unsure.  I know that he spoke to whomever
9       was available as to what happened.
10  Q   Do you believe that defendant, TWG, has a duty
11      to address reports of problems with pets at the
12      complex?
13  A   How do you define "problem"?
14  Q   Reports of bites, either of other tenants'
15      animals or of persons.
16  A   Yes, if we are made aware of harm to a person or
17      property, yes.
18  Q   Why is that important?
19  A   Because we want to be stewards of the property
20      and the community and the residents that we
21      serve.
22  Q   You stated that you do run background checks on
23      your employees.  Do you believe you have a duty
24      to run those background checks?
25  A   Yes.

Page 47

1   Q   Why?
2   A   Because we want to understand the people who
3       have the ability to enter residents' homes.
4   Q   Do people like in Mr. Terrell's position, he was
5       obviously maintenance tech on premises at one
6       point or another, do they have access to
7       individual apartments without the residents
8       being present at the same time?
9   A   We have keys available in our leasing office to
10      allow us access to an apartment, is that what
11      you're asking?
12  Q   Partly.
13          Does that mean that they have to ask the
14      leasing office for those keys if they need to
15      enter an apartment for a particular reason or a
16      complaint?
17  A   Yes.
18  Q   They don't just carry around a key chain with a
19      key to, say, 12F?  Mr. Zaragoza wouldn't have a
20      key chain and say I want to go in 12F and check
21      out the complaint?  He'd have to go to the
22      leasing office first?
23  A   That's correct.
24  Q   What, for instance on Mr. Zaragoza's key chain,
25      what areas would he have access to?

Page 48

1   A   Generally our maintenance technicians have
2       access to common areas, so janitorial closets,
3       amenities, laundry rooms, things of that nature,
4       but not access to any keys.
5   Q   So there would be a report or something they
6       would have to fill out to get access to one of
7       those keys, like a check-in, check-out process?
8   A   This property has a key tracking system, I
9       believe it's called HandyTrac.  They have to
10      gain access to the keys themselves.
11  Q   Do you have access to that key tracking system
12      here today?
13  A   I do not.
14  Q   What's the name of that key tracking system?
15  A   I believe it is called HandyTrac.
16  Q   That would presumably document when maintenance
17      officials for safety reasons would document when
18      maintenance staff, maintenance techs would have
19      access to individuals' apartments?
20  A   That's what it's supposed to, yes.
21  Q   Have you ever had complaints on premises since
22      the year preceding this incident, we'll just
23      call that January 31st, 2021, of any maintenance
24      tech or complex employee entering any apartment
25      in an unauthorized manner?

Page 49

1   A   No, not to my knowledge.
2   Q   Outside of your earlier testimony about calling
3       animal control if you see any unauthorized or
4       unclaimed dogs on premises roaming the complex,
5       does TWG have any other written policies or
6       procedures promulgated for dealing with
7       unclaimed dogs or unauthorized pets on premises?
8   A   No, no other process.
9   Q   Are employees given a manual that they have to
10      sign off on when they are on-boarded with TWG?
11      And I should be more specific.  Employees at the
12      Silver Oak complex.  I'm not talking about the
13      company in general here at corporate.  But for
14      the complex, are they given a manual or some
15      kind of booklet?
16  A   There is a handbook that's available on site,
17      but I'm not sure if they require a document of
18      said handbook.
19  Q   Do they have to sign anything to acknowledge
20      that they've received a copy of the handbook or
21      that they've reviewed the handbook or accept the
22      policies in the handbook?
23  A   I do not know if they were asked to do
24      acknowledgement of receipt.
25  Q   Do you have a copy of the handbook here on

13 (Pages 46 - 49)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 50

1    premises?
2  A  I can get you one.
3  Q  You can get us a copy of the handbook?
4  A  Yes.
5  Q  And is that a handbook for Silver Oak or for TWG
6     properties in general?
7  A  It would be for TWG properties in general.
8        MR. ZDRILICH: We'd ask that you produce
9     that at the earliest available date.
10    Presumably, all these within the next 30 days.
11       MR. ZDRILICH: Yes.
12       MR. ZDRILICH: We have discovery coming up
13    toward the end of discovery, November 15, I
14    believe.
15       MR. ALBERTSON: Yes, we'll have a formal
16    response to those.
17       MR. ZDRILICH: I feel comfortable I've
18    covered all the ground I need to cover today, so
19    I have no other questions.
20       MR. ALBERTSON: Can we go off the record
21    for a couple minutes.
22       (Off-the-record discussion.)
23       MR. ALBERTSON: I just have a couple
24    questions and I'll be ready to roll.
25       (Defendant's Deposition Exhibit 1 was

Page 51

1     marked for identification.)
2  CROSS-EXAMINATION,
3     QUESTIONS BY AUSTIN L. ALBERTSON:
4  Q  Mr. Bretz, I'm Austin Albertson, I'm your
5     counsel on behalf of TWG. I just have a couple
6     questions for you, and then we'll be ready to
7     get out of here.
8        I'm going to show you what I'm going to
9     mark as Defense Exhibit 1. Do you recognize
10    what this is?
11 A  This is a site plan for Silver Oak.
12 Q  When did TWG take over at Silver Oak?
13 A  I believe the acquisition was in 2019.
14 Q  Have there been any changes to the site since
15    TWG bought the property?
16 A  It was an acquisition rehab, so yes, we went in
17    and rehabbed the units, the leasing office and I
18    believe some of the amenities.
19 Q  Has that involved moving any of the buildings as
20    where they presently sit?
21 A  No.
22 Q  Just interior changes?
23 A  Yes.
24 Q  So what I've put in front of you is a site map
25    of Silver Oak. We've been talking a little bit

Page 52

1     about 12F. How does the apartment numbering
2     work at TWG? So 12F, what does that correspond
3     to?
4  A  12 is the building number, and F is the unit
5     identifier.
6  Q  Okay. So could you circle and initial next to
7     Building 12?
8  A  Sure. (Witness complied.)
9  Q  And we talked about this a little earlier,
10    that's the building that's been identified as
11    where Terrell was or living, according to
12    plaintiff, on the date of the bite; right?
13 A  Yeah, that's the unit.
14 Q  Was what alleged to be where Terrell was living?
15 A  Yes.
16 Q  I'll represent to you that plaintiff was deposed
17    in this case and identified, it's been circled
18    here, Building No. 3. Do you see Building
19    No. 3?
20 A  I do see Building No. 3.
21 Q  Is where she identified in her deposition as
22    where she believed the bite took place.
23       So can you find and circle and initial next
24    to where the leasing office is?
25 A  The leasing office is in this location.

Page 53

1  Q  Has the leasing office ever moved as long as TWG
2     has owned the property?
3  A  No, it has not.
4  Q  What time generally is the leasing office open
5     and then closes at?
6  A  8:30 to 5:30. And maybe it's possible that
7     someone was doing some admin work and they'd
8     leave as late as 6:00.
9  Q  And that hasn't changed the entire time TWG has
10    owned the property?
11 A  Not to my knowledge.
12 Q  Are any of the other buildings listed here on
13    this map for employees of TWG? Like where they
14    would work out of?
15 A  The maintenance shop is back here.
16 Q  Can you label that maintenance shop whatever
17    you're about to identify?
18 A  (Witness complies.)
19 Q  So are there any other buildings on site, other
20    than the leasing office and the maintenance shop
21    you identified, where would be based out of or
22    work out of if they weren't responding to an
23    issue of a specific unit?
24 A  No.
25       MR. ALBERTSON: That's all I have. That's

14 (Pages 50 - 53)

30(b)(6) Kendrel Bretz                                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 54

1    it.
2         MR. ZDRILICH:  I'll order a copy.
3         MR. ALBERTSON:  We'll take an E-Tran.
4    Signature.  Basically, you have a right to
5    review the transcript.  You can't make material
6    changes to it, but if there's like a spelling
7    mistake or something stylistic that could be an
8    error, you have the right to look over within
9    30 days and make any changes.  It's totally your
10   right to do that, but you can waive that right
11   to signature.  It's whatever you would like to
12   do.
13        THE WITNESS:  Do I need to decide today?
14        MR. ALBERTSON:  Normally we decide today.
15   Or if you want to take a look at, it -- you want
16   to see it?  All right, then, we won't waive
17   signature.
18        (Time noted:  12:23 p.m.)
19
20        AND FURTHER DEPONENT SAITH NOT.
21
22
23
24
25

Page 55

1   STATE OF INDIANA          )
                              )  SS:
2   COUNTY OF MARION          )
3
4        I, Craig Williams, RPR, CMRS, a Notary Public
5   in and for the County of Marion, State of Indiana,
6   at large, do hereby certify that KENDREL BRETZ, the
7   deponent herein, was by me first duly sworn to tell
8   the truth, the whole truth, and nothing but the
9   truth in the aforementioned matter;
10       That the foregoing 30(b)(6) deposition of
11  Kendrel Bretz, on behalf of TWG Management, LLC,
12  was taken on behalf of the Plaintiff, at the
13  offices of TWG Management, LLC, 1301 East
14  Washington Street, Suite 100, Indianapolis, Marion
15  County, Indiana, on the 17th day of September 2024,
16  scheduled to start at 10:00 a.m. EST, pursuant to
17  the Federal Rules of Civil Procedure;
18       That said deposition was taken down in
19  stenograph notes and translated into an English
20  transcript under my direction, and that said
21  transcript is a true record of the testimony given
22  by the said deponent; and that signature was
23  requested by the deponent and all parties present;
24       That the parties were represented by their
25  counsel as aforementioned.

Page 56

1        I do further certify that I am a disinterested
2    person in this cause of action, that I am not a
3    relative or attorney of either party or otherwise
4    interested in the event of this action, and that I
5    am not in the employ of the attorneys for any
6    party.
7        IN WITNESS WHEREOF, I have hereunto set my
8    hand and affixed my notarial seal on this 23rd day
9    of September 2024.
10
11
12               N O T A R Y   P U B L I C
13
14   My Commission Expires:
15   January 11, 2032
16   County of Residence:
17   Marion County
18
19
20
21
22
23
24
25

Page 57

1    Kendrel Bretz
2
3                September 23, 2024
4    RE:   Armistead, Jennifer v. TWG Management, LLC
5    9/17/2024, 30(b)(6) Kendrel Bretz (#6912190)
6      The above-referenced transcript is available for
7    review.
8      Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   litsup-ga@veritext.com
16    Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

15 (Pages 54 - 57)

```
                                                    Page 58
 1  Armistead, Jennifer v. TWG Management, LLC
 2  30(b)(6) Kendrel Bretz (#6912190)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  30(b)(6) Kendrel Bretz              Date
25
```

```
                                                    Page 59
 1  Armistead, Jennifer v. TWG Management, LLC
 2  30(b)(6) Kendrel Bretz (#6912190)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4      I, 30(b)(6) Kendrel Bretz, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____  _____
12  30(b)(6) Kendrel Bretz              Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

**[& - 7th]**                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   2:9

**0**

**02583**   1:3

**1**

**1**   3:10 7:3,6
50:25 51:9
**100**   1:17 55:14
**10:28**   4:1
**10:58**   26:2
**10th**   34:24
**11**   7:2 56:15
**11:21**   26:3
**12**   52:4,7
**125**   2:5
**12:23**   54:18
**12f**   21:10,11,16
21:22 24:16
32:20,21 38:12
47:19,20 52:1
52:2
**130**   29:13
33:18
**1301**   1:17
55:13
**13e**   38:11
**14**   3:11
**140**   33:18
**1420**   2:9
**14763**   6:6
**15**   50:13
**16g**   21:1
**17**   18:12

**17th**   1:18 55:15
**18**   17:6,9
**1:24**   1:3

**2**

**2**   3:10 38:6,8
**20**   17:9 59:15
**2019**   17:5,9
51:13
**2020**   16:12
17:10 19:18,21
20:2
**2021**   12:19
19:11 26:21
27:6 28:23
34:6 41:21
48:23
**2022**   10:5,15
11:8 19:22
20:4 28:7,24
34:24
**2023**   8:14
10:24,25 26:22
27:7,20 36:9
43:8
**2024**   1:18
55:15 56:9
57:3
**2032**   56:15
**21158**   56:11
**22nd**   28:6
**23**   57:3
**23rd**   17:18,19
56:8
**24**   22:14 24:3,5
24:9

**24th**   16:12
17:18,20,23
**25**   3:11

**3**

**3**   3:11 25:15,19
26:6 33:9
52:18,19,20
**3/10/22**   3:10
**3/22/22**   3:11
**30**   1:12,14 4:9
19:13 50:10
54:9 55:10
57:5,16 58:2
58:24 59:2,4
59:12
**30096**   2:5
**30309-3231**
2:10
**317**   6:13,15
**31st**   10:15 11:8
12:18 19:11
34:6 35:2
41:21 48:23
**32**   3:12
**3575**   2:5
**38**   3:10

**4**

**4**   3:2,11 14:1,5
14:6 17:16
18:11 39:16
42:12,14,15
44:1,6
**401**   18:15

**404.874.8800**
2:11
**404.888.1111**
2:6
**43**   3:12
**488**   11:13

**5**

**5**   3:12 32:3,7
33:8 34:23
42:12,14,15,17
44:2,6
**50**   3:14
**51**   3:3
**5500**   8:18
**5:00**   18:14
**5:30**   53:6

**6**

**6**   1:12,14 3:12
4:9 43:18,19
55:10 57:5
58:2,24 59:2,4
59:12
**60**   9:4,8
**607-6832**   6:13
6:15
**6912190**   57:5
58:2 59:2
**6:00**   53:8

**7**

**7**   3:10 22:5
**7th**   17:5

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[800 - apartment]**                                                    Page 2

| 8 |
|---|
| **800**  2:10 |
| **8:00**  18:14 |
| **8:30**  53:6 |

| 9 |
|---|
| **9/17/2024**  57:5 |
| **911**  41:15 |

| a |
|---|
| **a.m.**  1:18 4:1 |

**a.m.**  1:18 4:1
  18:14 26:2,3
  55:16
**abandoned**
  19:18 20:1
**abandonment**
  17:17
**ability**  31:16
  47:3
**able**  29:21
  31:19,21
**above**  57:6
  59:7
**absolutely**  26:1
**accept**  49:21
**acceptance**
  13:18
**access**  30:16
  36:20 45:15
  47:6,10,25
  48:2,4,6,10,11
  48:19
**accommodate**
  5:16
**accord**  11:3

**account**  13:18
**accuracy**  57:9
**acknowledge**
  49:19
**acknowledge...**
  49:24 59:3
**acknowledg...**
  57:12
**acquisition**
  51:13,16
**acting**  10:8,12
**action**  1:3 8:2
  19:22 21:8
  27:2 42:20
  56:2,4
**ada**  22:16 23:8
**addenda**  22:21
**addendum**
  22:11,22,24
  24:1
**additional**
  22:12
**additions**  59:6
**address**  6:5
  41:6 46:11
**addresses**  41:3
  41:11
**adjacent**  38:12
**adjuster**  45:25
**admin**  53:7
**administered**
  24:24
**administering**
  8:7

**administration**
  39:22
**admit**  34:8
**advance**  7:8
**advise**  28:3
  31:4 37:11
**affixed**  56:8
**aforemention...**
  55:9,25
**aggressive**  29:6
**ago**  9:12
**agreeable**  4:23
**agreement**
  13:19 19:5,6
  22:23
**agreements**
  39:3
**ahead**  24:7
**aid**  12:22
**akita**  15:12
  28:6 30:1,1,8
  31:23 32:1
  33:24 34:1
  38:14,18,23
**albertson**  2:8
  3:3 4:19,23 5:1
  13:14,24 16:8
  25:22 36:25
  41:9,13 43:9
  43:21 50:11,15
  50:20,23 51:3
  51:4 53:25
  54:3,14
**alexia**  38:10

**alleged**  37:13
  37:15 52:14
**allotted**  57:19
**allow**  22:10
  47:10
**allowed**  22:7
**amenities**  48:3
  51:18
**animal**  15:12
  22:10,11,13,16
  22:19,24 23:8
  23:13,20 24:1
  24:8 29:22
  30:4,6,6,11
  31:4,7,10 49:3
**animals**  22:6
  46:15
**answer**  4:21
  5:5,7,10 43:11
  43:22,22
**answered**
  27:16,17,22
**answers**  43:16
**anymore**  36:4
**anyone's**  37:15
**apartment**  9:5
  19:18,24 20:11
  20:14,16,17,19
  20:23,25 21:10
  21:11,16,22
  22:8,9 24:16
  25:4 32:19
  38:11,12 47:10
  47:15 48:24
  52:1

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[apartments - bretz]**                                    Page 3

**apartments** 9:5
  12:21 19:5
  23:5 24:18
  26:8 47:7
  48:19
**apologies** 6:16
**apologize** 25:12
  25:22
**apparently**
  30:21
**appear** 17:7
  38:12
**appearances**
  2:1 20:18
**appeared** 35:7
**appears** 19:5
  22:4 33:10
  34:8
**appended** 59:7
**applicable** 57:8
**application**
  13:20
**approximately**
  17:6,8,11 27:6
  28:21
**area** 31:15
**areas** 47:25
  48:2
**arising** 15:8
**arm** 7:25
**armistead** 1:4
  57:4 58:1 59:1
**ascertain** 31:12
  32:1,21

**aside** 32:5
**asked** 5:11 28:6
  33:12 49:23
**asking** 32:12
  35:3,10 47:11
**asserted** 35:25
**assigned** 16:24
**assistant** 36:12
**associated** 13:4
**assume** 27:24
**atlanta** 1:2
  2:10
**attached** 57:11
**attacked** 33:24
  33:25
**attention** 23:13
  23:21 24:21
  29:17 31:2
**attorney** 56:3
  57:13
**attorneys** 56:5
**aushiana** 10:16
  25:9,11,12,13
  36:18 41:3
**austin** 2:8 3:3
  4:18,20 43:5
  51:3,4
**austin.alberts...**
  2:11
**authority** 15:24
**authorize** 22:9
  22:16
**available** 46:9
  47:9 49:16
  50:9 57:6

**aware** 15:10
  20:6,15 21:18
  21:19 23:23
  28:19 30:13
  31:3 32:10,12
  34:15 42:20
  43:1 46:16

**b**

**b** 1:12,14 4:9
  4:15 10:18
  55:10 56:12
  57:5 58:2,24
  59:2,4,12
**back** 14:7 33:7
  53:15
**background**
  5:18 40:14,17
  40:23 44:16,21
  46:22,24
**based** 31:2
  37:12 44:3
  53:21
**basically** 54:4
**basis** 18:13
**beginning** 46:7
**behalf** 1:12,14
  1:16 7:12
  11:15 14:8
  15:25 51:5
  55:11,12
**believe** 8:24
  10:16,24 11:13
  12:14 26:21,25
  30:18 32:13
  42:1 44:22

  46:10,23 48:9
  48:15 50:14
  51:13,18
**believed** 52:22
**belong** 35:17
  35:21
**belonged** 29:21
  31:10 32:15
**best** 5:19 29:19
  31:15
**better** 5:21,23
**beyond** 38:4
**big** 29:6 33:14
  35:8
**bird** 22:7
**bit** 13:22 24:6
  25:17 30:2
  35:22 51:25
**bite** 52:12,22
**bites** 12:18,24
  15:4,8,17,17
  34:4,9 37:18
  46:14
**biting** 38:23
**bitten** 34:2
  38:15
**boarded** 49:10
**booklet** 49:15
**bought** 51:15
**boulevard** 2:5
**break** 5:9 25:25
**breaks** 5:15
**bretz** 1:12,14
  4:2,13 5:2 51:4
  55:6,11 57:1,5

30(b)(6) Kendrel Bretz
September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

[bretz - condition]

Page 4

58:2,24 59:2,4
59:12
**briefly**  16:9
25:23
**broadly**  23:18
**brought**  23:13
23:21 24:21
29:17 32:11
**building**  52:4,7
52:10,18,18,20
**buildings**  17:2
51:19 53:12,19

**c**

**c**  10:11 44:15
56:12
**cad**  41:16
**call**  14:4 17:15
30:4 31:7
48:23
**called**  30:6,7
42:15 48:9,15
**calling**  30:11
49:2
**calls**  41:15
**cameras**  11:24
14:25
**campo**  28:4
**canvass**  31:15
**canvassed**
31:23,25
**capacity**  7:11
7:13
**care**  12:22
**carmel**  6:8

**carry**  47:18
**case**  7:21 25:8
52:17
**cause**  56:2
**cell**  6:12
**certain**  31:19
**certainly**  21:3
41:5
**certified**  22:16
**certify**  55:6
56:1
**chain**  47:18,20
47:24
**change**  58:4,7
58:10,13,16,19
**changed**  53:9
**changes**  51:14
51:22 54:6,9
57:10 59:6
**charge**  39:18
**charges**  22:13
45:10
**chasity**  10:9
**check**  40:17,23
41:5,8 44:21
47:20 48:7,7
**checkr**  44:22
**checks**  40:14
44:16 45:2
46:22,24
**chief**  6:22
**circle**  52:6,23
**circled**  52:17
**circumstances**
26:23

**cited**  21:19
**civil**  1:3,19 4:8
55:17
**clarify**  5:21
13:21
**clarkston**  9:6
**client**  20:15
21:16 30:2
**closes**  53:5
**closets**  48:2
**cloud**  44:3
**cmrs**  1:15 55:4
**collectively**
14:4 16:4
**colorado**  8:23
**come**  14:6
23:25 33:7,23
39:24
**comes**  37:6
**comfortable**
50:17
**coming**  50:12
**commission**
56:14
**common**  48:2
**communities**
9:4
**community**
22:9 46:20
**companies**  7:22
44:21
**company**  7:25
49:13
**compensation**
18:9,10

**complained**
40:7
**complaint**  21:9
21:14,18 24:22
37:3 47:16,21
**complaints**
12:17,17 15:4
15:11 28:11
37:13,15,18
38:17,21,22
48:21
**complete**  59:8
**completed**
57:16
**complex**  9:6
11:17,20,25
14:20 15:5,9
16:16,19,20
18:17 23:4
27:15 28:18,21
30:8,11 31:22
46:12 48:24
49:4,12,14
**complexes**  9:3
**compliance**
23:25
**complied**  52:8
**complies**  53:18
**comply**  24:3,5
24:8
**composed**
43:16
**condition**  30:19
30:25

30(b)(6) Kendrel Bretz                                        September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[conduct - deposing]**                                                Page 5

**conduct** 34:20 40:14 44:19
**conducted** 32:8 40:17
**considered** 22:15
**constitutes** 30:18
**contact** 29:22 31:4 36:4
**contacted** 35:15
**content** 46:3,4
**continuing** 22:20
**contract** 22:15
**control** 29:22 30:4,6,6,12,16 31:5,8 49:3
**convicted** 45:1
**copies** 41:24 57:14
**copy** 7:6,8 12:12 32:18 40:20 41:1 49:20,25 50:3 54:2
**corporate** 40:2 49:13
**corporation** 7:12
**correct** 8:8 9:9 10:3 16:13,14 17:11,25 19:23 25:7 26:19

27:18,19,23 28:2 29:1,2 33:1,6 35:4,5 35:19,20 37:14 37:16 39:5,12 40:5,21 43:9 44:13,18 47:23 59:8
**corrections** 59:6
**correspond** 52:2
**corresponden...** 17:4
**counsel** 4:18 13:15 14:10,11 14:13,15 19:4 42:3,21 43:13 46:6 51:5 55:25 57:14
**county** 1:16,17 9:6 43:3 55:2,5 55:15 56:16,17
**couple** 17:24 30:7 50:21,23 51:5
**course** 14:13 15:20 31:14 42:2 46:3
**court** 1:1 42:21 42:24,25 43:3 43:12,14
**covenants** 23:11

**cover** 50:18
**covered** 50:18
**craig** 1:15 55:4
**crime** 41:21
**crimes** 45:3,6
**crooks** 32:14 36:6,6,7 41:7 41:14
**cross** 3:3 51:2
**currie** 2:9 4:19 14:16
**custody** 30:16
**cv** 1:3

**d**

**d** 10:12
**d1** 3:14
**date** 8:15 11:10 18:3 19:13 34:24 42:18 44:7 50:9 52:12 58:24 59:12
**dates** 10:23 13:9 17:18,21 26:20 28:22 45:9
**davin** 3:11 13:5 15:13,22 16:6 19:6,8 20:24 35:17,21,25 39:14 40:23 42:16 44:6
**day** 1:18 18:4,5 20:16 55:15 56:8 59:15

**days** 17:24 19:13 40:11 50:10 54:9 57:16
**deal** 23:5
**dealing** 12:7 49:6
**december** 19:11
**decide** 54:13,14
**decision** 40:2
**declare** 59:4
**deem** 31:1
**deemed** 59:6
**default** 22:15 39:10
**defendant** 1:8 2:7 4:11,17 15:25 46:10
**defendant's** 3:13 50:25
**defense** 51:9
**deficiencies** 27:3
**define** 46:13
**dekalb** 9:6
**denise** 19:9
**dependent** 45:5
**depends** 45:8
**deponent** 54:20 55:7,22,23 57:13 59:3
**deposed** 52:16
**deposing** 57:13

**[deposition - employees]**                                          Page 6

**deposition**  1:12
  1:14 3:9,10,13
  4:9,10 5:2 7:3
  7:6,7,9,17 8:15
  14:1 25:15
  32:3 38:6 42:4
  42:13 43:19
  45:23 46:7
  50:25 52:21
  55:10,18
**depositions**
  5:14
**deposits**  22:12
**describe**  29:13
  31:11
**describes**  29:10
  33:20
**describing**
  30:25
**description**
  32:13
**designated**
  11:14,22 12:15
  14:8
**determine**
  29:22
**development**
  7:20,24,24 8:4
  9:17
**devin**  19:8
**different**  11:4
  18:4,5 36:10
  36:11 38:15
  44:21 45:2

**direct**  3:2 4:6
  23:11
**direction**  55:20
**director**  39:20
**directors**  9:23
  10:1
**disciplinary**
  27:2
**disciplined**
  27:1
**disclose**  23:1
  39:9
**disclosed**  23:7
**disclosures**
  13:16 41:10
**discount**  18:16
  18:19
**discovered**
  35:16
**discovery**  43:4
  43:11 50:12,13
**discussed**  14:12
  16:1 28:16,16
  29:24 42:6
  44:1,17
**discussing**
  30:23 42:2
**discussion**  6:18
  16:10 50:22
**disinterested**
  56:1
**dispensed**  5:24
**disqualifiers**
  45:4,7

**distribute**
  45:11
**district**  1:1,1
  42:21,24 43:14
**division**  1:2
**document**
  17:14,15 18:2
  18:10 19:3
  48:16,17 49:17
**documented**
  23:14 34:9
  39:2
**documents**
  16:5 21:25
  42:10,13 43:25
**dog**  12:18,24
  15:4,8,12,16
  20:19 25:5
  28:4,6,9,9 29:3
  29:12,17 31:12
  32:13 33:13,21
  33:24 34:4,9
  34:10 35:9,10
  35:12,14,16,17
  35:21,23 36:2
  36:3 37:4,5,8
  37:15,18,18
  38:14,15,18,24
**dogs**  28:12,17
  29:5,16 30:14
  30:20 33:25
  34:2 37:19
  49:4,7
**doing**  53:7

**drive**  6:6 44:3
**drug**  45:6,10
**duluth**  2:5
**duly**  4:3 55:7
**duru**  38:10,18
  38:22
**duties**  9:13
  16:22,23
**duty**  46:10,23

**e**

**e**  4:15,15 54:3
  58:3,3,3
**earlier**  49:2
  52:9
**earliest**  50:9
**early**  20:10
**east**  1:17 55:13
**efficiently**  5:13
**either**  24:15,21
  37:19 46:14
  56:3
**email**  38:1
**employ**  56:5
**employed**  17:8
  26:21 32:16
**employee**  11:19
  13:7 14:22
  15:13 18:19
  26:12 33:12
  35:14,18 44:10
  48:24
**employees**  11:7
  11:16 14:19
  23:4 24:25
  28:12 30:10

**[employees - generally]**                                    Page 7

36:14 40:19
44:17 45:24
46:23 49:9,11
53:13
**employment**
13:9 26:20
27:6 28:22
39:14
**ended** 19:19
**english** 55:19
**enter** 47:3,15
**entering** 48:24
**entire** 27:21
53:9
**entity** 7:23 8:10
**errata** 57:11,13
57:16
**error** 54:8
**est** 1:18 55:16
**event** 20:11
56:4
**events** 8:2 9:12
19:21 34:14
40:10
**exact** 8:18
10:23
**examination**
1:14 3:1,2,3
4:6 51:2
**examined** 4:5
**except** 4:21
**exhaustive** 9:2
9:15
**exhibit** 3:9,10
3:10,11,11,12

3:12,13,14 7:3
7:6 13:13 14:1
14:5,6 17:16
18:11 25:15,19
26:6 32:3,7
33:8,9 34:23
38:6,8 39:16
42:14,17 43:18
43:19 50:25
51:9
**exhibits** 3:8
14:4 25:18
42:12 44:1,5,6
**existence** 23:7
**expand** 5:7
**expected** 29:8
**expires** 56:14
**expletive** 29:4
**expletives**
33:18
**extension** 19:16
**extent** 31:19
**extra** 6:14

**f**

**f** 52:4
**fact** 31:3 32:11
**fails** 57:18
**familiar** 7:15
**february** 26:21
27:6 28:23
**federal** 1:18 4:8
42:21,25 55:17
**fee** 24:2
**feel** 5:22 50:17

**fees** 22:12
**felonies** 45:3
**felony** 45:1
**file** 1:3 18:6
35:12 38:17
39:13 40:21
43:10
**files** 36:18
44:10
**fill** 48:6
**final** 13:17
**finally** 30:8
**find** 21:21 23:9
23:19 31:20
45:18 52:23
**fine** 21:6
**fire** 40:7
**firing** 13:5
15:22 39:19,22
40:11
**first** 4:22 10:11
17:14 34:25
43:7 47:22
55:7
**fish** 22:7
**five** 15:9
**follow** 17:22
43:7
**follows** 4:5
**foregoing**
55:10 59:5
**form** 3:12 4:21
4:22 34:23
37:21,22

**formal** 12:17
37:3,17 50:15
**former** 15:13
26:12 35:18
**formerly** 20:24
**forth** 7:16
19:10
**forwarding**
41:3,6
**free** 5:22 13:2
28:10 29:7
33:13
**freely** 38:16
**french** 33:15
**front** 7:5 25:20
26:5 30:21
32:6 33:9 38:8
43:17 51:24
**fucker** 33:14
**fucking** 29:5
**full** 15:24
**furnished**
21:25
**further** 54:20
56:1
**future** 17:21
22:3

**g**

**ga** 2:5,10 57:15
**gain** 48:10
**general** 14:10
49:13 50:6,7
**generally** 48:1
53:4

**[georgia - initial]**                                                    Page 8

**georgia**  1:1
  8:23 9:6 42:22
**give**  21:5 23:3
**given**  5:2 18:16
  29:9 34:13
  38:10 45:25
  46:2,5 49:9,14
  55:21 59:9
**giving**  8:2
  13:15 19:21
  21:8
**go**  6:16 16:8
  24:7 25:17,23
  47:20,21 50:20
**goes**  25:3 37:7
**going**  5:19
  17:14,19 19:16
  25:17,18 32:7
  34:22 51:8,8
**good**  43:24
  45:21
**great**  37:2
**ground**  5:10
  50:18
**grounds**  16:25
**guest**  20:17
  29:20
**gwinnett**  43:3

**h**

**h**  10:11,18 58:3
**hand**  56:8
**handbook**  23:3
  49:16,18,20,21
  49:22,25 50:3
  50:5

**handytrac**  48:9
  48:15
**happened**  46:9
**harassing**
  29:15
**hard**  44:3
**harm**  46:16
**hazard**  13:2
**head**  30:23,24
  45:16
**hear**  5:18 29:12
**heard**  34:1,25
**held**  21:15
**hell**  29:6 33:13
**help**  42:4,7
**hereto**  59:7
**hereunto**  56:7
**hey**  37:7
**hiers**  2:9
**higher**  26:17
**hire**  44:23,25
  45:18
**hireright**  44:20
**hires**  40:15
**hiring**  9:21
  11:15 13:5
  14:19 15:22
**hold**  27:5
**holly**  39:19,20
**home**  6:5
**homes**  47:3
**hop**  33:7
**hopefully**  22:1
  38:20

**hour**  18:12
**hours**  18:13
  22:14 24:3,5,9
**house**  14:11,13
  46:6
**hr**  40:9
**hris**  44:11
**human**  39:20
  44:11

**i**

**icloud**  44:3
**identification**
  7:4 14:2 25:16
  32:4 38:7
  43:20 51:1
**identified**  4:11
  8:25 13:16
  41:10 52:10,17
  52:21 53:21
**identifier**  52:5
**identify**  10:5
  29:19 31:9,21
  53:17
**identifying**
  42:14
**illegal**  22:13
**illinois**  8:22
**imagine**  5:14
**implementati...**
  11:23 14:24
**important**
  46:18
**incident**  3:12
  9:7 10:4 12:2,4
  12:5,19 19:1

  19:12 20:16
  21:8 24:13
  25:8 28:7,14
  32:5,6,9 34:3,5
  34:17,18,20,23
  34:24,25 35:1
  37:22,24 38:13
  39:13 41:17,20
  42:17 44:8
  48:22
**incidents**  37:5
  37:18 41:15
**include**  9:13,21
  16:25
**included**  16:23
**including**  12:23
  22:6
**index**  3:1,8
**indiana**  1:16,17
  4:17 6:8 8:22
  55:1,5,15
**indianapolis**
  1:17 4:16 6:7
  8:16 39:25
  55:14
**indirectly**  9:23
**individual**  7:13
  47:7
**individuals**
  44:24,25 48:19
**informal**  12:16
**information**
  10:25 32:11
**initial**  13:16
  41:10 52:6,23

**[initiated - law]**                                                    Page 9

| | | | |
|---|---|---|---|
| **initiated** 20:14 40:8 | **investigative** 34:16 | **joe** 2:6 13:25 41:9 | 21:14 23:23 24:10 26:9 |

initiated  20:14
  40:8
injured  12:23
  21:16
injury  2:4
insects  22:7
insist  43:13
inspected  24:18
instance  8:1
  23:16 47:24
instruct  38:1
insurance
  18:15 45:25
intend  43:11
intent  45:10
interest  33:22
interested  56:4
interior  51:22
internal  37:25
interrogatories
  3:12
interrupt  5:8
interruption
  24:6
interview  29:1
  29:10 33:12
intimidating
  33:21
investigated
  32:5
investigation
  32:8,10 34:14
  34:20 38:4
  45:23

investigative
  34:16
investigator
  3:10,11 25:21
  28:5 33:10
  34:19 35:3,7
  35:11 38:22
investigators
  26:7
involved  51:19
involving  11:24
  15:16 41:15
iowa  8:22
issue  28:17
  32:19 53:23
issued  43:8
issues  22:2

**j**

janitorial  48:2
january  10:5
  10:15 11:8
  12:18 17:5,9
  19:22 20:4
  34:6 35:2
  41:21 48:23
  56:15
jennifer  1:4
  57:4 58:1 59:1
job  6:21 9:13
  11:4 13:18
  16:3,15,22,23
  17:4,17 18:11
  26:14,17 27:3
  27:5 36:10,11

joe  2:6 13:25
  41:9
joined  33:11
joseph  2:4 3:2
  4:7
jr  19:8,8
july  17:18,18
jump  5:24
june  16:12
  17:10,19,20,23
  19:18,21 20:2
  26:21 27:7
  43:8

**k**

k  4:15 18:15
keeping  13:1
ken  4:13
kendrel  1:12,14
  4:2 55:6,11
  57:1,5 58:2,24
  59:2,4,12
kept  44:2,2
key  47:18,19,20
  47:24 48:8,11
  48:14
keys  47:9,14
  48:4,7,10
kind  14:5 49:15
knew  38:14
know  7:20 9:2
  10:14 11:1,7
  11:11 14:12
  18:2,3,5,22,24
  18:25 19:14
  20:10 21:10,12

21:14 23:23
  24:10 26:9
  34:12 35:2
  36:6 38:1,19
  40:6,8 41:14
  42:5,18 45:12
  45:14,15 46:2
  46:3,5,8 49:23
knowledgable
  14:18
knowledge
  7:16 15:15,21
  18:8,18 24:17
  27:4 31:18,25
  32:12,23 33:1
  33:4 36:17
  38:5 39:15
  40:13 43:12
  49:1 53:11
known  35:14
koger  2:5

**l**

l  2:8 3:3 6:4
  44:14,15 51:3
  56:12
label  53:16
lady  35:7
lamar  6:2
large  29:12
  30:20 35:12
  55:6
late  10:4 53:8
laundry  48:3
law  2:4

lawsuits 15:4,8
lawyer 14:12
  42:6
lease 9:18
  12:14 13:19
  19:4,6,11,13,16
  19:19 20:9,13
  22:5,15,20,23
  23:10,11 24:13
  32:18,24 39:3
  39:11
leaseholder
  20:20,22 23:15
leasing 35:11
  47:9,14,22
  51:17 52:24,25
  53:1,4,20
leave 10:22
  26:24 33:17
  53:8
leaving 11:6
left 11:1,3,4
  21:3 26:12,25
legacy 6:6
legal 57:23
lessor 33:6
letting 23:22
line 58:4,7,10
  58:13,16,19
lines 28:22
list 8:20
listed 18:10
  36:4 53:12
lists 17:18 19:7

litsup 57:15
little 5:12 25:17
  28:25 51:25
  52:9
live 18:20,22
  36:14,16
living 19:7 20:4
  20:6 32:21
  52:11,14
llc 1:7,12,14,17
  2:4 4:9,18
  55:11,13 57:4
  58:1 59:1
llp 2:9
located 10:7
location 29:20
  52:25
long 7:1 8:12
  53:1
longer 19:19
  32:15
look 16:3 54:8
  54:15
looking 22:4
  35:8
looks 17:3,9
  19:10 21:1
  36:5
lot 34:1
loud 5:19
lp 8:4

m

m 6:4
macdougall
  39:19,20,25

made 4:10 31:2
  37:17 46:16
  59:5
maintenance
  16:17,19,20
  17:1 24:25
  25:3 26:13,14
  27:8,15 30:23
  30:25 33:11
  47:5 48:1,16
  48:18,18,23
  53:15,16,20
make 54:5,9
makes 25:2
mammals 22:6
managed 9:4
management
  1:7,12,14,16
  4:9,18 6:19,23
  6:24 7:19,23
  7:23 8:6,13,17
  8:17 9:3,10,18
  9:20 29:9,23
  37:7 55:11,13
  57:4 58:1 59:1
manager 10:6
  10:13,14,19,20
  16:25 25:6
  36:8,9,12,13
managers 9:24
  9:25 10:2,2
managing 8:7
manner 48:25
manual 49:9,14

map 51:24
  53:13
march 28:6,24
  34:24
marion 1:16,17
  55:2,5,14
  56:17
mark 13:12
  32:7 43:18
  51:9
marked 7:4,5
  14:2 16:4
  25:16,19 26:5
  32:4 38:7
  42:11 43:20
  51:1
material 54:5
matter 4:5 43:4
  45:23 55:9
mcghee 2:9
mean 18:3
  47:13
meaning 23:6
means 24:1
meant 17:19
medical 12:23
member 33:11
members 8:4
  11:9
mentions 33:23
met 32:13
mf'er 33:17
mhc 1:3
michigan 8:23

**[middle - oversee]**                                               Page 11

middle  6:1
minutes  50:21
missed  17:23
missing  40:11
mistake  54:7
model  45:2
moment  33:8
month  17:21
  19:15,15
months  17:6,9
  28:7
mother  33:14
moved  36:13
  53:1
moving  51:19

**n**

n  4:15 10:18,18
  10:18 56:12
name  4:12 6:1
  10:11,11,17
  21:2,12 48:14
nature  48:3
ne  2:9
nearby  31:20
necessary  59:6
need  5:7,9,12
  5:14,20 22:18
  22:24 23:12
  25:24 47:14
  50:18 54:13
needed  28:1
neighbor  31:17
neither  32:23
never  30:6
  35:11

new  20:13
noise  5:18 24:6
noncompliant
  23:19
normally  54:14
northern  1:1
  42:21
notarial  56:8
notary  1:15
  55:4 59:13,19
note  57:10
noted  4:1 54:18
  59:7
notes  55:19
notice  1:19
  3:10 4:10 7:7
  7:17 13:17
  22:14 23:22
  24:10,14 36:23
noticed  24:23
november
  50:13
number  6:9,10
  6:12,14 8:18
  11:9 20:25
  52:4
numbering
  52:1

**o**

o  10:12,18,18
  44:14,15 56:12
oak  3:14 8:1
  9:5 10:7,15,19
  10:20 11:8,12
  11:16,19,25

12:21 13:20
  14:20 15:5,9
  15:16 16:16
  18:17 19:5
  23:4,17 26:8
  30:11,19 35:24
  40:4,6 41:16
  45:24 49:12
  50:5 51:11,12
  51:25
oaks  6:6
objections  4:21
obtaining
  12:22
obviously  47:5
occasions  38:15
  38:24
occupant  21:22
occupied  20:13
  20:24 21:3
occupying
  20:11
occur  17:21
occurred  8:2
  9:7,12 10:4
  15:8,18 19:1
  19:12,22 20:12
  20:17 21:9
  24:13 25:9
  28:8 35:1
  38:13
october  8:14
  10:24
offenses  45:19

offer  13:18
  16:3 17:4
  18:11,19
office  35:12
  37:7 40:4,6
  47:9,14,22
  51:17 52:24,25
  53:1,4,20
officer  6:22
offices  1:16
  4:17 55:13
official  21:21
officially  39:10
officials  48:17
ohio  8:22
okay  21:7,14
  37:2 43:2 52:6
oklahoma  8:24
older  29:3
ones  16:6
open  53:4
operate  8:19,22
opportunity
  11:4 25:24
oral  1:14
order  25:17
  54:2
original  13:19
outside  17:1
  34:18 39:2
  49:2
oversee  9:15,23
  9:24,24 10:1,1
  10:2

[oversight - prepare]                                                Page 12

**oversight** 9:16
**own** 11:2,3
**owned** 15:13
  53:2,10
**owner** 31:12
  36:2
**owners** 8:5
**ownership**
  14:10 32:1
**owns** 8:3

**p**

**p** 44:14,15
  56:12
**p.m.** 18:14
  54:18
**page** 22:5 38:4
  44:9 58:4,7,10
  58:13,16,19
**paid** 18:12
**pardon** 21:24
  24:6 29:4
  33:14
**part** 17:16 18:9
  18:11 34:13
  36:22 39:21
  45:22
**particular**
  47:15
**parties** 55:23
  55:24
**partly** 47:12
**party** 7:21 56:3
  56:6
**past** 19:13

**pauses** 21:24
**pay** 8:9
**paying** 24:1,2
**paylocity** 44:10
  44:12
**peachtree** 2:9
**pending** 42:24
  43:2
**people** 6:22
  19:7 29:5,15
  31:20 34:1,2
  35:10,15 37:9
  39:6 47:2,4
**performance**
  27:3
**period** 17:8
  41:17
**person** 7:15
  11:14,22 12:15
  14:18 15:15,21
  21:2,12 25:3
  29:18 31:9
  37:19 38:19
  39:18 46:16
  56:2
**personal** 6:10
**personnel** 3:11
  9:17,20 18:6
  33:11 36:18
  42:16 44:7
**persons** 9:21
  34:9 46:15
**pet** 12:10,12
  15:2 22:22,25
  23:1,7,14,24,24

24:2,2,3,11,16
24:20 29:21
31:16 39:2
**pets** 12:8 23:5
  24:19 39:6
  46:11 49:7
**phone** 6:9,10
  6:12
**phrase** 5:23
**picture** 28:5
**place** 1:19
  35:24 38:4
  52:22
**plaintiff** 1:5,16
  2:3 52:12,16
  55:12
**plaintiff's** 3:9
  7:3 13:15 14:1
  14:6 25:15
  26:6 32:3 38:6
  43:19
**plan** 3:14 18:15
  51:11
**platform** 44:11
**please** 5:21 6:3
  25:1
**plenty** 5:16,22
  28:9
**plus** 29:13
**point** 13:8 15:7
  27:1 36:11
  47:6
**policies** 9:17
  11:23 12:7,21
  13:1 14:24

15:2,16 49:5
49:22
**policy** 12:10,12
  23:6 27:25
  39:2 44:25
**portal** 38:2
**position** 32:17
  47:4
**possible** 53:6
**pounds** 29:13
  33:19
**pour** 21:24
  22:20
**practices** 7:16
**preceding**
  40:10 48:22
**pregnant** 21:24
**premarked**
  14:3
**premises** 12:8
  12:18,24 13:1
  18:23 23:20
  24:12,16,20,25
  28:12 29:14
  30:15,19,20
  31:13 32:24,25
  34:4,10 35:3
  36:14,16 37:8
  39:7 41:16,21
  47:5 48:21
  49:4,7 50:1
**preparation**
  42:3,13 45:22
**prepare** 42:4,7

**[prepared - records]**                                                Page 13

**prepared** 18:2
**presence** 24:19
**present** 19:20
    30:15 34:6
    41:22 47:8
    55:23
**presently** 51:20
**president** 6:22
    6:24 8:12 10:8
**presumably**
    35:18 39:6,8
    40:3,20,23
    48:16 50:10
**presume** 17:19
**pretty** 5:13 9:2
    41:18
**preventative**
    17:1
**previous** 35:13
**prior** 28:13
**private** 25:21
    26:7 34:19
**probably** 4:24
**problem** 46:13
**problems** 46:11
**procedure** 1:19
    4:8 55:17
**procedures**
    11:24 12:7
    14:24 49:6
**process** 37:3
    48:7 49:8
**produce** 40:20
    41:1,25 50:8

**produced** 1:15
    41:19 42:11,18
    43:25 44:7
**product** 46:4
**production**
    36:23 45:17
**professional**
    22:18
**promoted**
    36:12
**promulgated**
    49:6
**properties**
    23:17 50:6,7
**property** 6:22
    6:24 7:23 8:1,3
    8:7,13 9:25
    10:2,7,14 11:8
    11:12 16:25
    23:17 25:3,6
    35:10,13,15,24
    36:8,9,12,13
    38:16,23 45:24
    46:17,19 48:8
    51:15 53:2,10
**propose** 4:20
**provide** 9:16
    40:22
**provided** 16:20
    19:4,14
**provides** 18:15
**public** 1:15
    55:4 59:19
**publish** 37:24

**purposes** 13:14
**pursuant** 1:18
    55:16
**put** 7:5 25:19
    26:5 43:17
    51:24

**q**

**qualified** 22:18
**question** 4:22
    5:6,11,21
    15:12 19:12
    20:19 24:14
    28:4 30:2
    38:18 43:21
    44:24
**questions** 3:2,3
    4:7 5:23 13:22
    43:7,22 50:19
    50:24 51:3,6
**quick** 25:25
**quickly** 41:9
**quoting** 33:15

**r**

**r** 4:15 6:4 10:18
    13:5 56:12
    58:3,3
**ran** 19:11
**read** 57:9 59:5
**ready** 50:24
    51:6
**reason** 5:9
    17:16 47:15
    57:11 58:6,9
    58:12,15,18,21

**reasonable**
    31:11
**reasons** 11:6
    18:6 48:17
**recall** 11:9
**receipt** 49:24
    57:17
**receive** 8:9
    42:10,12
**received** 7:8
    28:11 49:20
**recently** 44:22
**recess** 26:2
**recognize** 51:9
**recognized**
    28:8
**recollection**
    38:21
**recommend**
    31:7
**recommendat...**
    39:23
**record** 6:17,18
    13:11 16:8,10
    20:8,20,22
    21:20 25:23
    28:15 37:10,20
    50:20,22 55:21
**recordings**
    11:25 14:25
**recordkeeping**
    13:14
**records** 3:11
    13:4,10 15:20
    16:11 17:3

[records - robinson]                                              Page 14

30:10 31:22,24
42:16 44:7
**refer**  13:11
14:6
**reference**  17:14
22:5 39:3
**referenced**  44:1
46:7 57:6
**references**
30:22
**referring**  20:25
44:5
**refiling**  43:13
**reflect**  17:7
**reflected**  12:14
**reflects**  17:4
27:10
**refresh**  38:20
**regard**  11:15
11:23 12:16
14:18 15:25
22:22 23:4
24:11,16
**regarding**
12:17,22 14:25
15:4,11,16,21
25:21 34:3
39:14
**region**  10:6
**regional**  9:24
10:1,6,12,13
**regular**  37:21
**regularly**  24:18
**rehab**  51:16

**rehabbed**
51:17
**related**  9:18
12:5 16:6 45:6
**relates**  45:12
**relating**  4:4
**relationship**
7:19,22
**relative**  56:3
**remain**  23:25
**remove**  22:13
**removed**  24:4,9
42:20
**rendering**
12:22
**rent**  18:16,19
19:10 24:2
**rents**  22:12
**repeat**  6:15
24:7 25:1
**repeatedly**
31:13
**replied**  33:13
**report**  3:10,11
3:12 25:5 26:6
27:10 30:21
32:6 33:15,22
34:16,18,22,23
35:19 37:22,24
42:17 44:8,9
48:5
**reported**  16:24
28:2 35:23
37:4

**reporting**  28:1
**reports**  12:2,4
12:16 30:14
34:3 37:12
39:13 41:16,20
46:11,14
**represent**
52:16
**represented**
55:24
**reptiles**  22:6
**request**  24:23
25:2,4 36:22
36:24 40:3,9
43:12
**requested**
55:23
**requests**  16:23
24:24 43:4
**require**  22:11
22:17 49:17
**required**  59:13
**requires**  31:1
**resided**  20:18
21:10
**residence**  20:1
56:16
**resident**  18:24
18:25 21:15
23:22,24 24:15
24:22 29:20
31:17 32:25
33:2,3,5 35:6
35:13 38:2,11
38:13

**resident's**
29:20
**residents**  13:2
16:24 35:3
37:17,25 46:20
47:3,7
**resources**
39:21 44:11
**responding**
53:22
**response**  50:16
**responses**  43:6
43:10
**responsible**  8:6
**responsive**  4:21
**restroom**  25:25
**retained**  34:19
**return**  57:13,16
**review**  22:1
54:5 57:7
**reviewed**  49:21
**revisit**  22:2
**rex**  25:21 26:8
36:16
**right**  5:24 39:7
52:12 54:4,8
54:10,10,16
**rise**  8:2 19:21
21:8
**roaming**  28:12
28:17 30:20
38:16,23 49:4
**robinson**  10:16
25:10 27:16,17
27:22 28:2,17

30(b)(6) Kendrel Bretz                                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[robinson - stabilization]**                                    Page 15

36:10,19 41:4
41:13
**rodents**  22:7
**role**  8:12 16:18
**roll**  50:24
**rooms**  48:3
**roughly**  9:4
**routine**  24:23
**rpr**  1:15 55:4
**rule**  4:8 5:10
**rules**  1:18
55:17
**run**  46:22,24
**running**  28:10
29:7 31:13

**s**

**s**  10:11,12,18
10:18 44:14
58:3
**sadowy**  10:9
**safe**  13:1
**safety**  48:17
**saith**  54:20
**saw**  27:24 28:1
35:10 37:8
**saying**  20:9
33:3,4
**says**  16:11
17:16 18:12,14
28:20 29:23
34:24 37:4
39:19
**scaring**  37:8
**scheduled**  1:18
18:13 55:16

**screening**
11:16 14:19
45:2
**seal**  56:8
**second**  18:10
**see**  18:3,9 25:4
27:25 29:19
31:12,16 35:15
49:3 52:18,20
54:16
**seem**  17:22
**seen**  28:9 33:25
**send**  36:21,23
**senior**  16:18
**sent**  57:14
**separate**  6:9
14:15 22:11
34:13 36:21,23
**separated**
13:24
**separation**
10:23 17:17
**september**  1:18
55:15 56:9
57:3
**serve**  23:22
46:21
**served**  24:10,15
**service**  16:23
22:16 24:23,24
25:2,4
**set**  7:16 56:7
**sets**  19:10
**severity**  45:3,9

**sheet**  57:11
**shoot**  33:16
**shop**  53:15,16
53:20
**short**  27:11
**show**  25:18
51:8
**shows**  28:5
**sign**  22:10,21
22:24 49:10,19
57:12
**signature**  4:25
54:4,11,17
55:22 56:11
**signed**  22:23
36:5 57:19
**signer**  32:24
**signing**  24:1
**silver**  3:14 8:1
9:5 10:7,15,19
10:20 11:8,12
11:16,19,25
12:21 13:20
14:19 15:5,9
15:16 16:16
18:17 19:5
23:4,17 26:8
30:11,19 35:24
40:4,6 41:16
45:24 49:12
50:5 51:11,12
51:25
**simple**  17:13
**sit**  51:20

**site**  3:14 9:17
9:20,21 11:10
15:18 17:2
18:20,22 20:7
20:8,10 49:16
51:11,14,24
53:19
**situation**  29:9
29:11
**software**  44:4
**solutions**  57:23
**somewhat**  45:5
**sorry**  4:10
29:11
**sound**  17:10
**sounds**  9:2
17:25
**speak**  5:20
11:14,22 12:15
14:8 15:24
44:23
**speaking**  26:8
**specific**  44:5
49:11 53:23
**specifically**
23:12 45:12,14
**specifics**  42:2
**spell**  4:14 6:3
10:10,17
**spelling**  54:6
**spoke**  46:8
**ss**  55:1
**stabilization**
9:19

[staff - testimony]                                              Page 16

**staff**  11:9 23:16
48:18
**standing**  23:6
**start**  1:18
39:23 55:16
**started**  29:4
**state**  1:16 4:12
11:6 34:1 43:3
43:12,22 55:1
55:5
**stated**  35:7,21
35:22 36:3
46:22
**statement**
13:18 22:17
25:20 34:11,12
34:13 38:10
**statements**
12:16 45:25
46:2,4,6
**states**  1:1 8:19
35:6
**stating**  22:23
33:24
**staying**  19:15
**stenograph**
55:19
**steps**  23:16
29:8 31:6,11
**stewards**  46:19
**strategic**  9:16
**strategies**  9:19
**streamline**
13:22 14:5

**street**  1:17 2:9
55:14
**stuff**  25:24
**stylistic**  54:7
**submitted**  43:4
**subscribed**
59:14
**subsidized**
18:16
**substituted**
7:20
**suite**  1:17 2:5
2:10 55:14
**summary**  35:6
**supervise**  16:18
**supervision**
11:19 14:22
**supervisor**
16:21 26:13,14
27:9,14,15
29:13 39:24
**supervisors**
29:25 30:3
**supplement**
21:5 45:17
**support**  22:19
23:8
**supposed**  23:18
23:22 25:5
48:20
**sure**  41:5,8,18
45:20 46:1
49:17 52:8
**swift**  2:9 4:19
14:15

**swiftcurrie.c...**
2:11
**sworn**  1:15 4:3
55:7 59:14
**system**  48:8,11
48:14

**t**

**t**  4:15 10:11
36:5,6 44:14
44:15 56:12
58:3,3
**take**  5:6,9,11
16:3 25:24
31:7 35:23
51:12 54:3,15
**taken**  1:16 26:2
27:2 29:9
55:12,18
**talked**  33:10
38:19 52:9
**talking**  35:19
49:12 51:25
**taylor**  19:8
**team**  9:17,20
**teams**  9:22
**tech**  27:11
29:24,25 47:5
48:24
**technician**
16:17 27:8,12
**technicians**
48:1
**techs**  48:18
**tell**  4:3 29:25
43:5 55:7

**telling**  33:16
**tells**  23:12
**temporarily**
22:8
**tenant**  19:15
23:9,19
**tenants**  33:23
39:4 46:14
**tennessee**  8:23
**term**  23:10
**terminated**
11:1 16:12
17:20,23 20:9
**terminating**
18:7
**termination**
13:17 17:6,15
40:8
**terrell**  3:11
13:5,7,17
15:13,22 16:7
16:11 17:5
18:7 19:6,8,9
20:24 21:15
22:21 24:11,15
26:15,17 32:23
35:17,22,25
39:14 40:7,24
42:16 44:6
52:11,14
**terrell's**  47:4
**testified**  4:5
39:1
**testimony**
20:23 34:11

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[testimony - used]**                                                    Page 17

| | | | **u** |
|---|---|---|---|

38:3 42:5,8
49:2 55:21
57:9,17 59:8
**thank** 13:23
41:11
**thereof** 1:19
15:17
**theresa** 32:14
36:7 41:6
**thing** 30:3,5
**things** 13:22
14:5 48:3
**think** 6:14 9:1
27:10 41:13
43:6
**third** 19:3
**thoroughly**
22:1
**thought** 28:1
32:14
**three** 19:7
**time** 1:19 4:1
5:7,12,12,16
10:4,9,13
18:25 20:21
21:5 24:13,14
25:8 27:17,21
28:25 30:22
33:6 44:23
47:8 53:4,9
54:18 57:18
**timeframe** 57:8
**times** 28:10
30:7

**title** 6:21 16:15
**titles** 27:5
**today** 4:17 5:16
7:12 8:16 12:5
12:13 14:8,15
15:24 19:4
21:25 32:7
42:11 43:25
44:8 48:12
50:18 54:13,14
**today's** 7:7,8
42:4,7,13
45:17,22
**told** 42:3
**took** 38:4 52:22
**tool** 37:25
**top** 18:3 45:16
**topics** 16:1
**totally** 54:9
**toward** 50:13
**tracking** 48:8
48:11,14
**tran** 54:3
**transcript** 54:5
55:20,21 57:6
57:19 59:5,8
**translated**
55:19
**treatment**
12:23 15:17
**true** 55:21 59:8
**truth** 4:3,4,4
55:8,8,9
**try** 29:19 32:1

**tuesday** 28:6
**turn** 34:22
**turning** 19:3
**twg** 1:7,12,14
1:16 4:9,17
6:19 7:1,19,20
7:23,24 8:4,6,9
8:11,17 9:14
10:22 11:7,14
11:15 12:10
13:7 14:9,10
15:25 16:16
17:8 23:3,16
23:17 26:24
28:11,16 29:8
30:10 32:8
34:13,16,19
44:25 45:19
46:10 49:5,10
50:5,7 51:5,12
51:15 52:2
53:1,9,13
55:11,13 57:4
58:1 59:1
**twg's** 15:5
**two** 7:22 9:12
18:13 28:7
38:15,24 40:11
**type** 5:6
**typically** 24:21
39:23
**typo** 17:13 18:1

**u** 10:18 56:12
**u.s.** 42:24
**unauthorized**
23:24 24:20
48:25 49:3,7
**unchecked**
29:15
**unclaimed** 49:4
49:7
**under** 8:17 9:3
9:10 26:23
55:20
**understand**
7:11 24:12
42:23 47:2
**understanding**
36:1
**unit** 52:4,13
53:23
**united** 1:1
**units** 8:16
11:11 17:2
51:17
**unleashed**
28:13 29:18
**unsafe** 30:18
**unsupervised**
28:13,18 29:14
30:20
**unsure** 46:8
**use** 4:22 25:23
37:21 44:19,22
**used** 26:15,17
44:21,23 57:19

30(b)(6) Kendrel Bretz                        September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

[utah - zinjurylaw.com]                                Page 18

**utah** 8:24

**v**

**v** 57:4 58:1
59:1
**vacated** 20:14
**various** 44:17
**verify** 57:9
**verifying** 22:18
**veritext** 57:14
57:23
**veritext.com**
57:15
**video** 11:24,24
14:25,25
**violation** 23:6,9
**violent** 41:20
**visit** 35:15
**visited** 20:15
**visitors** 13:2
**voluntarily**
26:25
**voluntary**
17:17
**vs** 1:6

**w**

**w** 10:12
**wait** 4:24
**waive** 4:20
54:10,16
**walking** 29:14
35:9
**want** 13:11
14:11 42:5
46:3,19 47:2

47:20 54:15,15
**wants** 23:24
**washington**
1:17 55:14
**we've** 7:20 16:1
38:19 42:11
44:1,17,21
51:25
**week** 18:13
**went** 27:14
31:16 51:16
**whereabouts**
31:23
**whereof** 56:7
**white** 35:9,12
35:14
**williams** 1:15
55:4
**wind** 24:19
**wisconsin** 8:24
**witness** 1:15
4:11 30:24
52:8 53:18
54:13 56:7
57:8,10,12,18
**witnesses** 31:20
**woman** 35:9,22
**wondering**
43:16
**work** 5:17 6:9
6:19 17:24
18:13 40:12
46:4 52:2 53:7
53:14,22

**worked** 5:13
16:15 27:21
**working** 28:20
**writing** 22:10
37:11
**written** 1:19
22:17 24:10
37:5,12,17
49:5
**wrong** 43:5
**wrote** 35:18

**y**

**y** 10:11,12
44:14,14,15,15
56:12
**yeah** 31:1
33:13 40:22
52:13
**year** 12:19
28:21,25 31:14
34:5 41:17
43:15 48:22
**years** 7:2 9:12
15:9

**z**

**z** 4:15
**zaragoza** 25:21
26:9,9,23 27:2
28:5,6,20
29:23 30:5
33:12,13,20,23
33:25,25 34:8
36:16 37:4
40:18 47:19

**zaragoza's**
26:20 37:1
40:21 47:24
**zdrilich** 2:4,4
3:2 4:7,16,24
6:16 13:21
14:3 16:5 26:1
26:4 36:21
37:2 41:11
43:24 50:8,12
50:17 54:2
**zinjurylaw.co...**
2:6

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit D



**INCIDENT REPORT FORM**

**Property:** Silver Oak

**Name(s):** Davin Terrell

**Address:** 1281 Brockett Rd Clarkston, GA 30021

**Date of incident:** 3/10/2022 - when we first heard of the incident

**Time (approximately):** 4pm.

**Involved Parties: (check which applies)** ☐ Resident ☐ Employee ☒ Other: Not a resident

**Were the police called?** ☐ Yes ☐ No unKnown

**Case Number:** _____

**Does the incident require physician/hospital visit?** ☒ Yes ☐ No

**Name of physician/hospital:** _____

**Summary:** A resident stated a lady who appeared to be an investigator was looking for someone who may have a big white dog. She said the woman was walking the property asking people if they had saw the dog. The investigator never came to the leasing office. No large white dog is on file for any resident on property. However a previous employee who had a white dog and is Known to visit people on property was contacted to see if the dog was his. It was discovered that

**Reported by:** T. CROOKS

**Title:** Property Manager

the dog did belong to Davin Terrell. He stated that the woman was bit by the dog but she reported that it did not take place on Silver Oak property. He stated he did not have the dog anymore.

His contact is (678) 521-3039.

10/04/18     Incident Report     1/1