Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3          Civil Action File No.: 1:24-cv-02583-MHC
4
  JENNIFER ARMISTEAD,                )
5                                    )
            Plaintiff,               )
6                                    )
               -vs-                  )
7                                    )
  TWG MANAGEMENT, LLC,               )
8                                    )
            Defendant.               )
9
10
11
12          30(b)(6) DEPOSITION OF KENDREL BRETZ
             ON BEHALF OF TWG MANAGEMENT, LLC
13
14          The 30(b)(6) deposition upon oral examination
  of KENDREL BRETZ, on behalf of TWG Management, LLC,
15  a witness produced and sworn before me, Craig
  Williams, RPR, CMRS, a Notary Public in and for the
16  County of Marion, State of Indiana, taken on behalf
  of the Plaintiff, at the offices of TWG Management,
17  LLC, 1301 East Washington Street, Suite 100,
  Indianapolis, Marion County, Indiana, on the
18  17th day of September 2024, scheduled to start at
  10:00 a.m. EST, pursuant to the Federal Rules of
19  Civil Procedure with written notice as to time and
  place thereof.
20
21
22
23
24
25

30(b)(6) Kendrel Bretz                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 2

1                    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4              Joseph A. Zdrilich
               ZDRILICH INJURY LAW, LLC
5              3575 Koger Boulevard, Suite 125
               Duluth, GA  30096
6              404.888.1111
               joe@zinjurylaw.com
7
     FOR THE DEFENDANT:
8
               Austin L. Albertson
9              SWIFT, CURRIE, McGHEE & HIERS, LLP
               1420 Peachtree Street, NE
10             Suite 800
               Atlanta, GA  30309-3231
11             404.874.8800
               austin.albertson@swiftcurrie.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                   INDEX OF EXAMINATION

2    DIRECT EXAMINATION  . . . . . . . . . . . . . . . . 4
         Questions by Joseph A. Zdrilich

3    CROSS-EXAMINATION . . . . . . . . . . . . . . . . .51
         Questions by Austin L. Albertson

4

5

6

7

8                    INDEX OF EXHIBITS

9    Plaintiff's Deposition Exhibit No.:

10   Exhibit 1 - Notice of Deposition  . . . . . . . . . 7

     Exhibit 2 - Investigator Report of 3/10/22  . . . . .38

11   Exhibit 3 - Investigator Report of 3/22/22  . . . . .25

     Exhibit 4 - Davin Terrell Personnel Records . . . . .14

12   Exhibit 5 - Incident Report Form  . . . . . . . . .32

     Exhibit 6 - Interrogatories . . . . . . . . . . . .43

13

     Defendant's Deposition Exhibit No.:

14

     Exhibit D1 - Site Plan for Silver Oak  . . . . . . .50

15

16

17

18

19

20

21

22

23

24

25

Page 4

1          (Time noted:  10:28 a.m.)

2                   KENDREL BRETZ,

3    having been duly sworn to tell the truth, the whole

4    truth, and nothing but the truth relating to said

5    matter was examined and testified as follows:

6    DIRECT EXAMINATION,

7       QUESTIONS BY JOSEPH A. ZDRILICH:

8    Q   This will be the Federal Rule of Civil Procedure

9        30(b)(6) deposition of TWG Management, LLC.  I'm

10       sorry, we made the deposition notice out before

11       the defendant had identified you as its witness.

12            Can you state your name.

13   A   Ken Bretz.

14   Q   Can you spell that.

15   A   K-E-N, B-R-E-T-Z.

16            MR. ZDRILICH:  We're here in Indianapolis,

17       Indiana today at the offices of defendant TWG

18       Management, LLC, and with their counsel, Austin

19       Albertson, from Swift Currie.

20            Austin, I propose that we waive all

21       objections except as to form, responsive answer

22       to the form of the question until first use.

23            MR. ALBERTSON:  That's agreeable with me.

24            MR. ZDRILICH:  And you'll probably wait

25       until the end for signature?

Page 5

```
1              MR. ALBERTSON:  Yes.

2    Q   Mr. Bretz, have you ever given a deposition

3        before?

4    A   I have not.

5    Q   I'd just ask you to answer yes or no to any

6        yes-or-no-type question, and then take as much

7        time as you need to expand on that answer.  I

8        won't interrupt you.

9              If you need to take a break for any reason,

10       the only ground rule is you do have to answer

11       the last question asked, and then we'll take as

12       much time or as little time as you might need.

13       I have worked pretty efficiently in these

14       depositions, so I can't imagine you'll need too

15       many breaks, but if you do, we're here to

16       accommodate, and we have plenty of time today to

17       work through anything.

18             I do hear some background noise, so I'm

19       going to do my best to be as loud as I can to

20       speak up over it, and if you ever need me to ask

21       a better question or clarify something, please

22       feel free to do that.  We all ask plenty of

23       questions that we could phrase better.  Having

24       dispensed with all that, I can just jump right

25       in.
```

Page 6

```
 1            Do you have a middle name?

 2   A   Lamar.

 3   Q   Could you spell that, please.

 4   A   L-A-M-A-R.

 5   Q   What's your home address?

 6   A   ███████████████████████.

 7   Q   Is that here in Indianapolis?

 8   A   It's in Carmel, Indiana.

 9   Q   Do you have a work phone number separate from

10       your personal phone number?

11   A   I do not.

12   Q   What's your cell phone number?

13   A   (317)607-6832.

14   Q   I think that might have an extra number in it.

15   A   I can repeat.  (317)607-6832.

16           MR. ZDRILICH:  My apologies.  Let's go off

17       the record.

18           (Off-the-record discussion.)

19   Q   Do you work for TWG Management?

20   A   I do.

21   Q   What is your job title?

22   A   Chief people officer and president of property

23       management.

24   Q   President of property management?

25   A   Yes.
```

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 7

1    Q    How long have you been with TWG?

2    A    11 years.

3              (Plaintiff's Deposition Exhibit 1 was

4         marked for identification.)

5    Q    I've put in front of you what I have marked as

6         Exhibit 1.  It is a copy of the deposition

7         notice for today's deposition.  Have you

8         received a copy of this in advance of today's

9         deposition?

10   A    Yes.

11   Q    You understand that you're here in your capacity

12        today on behalf of the corporation and not in

13        your individual capacity?

14   A    Yes.

15   Q    Are you the person most familiar with or with

16        the most knowledge of practices set forth in

17        this deposition notice?

18   A    Yes.

19   Q    What is the relationship between TWG Management

20        and TWG Development?  I know we've substituted

21        in a party in this case.  But what is the

22        relationship between the two companies?

23   A    TWG Management is the property management entity

24        for TWG Development, which is the development

25        arm of the company.

Page 8

1    Q    For instance, with the Silver Oak property where

2         the events giving rise to this action occurred,

3         who owns that property?

4    A    TWG Development and the other members of the LP

5         are the owners.

6    Q    But TWG Management is responsible for

7         administering or managing the property?

8    A    That's correct.

9    Q    Do you receive pay from TWG or from any other

10        entity?

11   A    Only from TWG.

12   Q    How long have you been in the role of president

13        of property management?

14   A    Since October of 2023.

15   Q    As of the date of this deposition, and we're

16        here in Indianapolis today, how many units does

17        TWG Management have under management?

18   A    It's over 5500.  I don't have the exact number.

19   Q    In what states do you all operate?

20   A    Would you like me to list them?

21   Q    Yes.

22   A    We operate in Indiana, Iowa, Ohio, Illinois,

23        Michigan, Georgia, Tennessee, Colorado,

24        Oklahoma, Utah, Wisconsin.  I believe I have

25        identified them all.

Page 9

1    Q    If you think of something else later, let me

2         know, but that sounds pretty exhaustive.

3              How many complexes are under management?

4    A    It's roughly over 60 communities managed.

5    Q    And Silver Oak Apartments is the one apartment

6         complex in Clarkston, DeKalb County, Georgia

7         where this incident occurred, that's one of

8         those 60?

9    A    That's correct.

10   Q    Is it still under management?

11   A    Yes.

12   Q    These events occurred over two years ago.

13             What would you say your job duties include

14        at TWG?

15   A    They are many and exhaustive.  I oversee and

16        provide strategic oversight for all of our

17        policies, development, site team and personnel

18        management, anything related to lease-up and

19        stabilization strategies.

20   Q    You say site team personnel management.  Does

21        that include the hiring of persons in those site

22        teams?

23   A    Indirectly.  So I oversee the directors who

24        oversee the regional managers who oversee the

25        property managers.

Page 10

1    Q    You oversee directors who oversee regional

2         managers who oversee the property managers?

3    A    That's correct.

4    Q    At the time this incident occurred in late

5         January of 2022, can you identify who the

6         regional manager was for the region where the

7         Silver Oak property is located?

8    A    That would have been the acting president of

9         that time, which is Chasity Sadowy.

10   Q    Can you spell that?

11   A    First name is C-H-A-S-I-T-Y, last name

12        S-A-D-O-W-Y.  She was the acting regional.

13        There was not a regional manager at that time.

14   Q    Do you know who the property manager was for

15        Silver Oak on January 31st, 2022?

16   A    I believe it was Aushiana Robinson.

17   Q    Can you spell that name?

18   A    A-U-S-H-I-A-N-A, R-O-B-I-N-S-O-N.

19   Q    She would have been the manager at Silver Oak.

20        Is she still the manager at Silver Oak?

21   A    She is not.

22   Q    When did she leave TWG?

23   A    I do not have the exact dates of separation, but

24        it was in 2023.  I believe it was October of

25        2023.  I can get that information.

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 11

1    Q    Do you know if she was terminated or if she left
2         on her own?

3    A    She left on her own accord.

4    Q    She left for a different job opportunity or
5         something?

6    A    She did not state her reasons for leaving.

7    Q    Do you know how many employees TWG had at the
8         Silver Oak property on January 31st, 2022?

9    A    I do not recall the number of staff members that
10        were on site at that date.

11   Q    Do you know how many units there are at the
12        Silver Oak property?

13   A    488, I believe.

14   Q    Are you the person at TWG designated to speak on
15        behalf of TWG with regard to hiring and
16        screening of employees at the Silver Oak
17        complex?

18   A    Yes.

19   Q    How about employee supervision at the Silver Oak
20        complex?

21   A    Yes.

22   Q    Are you the person designated to speak with
23        regard to implementation of policies and
24        procedures involving video cameras or video
25        recordings at the Silver Oak complex?

30(b)(6) Kendrel Bretz                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 12

1    A    Yes.

2    Q    How about incident reports?

3    A    Yes.

4    Q    And you have some of those incident reports with

5         you today related to this incident?

6    A    Yes.

7    Q    How about policies and procedures dealing with

8         pets at the premises?

9    A    Yes.

10   Q    Does TWG have a pet policy?

11   A    We do.

12   Q    Do you have a copy of that pet policy with you

13        today?

14   A    I believe it's reflected in the lease.

15   Q    Are you the person designated to speak with

16        regard to any reports, statements, informal

17        complaints or formal complaints regarding any

18        dog bites on the premises from January 31st,

19        2021, a year before this incident?

20   A    Yes.

21   Q    How about policies at Silver Oak Apartments

22        regarding obtaining or rendering aid and care,

23        including medical treatment, to anyone injured

24        by dog bites at the premises?

25   A    Yes.

Page 13

```
1    Q    How about policies keeping the premises safe and

2         hazard free to residents or visitors?

3    A    Yes.

4    Q    Do you have any records associated with the

5         hiring or firing of Davin R. Terrell?

6    A    Yes.

7    Q    Was Mr. Terrell an employee of TWG?

8    A    He was at one point, yes.

9    Q    What were his dates of employment, if you have

10        them?  And again, I don't have these records

11        yet, but if you want us to refer to the record,

12        we can do that and we'll just mark it as an

13        exhibit.

14             MR. ALBERTSON:  For recordkeeping purposes,

15        I'm giving to plaintiff's counsel what is

16        identified in our initial disclosures, which is

17        the termination notice for Mr. Terrell, final

18        account statement, his job offer acceptance, and

19        then his original lease agreement and

20        application at Silver Oak.

21             MR. ZDRILICH:  And this might clarify some

22        of my questions and streamline things just a bit

23        to have these, so thank you.

24             MR. ALBERTSON:  They are separated there,

25        Joe.
```

Page 14

```
 1              (Plaintiff's Deposition Exhibit 4 was
 2         marked for identification.)
 3              MR. ZDRILICH:  I have premarked a few of my
 4         exhibits, so I will call this collectively
 5         Exhibit 4 just to kind of streamline things.
 6         I'll refer to Plaintiff's Exhibit 4.  We'll come
 7         back to that.
 8    Q    Who designated you today to speak on behalf of
 9         TWG?
10    A    TWG ownership and general counsel.
11    Q    Do you have in-house counsel?  And we don't want
12         to know anything you discussed with your lawyer,
13         of course, but do you have in-house counsel?
14    A    We do.
15    Q    As separate from your counsel today from Swift
16         Currie?
17    A    Yes.
18    Q    Are you the person most knowledgable with regard
19         to hiring and screening employees at the Silver
20         Oak complex?
21    A    Yes.
22    Q    How about employee supervision?
23    A    Yes.
24    Q    Implementation of policies and procedures
25         regarding video cameras and video recordings?
```

30(b)(6) Kendrel Bretz          September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 15

1    A    Yes.

2    Q    Pet policies?

3    A    Yes.

4    Q    Complaints or lawsuits regarding dog bites at

5         TWG's Silver Oak complex?

6    A    Yes.

7    Q    On that point, have there been any other

8         lawsuits arising from dog bites that occurred at

9         the Silver Oak complex in the last five years?

10   A    Not that I'm aware of.

11   Q    Had there been any other complaints regarding

12        the animal in question, which is an Akita dog,

13        owned by your now former employee Davin Terrell?

14   A    No.

15   Q    Are you the person with the most knowledge

16        regarding policies at Silver Oak involving dog

17        bites and treatment thereof of the bites that

18        occurred on site?

19   A    Yes.

20   Q    Of course, the records are here, so are you the

21        person with the most knowledge regarding the

22        hiring or firing of Davin Terrell?

23   A    Yes.

24   Q    Do you have full authority to speak today on

25        behalf of defendant TWG with regard to the

Page 16

1      topics we've discussed?

2   A  Yes.

3   Q  Take a look here at the job offer, and I've

4      collectively marked these --

5          MR. ZDRILICH:  Are these all the documents

6      or are these just the ones related to Davin

7      Terrell?

8          MR. ALBERTSON:  Can we go off the record

9      just briefly.

10         (Off-the-record discussion.)

11  Q  It says here in these records that Mr. Terrell

12     was terminated on or about June 24th, 2020; is

13     that correct?

14  A  That is correct.

15  Q  What was his job title when he worked for the

16     TWG Silver Oak complex?

17  A  Maintenance technician.

18  Q  Was he in a senior role, did he supervise the

19     maintenance of the whole complex?

20  A  He provided maintenance for the whole complex

21     but he was not a supervisor.

22  Q  What were his job duties?

23  A  His job duties included service requests as they

24     were reported by residents and/or assigned by

25     the property manager.  It could include grounds

Page 17

1          and preventative maintenance in and outside of

2          the units and the buildings on site.

3    Q    It looks from these records, at least

4          correspondence in here, reflects a job offer to

5          Mr. Terrell on January 7th, 2019.  So

6          approximately 18 months before his termination.

7          That would appear to reflect that he was

8          employed by TWG for a period of approximately

9          18 months between January 20, 2019 and it looks

10         like June of 2020.  Does that sound

11         approximately correct?

12   A    Yes.

13   Q    And this could be a simple typo, so I'm just

14         going to reference this, in the first document,

15         the termination document, we'll call it that's

16         part of Exhibit 4, it says, "Reason for

17         Separation:  Voluntary Job Abandonment," then it

18         lists the dates July 23rd and July 24th.  I'm

19         going to presume from this they meant June 23rd

20         and June 24th when he was terminated, because

21         those other dates occur a month in the future.

22         It would seem to follow that that's when he was

23         terminated, June 24th, and that maybe he missed

24         a couple of days of work and that's why.

25   A    Yes, that sounds that would be correct, that's a

Page 18

1         typo.

2    Q    Do you know when this document was prepared?  I

3         mean, I see the date at the top, but do you know

4         it to be a different day?

5    A    I do not know it to be a different day.

6    Q    Were there other reasons in his personnel file

7         for terminating Mr. Terrell?

8    A    Not to my knowledge.

9    Q    As part of his compensation -- I do see his

10        compensation listed here in the second document,

11        which is the job offer, it's part of Exhibit 4,

12        it says he's paid $17 per hour on an every

13        two-week basis and that his scheduled work hours

14        are 8:00 a.m. to 5:00 p.m.  It also says it

15        provides him insurance, a 401(k) plan.  Was he

16        ever subsidized or given a discount for his rent

17        at the Silver Oak complex?

18   A    No, not to my knowledge.

19   Q    Do you all offer an employee discount for rent

20        if they live on site?

21   A    No.

22   Q    Did you know him to live on site at the

23        premises?

24   A    I did know that he was a resident.

25   Q    Did you know that he was a resident at the time

30(b)(6) Kendrel Bretz                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 19

1          this incident occurred?

2     A    Yes.

3     Q    Turning now to the third document that your

4          counsel has provided us today, this is the lease

5          agreement with Silver Oak Apartments, it appears

6          to be the lease agreement for Davin Terrell.

7          And it lists three other people living there; a

8          Devin Taylor, Jr., a Davin Terrell, Jr. and a

9          Denise Terrell.

10              It sets forth his rent, and it looks like

11         this lease ran through December 31st of 2021.

12         I'll ask, the incident in question occurred

13         about 30 days past the end date of this lease

14         that's been provided.  Do you know if he was

15         staying on as a month-to-month tenant or if

16         there is a lease extension that's going to be in

17         here?

18    A    No, he abandoned his apartment in June of 2020,

19         and we ended the lease because he was no longer

20         present.

21    Q    June of 2020.  But the events giving rise to

22         this action occurred in January of 2022.

23    A    Correct.

24    Q    In the apartment?

25    A    Yes.

Page 20

1    Q    So you said that he abandoned the residence in
2         June of 2020?
3    A    Yes.
4    Q    But he was living there in January of 2022.
5    A    No, he was not.
6    Q    Are you just not aware that he was living in the
7         site?
8    A    We don't have record that he was on site.
9    Q    So you're saying that this lease was terminated
10        early and he was not at the site.  Do you know
11        who was occupying the apartment where this event
12        occurred?
13   A    Someone else occupied and a new lease was
14        initiated after he vacated his apartment.
15   Q    You are aware that my client visited with him at
16        this apartment the day that this incident
17        occurred; she was his guest in the apartment
18        and, by all appearances, he resided at that
19        apartment with the dog in question?
20   A    We do not have record that he was a leaseholder
21        at that time.
22   Q    Do you have a record of who was the leaseholder
23        in the apartment that was, per your testimony,
24        formerly occupied by Davin Terrell?
25   A    Which apartment number are you referring to?

Page 21

1   Q   It looks like 16G.

2   A   I do not have the name of the person who

3       occupied after he left, but I can certainly get

4       it.

5   Q   And we'll give you all time to supplement that,

6       that's fine.

7   A   Okay.

8   Q   The incident giving rise to this action,

9       according to the complaint, occurred in

10      Apartment 12F.  Do you know who resided in

11      Apartment 12F?

12  A   I do not know the name of the person, but I can

13      get it.

14  Q   Okay.  As you may know from the complaint,

15      Mr. Terrell held himself out as a resident of

16      Apartment 12F where my client was injured.

17  A   No, I do not.

18  Q   You're aware that that's in the complaint?

19  A   I'm aware that it was cited, but I do not have

20      record of that.

21  Q   But you can find out who was the official

22      occupant of Apartment 12F?

23  A   Yes.

24  Q   And again, pardon any pregnant pauses as I pour

25      over the documents that are furnished here today

Page 22

1        so we can review them hopefully thoroughly and

2        not have to revisit too many issues in the

3        future.

4            I'm looking through here, and it appears

5        that on page 7 of his lease, it does reference

6        that, "No animals, including mammals, reptiles,

7        bird, fish, rodents and insects are allowed,

8        even temporarily, anywhere in the apartment or

9        apartment community unless we so authorize in

10       writing.  If we allow an animal, you must sign a

11       separate animal addendum which may require

12       additional deposits, rents, fees or other

13       charges.  You must remove an illegal animal

14       within 24 hours of notice from us or you will be

15       considered in default of the lease contract.  We

16       will authorize an ADA-certified service animal.

17       We may require a written statement from a

18       qualified professional verifying the need for a

19       support animal."

20           I'm continuing to pour over the lease

21       addenda here, but did Mr. Terrell sign such an

22       addendum with regard to a pet?

23    A   He signed the lease agreement itself stating

24       that he would need to sign an animal addendum if

25       he had a pet.

Page 23

1   Q   Did he ever disclose that he had a pet?

2   A   No.

3   Q   Do you all have a handbook that you give to TWG

4       employees at the Silver Oak complex with regard

5       how to deal with pets that are in apartments in

6       violation of this standing policy, meaning that

7       they haven't disclosed the existence of the pet,

8       it's not an ADA support animal, and then you

9       find out that the tenant is in violation of this

10      term of the lease?

11  A   No, we direct them to the covenants of the lease

12      that specifically tells them what they need to

13      do if an animal is brought to our attention

14      that's not documented as a pet for the

15      leaseholder.

16  Q   And what steps are TWG staff, at this instance

17      the Silver Oak property, but at TWG properties

18      broadly, what are they supposed to do when they

19      find out that the tenant has a noncompliant

20      animal on premises?

21  A   When it is brought to their attention, they are

22      supposed to serve the resident a notice, letting

23      them know that we are aware that there is an

24      unauthorized pet.  If the resident wants the pet

25      to remain, they have to come in compliance,

Page 24

```
 1          which means signing the animal addendum, paying

 2          the pet fee and paying the pet rent.  If they do

 3          not comply, then within 24 hours the pet must be

 4          removed.

 5     Q    If they do not comply within 24 hours, then --

 6          pardon the noise, a bit of an interruption, but

 7          go ahead, can you repeat that.

 8     A    If they do not comply, the animal has to be

 9          removed within 24 hours.

10     Q    Do you know if written notice was ever served on

11          Mr. Terrell with regard to a pet that he had on

12          premises?  And I understand again that he is not

13          on a lease at the time this incident occurred,

14          the time in question.  But was notice ever

15          served on either Mr. Terrell or the resident of

16          Apartment 12F with regard to a pet on premises?

17     A    No, not to my knowledge.

18     Q    Are the apartments regularly inspected for the

19          presence of pets, or how do you all get wind if

20          someone has an unauthorized pet on premises?

21     A    Typically it is brought to our attention either

22          because there is a complaint by a resident or it

23          is noticed during a routine service request.

24     Q    And service requests are administered by

25          maintenance employees of the premises; yes?
```

Page 25

```
 1    A    Can you repeat, please.

 2    Q    If someone makes a service request -- the

 3         maintenance person goes on property in the

 4         apartment for a service request and they see a

 5         dog there, then they're supposed to report it to

 6         the property manager?

 7    A    That's correct.

 8    Q    In this case, at the time this incident

 9         occurred, that would have been Aushiana

10         Robinson?

11    A    Aushiana.

12    Q    Aushiana, I apologize.  It would have been

13         Aushiana?

14    A    Yes.

15              (Plaintiff's Deposition Exhibit 3 was

16         marked for identification.)

17    Q    I'm going to go a little bit out of order in my

18         exhibits.  I'm going to you show you what I

19         marked here as Exhibit 3.  I'll put this in

20         front of you.  This is a statement from our

21         private investigator regarding a Rex Zaragoza.

22              MR. ALBERTSON:  I apologize, could we

23         briefly go off the record and use this as an

24         opportunity to get our stuff, and I need to take

25         a quick restroom break.
```

Page 26

1          MR. ZDRILICH:  Absolutely.

2          (A recess was taken between 10:58 a.m. and

3      11:21 a.m.)

4  BY MR. ZDRILICH:

5  Q   I put in front of you what I've marked as

6      Plaintiff's Exhibit 3.  This is a report by one

7      of the private investigators we had at the

8      Silver Oak Apartments speaking with a Rex

9      Zaragoza.  Do you know who Mr. Zaragoza was?

10 A   I do.

11 Q   Who was he?

12 A   He was a former employee.  He left as a

13     maintenance supervisor.

14 Q   He was maintenance supervisor.  Was that the job

15     that Mr. Terrell used to have?

16 A   No.

17 Q   Is that a higher-up job than Mr. Terrell used to

18     have?

19 A   That's correct.

20 Q   What were Mr. Zaragoza's dates of employment?

21 A   I believe he was employed February 2021 to June

22     2023.

23 Q   And under what circumstances did Mr. Zaragoza

24     leave TWG?

25 A   I believe he left voluntarily.

Page 27

1    Q    Had he been at any point disciplined or had any

2         disciplinary action taken against Mr. Zaragoza

3         for any deficiencies in his job performance?

4    A    Not to my knowledge.

5    Q    Did he hold any other job titles during his

6         employment between approximately February 2021

7         and June 2023?

8    A    He was a maintenance technician before he was a

9         supervisor.

10   Q    I think this report reflects that he said in

11        here that he was a tech, and that's short for

12        technician?

13   A    Yes.

14   Q    And he went on to become the supervisor for the

15        complex, the maintenance supervisor.  He still

16        answered to, is it Ms. Robinson?  He still

17        answered to Ms. Robinson at that time; is that

18        correct?

19   A    That's correct.

20   Q    She was there until later in 2023.  So the

21        entire time he worked there, he would have

22        answered to Ms. Robinson; yes?

23   A    That's correct.

24   Q    And if he saw something, I would assume you have

25        a see something, say something policy.  So if he

Page 28

```
 1        saw something that he thought needed reporting,

 2        he would have reported to Ms. Robinson; correct?

 3   A    Yes, that's what we advise.

 4   Q    Here the dog in question, Ms. Campo, the

 5        investigator, shows Zaragoza a picture of the

 6        Akita dog and asked Zaragoza Tuesday, March 22nd

 7        of 2022, less than two months after the incident

 8        had occurred, and he said that he recognized

 9        that dog and that he had, "seen that dog plenty

10        of times running free."

11            Had TWG received complaints from its

12        employees about dogs roaming the premises

13        unleashed and unsupervised prior to this

14        incident?

15   A    No, not that I have record of.

16   Q    Have you discussed or anyone from TWG discussed

17        with Ms. Robinson the issue of dogs roaming

18        around the complex unsupervised?

19   A    No, not that I'm aware of.

20   Q    It says here that Zaragoza had been working for

21        the complex for approximately a year, which

22        lines up with the dates of employment that you

23        gave, because you said February of 2021 and this

24        was done in March of 2022, so he had been there

25        a little over a year at the time of this
```

Page 29

1       interview; correct?

2    A  That's correct.

3    Q  He said that as the dog "got older, he

4       started" -- pardon the expletive here --

5       "fucking with people and other dogs and got

6       aggressive.  He's big as hell too."  And that he

7       was "running free."

8          What steps would you have expected TWG

9       Management to have taken, given the situation

10      that he describes in this interview?

11   A  What situation, I'm sorry?

12   Q  This very large dog, and you'll hear another

13      supervisor here describe as 130 plus pounds,

14      walking around the premises unsupervised,

15      unchecked, and harassing other people and other

16      dogs.

17   A  Well, if a dog is brought to our attention that

18      is unleashed and not with a person, we would do

19      our best to try to see if we can identify the

20      location, the resident or resident's guest that

21      the pet belonged to.  If it we weren't able to

22      determine that, we would contact animal control.

23   Q  It says here, "Before Zaragoza was management,

24      he was a 'tech,'" which we just discussed, "and

25      while he was a tech, he did tell his supervisors

Case 1:24-cv-02583-TRJ   Document 22   Filed 01/02/25   Page 30 of 164
30(b)(6) Kendrel Bretz
September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 30

```
 1          about the Akita."  And that's the Akita in

 2          question that bit my client.

 3               "The only thing that his supervisors did

 4          was call animal control," he said, "because

 5          that's the 'only thing they can do.'  Zaragoza

 6          never called animal control.  Animal control was

 7          called a 'couple of times,' but when they

 8          finally got to the complex, the Akita would be

 9          gone."

10               Are there any records of employees from TWG

11          at the Silver Oak complex calling animal

12          control?

13     A    Not that I'm aware of.

14     Q    Are there any reports about this or other dogs

15          on premises that you have in your present

16          custody, access or control?

17     A    No.

18     Q    Do you believe that this constitutes an unsafe

19          condition at the Silver Oak premises to have

20          large unsupervised dogs roaming the premises,

21          apparently?  You have the report in front of

22          you, so you can references it at any time.  And

23          this is your head of maintenance discussing,

24          this isn't my witness, this is your head of

25          maintenance describing the condition.
```

1    A    Yeah.  I deem this as something that requires
2         attention, and based off of what we were made
3         aware of after the fact, that's something I
4         would advise that they would contact animal
5         control about.
6    Q    Are there any other steps that you would
7         recommend that they take other than call animal
8         control?
9    A    Not if we could not identify the person that the
10        animal belonged to.
11   Q    What would you describe as reasonable steps to
12        ascertain the owner of the dog if you'd see it
13        running around the premises repeatedly over the
14        course of a year?
15   A    We would canvass the area to the best of our
16        ability, see if the pet went somewhere or if a
17        resident neighbor or such would have any
18        knowledge of where it came from.  It would be,
19        to a certain extent, up to what we were able to
20        find out from other people nearby, witnesses, if
21        we were able to identify it.
22   Q    Do you have any records that the complex was
23        canvassed for the whereabouts of this Akita?
24   A    I do not have records.
25   Q    Do you have any knowledge that it was canvassed

Page 32

1           to try to ascertain the ownership of the Akita?

2    A     No, I do not.

3                (Plaintiff's Deposition Exhibit 5 was

4           marked for identification.)

5    Q     Have you investigated this incident, aside from

6           the incident report that I have in front of me

7           that we're going to mark Exhibit 5 today, has

8           TWG conducted any investigation about this

9           incident?

10   A     The only investigation I was aware of since that

11          information was brought to us after the fact was

12          asking if anyone was aware or had knowledge of a

13          dog that met that description, which I believe

14          is what Theresa Crooks did when she thought that

15          it belonged to someone who was no longer

16          employed.

17   Q     And it's your position -- and again, you said

18          you will get us a copy of the lease for the

19          apartment at issue here.

20   A     12F?

21   Q     12F.  So we can ascertain who was living there.

22   A     Yes.

23   Q     But to your knowledge, Mr. Terrell was neither

24          the signer of a lease for that premises nor a

25          resident at that premises?

Page 33

1  A   That's correct, we do not have knowledge that he

2      was a resident.

3  Q   You're not saying he wasn't a resident, you're

4      saying you just had no knowledge that he was a

5      resident?

6  A   Correct, he was not a lessor at that time.

7  Q   Not to hop around too much, I'll come back to

8      that Exhibit 5 in a moment.

9          But Exhibit 3 that I have in front you, it

10     appears our investigator talked to another

11     maintenance personnel member who joined the

12     interview, "One employee asked Zaragoza, 'that

13     dog be free?'  Zaragoza replied, 'Hell yeah,

14     that big mother fucker'" -- pardon again my

15     French, I'm just quoting from the report --

16     "that's the one I be telling I will shoot that

17     MF'er sometime."  I'll leave some of the other

18     expletives out of it.  "He's about 130 to 140

19     pounds."

20         Zaragoza also describes it as an

21     "intimidating dog."

22         Of some interest in this report, he

23     mentions that, "Tenants have come up to Zaragoza

24     stating that the Akita attacked their dog and

25     Zaragoza has seen those attacked dogs.  Zaragoza

Page 34

1      has heard 'a lot' of people state that Akita has

2      bitten people and other dogs."

3          Do you have any incident reports regarding

4      any other dog bites at the premises, and we'll

5      just say from the year before this incident of

6      January 31st, 2021, to the present?

7   A   No.

8   Q   You would admit here that Mr. Zaragoza appears

9      to have documented other dog bites of persons on

10     premises by this dog?  That's his -- it's not

11     testimony, but that's his statement?

12  A   I do know that that is his statement.

13  Q   Has he given a separate statement to TWG as part

14     of any investigation into these events?

15  A   No, not that I'm aware of.

16  Q   Has TWG any investigative report about this

17     incident?

18  A   Not outside of the incident report.

19  Q   Has TWG ever retained a private investigator to

20     conduct an investigation about this incident?

21  A   No.

22  Q   I'm going to turn now to the report here.  This

23     is the incident report form, Exhibit 5.  It

24     says, "Date of Incident," March 10th, 2022,

25     "when we first heard of the incident."

Page 35

1          So before when this incident occurred on

2     January 31st, you didn't know about it until our

3     investigator was on premises asking residents

4     about it; correct?

5     A    That is correct.

6     Q    In the summary here it states that, "A resident

7          stated a lady who appeared to be an investigator

8          was looking for someone who have may have a big

9          white dog.  She said the woman was walking the

10         property asking people if they had saw the dog.

11         The investigator never came to the leasing

12         office.  No large white dog is on file for any

13         resident on property.  However a previous

14         employee who had a white dog and is known to

15         visit people on property was contacted to see

16         if the dog was his.  It was discovered that the

17         dog did belong to Davin Terrell," and that's

18         presumably the former employee whoever wrote

19         this report is talking about here; correct?

20    A    That's correct.

21    Q    "He stated that the dog did belong to Davin

22         Terrell.  He stated that the woman was bit by

23         the dog but she reported that it did not take

24         place on Silver Oak property."

25              And that's Davin Terrell who asserted that?

Page 36

1    A    That is my understanding.

2    Q    He's the owner of the dog.

3              "He stated he did not have the dog

4         anymore."  And his contact is listed here.

5              And it looks like it's signed by a T.

6         Crooks.  Do you know who T. Crooks is?

7    A    Theresa Crooks, yes, I do.

8    Q    That's the property manager?

9    A    She was a property manager in 2023.

10   Q    And that's a different job than Ms. Robinson?

11   A    It is a different job.  At some point she was

12        promoted, she was assistant property manager,

13        and then she moved into property manager.

14   Q    Do any of these employees live on premises?

15   A    No.

16   Q    Did Rex Zaragoza live on premises?

17   A    Not to my knowledge.

18   Q    Do you have personnel files for Aushiana

19        Robinson?

20   A    I have access to them.

21             MR. ZDRILICH:  We'll send over a separate

22        request for those, because they're not part of

23        the notice, but we'll send a separate production

24        request for that.

25             MR. ALBERTSON:  We can also get you

Case 1:24-cv-02583-TRJ    Document 22    Filed 01/02/25    Page 37 of 164
30(b)(6) Kendrel Bretz          September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 37

1          Zaragoza's.

2              MR. ZDRILICH:  Okay, that would be great.

3    Q    Is there a formal complaint process where --

4          Mr. Zaragoza, he says he reported this dog or

5          incidents with this dog.  Would he have written

6          that up, or would it just be something he comes

7          into the management office and goes, hey,

8          there's this dog I saw on premises scaring

9          people?

10   A    I don't have a record of what he did, but we

11         would advise they do it in writing.

12   Q    But you have no written reports based on his

13         alleged complaints?

14   A    That's correct.

15   Q    Or anyone's alleged complaints about this dog?

16   A    That's correct.

17   Q    Would other residents have made formal written

18         complaints about dog incidents, dog bites,

19         either of their person or of their dogs?

20   A    I don't have record that they did.

21   Q    Do you have a regular form that they would use

22         for that, like an incident report form like this

23         one?

24   A    We don't publish our incident report to our

25         residents, it's an internal tool, but we would

Page 38

```
 1        just instruct them to let us know via email or

 2        through our resident portal.

 3   Q    So it's your testimony that no other

 4        investigation took place beyond this one page?

 5   A    Not to my knowledge, no.

 6            (Plaintiff's Deposition Exhibit 2 was

 7        marked for identification.)

 8   Q    Do you have Exhibit 2 in front of you?

 9   A    Yes.

10   Q    This is a statement given by an Alexia Duru, who

11        was a resident of Apartment 13E, which would

12        appear to be adjacent to Apartment 12F where

13        this incident occurred.  They were a resident

14        and they knew of the Akita dog because it had

15        bitten her dog on two different occasions and

16        that it was freely roaming the property.

17            Do you have any complaints on file from

18        Ms. Duru about the Akita dog in question?  I

19        know we've talked about did any other person,

20        but hopefully this might refresh your

21        recollection about it.  Any complaints by Ms.

22        Duru other than complaints to our investigator

23        about this Akita roaming the property and biting

24        her dog on two occasions?

25   A    No, nothing more.
```

Case 1:24-cv-02583-TRJ    Document 22    Filed 01/02/25    Page 39 of 164
30(b)(6) Kendrel Bretz                     September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 39

1    Q    You've testified about this, but you said that

2         there's no documented pet policy outside of what

3         you reference in the lease agreements with the

4         tenants?

5    A    That's correct.

6    Q    Presumably there are people with pets on the

7         premises, though; right?

8    A    Presumably.

9    Q    And they would have to disclose them to you

10        officially or they'd be in default of their

11        lease?

12   A    Correct.

13   Q    Do you have any other incident reports on file

14        regarding the employment of Davin Terrell?

15   A    Not to my knowledge.

16   Q    Other than what's in the Exhibit 4 here?

17   A    No.

18   Q    Who would have been the person in charge of

19        firing him?  It says here Holly MacDougall.

20   A    Holly MacDougall was the director of human

21        resources, so she would be a part of the

22        administration of the firing, but she herself

23        would not start a recommendation.  Typically it

24        would come from a supervisor.

25   Q    And Ms. MacDougall is here in Indianapolis?

Page 40

1   A   Yes.

2   Q   So this decision came from corporate, but

3       presumably at the request of someone in the

4       Silver Oak office?

5   A   That is correct.

6   Q   Do you know who in the Silver Oak office

7       complained of Mr. Terrell to fire him?

8   A   I do not know who initiated that termination

9       request to HR.

10  Q   There hadn't been any events preceding this

11      firing other than the missing the two days of

12      work?

13  A   Not to my knowledge.

14  Q   Do you all conduct background checks on your

15      hires?

16  A   We do.

17  Q   Have you conducted a background check of

18      Mr. Zaragoza?

19  A   All employees, yes.

20  Q   You presumably will produce that copy with

21      Mr. Zaragoza's file; correct?

22  A   Yeah, we can provide that.

23  Q   Presumably you have a background check of Davin

24      Terrell?

25  A   Yes.

1    Q    And you'll produce a copy of that as well?

2    A    Yes.

3    Q    Do you have forwarding addresses for Aushiana

4         Robinson?

5    A    I'm not sure.  I certainly can check.

6    Q    Do you have a forwarding address for Theresa

7         Crooks?

8    A    I'm not sure but I can check.

9              MR. ALBERTSON:  Just quickly, Joe, those

10        are identified in our initial disclosures.

11             MR. ZDRILICH:  For the addresses?  Thank

12        you.

13             MR. ALBERTSON:  Yes.  I think Robinson is

14        in there, but I know Crooks is.

15   Q    Do you have any incidents involving 911 calls or

16        CAD reports from the Silver Oak premises for the

17        one-year period before this incident?

18   A    I do not have them, but I'm pretty sure they can

19        be produced.

20   Q    Have there been any incident reports of violent

21        crime on premises from January 31st, 2021 to the

22        present?

23   A    Yes.

24   Q    Do you have copies of those that you can

25        produce?

Page 42

1    A    I believe so.

2    Q    Of course, other than discussing specifics of

3         what you've told your counsel in preparation for

4         today's deposition, did anyone help you prepare

5         for your testimony?  We don't want to know

6         anything you discussed with your lawyer, but did

7         anyone else help you prepare for today's

8         testimony?

9    A    No.

10   Q    When did you receive the documents that we had

11        produced to us today and that we've marked as

12        Exhibits 4 and 5, when did you receive those

13        documents in preparation for today's deposition?

14   A    What exhibit are you identifying as 4 and 5?

15   Q    I've called them 4 and 5.  These are the

16        personnel records for Davin Terrell and the

17        incident report is Exhibit 5.

18   A    I do not know the date that they were produced

19        to me.

20   Q    You're aware this action was removed by your

21        counsel to the Northern District Federal Court

22        in Georgia?

23   A    I don't understand.

24   Q    Where this is pending in U.S. District Court,

25        it's in Federal Court.

Page 43

1    A    I'm not aware.

2    Q    Okay.  But before that it was pending in the

3         State Court of Gwinnett County.  And we

4         submitted some discovery requests in that matter

5         and, Austin, tell me if I'm wrong, but I don't

6         think we have responses to those.  And I'll ask

7         some follow-up questions, but those were first

8         issued in June of 2023.

9              MR. ALBERTSON:  Correct.

10   Q    And we don't have any responses on file.

11             Do you intend to answer the discovery

12        request from State Court or, to your knowledge,

13        will your counsel insist on us refiling them in

14        the District Court?  And we will if we have to.

15        But you've had these now for over a year, so I'm

16        just wondering if you've composed answers to

17        them yet?  And I'll put them in front of you and

18        I'll mark them as Exhibit 6.

19             (Plaintiff's Deposition Exhibit 6 was

20        marked for identification.)

21             MR. ALBERTSON:  That's a question for us,

22        we can answer the State questions.  We'll answer

23        those.

24             MR. ZDRILICH:  Very good.

25   Q    Besides the documents you've produced today that

Case 1:24-cv-02583-TRJ    Document 22    Filed 01/02/25    Page 44 of 164
30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 44

1      we've discussed and I referenced as Exhibits 4

2      and 5, where were they kept?  Were they kept in

3      the hard drive or iCloud, a cloud-based

4      software?

5   A  Which specific exhibits are you referring to?

6   Q  Exhibits 4 and 5.  Those are the Davin Terrell

7      personnel records to date that you've produced

8      as of today and then the incident report, that

9      one-page report we have.

10  A  Our employee files are in Paylocity, which is

11     our human resources platform, HRIS.

12  Q  Did you say Paylocity?

13  A  That's correct.

14  Q  P-A-Y-L-O-S-I-T-Y?

15  A  P-A-Y-L-O-C-I-T-Y.

16  Q  Is that also where the background checks would

17     be on the various employees we've discussed?

18  A  That's correct.

19  Q  Who do you conduct those through?  Do you use

20     HireRight?

21  A  We've used different background check companies.

22     I believe most recently we use Checkr, but I

23     can't speak to what was used at the time of hire

24     for the individuals in question.

25  Q  Does TWG have a policy to not hire individuals

Page 45

1       who have been convicted of a felony?

2    A  We have a screening model that checks different

3       crimes, as well as severity.  Felonies in and of

4       themselves are not disqualifiers, but it is

5       somewhat dependent.

6    Q  How about drug-related crimes, are they

7       disqualifiers?

8    A  Not in and of themselves, no.  It depends upon

9       severity, as well as dates.

10   Q  How about drug charges with intent to

11      distribute?

12   A  I do not know specifically as it relates to that

13      one.

14   Q  Who would know specifically?

15   A  I can get access to them, I just don't know off

16      the top of my head.

17   Q  And you can supplement today's production and

18      you can find out what are or are not no hire

19      offenses for TWG?

20   A  Sure.

21   Q  Very good.

22          As part of preparation for today's

23      deposition and investigation into this matter,

24      have any employees at the Silver Oak property

25      given statements to any insurance adjuster?

30(b)(6) Kendrel Bretz                September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 46

1    A    I am not sure.

2    Q    Do you know if they've given statements -- of

3         course, I don't want to know the content of

4         those statements, that content is work product.

5         But do you know if they have given any

6         statements to your in-house counsel that you

7         referenced at the beginning of the deposition?

8    A    I'm unsure.  I know that he spoke to whomever

9         was available as to what happened.

10   Q    Do you believe that defendant, TWG, has a duty

11        to address reports of problems with pets at the

12        complex?

13   A    How do you define "problem"?

14   Q    Reports of bites, either of other tenants'

15        animals or of persons.

16   A    Yes, if we are made aware of harm to a person or

17        property, yes.

18   Q    Why is that important?

19   A    Because we want to be stewards of the property

20        and the community and the residents that we

21        serve.

22   Q    You stated that you do run background checks on

23        your employees.  Do you believe you have a duty

24        to run those background checks?

25   A    Yes.

Page 47

1    Q    Why?

2    A    Because we want to understand the people who

3         have the ability to enter residents' homes.

4    Q    Do people like in Mr. Terrell's position, he was

5         obviously maintenance tech on premises at one

6         point or another, do they have access to

7         individual apartments without the residents

8         being present at the same time?

9    A    We have keys available in our leasing office to

10        allow us access to an apartment, is that what

11        you're asking?

12   Q    Partly.

13            Does that mean that they have to ask the

14        leasing office for those keys if they need to

15        enter an apartment for a particular reason or a

16        complaint?

17   A    Yes.

18   Q    They don't just carry around a key chain with a

19        key to, say, 12F?  Mr. Zaragoza wouldn't have a

20        key chain and say I want to go in 12F and check

21        out the complaint.  He'd have to go to the

22        leasing office first?

23   A    That's correct.

24   Q    What, for instance on Mr. Zaragoza's key chain,

25        what areas would he have access to?

Page 48

```
1    A    Generally our maintenance technicians have

2         access to common areas, so janitorial closets,

3         amenities, laundry rooms, things of that nature,

4         but not access to any keys.

5    Q    So there would be a report or something they

6         would have to fill out to get access to one of

7         those keys, like a check-in, check-out process?

8    A    This property has a key tracking system, I

9         believe it's called HandyTrac.  They have to

10        gain access to the keys themselves.

11   Q    Do you have access to that key tracking system

12        here today?

13   A    I do not.

14   Q    What's the name of that key tracking system?

15   A    I believe it is called HandyTrac.

16   Q    That would presumably document when maintenance

17        officials for safety reasons would document when

18        maintenance staff, maintenance techs would have

19        access to individuals' apartments?

20   A    That's what it's supposed to, yes.

21   Q    Have you ever had complaints on premises since

22        the year preceding this incident, we'll just

23        call that January 31st, 2021, of any maintenance

24        tech or complex employee entering any apartment

25        in an unauthorized manner?
```

Page 49

```
 1    A   No, not to my knowledge.

 2    Q   Outside of your earlier testimony about calling

 3        animal control if you see any unauthorized or

 4        unclaimed dogs on premises roaming the complex,

 5        does TWG have any other written policies or

 6        procedures promulgated for dealing with

 7        unclaimed dogs or unauthorized pets on premises?

 8    A   No, no other process.

 9    Q   Are employees given a manual that they have to

10        sign off on when they are on-boarded with TWG?

11        And I should be more specific.  Employees at the

12        Silver Oak complex.  I'm not talking about the

13        company in general here at corporate.  But for

14        the complex, are they given a manual or some

15        kind of booklet?

16    A   There is a handbook that's available on site,

17        but I'm not sure if they require a document of

18        said handbook.

19    Q   Do they have to sign anything to acknowledge

20        that they've received a copy of the handbook or

21        that they've reviewed the handbook or accept the

22        policies in the handbook?

23    A   I do not know if they were asked to do

24        acknowledgement of receipt.

25    Q   Do you have a copy of the handbook here on
```

Page 50

1        premises?

2    A    I can get you one.

3    Q    You can get us a copy of the handbook?

4    A    Yes.

5    Q    And is that a handbook for Silver Oak or for TWG

6        properties in general?

7    A    It would be for TWG properties in general.

8            MR. ZDRILICH:  We'd ask that you produce

9        that at the earliest available date.

10        Presumably, all these within the next 30 days.

11            MR. ALBERTSON:  Yes.

12            MR. ZDRILICH:  We have discovery coming up

13        toward the end of discovery, November 15, I

14        believe.

15            MR. ALBERTSON:  Yes, we'll have a formal

16        response to those.

17            MR. ZDRILICH:  I feel comfortable I've

18        covered all the ground I need to cover today, so

19        I have no other questions.

20            MR. ALBERTSON:  Can we go off the record

21        for a couple minutes.

22            (Off-the-record discussion.)

23            MR. ALBERTSON:  I just have a couple

24        questions and I'll be ready to roll.

25            (Defendant's Deposition Exhibit 1 was

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 51

1          marked for identification.)

2     CROSS-EXAMINATION,

3        QUESTIONS BY AUSTIN L. ALBERTSON:

4     Q   Mr. Bretz, I'm Austin Albertson, I'm your

5         counsel on behalf of TWG.  I just have a couple

6         questions for you, and then we'll be ready to

7         get out of here.

8              I'm going to show you what I'm going to

9         mark as Defense Exhibit 1.  Do you recognize

10        what this is?

11    A   This is a site plan for Silver Oak.

12    Q   When did TWG take over at Silver Oak?

13    A   I believe the acquisition was in 2019.

14    Q   Have there been any changes to the site since

15        TWG bought the property?

16    A   It was an acquisition rehab, so yes, we went in

17        and rehabbed the units, the leasing office and I

18        believe some of the amenities.

19    Q   Has that involved moving any of the buildings as

20        where they presently sit?

21    A   No.

22    Q   Just interior changes?

23    A   Yes.

24    Q   So what I've put in front of you is a site map

25        of Silver Oak.  We've been talking a little bit

Page 52

1          about 12F.  How does the apartment numbering

2          work at TWG?  So 12F, what does that correspond

3          to?

4     A    12 is the building number, and F is the unit

5          identifier.

6     Q    Okay.  So could you circle and initial next to

7          Building 12?

8     A    Sure.  (Witness complied.)

9     Q    And we talked about this a little earlier,

10         that's the building that's been identified as

11         where Terrell was or living, according to

12         plaintiff, on the date of the bite; right?

13    A    Yeah, that's the unit.

14    Q    Was what alleged to be where Terrell was living?

15    A    Yes.

16    Q    I'll represent to you that plaintiff was deposed

17         in this case and identified, it's been circled

18         here, Building No. 3.  Do you see Building

19         No. 3?

20    A    I do see Building No. 3.

21    Q    Is where she identified in her deposition as

22         where she believed the bite took place.

23              So can you find and circle and initial next

24         to where the leasing office is?

25    A    The leasing office is in this location.

Page 53

1    Q    Has the leasing office ever moved as long as TWG

2         has owned the property?

3    A    No, it has not.

4    Q    What time generally is the leasing office open

5         and then closes at?

6    A    8:30 to 5:30.  And maybe it's possible that

7         someone was doing some admin work and they'd

8         leave as late as 6:00.

9    Q    And that hasn't changed the entire time TWG has

10        owned the property?

11   A    Not to my knowledge.

12   Q    Are any of the other buildings listed here on

13        this map for employees of TWG?  Like where they

14        would work out of?

15   A    The maintenance shop is back here.

16   Q    Can you label that maintenance shop whatever

17        you're about to identify?

18   A    (Witness complies.)

19   Q    So are there any other buildings on site, other

20        than the leasing office and the maintenance shop

21        you identified, where would be based out of or

22        work out of if they weren't responding to an

23        issue of a specific unit?

24   A    No.

25             MR. ALBERTSON:  That's all I have.  That's

Page 54

1    it.

2           MR. ZDRILICH:  I'll order a copy.

3           MR. ALBERTSON:  We'll take an E-Tran.

4           Signature.  Basically, you have a right to

5    review the transcript.  You can't make material

6    changes to it, but if there's like a spelling

7    mistake or something stylistic that could be an

8    error, you have the right to look over within

9    30 days and make any changes.  It's totally your

10   right to do that, but you can waive that right

11   to signature.  It's whatever you would like to

12   do.

13          THE WITNESS:  Do I need to decide today?

14          MR. ALBERTSON:  Normally we decide today.

15   Or if you want to take a look at, it -- you want

16   to see it?  All right, then, we won't waive

17   signature.

18          (Time noted:  12:23 p.m.)

19

20          AND FURTHER DEPONENT SAITH NOT.

21

22

23

24

25

Page 55

1    STATE OF INDIANA            )

                                )  SS:

2    COUNTY OF MARION            )

3

4          I, Craig Williams, RPR, CMRS, a Notary Public

5    in and for the County of Marion, State of Indiana,

6    at large, do hereby certify that KENDREL BRETZ, the

7    deponent herein, was by me first duly sworn to tell

8    the truth, the whole truth, and nothing but the

9    truth in the aforementioned matter;

10         That the foregoing 30(b)(6) deposition of

11   Kendrel Bretz, on behalf of TWG Management, LLC,

12   was taken on behalf of the Plaintiff, at the

13   offices of TWG Management, LLC, 1301 East

14   Washington Street, Suite 100, Indianapolis, Marion

15   County, Indiana, on the 17th day of September 2024,

16   scheduled to start at 10:00 a.m. EST, pursuant to

17   the Federal Rules of Civil Procedure;

18         That said deposition was taken down in

19   stenograph notes and translated into an English

20   transcript under my direction, and that said

21   transcript is a true record of the testimony given

22   by the said deponent; and that signature was

23   requested by the deponent and all parties present;

24         That the parties were represented by their

25   counsel as aforementioned.

30(b)(6) Kendrel Bretz                                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

Page 56

1      I do further certify that I am a disinterested

2  person in this cause of action, that I am not a

3  relative or attorney of either party or otherwise

4  interested in the event of this action, and that I

5  am not in the employ of the attorneys for any

6  party.

7      IN WITNESS WHEREOF, I have hereunto set my

8  hand and affixed my notarial seal on this 23rd day

9  of September 2024.

10

11                                          _Craig Williams_

12                        N O T A R Y    P U B L I C

13

14  My Commission Expires:

15  January 11, 2032

16  County of Residence:

17  Marion County

18

19

20

21

22

23

24

25

Page 57

1    Kendrel Bretz

2

3                      September 23, 2024

4    RE:    Armistead, Jennifer v. TWG Management, LLC

5         9/17/2024, 30(b)(6) Kendrel Bretz (#6912190)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   litsup-ga@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Page 58

```
 1    Armistead, Jennifer v. TWG Management, LLC

 2    30(b)(6) Kendrel Bretz (#6912190)

 3                 E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____     _____

24    30(b)(6) Kendrel Bretz                          Date

25
```

Page 59

1    Armistead, Jennifer v. TWG Management, LLC

2    30(b)(6) Kendrel Bretz (#6912190)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, 30(b)(6) Kendrel Bretz, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   30(b)(6) Kendrel Bretz                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**[& - 7th]**                                                    Page 1

| & |
|---|
| **&**   2:9 |

| 0 |
|---|
| **02583**   1:3 |

| 1 |
|---|
| **1**   3:10 7:3,6 |
| 50:25 51:9 |
| **100**   1:17 55:14 |
| **10:28**   4:1 |
| **10:58**   26:2 |
| **10th**   34:24 |
| **11**   7:2 56:15 |
| **11:21**   26:3 |
| **12**   52:4,7 |
| **125**   2:5 |
| **12:23**   54:18 |
| **12f**   21:10,11,16 |
| 21:22 24:16 |
| 32:20,21 38:12 |
| 47:19,20 52:1 |
| 52:2 |
| **130**   29:13 |
| 33:18 |
| **1301**   1:17 |
| 55:13 |
| **13e**   38:11 |
| **14**   3:11 |
| **140**   33:18 |
| **1420**   2:9 |
| **14763**   6:6 |
| **15**   50:13 |
| **16g**   21:1 |
| **17**   18:12 |

**17th**   1:18 55:15
**18**   17:6,9
**1:24**   1:3

| 2 |
|---|
| **2**   3:10 38:6,8 |
| **20**   17:9 59:15 |
| **2019**   17:5,9 |
| 51:13 |
| **2020**   16:12 |
| 17:10 19:18,21 |
| 20:2 |
| **2021**   12:19 |
| 19:11 26:21 |
| 27:6 28:23 |
| 34:6 41:21 |
| 48:23 |
| **2022**   10:5,15 |
| 11:8 19:22 |
| 20:4 28:7,24 |
| 34:24 |
| **2023**   8:14 |
| 10:24,25 26:22 |
| 27:7,20 36:9 |
| 43:8 |
| **2024**   1:18 |
| 55:15 56:9 |
| 57:3 |
| **2032**   56:15 |
| **21158**   56:11 |
| **22nd**   28:6 |
| **23**   57:3 |
| **23rd**   17:18,19 |
| 56:8 |
| **24**   22:14 24:3,5 |
| 24:9 |

**24th**   16:12
17:18,20,23
**25**   3:11

| 3 |
|---|
| **3**   3:11 25:15,19 |
| 26:6 33:9 |
| 52:18,19,20 |
| **3/10/22**   3:10 |
| **3/22/22**   3:11 |
| **30**   1:12,14 4:9 |
| 19:13 50:10 |
| 54:9 55:10 |
| 57:5,16 58:2 |
| 58:24 59:2,4 |
| 59:12 |
| **30096**   2:5 |
| **30309-3231** |
| 2:10 |
| **317**   6:13,15 |
| **31st**   10:15 11:8 |
| 12:18 19:11 |
| 34:6 35:2 |
| 41:21 48:23 |
| **32**   3:12 |
| **3575**   2:5 |
| **38**   3:10 |

| 4 |
|---|
| **4**   3:2,11 14:1,5 |
| 14:6 17:16 |
| 18:11 39:16 |
| 42:12,14,15 |
| 44:1,6 |
| **401**   18:15 |

| **404.874.8800** |
|---|
| 2:11 |
| **404.888.1111** |
| 2:6 |
| **43**   3:12 |
| **488**   11:13 |

| 5 |
|---|
| **5**   3:12 32:3,7 |
| 33:8 34:23 |
| 42:12,14,15,17 |
| 44:2,6 |
| **50**   3:14 |
| **51**   3:3 |
| **5500**   8:18 |
| **5:00**   18:14 |
| **5:30**   53:6 |

| 6 |
|---|
| **6**   1:12,14 3:12 |
| 4:9 43:18,19 |
| 55:10 57:5 |
| 58:2,24 59:2,4 |
| 59:12 |
| **60**   9:4,8 |
| **607-6832**   6:13 |
| 6:15 |
| **6912190**   57:5 |
| 58:2 59:2 |
| **6:00**   53:8 |

| 7 |
|---|
| **7**   3:10 22:5 |
| **7th**   17:5 |

**[800 - apartment]**                                                    Page 2

| **8** | |
|---|---|
| **800** 2:10 | |
| **8:00** 18:14 | |
| **8:30** 53:6 | |

| **9** | |
|---|---|
| **9/17/2024** 57:5 | |
| **911** 41:15 | |

**a**

**a.m.** 1:18 4:1
  18:14 26:2,3
  55:16
**abandoned**
  19:18 20:1
**abandonment**
  17:17
**ability** 31:16
  47:3
**able** 29:21
  31:19,21
**above** 57:6
  59:7
**absolutely** 26:1
**accept** 49:21
**acceptance**
  13:18
**access** 30:16
  36:20 45:15
  47:6,10,25
  48:2,4,6,10,11
  48:19
**accommodate**
  5:16
**accord** 11:3

**account** 13:18
**accuracy** 57:9
**acknowledge**
  49:19
**acknowledge...**
  49:24 59:3
**acknowledg...**
  57:12
**acquisition**
  51:13,16
**acting** 10:8,12
**action** 1:3 8:2
  19:22 21:8
  27:2 42:20
  56:2,4
**ada** 22:16 23:8
**addenda** 22:21
**addendum**
  22:11,22,24
  24:1
**additional**
  22:12
**additions** 59:6
**address** 6:5
  41:6 46:11
**addresses** 41:3
  41:11
**adjacent** 38:12
**adjuster** 45:25
**admin** 53:7
**administered**
  24:24
**administering**
  8:7

**administration**
  39:22
**admit** 34:8
**advance** 7:8
**advise** 28:3
  31:4 37:11
**affixed** 56:8
**aforemention...**
  55:9,25
**aggressive** 29:6
**ago** 9:12
**agreeable** 4:23
**agreement**
  13:19 19:5,6
  22:23
**agreements**
  39:3
**ahead** 24:7
**aid** 12:22
**akita** 15:12
  28:6 30:1,1,8
  31:23 32:1
  33:24 34:1
  38:14,18,23
**albertson** 2:8
  3:3 4:19,23 5:1
  13:14,24 16:8
  25:22 36:25
  41:9,13 43:9
  43:21 50:11,15
  50:20,23 51:3
  51:4 53:25
  54:3,14
**alexia** 38:10

**alleged** 37:13
  37:15 52:14
**allotted** 57:19
**allow** 22:10
  47:10
**allowed** 22:7
**amenities** 48:3
  51:18
**animal** 15:12
  22:10,11,13,16
  22:19,24 23:8
  23:13,20 24:1
  24:8 29:22
  30:4,6,6,11
  31:4,7,10 49:3
**animals** 22:6
  46:15
**answer** 4:21
  5:5,7,10 43:11
  43:22,22
**answered**
  27:16,17,22
**answers** 43:16
**anymore** 36:4
**anyone's** 37:15
**apartment** 9:5
  19:18,24 20:11
  20:14,16,17,19
  20:23,25 21:10
  21:11,16,22
  22:8,9 24:16
  25:4 32:19
  38:11,12 47:10
  47:15 48:24
  52:1

**[apartments - bretz]**                                    Page 3

**apartments** 9:5
   12:21 19:5
   23:5 24:18
   26:8 47:7
   48:19
**apologies** 6:16
**apologize** 25:12
   25:22
**apparently**
   30:21
**appear** 17:7
   38:12
**appearances**
   2:1 20:18
**appeared** 35:7
**appears** 19:5
   22:4 33:10
   34:8
**appended** 59:7
**applicable** 57:8
**application**
   13:20
**approximately**
   17:6,8,11 27:6
   28:21
**area** 31:15
**areas** 47:25
   48:2
**arising** 15:8
**arm** 7:25
**armistead** 1:4
   57:4 58:1 59:1
**ascertain** 31:12
   32:1,21

**aside** 32:5
**asked** 5:11 28:6
   33:12 49:23
**asking** 32:12
   35:3,10 47:11
**asserted** 35:25
**assigned** 16:24
**assistant** 36:12
**associated** 13:4
**assume** 27:24
**atlanta** 1:2
   2:10
**attached** 57:11
**attacked** 33:24
   33:25
**attention** 23:13
   23:21 24:21
   29:17 31:2
**attorney** 56:3
   57:13
**attorneys** 56:5
**aushiana** 10:16
   25:9,11,12,13
   36:18 41:3
**austin** 2:8 3:3
   4:18,20 43:5
   51:3,4
**austin.alberts...**
   2:11
**authority** 15:24
**authorize** 22:9
   22:16
**available** 46:9
   47:9 49:16
   50:9 57:6

**aware** 15:10
   20:6,15 21:18
   21:19 23:23
   28:19 30:13
   31:3 32:10,12
   34:15 42:20
   43:1 46:16

**b**

**b** 1:12,14 4:9
   4:15 10:18
   55:10 56:12
   57:5 58:2,24
   59:2,4,12
**back** 14:7 33:7
   53:15
**background**
   5:18 40:14,17
   40:23 44:16,21
   46:22,24
**based** 31:2
   37:12 44:3
   53:21
**basically** 54:4
**basis** 18:13
**beginning** 46:7
**behalf** 1:12,14
   1:16 7:12
   11:15 14:8
   15:25 51:5
   55:11,12
**believe** 8:24
   10:16,24 11:13
   12:14 26:21,25
   30:18 32:13
   42:1 44:22

46:10,23 48:9
   48:15 50:14
   51:13,18
**believed** 52:22
**belong** 35:17
   35:21
**belonged** 29:21
   31:10 32:15
**best** 5:19 29:19
   31:15
**better** 5:21,23
**beyond** 38:4
**big** 29:6 33:14
   35:8
**bird** 22:7
**bit** 13:22 24:6
   25:17 30:2
   35:22 51:25
**bite** 52:12,22
**bites** 12:18,24
   15:4,8,17,17
   34:4,9 37:18
   46:14
**biting** 38:23
**bitten** 34:2
   38:15
**boarded** 49:10
**booklet** 49:15
**bought** 51:15
**boulevard** 2:5
**break** 5:9 25:25
**breaks** 5:15
**bretz** 1:12,14
   4:2,13 5:2 51:4
   55:6,11 57:1,5

30(b)(6) Kendrel Bretz                        September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[bretz - condition]**                                      Page 4

58:2,24 59:2,4
59:12
**briefly**  16:9
25:23
**broadly**  23:18
**brought**  23:13
23:21 24:21
29:17 32:11
**building**  52:4,7
52:10,18,18,20
**buildings**  17:2
51:19 53:12,19

**c**

**c**  10:11 44:15
56:12
**cad**  41:16
**call**  14:4 17:15
30:4 31:7
48:23
**called**  30:6,7
42:15 48:9,15
**calling**  30:11
49:2
**calls**  41:15
**cameras**  11:24
14:25
**campo**  28:4
**canvass**  31:15
**canvassed**
31:23,25
**capacity**  7:11
7:13
**care**  12:22
**carmel**  6:8

**carry**  47:18
**case**  7:21 25:8
52:17
**cause**  56:2
**cell**  6:12
**certain**  31:19
**certainly**  21:3
41:5
**certified**  22:16
**certify**  55:6
56:1
**chain**  47:18,20
47:24
**change**  58:4,7
58:10,13,16,19
**changed**  53:9
**changes**  51:14
51:22 54:6,9
57:10 59:6
**charge**  39:18
**charges**  22:13
45:10
**chasity**  10:9
**check**  40:17,23
41:5,8 44:21
47:20 48:7,7
**checkr**  44:22
**checks**  40:14
44:16 45:2
46:22,24
**chief**  6:22
**circle**  52:6,23
**circled**  52:17
**circumstances**
26:23

**cited**  21:19
**civil**  1:3,19 4:8
55:17
**clarify**  5:21
13:21
**clarkston**  9:6
**client**  20:15
21:16 30:2
**closes**  53:5
**closets**  48:2
**cloud**  44:3
**cmrs**  1:15 55:4
**collectively**
14:4 16:4
**colorado**  8:23
**come**  14:6
23:25 33:7,23
39:24
**comes**  37:6
**comfortable**
50:17
**coming**  50:12
**commission**
56:14
**common**  48:2
**communities**
9:4
**community**
22:9 46:20
**companies**  7:22
44:21
**company**  7:25
49:13
**compensation**
18:9,10

**complained**
40:7
**complaint**  21:9
21:14,18 24:22
37:3 47:16,21
**complaints**
12:17,17 15:4
15:11 28:11
37:13,15,18
38:17,21,22
48:21
**complete**  59:8
**completed**
57:16
**complex**  9:6
11:17,20,25
14:20 15:5,9
16:16,19,20
18:17 23:4
27:15 28:18,21
30:8,11 31:22
46:12 48:24
49:4,12,14
**complexes**  9:3
**compliance**
23:25
**complied**  52:8
**complies**  53:18
**comply**  24:3,5
24:8
**composed**
43:16
**condition**  30:19
30:25

**[conduct - deposing]**                                        Page 5

| | | | |
|---|---|---|---|
| **conduct**  34:20 | 27:18,19,23 | **cover**  50:18 | **days**  17:24 |
| 40:14 44:19 | 28:2 29:1,2 | **covered**  50:18 | 19:13 40:11 |
| **conducted**  32:8 | 33:1,6 35:4,5 | **craig**  1:15 55:4 | 50:10 54:9 |
| 40:17 | 35:19,20 37:14 | **crime**  41:21 | 57:16 |
| **considered** | 37:16 39:5,12 | **crimes**  45:3,6 | **deal**  23:5 |
| 22:15 | 40:5,21 43:9 | **crooks**  32:14 | **dealing**  12:7 |
| **constitutes** | 44:13,18 47:23 | 36:6,6,7 41:7 | 49:6 |
| 30:18 | 59:8 | 41:14 | **december** |
| **contact**  29:22 | **corrections** | **cross**  3:3 51:2 | 19:11 |
| 31:4 36:4 | 59:6 | **currie**  2:9 4:19 | **decide**  54:13,14 |
| **contacted** | **correspond** | 14:16 | **decision**  40:2 |
| 35:15 | 52:2 | **custody**  30:16 | **declare**  59:4 |
| **content**  46:3,4 | **corresponden...** | **cv**  1:3 | **deem**  31:1 |
| **continuing** | 17:4 | | **deemed**  59:6 |
| 22:20 | **counsel**  4:18 | **d** | **default**  22:15 |
| **contract**  22:15 | 13:15 14:10,11 | | 39:10 |
| **control**  29:22 | 14:13,15 19:4 | **d**  10:12 | **defendant**  1:8 |
| 30:4,6,6,12,16 | 42:3,21 43:13 | **d1**  3:14 | 2:7 4:11,17 |
| 31:5,8 49:3 | 46:6 51:5 | **date**  8:15 11:10 | 15:25 46:10 |
| **convicted**  45:1 | 55:25 57:14 | 18:3 19:13 | **defendant's** |
| **copies**  41:24 | **county**  1:16,17 | 34:24 42:18 | 3:13 50:25 |
| 57:14 | 9:6 43:3 55:2,5 | 44:7 50:9 | **defense**  51:9 |
| **copy**  7:6,8 | 55:15 56:16,17 | 52:12 58:24 | **deficiencies** |
| 12:12 32:18 | **couple**  17:24 | 59:12 | 27:3 |
| 40:20 41:1 | 30:7 50:21,23 | **dates**  10:23 | **define**  46:13 |
| 49:20,25 50:3 | 51:5 | 13:9 17:18,21 | **dekalb**  9:6 |
| 54:2 | **course**  14:13 | 26:20 28:22 | **denise**  19:9 |
| **corporate**  40:2 | 15:20 31:14 | 45:9 | **dependent**  45:5 |
| 49:13 | 42:2 46:3 | **davin**  3:11 13:5 | **depends**  45:8 |
| **corporation** | **court**  1:1 42:21 | 15:13,22 16:6 | **deponent**  54:20 |
| 7:12 | 42:24,25 43:3 | 19:6,8 20:24 | 55:7,22,23 |
| **correct**  8:8 9:9 | 43:12,14 | 35:17,21,25 | 57:13 59:3 |
| 10:3 16:13,14 | **covenants** | 39:14 40:23 | **deposed**  52:16 |
| 17:11,25 19:23 | 23:11 | 42:16 44:6 | **deposing**  57:13 |
| 25:7 26:19 | | **day**  1:18 18:4,5 | |
| | | 20:16 55:15 | |
| | | 56:8 59:15 | |

**[deposition - employees]**                                    Page 6

**deposition**  1:12 1:14 3:9,10,13 4:9,10 5:2 7:3 7:6,7,9,17 8:15 14:1 25:15 32:3 38:6 42:4 42:13 43:19 45:23 46:7 50:25 52:21 55:10,18
**depositions**  5:14
**deposits**  22:12
**describe**  29:13 31:11
**describes**  29:10 33:20
**describing**  30:25
**description**  32:13
**designated**  11:14,22 12:15 14:8
**determine**  29:22
**development**  7:20,24,24 8:4 9:17
**devin**  19:8
**different**  11:4 18:4,5 36:10 36:11 38:15 44:21 45:2

**direct**  3:2 4:6 23:11
**direction**  55:20
**director**  39:20
**directors**  9:23 10:1
**disciplinary**  27:2
**disciplined**  27:1
**disclose**  23:1 39:9
**disclosed**  23:7
**disclosures**  13:16 41:10
**discount**  18:16 18:19
**discovered**  35:16
**discovery**  43:4 43:11 50:12,13
**discussed**  14:12 16:1 28:16,16 29:24 42:6 44:1,17
**discussing**  30:23 42:2
**discussion**  6:18 16:10 50:22
**disinterested**  56:1
**dispensed**  5:24
**disqualifiers**  45:4,7

**distribute**  45:11
**district**  1:1,1 42:21,24 43:14
**division**  1:2
**document**  17:14,15 18:2 18:10 19:3 48:16,17 49:17
**documented**  23:14 34:9 39:2
**documents**  16:5 21:25 42:10,13 43:25
**dog**  12:18,24 15:4,8,12,16 20:19 25:5 28:4,6,9,9 29:3 29:12,17 31:12 32:13 33:13,21 33:24 34:4,9 34:10 35:9,10 35:12,14,16,17 35:21,23 36:2 36:3 37:4,5,8 37:15,18,18 38:14,15,18,24
**dogs**  28:12,17 29:5,16 30:14 30:20 33:25 34:2 37:19 49:4,7
**doing**  53:7

**drive**  6:6 44:3
**drug**  45:6,10
**duluth**  2:5
**duly**  4:3 55:7
**duru**  38:10,18 38:22
**duties**  9:13 16:22,23
**duty**  46:10,23

**e**

**e**  4:15,15 54:3 58:3,3,3
**earlier**  49:2 52:9
**earliest**  50:9
**early**  20:10
**east**  1:17 55:13
**efficiently**  5:13
**either**  24:15,21 37:19 46:14 56:3
**email**  38:1
**employ**  56:5
**employed**  17:8 26:21 32:16
**employee**  11:19 13:7 14:22 15:13 18:19 26:12 33:12 35:14,18 44:10 48:24
**employees**  11:7 11:16 14:19 23:4 24:25 28:12 30:10

[employees - generally]                                    Page 7

36:14 40:19
44:17 45:24
46:23 49:9,11
53:13
**employment**
13:9 26:20
27:6 28:22
39:14
**ended** 19:19
**english** 55:19
**enter** 47:3,15
**entering** 48:24
**entire** 27:21
53:9
**entity** 7:23 8:10
**errata** 57:11,13
57:16
**error** 54:8
**est** 1:18 55:16
**event** 20:11
56:4
**events** 8:2 9:12
19:21 34:14
40:10
**exact** 8:18
10:23
**examination**
1:14 3:1,2,3
4:6 51:2
**examined** 4:5
**except** 4:21
**exhaustive** 9:2
9:15
**exhibit** 3:9,10
3:10,11,11,12

3:12,13,14 7:3
7:6 13:13 14:1
14:5,6 17:16
18:11 25:15,19
26:6 32:3,7
33:8,9 34:23
38:6,8 39:16
42:14,17 43:18
43:19 50:25
51:9
**exhibits** 3:8
14:4 25:18
42:12 44:1,5,6
**existence** 23:7
**expand** 5:7
**expected** 29:8
**expires** 56:14
**expletive** 29:4
**expletives**
33:18
**extension** 19:16
**extent** 31:19
**extra** 6:14

|         **f**         |

**f** 52:4
**fact** 31:3 32:11
**fails** 57:18
**familiar** 7:15
**february** 26:21
27:6 28:23
**federal** 1:18 4:8
42:21,25 55:17
**fee** 24:2
**feel** 5:22 50:17

**fees** 22:12
**felonies** 45:3
**felony** 45:1
**file** 1:3 18:6
35:12 38:17
39:13 40:21
43:10
**files** 36:18
44:10
**fill** 48:6
**final** 13:17
**finally** 30:8
**find** 21:21 23:9
23:19 31:20
45:18 52:23
**fine** 21:6
**fire** 40:7
**firing** 13:5
15:22 39:19,22
40:11
**first** 4:22 10:11
17:14 34:25
43:7 47:22
55:7
**fish** 22:7
**five** 15:9
**follow** 17:22
43:7
**follows** 4:5
**foregoing**
55:10 59:5
**form** 3:12 4:21
4:22 34:23
37:21,22

**formal** 12:17
37:3,17 50:15
**former** 15:13
26:12 35:18
**formerly** 20:24
**forth** 7:16
19:10
**forwarding**
41:3,6
**free** 5:22 13:2
28:10 29:7
33:13
**freely** 38:16
**french** 33:15
**front** 7:5 25:20
26:5 30:21
32:6 33:9 38:8
43:17 51:24
**fucker** 33:14
**fucking** 29:5
**full** 15:24
**furnished**
21:25
**further** 54:20
56:1
**future** 17:21
22:3

|         **g**         |

**ga** 2:5,10 57:15
**gain** 48:10
**general** 14:10
49:13 50:6,7
**generally** 48:1
53:4

[georgia - initial]                                                        Page 8

**georgia** 1:1
  8:23 9:6 42:22
**give** 21:5 23:3
**given** 5:2 18:16
  29:9 34:13
  38:10 45:25
  46:2,5 49:9,14
  55:21 59:9
**giving** 8:2
  13:15 19:21
  21:8
**go** 6:16 16:8
  24:7 25:17,23
  47:20,21 50:20
**goes** 25:3 37:7
**going** 5:19
  17:14,19 19:16
  25:17,18 32:7
  34:22 51:8,8
**good** 43:24
  45:21
**great** 37:2
**ground** 5:10
  50:18
**grounds** 16:25
**guest** 20:17
  29:20
**gwinnett** 43:3

**h**

**h** 10:11,18 58:3
**hand** 56:8
**handbook** 23:3
  49:16,18,20,21
  49:22,25 50:3
  50:5

**handytrac** 48:9
  48:15
**happened** 46:9
**harassing**
  29:15
**hard** 44:3
**harm** 46:16
**hazard** 13:2
**head** 30:23,24
  45:16
**hear** 5:18 29:12
**heard** 34:1,25
**held** 21:15
**hell** 29:6 33:13
**help** 42:4,7
**hereto** 59:7
**hereunto** 56:7
**hey** 37:7
**hiers** 2:9
**higher** 26:17
**hire** 44:23,25
  45:18
**hireright** 44:20
**hires** 40:15
**hiring** 9:21
  11:15 13:5
  14:19 15:22
**hold** 27:5
**holly** 39:19,20
**home** 6:5
**homes** 47:3
**hop** 33:7
**hopefully** 22:1
  38:20

**hour** 18:12
**hours** 18:13
  22:14 24:3,5,9
**house** 14:11,13
  46:6
**hr** 40:9
**hris** 44:11
**human** 39:20
  44:11

**i**

**icloud** 44:3
**identification**
  7:4 14:2 25:16
  32:4 38:7
  43:20 51:1
**identified** 4:11
  8:25 13:16
  41:10 52:10,17
  52:21 53:21
**identifier** 52:5
**identify** 10:5
  29:19 31:9,21
  53:17
**identifying**
  42:14
**illegal** 22:13
**illinois** 8:22
**imagine** 5:14
**implementati...**
  11:23 14:24
**important**
  46:18
**incident** 3:12
  9:7 10:4 12:2,4
  12:5,19 19:1

19:12 20:16
  21:8 24:13
  25:8 28:7,14
  32:5,6,9 34:3,5
  34:17,18,20,23
  34:24,25 35:1
  37:22,24 38:13
  39:13 41:17,20
  42:17 44:8
  48:22
**incidents** 37:5
  37:18 41:15
**include** 9:13,21
  16:25
**included** 16:23
**including** 12:23
  22:6
**index** 3:1,8
**indiana** 1:16,17
  4:17 6:8 8:22
  55:1,5,15
**indianapolis**
  1:17 4:16 6:7
  8:16 39:25
  55:14
**indirectly** 9:23
**individual** 7:13
  47:7
**individuals**
  44:24,25 48:19
**informal** 12:16
**information**
  10:25 32:11
**initial** 13:16
  41:10 52:6,23

**[initiated - law]**                                        Page 9

initiated   20:14
  40:8
injured   12:23
  21:16
injury   2:4
insects   22:7
insist   43:13
inspected   24:18
instance   8:1
  23:16 47:24
instruct   38:1
insurance
  18:15 45:25
intend   43:11
intent   45:10
interest   33:22
interested   56:4
interior   51:22
internal   37:25
interrogatories
  3:12
interrupt   5:8
interruption
  24:6
interview   29:1
  29:10 33:12
intimidating
  33:21
investigated
  32:5
investigation
  32:8,10 34:14
  34:20 38:4
  45:23

investigative
  34:16
investigator
  3:10,11 25:21
  28:5 33:10
  34:19 35:3,7
  35:11 38:22
investigators
  26:7
involved   51:19
involving   11:24
  15:16 41:15
iowa   8:22
issue   28:17
  32:19 53:23
issued   43:8
issues   22:2

**j**

janitorial   48:2
january   10:5
  10:15 11:8
  12:18 17:5,9
  19:22 20:4
  34:6 35:2
  41:21 48:23
  56:15
jennifer   1:4
  57:4 58:1 59:1
job   6:21 9:13
  11:4 13:18
  16:3,15,22,23
  17:4,17 18:11
  26:14,17 27:3
  27:5 36:10,11

joe   2:6 13:25
  41:9
joined   33:11
joseph   2:4 3:2
  4:7
jr   19:8,8
july   17:18,18
jump   5:24
june   16:12
  17:10,19,20,23
  19:18,21 20:2
  26:21 27:7
  43:8

**k**

k   4:15 18:15
keeping   13:1
ken   4:13
kendrel   1:12,14
  4:2 55:6,11
  57:1,5 58:2,24
  59:2,4,12
kept   44:2,2
key   47:18,19,20
  47:24 48:8,11
  48:14
keys   47:9,14
  48:4,7,10
kind   14:5 49:15
knew   38:14
know   7:20 9:2
  10:14 11:1,7
  11:11 14:12
  18:2,3,5,22,24
  18:25 19:14
  20:10 21:10,12

21:14 23:23
  24:10 26:9
  34:12 35:2
  36:6 38:1,19
  40:6,8 41:14
  42:5,18 45:12
  45:14,15 46:2
  46:3,5,8 49:23
knowledgable
  14:18
knowledge
  7:16 15:15,21
  18:8,18 24:17
  27:4 31:18,25
  32:12,23 33:1
  33:4 36:17
  38:5 39:15
  40:13 43:12
  49:1 53:11
known   35:14
koger   2:5

**l**

l   2:8 3:3 6:4
  44:14,15 51:3
  56:12
label   53:16
lady   35:7
lamar   6:2
large   29:12
  30:20 35:12
  55:6
late   10:4 53:8
laundry   48:3
law   2:4

[lawsuits - michigan]                                          Page 10

**lawsuits** 15:4,8
**lawyer** 14:12
  42:6
**lease** 9:18
  12:14 13:19
  19:4,6,11,13,16
  19:19 20:9,13
  22:5,15,20,23
  23:10,11 24:13
  32:18,24 39:3
  39:11
**leaseholder**
  20:20,22 23:15
**leasing** 35:11
  47:9,14,22
  51:17 52:24,25
  53:1,4,20
**leave** 10:22
  26:24 33:17
  53:8
**leaving** 11:6
**left** 11:1,3,4
  21:3 26:12,25
**legacy** 6:6
**legal** 57:23
**lessor** 33:6
**letting** 23:22
**line** 58:4,7,10
  58:13,16,19
**lines** 28:22
**list** 8:20
**listed** 18:10
  36:4 53:12
**lists** 17:18 19:7

**litsup** 57:15
**little** 5:12 25:17
  28:25 51:25
  52:9
**live** 18:20,22
  36:14,16
**living** 19:7 20:4
  20:6 32:21
  52:11,14
**llc** 1:7,12,14,17
  2:4 4:9,18
  55:11,13 57:4
  58:1 59:1
**llp** 2:9
**located** 10:7
**location** 29:20
  52:25
**long** 7:1 8:12
  53:1
**longer** 19:19
  32:15
**look** 16:3 54:8
  54:15
**looking** 22:4
  35:8
**looks** 17:3,9
  19:10 21:1
  36:5
**lot** 34:1
**loud** 5:19
**lp** 8:4

**m**

**m** 6:4
**macdougall**
  39:19,20,25

**made** 4:10 31:2
  37:17 46:16
  59:5
**maintenance**
  16:17,19,20
  17:1 24:25
  25:3 26:13,14
  27:8,15 30:23
  30:25 33:11
  47:5 48:1,16
  48:18,18,23
  53:15,16,20
**make** 54:5,9
**makes** 25:2
**mammals** 22:6
**managed** 9:4
**management**
  1:7,12,14,16
  4:9,18 6:19,23
  6:24 7:19,23
  7:23 8:6,13,17
  8:17 9:3,10,18
  9:20 29:9,23
  37:7 55:11,13
  57:4 58:1 59:1
**manager** 10:6
  10:13,14,19,20
  16:25 25:6
  36:8,9,12,13
**managers** 9:24
  9:25 10:2,2
**managing** 8:7
**manner** 48:25
**manual** 49:9,14

**map** 51:24
  53:13
**march** 28:6,24
  34:24
**marion** 1:16,17
  55:2,5,14
  56:17
**mark** 13:12
  32:7 43:18
  51:9
**marked** 7:4,5
  14:2 16:4
  25:16,19 26:5
  32:4 38:7
  42:11 43:20
  51:1
**material** 54:5
**matter** 4:5 43:4
  45:23 55:9
**mcghee** 2:9
**mean** 18:3
  47:13
**meaning** 23:6
**means** 24:1
**meant** 17:19
**medical** 12:23
**member** 33:11
**members** 8:4
  11:9
**mentions** 33:23
**met** 32:13
**mf'er** 33:17
**mhc** 1:3
**michigan** 8:23

[middle - oversee]                                        Page 11

**middle** 6:1
**minutes** 50:21
**missed** 17:23
**missing** 40:11
**mistake** 54:7
**model** 45:2
**moment** 33:8
**month** 17:21
  19:15,15
**months** 17:6,9
  28:7
**mother** 33:14
**moved** 36:13
  53:1
**moving** 51:19

**n**

**n** 4:15 10:18,18
  10:18 56:12
**name** 4:12 6:1
  10:11,11,17
  21:2,12 48:14
**nature** 48:3
**ne** 2:9
**nearby** 31:20
**necessary** 59:6
**need** 5:7,9,12
  5:14,20 22:18
  22:24 23:12
  25:24 47:14
  50:18 54:13
**needed** 28:1
**neighbor** 31:17
**neither** 32:23
**never** 30:6
  35:11

**new** 20:13
**noise** 5:18 24:6
**noncompliant**
  23:19
**normally** 54:14
**northern** 1:1
  42:21
**notarial** 56:8
**notary** 1:15
  55:4 59:13,19
**note** 57:10
**noted** 4:1 54:18
  59:7
**notes** 55:19
**notice** 1:19
  3:10 4:10 7:7
  7:17 13:17
  22:14 23:22
  24:10,14 36:23
**noticed** 24:23
**november**
  50:13
**number** 6:9,10
  6:12,14 8:18
  11:9 20:25
  52:4
**numbering**
  52:1

**o**

**o** 10:12,18,18
  44:14,15 56:12
**oak** 3:14 8:1
  9:5 10:7,15,19
  10:20 11:8,12
  11:16,19,25

12:21 13:20
14:20 15:5,9
15:16 16:16
18:17 19:5
23:4,17 26:8
30:11,19 35:24
40:4,6 41:16
45:24 49:12
50:5 51:11,12
51:25
**oaks** 6:6
**objections** 4:21
**obtaining**
  12:22
**obviously** 47:5
**occasions** 38:15
  38:24
**occupant** 21:22
**occupied** 20:13
  20:24 21:3
**occupying**
  20:11
**occur** 17:21
**occurred** 8:2
  9:7,12 10:4
  15:8,18 19:1
  19:12,22 20:12
  20:17 21:9
  24:13 25:9
  28:8 35:1
  38:13
**october** 8:14
  10:24
**offenses** 45:19

**offer** 13:18
  16:3 17:4
  18:11,19
**office** 35:12
  37:7 40:4,6
  47:9,14,22
  51:17 52:24,25
  53:1,4,20
**officer** 6:22
**offices** 1:16
  4:17 55:13
**official** 21:21
**officially** 39:10
**officials** 48:17
**ohio** 8:22
**okay** 21:7,14
  37:2 43:2 52:6
**oklahoma** 8:24
**older** 29:3
**ones** 16:6
**open** 53:4
**operate** 8:19,22
**opportunity**
  11:4 25:24
**oral** 1:14
**order** 25:17
  54:2
**original** 13:19
**outside** 17:1
  34:18 39:2
  49:2
**oversee** 9:15,23
  9:24,24 10:1,1
  10:2

30(b)(6) Kendrel Bretz                    September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[oversight - prepare]**                                Page 12

**oversight** 9:16
**own** 11:2,3
**owned** 15:13
  53:2,10
**owner** 31:12
  36:2
**owners** 8:5
**ownership**
  14:10 32:1
**owns** 8:3

**p**

**p** 44:14,15
  56:12
**p.m.** 18:14
  54:18
**page** 22:5 38:4
  44:9 58:4,7,10
  58:13,16,19
**paid** 18:12
**pardon** 21:24
  24:6 29:4
  33:14
**part** 17:16 18:9
  18:11 34:13
  36:22 39:21
  45:22
**particular**
  47:15
**parties** 55:23
  55:24
**partly** 47:12
**party** 7:21 56:3
  56:6
**past** 19:13

**pauses** 21:24
**pay** 8:9
**paying** 24:1,2
**paylocity** 44:10
  44:12
**peachtree** 2:9
**pending** 42:24
  43:2
**people** 6:22
  19:7 29:5,15
  31:20 34:1,2
  35:10,15 37:9
  39:6 47:2,4
**performance**
  27:3
**period** 17:8
  41:17
**person** 7:15
  11:14,22 12:15
  14:18 15:15,21
  21:2,12 25:3
  29:18 31:9
  37:19 38:19
  39:18 46:16
  56:2
**personal** 6:10
**personnel** 3:11
  9:17,20 18:6
  33:11 36:18
  42:16 44:7
**persons** 9:21
  34:9 46:15
**pet** 12:10,12
  15:2 22:22,25
  23:1,7,14,24,24

24:2,2,3,11,16
24:20 29:21
31:16 39:2
**pets** 12:8 23:5
  24:19 39:6
  46:11 49:7
**phone** 6:9,10
  6:12
**phrase** 5:23
**picture** 28:5
**place** 1:19
  35:24 38:4
  52:22
**plaintiff** 1:5,16
  2:3 52:12,16
  55:12
**plaintiff's** 3:9
  7:3 13:15 14:1
  14:6 25:15
  26:6 32:3 38:6
  43:19
**plan** 3:14 18:15
  51:11
**platform** 44:11
**please** 5:21 6:3
  25:1
**plenty** 5:16,22
  28:9
**plus** 29:13
**point** 13:8 15:7
  27:1 36:11
  47:6
**policies** 9:17
  11:23 12:7,21
  13:1 14:24

15:2,16 49:5
  49:22
**policy** 12:10,12
  23:6 27:25
  39:2 44:25
**portal** 38:2
**position** 32:17
  47:4
**possible** 53:6
**pounds** 29:13
  33:19
**pour** 21:24
  22:20
**practices** 7:16
**preceding**
  40:10 48:22
**pregnant** 21:24
**premarked**
  14:3
**premises** 12:8
  12:18,24 13:1
  18:23 23:20
  24:12,16,20,25
  28:12 29:14
  30:15,19,20
  31:13 32:24,25
  34:4,10 35:3
  36:14,16 37:8
  39:7 41:16,21
  47:5 48:21
  49:4,7 50:1
**preparation**
  42:3,13 45:22
**prepare** 42:4,7

[prepared - records]                                              Page 13

**prepared**  18:2
**presence**  24:19
**present**  19:20
  30:15 34:6
  41:22 47:8
  55:23
**presently**  51:20
**president**  6:22
  6:24 8:12 10:8
**presumably**
  35:18 39:6,8
  40:3,20,23
  48:16 50:10
**presume**  17:19
**pretty**  5:13 9:2
  41:18
**preventative**
  17:1
**previous**  35:13
**prior**  28:13
**private**  25:21
  26:7 34:19
**probably**  4:24
**problem**  46:13
**problems**  46:11
**procedure**  1:19
  4:8 55:17
**procedures**
  11:24 12:7
  14:24 49:6
**process**  37:3
  48:7 49:8
**produce**  40:20
  41:1,25 50:8

**produced**  1:15
  41:19 42:11,18
  43:25 44:7
**product**  46:4
**production**
  36:23 45:17
**professional**
  22:18
**promoted**
  36:12
**promulgated**
  49:6
**properties**
  23:17 50:6,7
**property**  6:22
  6:24 7:23 8:1,3
  8:7,13 9:25
  10:2,7,14 11:8
  11:12 16:25
  23:17 25:3,6
  35:10,13,15,24
  36:8,9,12,13
  38:16,23 45:24
  46:17,19 48:8
  51:15 53:2,10
**propose**  4:20
**provide**  9:16
  40:22
**provided**  16:20
  19:4,14
**provides**  18:15
**public**  1:15
  55:4 59:19
**publish**  37:24

**purposes**  13:14
**pursuant**  1:18
  55:16
**put**  7:5 25:19
  26:5 43:17
  51:24

### q

**qualified**  22:18
**question**  4:22
  5:6,11,21
  15:12 19:12
  20:19 24:14
  28:4 30:2
  38:18 43:21
  44:24
**questions**  3:2,3
  4:7 5:23 13:22
  43:7,22 50:19
  50:24 51:3,6
**quick**  25:25
**quickly**  41:9
**quoting**  33:15

### r

**r**  4:15 6:4 10:18
  13:5 56:12
  58:3,3
**ran**  19:11
**read**  57:9 59:5
**ready**  50:24
  51:6
**reason**  5:9
  17:16 47:15
  57:11 58:6,9
  58:12,15,18,21

**reasonable**
  31:11
**reasons**  11:6
  18:6 48:17
**recall**  11:9
**receipt**  49:24
  57:17
**receive**  8:9
  42:10,12
**received**  7:8
  28:11 49:20
**recently**  44:22
**recess**  26:2
**recognize**  51:9
**recognized**
  28:8
**recollection**
  38:21
**recommend**
  31:7
**recommendat...**
  39:23
**record**  6:17,18
  13:11 16:8,10
  20:8,20,22
  21:20 25:23
  28:15 37:10,20
  50:20,22 55:21
**recordings**
  11:25 14:25
**recordkeeping**
  13:14
**records**  3:11
  13:4,10 15:20
  16:11 17:3

**[records - robinson]**                                Page 14

30:10 31:22,24
42:16 44:7
**refer**  13:11
14:6
**reference**  17:14
22:5 39:3
**referenced**  44:1
46:7 57:6
**references**
30:22
**referring**  20:25
44:5
**refiling**  43:13
**reflect**  17:7
**reflected**  12:14
**reflects**  17:4
27:10
**refresh**  38:20
**regard**  11:15
11:23 12:16
14:18 15:25
22:22 23:4
24:11,16
**regarding**
12:17,22 14:25
15:4,11,16,21
25:21 34:3
39:14
**region**  10:6
**regional**  9:24
10:1,6,12,13
**regular**  37:21
**regularly**  24:18
**rehab**  51:16

**rehabbed**
51:17
**related**  9:18
12:5 16:6 45:6
**relates**  45:12
**relating**  4:4
**relationship**
7:19,22
**relative**  56:3
**remain**  23:25
**remove**  22:13
**removed**  24:4,9
42:20
**rendering**
12:22
**rent**  18:16,19
19:10 24:2
**rents**  22:12
**repeat**  6:15
24:7 25:1
**repeatedly**
31:13
**replied**  33:13
**report**  3:10,11
3:12 25:5 26:6
27:10 30:21
32:6 33:15,22
34:16,18,22,23
35:19 37:22,24
42:17 44:8,9
48:5
**reported**  16:24
28:2 35:23
37:4

**reporting**  28:1
**reports**  12:2,4
12:16 30:14
34:3 37:12
39:13 41:16,20
46:11,14
**represent**
52:16
**represented**
55:24
**reptiles**  22:6
**request**  24:23
25:2,4 36:22
36:24 40:3,9
43:12
**requested**
55:23
**requests**  16:23
24:24 43:4
**require**  22:11
22:17 49:17
**required**  59:13
**requires**  31:1
**resided**  20:18
21:10
**residence**  20:1
56:16
**resident**  18:24
18:25 21:15
23:22,24 24:15
24:22 29:20
31:17 32:25
33:2,3,5 35:6
35:13 38:2,11
38:13

**resident's**
29:20
**residents**  13:2
16:24 35:3
37:17,25 46:20
47:3,7
**resources**
39:21 44:11
**responding**
53:22
**response**  50:16
**responses**  43:6
43:10
**responsible**  8:6
**responsive**  4:21
**restroom**  25:25
**retained**  34:19
**return**  57:13,16
**review**  22:1
54:5 57:7
**reviewed**  49:21
**revisit**  22:2
**rex**  25:21 26:8
36:16
**right**  5:24 39:7
52:12 54:4,8
54:10,10,16
**rise**  8:2 19:21
21:8
**roaming**  28:12
28:17 30:20
38:16,23 49:4
**robinson**  10:16
25:10 27:16,17
27:22 28:2,17

**[robinson - stabilization]**                                              Page 15

36:10,19 41:4
41:13
**rodents**  22:7
**role**  8:12 16:18
**roll**  50:24
**rooms**  48:3
**roughly**  9:4
**routine**  24:23
**rpr**  1:15 55:4
**rule**  4:8 5:10
**rules**  1:18
55:17
**run**  46:22,24
**running**  28:10
29:7 31:13

**s**

**s**  10:11,12,18
10:18 44:14
58:3
**sadowy**  10:9
**safe**  13:1
**safety**  48:17
**saith**  54:20
**saw**  27:24 28:1
35:10 37:8
**saying**  20:9
33:3,4
**says**  16:11
17:16 18:12,14
28:20 29:23
34:24 37:4
39:19
**scaring**  37:8
**scheduled**  1:18
18:13 55:16

**screening**
11:16 14:19
45:2
**seal**  56:8
**second**  18:10
**see**  18:3,9 25:4
27:25 29:19
31:12,16 35:15
49:3 52:18,20
54:16
**seem**  17:22
**seen**  28:9 33:25
**send**  36:21,23
**senior**  16:18
**sent**  57:14
**separate**  6:9
14:15 22:11
34:13 36:21,23
**separated**
13:24
**separation**
10:23 17:17
**september**  1:18
55:15 56:9
57:3
**serve**  23:22
46:21
**served**  24:10,15
**service**  16:23
22:16 24:23,24
25:2,4
**set**  7:16 56:7
**sets**  19:10
**severity**  45:3,9

**sheet**  57:11
**shoot**  33:16
**shop**  53:15,16
53:20
**short**  27:11
**show**  25:18
51:8
**shows**  28:5
**sign**  22:10,21
22:24 49:10,19
57:12
**signature**  4:25
54:4,11,17
55:22 56:11
**signed**  22:23
36:5 57:19
**signer**  32:24
**signing**  24:1
**silver**  3:14 8:1
9:5 10:7,15,19
10:20 11:8,12
11:16,19,25
12:21 13:20
14:19 15:5,9
15:16 16:16
18:17 19:5
23:4,17 26:8
30:11,19 35:24
40:4,6 41:16
45:24 49:12
50:5 51:11,12
51:25
**simple**  17:13
**sit**  51:20

**site**  3:14 9:17
9:20,21 11:10
15:18 17:2
18:20,22 20:7
20:8,10 49:16
51:11,14,24
53:19
**situation**  29:9
29:11
**software**  44:4
**solutions**  57:23
**somewhat**  45:5
**sorry**  4:10
29:11
**sound**  17:10
**sounds**  9:2
17:25
**speak**  5:20
11:14,22 12:15
14:8 15:24
44:23
**speaking**  26:8
**specific**  44:5
49:11 53:23
**specifically**
23:12 45:12,14
**specifics**  42:2
**spell**  4:14 6:3
10:10,17
**spelling**  54:6
**spoke**  46:8
**ss**  55:1
**stabilization**
9:19

[staff - testimony]                                                   Page 16

**staff**   11:9 23:16
48:18
**standing**   23:6
**start**   1:18
39:23 55:16
**started**   29:4
**state**   1:16 4:12
11:6 34:1 43:3
43:12,22 55:1
55:5
**stated**   35:7,21
35:22 36:3
46:22
**statement**
13:18 22:17
25:20 34:11,12
34:13 38:10
**statements**
12:16 45:25
46:2,4,6
**states**   1:1 8:19
35:6
**stating**   22:23
33:24
**staying**   19:15
**stenograph**
55:19
**steps**   23:16
29:8 31:6,11
**stewards**   46:19
**strategic**   9:16
**strategies**   9:19
**streamline**
13:22 14:5

**street**   1:17 2:9
55:14
**stuff**   25:24
**stylistic**   54:7
**submitted**   43:4
**subscribed**
59:14
**subsidized**
18:16
**substituted**
7:20
**suite**   1:17 2:5
2:10 55:14
**summary**   35:6
**supervise**   16:18
**supervision**
11:19 14:22
**supervisor**
16:21 26:13,14
27:9,14,15
29:13 39:24
**supervisors**
29:25 30:3
**supplement**
21:5 45:17
**support**   22:19
23:8
**supposed**   23:18
23:22 25:5
48:20
**sure**   41:5,8,18
45:20 46:1
49:17 52:8
**swift**   2:9 4:19
14:15

**swiftcurrie.c...**
2:11
**sworn**   1:15 4:3
55:7 59:14
**system**   48:8,11
48:14

**t**

**t**   4:15 10:11
36:5,6 44:14
44:15 56:12
58:3,3
**take**   5:6,9,11
16:3 25:24
31:7 35:23
51:12 54:3,15
**taken**   1:16 26:2
27:2 29:9
55:12,18
**talked**   33:10
38:19 52:9
**talking**   35:19
49:12 51:25
**taylor**   19:8
**team**   9:17,20
**teams**   9:22
**tech**   27:11
29:24,25 47:5
48:24
**technician**
16:17 27:8,12
**technicians**
48:1
**techs**   48:18
**tell**   4:3 29:25
43:5 55:7

**telling**   33:16
**tells**   23:12
**temporarily**
22:8
**tenant**   19:15
23:9,19
**tenants**   33:23
39:4 46:14
**tennessee**   8:23
**term**   23:10
**terminated**
11:1 16:12
17:20,23 20:9
**terminating**
18:7
**termination**
13:17 17:6,15
40:8
**terrell**   3:11
13:5,7,17
15:13,22 16:7
16:11 17:5
18:7 19:6,8,9
20:24 21:15
22:21 24:11,15
26:15,17 32:23
35:17,22,25
39:14 40:7,24
42:16 44:6
52:11,14
**terrell's**   47:4
**testified**   4:5
39:1
**testimony**
20:23 34:11

30(b)(6) Kendrel Bretz                              September 17, 2024
Armistead, Jennifer Vs. TWG Management, LLC

**[testimony - used]**                                              Page 17

| | | | |
|---|---|---|---|
| 38:3 42:5,8 | **title**  6:21 16:15 | **tuesday**  28:6 | **u** |
| 49:2 55:21 | **titles**  27:5 | **turn**  34:22 | **u**  10:18 56:12 |
| 57:9,17 59:8 | **today**  4:17 5:16 | **turning**  19:3 | **u.s.**  42:24 |
| **thank**  13:23 | 7:12 8:16 12:5 | **twg**  1:7,12,14 | **unauthorized** |
| 41:11 | 12:13 14:8,15 | 1:16 4:9,17 | 23:24 24:20 |
| **thereof**  1:19 | 15:24 19:4 | 6:19 7:1,19,20 | 48:25 49:3,7 |
| 15:17 | 21:25 32:7 | 7:23,24 8:4,6,9 | **unchecked** |
| **theresa**  32:14 | 42:11 43:25 | 8:11,17 9:14 | 29:15 |
| 36:7 41:6 | 44:8 48:12 | 10:22 11:7,14 | **unclaimed**  49:4 |
| **thing**  30:3,5 | 50:18 54:13,14 | 11:15 12:10 | 49:7 |
| **things**  13:22 | **today's**  7:7,8 | 13:7 14:9,10 | **under**  8:17 9:3 |
| 14:5 48:3 | 42:4,7,13 | 15:25 16:16 | 9:10 26:23 |
| **think**  6:14 9:1 | 45:17,22 | 17:8 23:3,16 | 55:20 |
| 27:10 41:13 | **told**  42:3 | 23:17 26:24 | **understand** |
| 43:6 | **took**  38:4 52:22 | 28:11,16 29:8 | 7:11 24:12 |
| **third**  19:3 | **tool**  37:25 | 30:10 32:8 | 42:23 47:2 |
| **thoroughly** | **top**  18:3 45:16 | 34:13,16,19 | **understanding** |
| 22:1 | **topics**  16:1 | 44:25 45:19 | 36:1 |
| **thought**  28:1 | **totally**  54:9 | 46:10 49:5,10 | **unit**  52:4,13 |
| 32:14 | **toward**  50:13 | 50:5,7 51:5,12 | 53:23 |
| **three**  19:7 | **tracking**  48:8 | 51:15 52:2 | **united**  1:1 |
| **time**  1:19 4:1 | 48:11,14 | 53:1,9,13 | **units**  8:16 |
| 5:7,12,12,16 | **tran**  54:3 | 55:11,13 57:4 | 11:11 17:2 |
| 10:4,9,13 | **transcript**  54:5 | 58:1 59:1 | 51:17 |
| 18:25 20:21 | 55:20,21 57:6 | **twg's**  15:5 | **unleashed** |
| 21:5 24:13,14 | 57:19 59:5,8 | **two**  7:22 9:12 | 28:13 29:18 |
| 25:8 27:17,21 | **translated** | 18:13 28:7 | **unsafe**  30:18 |
| 28:25 30:22 | 55:19 | 38:15,24 40:11 | **unsupervised** |
| 33:6 44:23 | **treatment** | **type**  5:6 | 28:13,18 29:14 |
| 47:8 53:4,9 | 12:23 15:17 | **typically**  24:21 | 30:20 |
| 54:18 57:18 | **true**  55:21 59:8 | 39:23 | **unsure**  46:8 |
| **timeframe**  57:8 | **truth**  4:3,4,4 | **typo**  17:13 18:1 | **use**  4:22 25:23 |
| **times**  28:10 | 55:8,8,9 | | 37:21 44:19,22 |
| 30:7 | **try**  29:19 32:1 | | **used**  26:15,17 |
| | | | 44:21,23 57:19 |

**[utah - zinjurylaw.com]**                                      Page 18

| | | | |
|---|---|---|---|
| **utah** 8:24 | 47:20 54:15,15 | **worked** 5:13 | **zaragoza's** |
| **v** | **wants** 23:24 | 16:15 27:21 | 26:20 37:1 |
| **v** 57:4 58:1 | **washington** | **working** 28:20 | 40:21 47:24 |
| 59:1 | 1:17 55:14 | **writing** 22:10 | **zdrilich** 2:4,4 |
| **vacated** 20:14 | **we've** 7:20 16:1 | 37:11 | 3:2 4:7,16,24 |
| **various** 44:17 | 38:19 42:11 | **written** 1:19 | 6:16 13:21 |
| **verify** 57:9 | 44:1,17,21 | 22:17 24:10 | 14:3 16:5 26:1 |
| **verifying** 22:18 | 51:25 | 37:5,12,17 | 26:4 36:21 |
| **veritext** 57:14 | **week** 18:13 | 49:5 | 37:2 41:11 |
| 57:23 | **went** 27:14 | **wrong** 43:5 | 43:24 50:8,12 |
| **veritext.com** | 31:16 51:16 | **wrote** 35:18 | 50:17 54:2 |
| 57:15 | **whereabouts** | **y** | **zinjurylaw.co...** |
| **video** 11:24,24 | 31:23 | **y** 10:11,12 | 2:6 |
| 14:25,25 | **whereof** 56:7 | 44:14,14,15,15 | |
| **violation** 23:6,9 | **white** 35:9,12 | 56:12 | |
| **violent** 41:20 | 35:14 | **yeah** 31:1 | |
| **visit** 35:15 | **williams** 1:15 | 33:13 40:22 | |
| **visited** 20:15 | 55:4 | 52:13 | |
| **visitors** 13:2 | **wind** 24:19 | **year** 12:19 | |
| **voluntarily** | **wisconsin** 8:24 | 28:21,25 31:14 | |
| 26:25 | **witness** 1:15 | 34:5 41:17 | |
| **voluntary** | 4:11 30:24 | 43:15 48:22 | |
| 17:17 | 52:8 53:18 | **years** 7:2 9:12 | |
| **vs** 1:6 | 54:13 56:7 | 15:9 | |
| **w** | 57:8,10,12,18 | **z** | |
| **w** 10:12 | **witnesses** 31:20 | **z** 4:15 | |
| **wait** 4:24 | **woman** 35:9,22 | **zaragoza** 25:21 | |
| **waive** 4:20 | **wondering** | 26:9,9,23 27:2 | |
| 54:10,16 | 43:16 | 28:5,6,20 | |
| **walking** 29:14 | **work** 5:17 6:9 | 29:23 30:5 | |
| 35:9 | 6:19 17:24 | 33:12,13,20,23 | |
| **want** 13:11 | 18:13 40:12 | 33:25,25 34:8 | |
| 14:11 42:5 | 46:4 52:2 53:7 | 36:16 37:4 | |
| 46:3,19 47:2 | 53:14,22 | 40:18 47:19 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JENNIFER ARMISTEAD, | § | CIVIL ACTION FILE NO.: |
| | § | 1:24-cv-02583-MHC |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TWG MANAGEMENT, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

---

**PLAINTIFF'S NOTICE OF 30(b)(6) DEPOSITION OF
DEFENDANT TWG MANAGEMENT, LLC**

---

To:   **30(b)(6) Designee(s) of Defendant TWG Management, LLC
c/o its Counsel of Record:
Erica L. Morton, Esq.
Austin L. Albertson, Esq
SWIFT, CURRIE, MCGHEE & HIERS, LLP
1420 Peachtree Street, NE, Suite 800
Atlanta, Georgia 30309-3231
erica.morton@swiftcurrie.com
austin.albertson@swiftcurrie.com**

   **COMES NOW, JENNIFER ARMISTEAD,** (hereinafter, "Plaintiff"), who,

pursuant to O.C.G.A. § 9-11-30(b)(6), will take the deposition upon oral



PLAINTIFF'S
EXHIBIT
1 Bretz
CW 9/17/24

examination of **TWG MANAGEMENT, LLC** (hereinafter, "Defendant TWG").

This deposition will take place at **10:00 A.M. Eastern Standard Time** on **Tuesday,**

**September 17, 2024**, **at 1301 East Washington Street, Suite 100, Indianapolis,**

**IN 46202**. The deposition will take place before an officer duly authorized to

administer oaths by the laws of the United States or the State of Georgia and will be

stenographically recorded and videotaped with the intent to use the videotape of

these depositions at trial. The oral examination will continue from day to day until

its completion.

Plaintiff does not know the address of any particular individual(s) Defendant

TWG shall designate to testify.

As required by O.C.G.A. § 9-11-30(b)(6), Defendant TWG is required to

designate one or more officers, directors, managing agents, or other persons with the

most knowledge concerning the following designated matters and as to such

information that is known or reasonably available to the organization about the

following matters, where Premises is defined as the property known and/or marked

as the Silver Oak Apartments, located at 1281 Brockett Road, Clarkston, DeKalb

County, Georgia:

1) Person(s) with most knowledge of the incident giving rise to this
   lawsuit that took place on January 31, 2022, including but not limited

to, any investigations or other actions taken by this Defendant in connection with the incident;

2) Person(s) with most knowledge concerning the placement, recording and preservation of all video recordings from any and all cameras that cover the approaches of the Premises;

3) Person(s) with most knowledge concerning this Defendant's policies, procedures, techniques, methods, training, instructions and practices for the proper operation of all video recordings from all cameras located interior floor surfaces of the Premises;

4) Person(s) with most knowledge concerning this Defendant's policies, procedures, techniques, methods, training, instructions, analysis, and practices for the safe maintenance of, removal of, warning of potentially dangerous pets at the Premises;

5) Person(s) with most knowledge concerning this Defendant's policies, procedures, techniques, methods and practices regarding employee qualification, training, supervision and safety that apply to the maintenance of, removal of, and warning of potentially dangerous pets at the Premises;

6) Person(s) with most knowledge of all reports, statements, informal complaints, formal complaints and lawsuits concerning this Defendant

involving dog bites at the Premises from January 31, 2021 to the present;

7) Person(s) with most knowledge concerning this Defendant's policies, procedures, techniques, methods, training, instructions and practices for providing or obtaining aid, assistance, medical care and emergency treatment to invitees and customers who are injured by dog bites at the Premises;

8) Person(s) with most knowledge concerning this Defendant's policies, procedures, practices, duties and responsibilities to provide safe and hazard-free premises to customers, invitees and the public;

9) Person(s) with most knowledge concerning this Defendant's defenses to this lawsuit; and

10)    All records associated with the hiring and firing of employees at the Premises from January 31, 2022 to the present.

11)    All records associated with the hiring and/or firing of Davin R. Terrell.

Said Deponent(s) is/are required by this notice to be present for the taking of deponent(s)' deposition. Said Deponent(s) shall also be examined for all purposes allowed under the Georgia Civil Practice Act and the Georgia Rules of Evidence,

including for the purposes of discovery, preservation of evidence, and cross-examination as if he/she/they had testified on their own behalf and were being cross-examined, with full right to examine and the privilege of impeachment. Said Deponent(s) shall also be subject to examination as to any personal knowledge of all matters relevant to any issue in this proceeding. You may attend and examine.

This 9th day of September, 2024.

ZDRILICH INJURY LAW, LLC


/s/Joseph A. Zdrilich_____
Attorney for Plaintiff
State Bar of Georgia No.: 569248
Attorney for Plaintiff


3575 Koger Boulevard, Suite 125
Duluth, Georgia 30096
Phone: 770-931-9604
Fax: 770-931-9610
E-mail: joe@zinjurylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the within and foregoing *Plaintiff's*

*Notice of 30(b)(6) Deposition of TWG Management, LLC* with the clerk of court

via the CM/ECF system which will automatically serve all counsel of record by

statutory electronic service via email as follows:

**Erica L. Morton, Esq.**
**Austin L. Albertson, Esq**
**SWIFT, CURRIE, MCGHEE & HIERS, LLP**
**1420 Peachtree Street, NE, Suite 800**
**Atlanta, Georgia 30309-3231**
**erica.morton@swiftcurrie.com**
**austin.albertson@swiftcurrie.com**
*Attorneys for Defendant TWG Management, LLC*

This 9th day of September, 2024.

ZDRILICH INJURY LAW, LLC

3575 Koger Boulevard, Suite 125
Duluth, Georgia 30096
Phone: 404-888-1111
Facsimile: 770-931-9610
E-mail: joe@zinjurylaw.com

*/s/ Joseph A. Zdrilich*
JOSEPH A. ZDRILICH
State Bar of Georgia No.: 569248
Attorney for Plaintiff

PRIVILEGED AND CONFIDENTIAL PREPARED AT REQUEST OF COUNSEL

THE FOLLOWING REPORT WAS PREPARED BY PRIVATE INVESTIGATOR VANESSA CAMPO
FOR SPEARHEAD INVESTIGATIONS, LLC.

On Thursday, March 10, 2022, at approximately 2:31 PM, Private Investigator Vanessa Campo conducted an interview of Alexia Duru at Silver Oak Apartments, ██████████ #13E, Clarkston, GA 30021. Duru can also be reached at 470-759-8449.

PI Campo introduced herself as an investigator working on behalf of The Zdrilich Law Group. After being advised of the identity of the interviewing investigator and the nature of the interview, Duru voluntarily provided the following information:

PI Campo approached Duru while she was sitting on her porch and immediately showed her pictures of an Akita. When Duru was asked by PI Campo if she has seen an Akita around the complex, she replied, "I know what these dogs look like because my dog been outside before when that dog came over here and started fighting. He bit my dog in the face one time." Duru owns a Pitbull.

Duru recalled two incidences involving the Akita. The first one was around September or October of 2021. Duru heard her Pitbull, who was chained up on the porch per usual, barking. As barking was out of character for her Pitbull, Duru went onto the porch to see what was going on. Duru witnessed an Akita attacking her Pitbull. The Akita did not have a leash and Duru did not see the owner around.

The second incident happened within the same month. Duru's mother witnessed the Akita come onto the porch again. This time, Duru's Pitbull was able to put his mouth around the Akita's neck.

Duru told management about these incidents. Duru also tried to go around and ask if anyone knew who the Akita belonged to. However, no one from management got back to her nor does Duru know who the Akita belongs to.

Duru also stated that there are many dogs that roam around the complex off leashes, sometimes even with no collar.

End of interview.

Investigator Vanessa Campo, Spearhead Investigations, LLC



PLAINTIFF'S EXHIBIT
2 Bretz
CW 9/17/24

PRIVILEGED AND CONFIDENTIAL PREPARED AT REQUEST OF COUNSEL

## THE FOLLOWING REPORT WAS PREPARED BY PRIVATE INVESTIGATOR VANESSA CAMPO FOR SPEARHEAD INVESTIGATIONS, LLC.

On Thursday, March 10, 2022, at approximately 2:31 PM, Private Investigator Vanessa Campo conducted an interview of Alexia Duru at Silver Oak Apartments, ▇▇▇▇▇▇▇ #13E, Clarkston, GA 30021. Duru can also be reached at 470-759-8449.

PI Campo introduced herself as an investigator working on behalf of The Zdrilich Law Group. After being advised of the identity of the interviewing investigator and the nature of the interview, Duru voluntarily provided the following information:

PI Campo approached Duru while she was sitting on her porch and immediately showed her pictures of an Akita. When Duru was asked by PI Campo if she has seen an Akita around the complex, she replied, "I know what these dogs look like because my dog been outside before when that dog came over here and started fighting. He bit my dog in the face one time." Duru owns a Pitbull.

Duru recalled two incidences involving the Akita. The first one was around September or October of 2021. Duru heard her Pitbull, who was chained up on the porch per usual, barking. As barking was out of character for her Pitbull, Duru went onto the porch to see what was going on. Duru witnessed an Akita attacking her Pitbull. The Akita did not have a leash and Duru did not see the owner around.

The second incident happened within the same month. Duru's mother witnessed the Akita come onto the porch again. This time, Duru's Pitbull was able to put his mouth around the Akita's neck.

Duru told management about these incidents. Duru also tried to go around and ask if anyone knew who the Akita belonged to. However, no one from management got back to her nor does Duru know who the Akita belongs to.

Duru also stated that there are many dogs that roam around the complex off leashes, sometimes even with no collar.

End of interview.

Investigator Vanessa Campo, Spearhead Investigations, LLC


PLAINTIFF'S EXHIBIT
2

1

PRIVILEGED AND CONFIDENTIAL PREPARED AT REQUEST OF COUNSEL

THE FOLLOWING REPORT WAS PREPARED BY PRIVATE INVESTIGATOR VANESSA CAMPO
FOR SPEARHEAD INVESTIGATIONS, LLC.

On Thursday, March 10, 2022, at approximately 2:31 PM, Private Investigator Vanessa Campo
conducted an interview of Alexia Duru at Silver Oak Apartments, ███████████ #13E, Clarkston,
GA 30021. Duru can also be reached at 470-759-8449.

PI Campo introduced herself as an investigator working on behalf of The Zdrilich Law Group. After
being advised of the identity of the interviewing investigator and the nature of the interview, Duru
voluntarily provided the following information:

PI Campo approached Duru while she was sitting on her porch and immediately showed her
pictures of an Akita. When Duru was asked by PI Campo if she has seen an Akita around the
complex, she replied, "I know what these dogs look like because my dog been outside before when
that dog came over here and started fighting. He bit my dog in the face one time." Duru owns a
Pitbull.

Duru recalled two incidences involving the Akita. The first one was around September or October
of 2021. Duru heard her Pitbull, who was chained up on the porch per usual, barking. As barking
was out of character for her Pitbull, Duru went onto the porch to see what was going on. Duru
witnessed an Akita attacking her Pitbull. The Akita did not have a leash and Duru did not see the
owner around.

The second incident happened within the same month. Duru's mother witnessed the Akita come
onto the porch again. This time, Duru's Pitbull was able to put his mouth around the Akita's neck.

Duru told management about these incidents. Duru also tried to go around and ask if anyone knew
who the Akita belonged to. However, no one from management got back to her nor does Duru
know who the Akita belongs to.

Duru also stated that there are many dogs that roam around the complex off leashes, sometimes
even with no collar.

End of interview.

Investigator Vanessa Campo, Spearhead Investigations, LLC

1



THE FOLLOWING REPORT WAS PREPARED BY PRIVATE INVESTIGATOR VANESSA CAMPO
FOR SPEARHEAD INVESTIGATIONS, LLC.

On Tuesday, March 22, 2022, at approximately 10:02 AM, Private Investigator Vanessa Campo conducted an interview of Rex Zaragoza at Silver Oak Apartments, ▮▮▮▮▮▮▮▮ Clarkston, GA 30021. Zaragoza can also be reached at 317-832-6856.

PI Campo introduced herself as an investigator working on behalf of The Zdrilich Law Group. After being advised of the identity of the interviewing investigator and the nature of the interview, Zaragoza voluntarily provided the following information:

PI Campo immediately showed Zaragoza pictures of an Akita. When PI Campo asked if Zaragoza saw a similar dog in the complex, Zaragoza nodded that he did. Then Zaragoza stated that he has "seen that dog plenty of times...running free."

Zaragoza has worked for the complex for about a year. When Zaragoza was first employed, he saw the Akita as a puppy and that it "didn't really bother nobody, but as he got older, he started fucking with people and other dogs and got aggressive, he's big as hell too."

Zaragoza estimated that he has seen the Akita about every two weeks since his employment. Zaragoza also stated that there is a Pitbull around the complex "that terrorizes shit too." Zaragoza thinks the Akita, "breaks out or whatever," because the Akita runs around the complex free with no leash.

Zaragoza took over management about a month ago but has not seen the Akita since. He assumes that the Akita is leashed up. Zaragoza does not know who the owner of the Akita is. When PI Campo showed Zaragoza mugshots of Terrell, Zaragoza did not recognize him. Zaragoza does not know where the dog "stays at," and Zaragoza has "been in damn near every apartment." Zaragoza further stated, "won't never see him (the Akita) at nobody's house and I've been working this apartment complex for a while and haven't went in nobody's house and seen that dog."

Before Zaragoza was management, he was a 'tech,' and while he was a tech, he did tell his supervisors about the Akita. The only thing that his supervisors did was call animal control because that's the "only thing they can do." Zaragoza never himself called animal control. Animal control was called "a couple of times," but when they finally got to the complex, the Akita would be gone.

More maintenance personnel then joined the interview. One employee asked Zaragoza, "that dog be free?" Zaragoza replied, "Hell yeah, that big motherfucker, that's the one I be telling I will shoot that motherfucker sometime...I will shoot that bitch.... he's about 130-140 pounds."

1



THE FOLLOWING REPORT WAS PREPARED BY PRIVATE INVESTIGATOR VANESSA CAMPO
FOR SPEARHEAD INVESTIGATIONS, LLC.

Zaragoza has not witnessed the Akita attack anyone or another animal. Zaragoza has observed the Akita walking around smelling stuff mostly. However, once the Akita recognizes a person it will stand at attention, stated Zaragoze, "he's an intimidating dog." Zaragoza is not sure what the Akita will ever do.

Tenants have come up to Zaragoza stating that the Akita attacked their dog and Zaragoza has seen those attacked dogs. Zaragoza has heard "a lot" of people state that the Akita has bitten people and other dogs. Several times Zaragoza has gotten in his truck and yelled, "Hey!" at the Akita which made the Akita run off.

A specific tenant that has complained about the Akita multiple times to Zaragoza is a man in his 60s or 70s that walks around the complex daily. This senior man wears a mask, shuffles when he walks, and talks like he has had a stroke. PI Campo tried to locate this man but was not able to.

End of interview.

Inv. Vanessa Campo for Spearhead Investigations, LLC

TWG Management, LLC
333 N. Pennsylvania St., Suite 100
Indianapolis, IN 46204
Tel 317-264-1833
www.twgdev.com



June 24, 2020

Davin Terrell
████████ APT 16G
Clarkston, GA 30021
(317) 864-9159
████████@gmail.com

Dear Mr. Terrell,

The purpose of this letter is to notify you of your decision to terminate your employment with TWG Management, LLC effective today. Your last day will be today and your final paycheck will be on July 3, 2020.

Reason for Separation: Voluntary Job Abandonment

- On July 23, 2020 and July 24, 2020 you had 2 consecutive no-call-no-shows, meaning you did not show up to work for your scheduled shift and did not notify your supervisor.
- Per company policy, which you previously acknowledged, employees who fail to report to work or contact their direct supervisor for two (2) consecutive workdays shall be considered to have abandoned the job without notice, effective at the end of their normal shift on the second day.

**Please arrange to return all company property, including but not limited to; company cell phone, office keys and access fobs.** These items should be mailed to TWG at 1301 E Washington St., STE 100, Indianapolis, IN 46202 no later than Monday June 29, 2020.

Your elected health insurance coverage with Cigna will terminate June 30, 2020. Voluntary health products are terminated immediately. If you are eligible for COBRA extended health insurance coverage, you will receive information notifying you of the enrollment process from our COBRA Administrator, BPC, in the next 45 days. Please contact BPC, 1-877-272-8880, regarding any questions on extended insurance coverage available under COBRA. For questions regarding your 401(k) funds, please contact Empower Retirement Services at 1-855-756-4738.

Please feel free to contact me directly at (317) 333-6431 concerning any questions or concerns you may have.

Sincerely,

*Holly MacDougall*

Holly MacDougall
Human Resources and Talent Manager
TWG Development, LLC

**PLAINTIFF'S EXHIBIT**
4 Bretz
CW 9/17/24

Silver Oak Apartments
1281 Brockett Rd
Clarkston, GA 30021-1600

Subjournal: RESIDENT
Davin Terrell
█████████████ #16-G
Clarkston, GA 30021

## Final Account Statement

| Ledger Account at Move out | | FAS Prepared | |
|---|---|---|---|
| Prorated due to move out (06/01/20 - 06/01/20) | $28.00 | Date | 06/17/2020 |
| Rent | $1,676.00 | Property Date | 07/26/2023 |
| Balance at Move Out | **$1,704.00** | User | Nina Robinson |
| * See the itemized charges for a complete listing of the work. | | | |

| Deposit Activities | | Pay To | |
|---|---|---|---|
| Total Deposits on hand | $0.00 | Silver Oak Apartments 1281 Brockett Rd Clarkston , GA  30021-1600 US | |

| Additional Charges/Credits/Payments after Move Out | | | |
|---|---|---|---|
| Total additional Charges/Credits/Payments | $0.00 | Lease Information | Unit 16-G | |

| Final Account Balance | | Move In | 01/22/2020 |
|---|---|---|---|
| Balance at Move Out | $1,704.00 | Notice Given | |
| Total Deposits | $0.00 | Lease Expires | 12/31/2021 |
| Total additional Charges/Credits/Payments | $0.00 | Move Out | 06/01/2020 |
| Total account balance due | $1,704.00 | Move Out reason | Skipped without notice |

Thank you for staying with us. Your final account statement resulted in the balance above. Please remit your payment to the management office. If we do not receive your payment within 30 days, the account will be turned over for collection efforts and may be subject to additional fees/penalties. If you have any questions, please feel free to contact the management office.

Manager

**TWG Management, LLC**
333 N. Pennsylvania St., Suite 100
Indianapolis, IN 46204
T 317.264.1833
www.twgdev.com

January 7, 2019

**Davin Terrell**

Norcross, GA 30093

███████████icloud.com
(470) 658-6005

RE: Maintenance Technician

Dear Davin,

We are pleased to offer you the Maintenance Technician position at Silver Oak Apartments in Clarkston, GA.

We would like for you to join our company full-time on Wednesday, 1/9/2019. You will be reporting to Aushiana White, Property Manager. Your base compensation for this position will be $17.00 per hour. Earnings are paid every two weeks, and this position is non-exempt and full-time. Your scheduled work hours will be 8:00am – 5:00pm. You will also be responsible to take calls after-hours in the case of an emergency.

We provide health, dental, and vision insurance up to $550/month for the employee only plan. You will be responsible, via payroll withholding, for any excess coverage costs you elect. The insurance plans, if used, take effect 30 days after your hire date. TWG offers a 401k plan for all full-time employees and will match employee contributions up to 4% of their annual compensation. The 401k plan takes effect 60 days after your hire date. In addition, you will receive a company cell phone. Regarding vacation and sick time, you will be entitled to 2 weeks of paid vacation and 5 days of sick time that accrues bi-weekly for your first full year of employment.

Jamie Barnes, our Payroll and Benefits Coordinator schedule a call with you during your first week to review our benefits offerings. If you have any questions or need further information, please feel free to contact me directly at (317) 333-6431.

Sincerely,

*Holly Neff*

Holly Neff
HR and Talent Manager
TWG Development, LLC

Agreed to and accepted on January _8_, 2019

_____

**Davin Terrell**

Shirt Size: _M_ Jacket Size: _L_

TWG Management, LLC
333 N. Pennsylvania St., Suite 100
Indianapolis, IN 46204
Tel 317-264-1833
www.twgdev.com



# Maintenance Technician – Non-Exempt

**A. Purpose of Position:** TWG Management, LLC. is seeking a full-time Maintenance Technician to assist with maintenance/janitorial operations. The Maintenance Technician will be responsible for the general upkeep of the property, positive resident relations, and works in the direction of company goals. A Maintenance Technician is also responsible to complete any other assignments as directed by management.

**B. Reports to:** will be reporting to Property Manager/Area Manager

**C. Essential Duties and Qualifications:**

- HVAC & EPA certifications preferred
- Perform general punch requirements
- Grounds and equipment upkeep
- Snow removal
- Basic service requests such as: replacing light bulbs/light kits, unclogging toilets, garbage disposal installation/repair, basic water heater repair, basic cleaning and resident services
- Repair plumbing, appliance, electrical, and carpentry
- Make Ready Process: Painting, carpet repair and carpet cleaning
- Maintain work order system, logs, and other records as needed
- Timely reporting of incidents that include property loss or work related injuries
- Operates various mechanical, electrical equipment, and power/garden tools
- Must comply with all local, state, federal guidelines as well as company policies & procedures
- On call duty and weekend work schedules to be expected for emergency maintenance service

**D. Essential Qualifications**

- Must have valid driver's license, reliable transportation, and provide own vehicle for travel between apartment communities (mileage paid).
- Must be able to pass criminal background check.
- Must be able to work with moderate to minimal direct supervision.
- Able to work in fast-paced environment while remaining conscientious and adhering to policies and procedures.
- Good human relation skills demonstrating the ability to deal with residents, peers and supervisors.
- Qualified candidates must possess adequate proficiency and communication skills to deliver excellent customer service.

TWG Management, LLC
333 N. Pennsylvania St., Suite 100
Indianapolis, IN 46204
Tel 317-264-1833
www.twgdev.com



**Work environment/Physical Demands:**

The physical demands described below are representative of those that must be met by an employee to successfully perform the essential functions of this job.

Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions:

- The position requires the employee to work indoors and outdoors, day or night, in a wide range of temperatures and overall weather conditions. While performing the duties of this job, the employee is regularly required to stand; walk; use hands to finger, handle, or feel; reach with hands and arms and talk or hear. The employee is frequently required to climb or balance and stoop, kneel, crouch, or crawl.
- Work involves use of hand and small power tools, and involves significant amounts of bending, stretching, walking, reaching, pushing, pulling, grasping, standing, and lifting of up to 100 pounds on a regular basis.

**Disclaimer:** The above statements are intended to describe the general nature and level of work being performed by people assigned to this classification. They are not to be construed as an exhaustive list of all responsibilities, duties, and skills required of personnel so classified. All personnel may be required to perform duties outside of their normal responsibilities from time to time, as needed.

Employee Acknowledgement _____ Date _1-8-19_



Silver Oak Apartments

## LEASE AGREEMENT

NOTICE: ATLANTA LAW ESTABLISHES RIGHTS AND OBLIGATIONS FOR PARTIES TO RENTAL AGREEMENTS. THIS AGREEMENT IS REQUIRED TO COMPLY WITH THE TRUTH IN RENTING ACT. IF YOU HAVE A QUESTION ABOUT THE INTERPRETATION OR LEGALITY OF A PROVISION OF THIS AGREEMENT, YOU MAY WANT TO SEEK ASSISTANCE FROM A LAWYER OR OTHER QUALIFIED PERSON.

### 1   General Provisions

This rental agreement shall evidence the complete terms and conditions under which the parts whose signatures appear below have agreed.  The landlord/lessor/agent, TWG Management, shall be referred to as 'Owner' and the Tenant(s)/Lessee, **Davin Terrell** shall be referred to as 'Tenant'. As consideration for this agreement, Owner agrees to rent/lease to Tenant and Tenant agrees to rent/lease from Owner for use solely as a private residence located at ███████ **#16-G**. The tenants lease terms will begin **01/22/2020** and will terminate on **12/31/2021.**

### 2   Occupants

Those occupying the unit are as follows:

| Resident First Name | | Resident Last Name | |
|---|---|---|---|
| 1. | Davin | Terrell | |
| 2. | Devin | Taylor Jr. | |
| 3. | ███████ | ███████ | |
| 4. | | | |

### 3   RENT

The Tenant is to pay TWG Management rent in monthly installments of **$842.00** during the term of this Lease set forth in Section 1 above.  The monthly installments shall be due and payable on or before the first day of each month during the term hereof. Tenant agrees to pay a late fee in the amount of **$50.00** in the event that rent is not received in the office by the 6th of the month. Resident will be charged **$0** each day after the 6th  until rent is paid in full.  Rent shall be paid to: 1281 Brockett Rd Clarkston, GA 30021-1600 or such other location designated in writing by the Management. The Tenant's move in prorate to pay in full is **$272.00,** along with the deposit of **$300.00**

### 4   UTILITIES

The following utilities and amenities are **_included_** in the rental charge to the Tenant:

- ☑ Water
- ☑ Sewage
- ○ Electric
- ○ Cable
- ○ Phone
- ○ Internet
- ☑ Trash






Silver Oak Apartments

The Tenant is responsible for all other utilities, related deposits, and any charges, fees or services on such utilities. The Tenant agrees to immediately place in his or her own name the utilities for which the Tenant is responsible and to promptly pay all charges for such utilities when due. The Tenant also agrees to pay for all utility hookup and disconnection charges as they become due. The amount of any unpaid charge which under the Lease are the responsibility of the Tenant; but which are paid by the Management; shall be considered additional rent due under this Lease and shall be paid by the Tenant within ten (10) days of receipt of notice there of from the Management. There will also be an administration fee of $25.00 for each utility bill that is paid by Management for the Tenant.

**5    ASSIGNMENT AND SUBLETTING**
The Tenant agrees not to assign this Lease or sublet the premises.

**6    RULES & REGULATIONS**
The Tenant agrees to comply with both the Crime Free Addendum and the Rules and Regulations attached to and forming a part of this Lease. The Tenant acknowledges that a violation of such Crime Free Addendum or Rules and Regulations by the Tenant or their guest, is a violation of this Lease and may permit the Management to terminate this Lease and initiate legal proceedings to evict the Tenant from the premises. The Tenant agrees to keep the premises in a clean and sanitary condition and comply with all applicable health laws with respect to the premises and to hold Management harmless from all fines, penalties and costs for violations or noncompliance. The Tenant shall be responsible for any damages to the premises including the common areas caused by the Tenant and/or guest, ordinary wear and tear are accepted. The cost of repairing any damage to the premises including the common areas caused by the Tenant or his/her guest(s) shall be considered additional fees due under this Lease agreement and shall be paid by the Tenant within ten (10) days of receipt of notice thereof from the Management. The Tenant agrees not to use the premises for any purpose deemed hazardous by insurance companies carrying insurance on the project. The Tenant shall not install an air-conditioning unit in or on the premises without Management's prior written approval. The Tenant shall make no alterations, additions or improvements to the premises such as painting, decoration, lock changes or wall coverings, not place pictures, signs or fences in or about the premises without the Management's prior written approval in accordance with the current Rules and Regulations. If approval is obtained, the Tenant agrees upon vacating the premises to remove, at Management's discretion, any such fixtures, signs or fences without damage to the premises. The maintenance of animals or pets on the premises is prohibited. The Tenant shall occupy a maximum of 1 parking space with an operational vehicle only.

**7    CONDITION OF PREMISES**
The Management shall not be liable for damage, theft or injury to person or property unless such loss results from Management's negligence or intentional misconduct. The Management recommends that the Tenant secure renter's insurance for protection of the Tenant's personal property. The Tenant acknowledges that he/she has examined the leased premises prior to signing this Lease and that the same is in good and habitable condition.

**8    RENEWAL**
At least sixty (60) days before the end of the term of this Lease, the Tenant shall notify the Management of the Tenant's intention to either execute a new Lease for an additional one-year term at the rent set by the Landlord or to vacate the premises at the expiration of the Lease term. If the tenant fails to notify the Management of his or her intentions or has not completed the necessary recertification process as required by Section 42 (as further described in a Low Income Housing Tax Credit Program Lease Addendum), the Tenant agrees to vacate the unit at the end of the Lease Term. The Tenant shall deliver the keys to the premises to Management when Tenant vacates the premises. Any property left in, at, or about the premises when the Tenant vacates the premises shall be deemed abandoned by the Tenant. The Tenant hereby agrees to hold the Management and its agents harmless from any and all claims for return of such property or from any claims for accounting as to the proceeds, if any, from the sale of such property, it being intended hereby that the Tenant relinquishes any and all claims on behalf of the Tenant or or of the Tenant's guest or invitees for damages arising out of the Management's disposition of property deemed abandoned hereunder. Until the keys to the Leased premises are returned to the Management







Silver Oak Apartments

as evidenced by the Management's receipt thereof, the Tenant shall be bound by the terms of the Lease and the obligations to pay rent to the full extent permitted by law.

**9    RIGHT OF ENTRY**

The Management may show the premises to prospective Tenants beginning thirty (30) days prior to the termination of this Lease during reasonable business hours and have access to the premises at all reasonable and necessary times to inspect them for any purpose connected with the repair, improvement, care and management of the premises and the building in which the premises are situated. The Management may enter the premises at any time for the purposes of effecting repairs necessary to prevent injury or damage to person or property. A service request phoned into the Site Manager by the Tenant grants permission to Management to enter the unit without further notice to the Tenant.

**10   TERMINATION**

This Lease shall terminate upon expiration of the term hereof, or under default as described in this Lease Agreement. Upon termination, the Management shall be entitled to possession of the premises as authorized by law. The Tenant shall remain liable for any rent due during the remaining portion of the original term of this Lease, regardless of whether the Management has regained possession. The Management's rights shall be cumulative and shall not be exclusive of any other rights, remedies and benefits allowed by law.

**11   MANAGEMENT OBLIGATION**

The Management agrees as follows:

* That the premises and all common areas are fit for the use intended by the parties to this Lease;
* To keep the premises in reasonable repair during the term of this Lease and to comply with the applicable health and safety laws of the State of ATLANTA and of the local government unit, except when the disrepair or violation of the health or safety laws has been caused by the Tenant;
* That during the term of this Lease the Tenant shall peacefully, quietly and exclusively have, hold and enjoy, for his or her used and benefit, the premises covered by this Lease.

**12   DEFAULT**

If the Tenant should default under this Lease or if the Tenant's statements in the rental application are incorrect, Management shall have the right, among others, to terminate this Lease and to repossess the premises and cause the Tenant to vacate the premises in a manner provided by law. If this should occur, Tenant shall pay Management the expense incurred in obtaining possession of the premises and all other damages sustained by Management to the extent permitted by law. If for any reason the Tenant defaults on this Lease (including but not limited to Tenant skips or evictions for any reason) or turns in a 60-day Notice to Vacate prior to the Lease Term End, the Tenant agrees to pay a $1,200.00 Lease buy out fee. This fee will be due upon the last day of Occupancy. In addition, if the tenant does not give sufficient notice to vacate (i.e. 60 days prior to move out) the unit deposit will be forfeited to Management.

**13   RENTAL INCREASES**

The Management shall have the right to raise the rent at any time during the Lease term or during the term of any renewal thereof, provided that the rental increase is the result of an increase ad valorem property taxes applicable to the project, increased insurance premiums for liability, hazard or worker's compensation coverage or for an increase in consumption or rates for electricity, water or sewage use. The rental increase shall be effective thirty (30) days after the Management has provided written notification thereof to the Tenant. The Management shall have no duty to the Tenant to provide supporting data for such increase(s).

**14   ADDITIONAL RULES & REGULATIONS**

The Management may change or adopt additional Rules & Regulations relating to the premises or the common areas which are necessary to protect the physical health, safety or peaceful enjoyment of the Tenant, his or her guests or other Tenants residing within the project. The current Rules & Regulations are attached hereto. The Management shall give at least thirty (30) days written notice to the Tenant of any changes or additions to the Rules & Regulations.






Silver Oak Apartments

**15   SALE OF PROJECT**

The Management may sell or assign the project, in which event this Lease shall continue in full force and effect between the Tenant and the Management's successor in interest. In such event the Management will transfer the Tenant's security deposit to the purchaser or assignee and the Management shall thereupon be relieved of any further responsibilities with respect to the security deposit.

**16   MILITARY CLAUSE**

The Tenant may terminate their tenancy if they are enlisted or are drafted or commissioned and on active duty in the U.S. Armed Forces. Tenant also may terminate tenancy if: (1) (i) a member of the U.S. Armed Forces or reserves on active duty or (ii) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; and (2) (i) receive orders for permanent change-of-station, (ii) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (iii) are relieved or released from active duty. Upon these requirements, Tenant may terminate this lease upon giving thirty (30) days written notice to the Landlord. Tenant must furnish a copy of his/her military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or written notification from Tenant's commanding officer. Military permission for base housing does not constitute change-of-station order. After you move out, Owner will return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Even if you are entitled to terminate your tenancy under this paragraph, liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out. Tenant must immediately notify Owner if Tenant is called to active duty or receive deployment or permanent change-of-station orders.

**17   DAMAGE TO THE PREMISES**

If the premises or any part of them are damaged by fire or other casualty, but can be restored to habitable condition, the Management shall repair the premises with reasonable dispatch and the Tenant's obligation to pay rent shall be suspended during the period that the premises remains inhabitable. If the premises are destroyed by fire or other casualty or if the premises, in the Management's opinion, cannot be restored to habitable condition within one-hundred twenty (120) days from the date that the Tenant is forced by the casualty to vacated the premises, either party may terminate this Lease by written notice to the other party.

**18   SUBORDINATION OF LEASE**

This Lease is and shall be subordinate to any mortgage now or after the date of this Lease executed and recorded with respect to the project. The lien of any mortgage or mortgages, upon recording shall be superior and prior to this Lease or any right created by this Lease, regardless of the date of recording. The Tenant agrees to execute any instrument deemed necessary or desirable to further effect the subordination of this Lease to any such mortgage or mortgages without charge, and refusal to execute such instrument shall entitle Management or Management's successors, assignees or legal representatives to cancel this Lease without incurring any expense or damage. The term of this Lease is expressly limited by this requirement.

**19   WAVIER OF SUBROGATION**

Each party releases the other party from any liability or loss, damages or injury caused by fire or other casualty for which insurance (permitting wavier of liability and wavier of insured right of subrogation) is carried by the insured party to the extent of any recovery by the insured party under such insurance policy. Management, at its sole expense, shall obtain fire and extended coverage insurance covering the buildings in the project. Tenant, at Tenant's sole expense, is advised to obtain fire and extended coverage insurance covering Tenant's personal property in the premises and at the project.

**20   EMINENT DOMAIN**

If any part of the premises is condemned by any government authority; then this Lease shall terminate as of the date that possession is taken by the government authority.







Silver Oak Apartments

**21  SEVERABILITY**

If any provision of this Lease should be or become invalid, such invalidity shall not in any way effect any other provisions of this Lease which shall continue to remain in full force and effect.

**22  MODIFICATIONS**

No modification (with the exception of the revised Rules & Regulations from time to time) of this Lease shall be binding unless in writing signed by the Tenant and by an authorized agent of the Management.

**23  LIABILITY**

In the event that this Lease should be signed as Tenant by more than one person, then the liability of the persons signing shall be joint and several.

**24  STORAGE OF PROPERTY**

If Management should provide storage space, Tenant's property shall only be stored in the space designated by Management. This storage space shall be subject to all applicable provisions of this Lease.

**25  NOTICE OF INJURIES**

In the event of any injuries to Tenant or Tenant's family, guests or invitees or in the event of any damage to any of their property that is allegedly caused by the negligence of Management or its agents of employees, Tenant shall give Management a written notice of the occurrence of the injury or damage within five (5) days of the happening thereof. The written notice shall be delivered to Management at the Management's office set forth in Paragraph 2 above, or at such other address which Management should hereafter furnish in writing to the Tenant.

**26  CHECKLIST**

Management will provide Tenant with a Move-In Checklist at the execution of this Lease. The Tenant should complete the checklist noting the conditions of the premises with a representative of Management at the time of lease signing. Tenant is entitled to request and receive a copy of the last termination inventory checklist which shows what claims were chargeable to the last prior Tenant.

**27  MANAGEMENT**

The party described as Management in this Lease is either the Owner or Landlord of the project or the authorized representative of the Owner and Landlord.

**28  ENFORCEMENT OF LEASE TERMS**

The failure of the Management to enforce or demand strict performance of the terms, covenants, agreements and conditions contained in this Lease shall not constitute or be construed as a wavier or relinquishment of the Management's right to enforce such terms, covenants, agreements and conditions which shall remain in full force and effect whether or not enforced.

**29  NOTICE TO MANAGEMENT**

Notices to the Management must be in writing and sent by mail to the Management office or the following address:

**Silver Oak Apartments– OFFICE**
**1281 Brockett Rd Clarkston, GA 30021-1600**

**30  SECURITY DEPOSIT**

The security deposit required of you will be deposited in the following regulated financial institution or is covered by a surety bond issued by:

**Centier**
**1 N Pennsylvania Street**
**Indianapolis, IN 46204**





Silver Oak Apartments

NOTICE TO TENANT; YOU MUST NOTIFY MANAGEMENT IN WRITING WITHIN 4 DAYS AFTER YOU VACATE THE PREMISES OF A FORWARDING ADDRESS WHERE YOU CAN BE REACHED AND WHERE YOU WILL RECEIVE US MAIL, OTHERWISE MANAGEMENT SHALL BE RELIEVED OF SENDING YOU AN ITEMIZED LIST OF DAMAGES AND THE PENALTIES ADHERENT TO THAT FAILURE.

This lease has been signed by the Tenant and by the Management's authorized agent as of the sate set forth in paragraph 1 above.

By: _____
     Authorized Agent

_____      1-22-20
Tenant                         Date

Davin Taylor Jr.      1/22/20
Tenant                         Date

_____      _____
Tenant                         Date

_____      _____
Tenant                         Date





Silver Oak Apartments

## APARTMENT RULES & REGULATIONS

The following Rules & Regulations apply to all Tenants, all members of the Tenant's household and all of the Tenant's relatives, guests, invitees or other agents. Tenants shall be responsible for the actions and conduct of all members of the Tenant's household and all of the Tenant's relatives, guests, invitees or other agents. Violation of these Rules & Regulations by the Tenant, any member of the Tenant's household, or Tenant's relatives, guests, invitees or other agents may result in the termination of the Tenant's residency. "Tenant" is used in these Rules & Regulations and includes Tenants, all members of Tenant's household, and all of Tenant's relatives, guests, invitees or other agents.

1.  Tenants are responsible for damage caused to the Property while in possession of the unit. This includes damage to the unit from theft and vandalism. Tenant should take care to secure unit at all times, and is hereby advised to activate an alarm with the alarm company of their choice, and to obtain a "Renter's Insurance" policy to cover Tenant's personal belongings.

2.  Management and its Management Company are empowered to enforce these Rules & Regulations. All Rules & Regulations shall apply at all times. Management shall have the right to change the Rules & Regulations after a thirty (30) day written notice to Tenant. Tenants may appeal changes in the Rules & Regulations in writing to the Manager.

3.  Tenant shall, at all times, provide appropriate adult supervision of all minor children of the Tenant's household and of all Tenant's guests who are minor children, whether said minor children are with the Tenant Unit or in the common areas.

4.  No animals (including mammals, reptiles, birds, fish, rodents and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum, which may require additional deposits, rents, fees or other charges. You must remove an illegal animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. We will authorize an ADA-certified service animals. We may require a written statement from a qualified professional verifying the need for the support animal.

5.  The trees, shrubbery and planted areas are a vital and valuable part of the Apartment Community. Tenant shall not damage, deface or mutilate any of the trees, shrubbery or planted areas. Tenant shall not use the outside water faucets without prior written consent of Management. The cost of repair or replacement of damage as described in this paragraph shall be paid by Tenant upon receipt of a bill from Management.

6.  All common grounds, including but not limited to, courtyards, lawn areas, dog parks, etc., shall remain undisturbed by Tenant and guests of Tenant. Digging and/or disrupting the soil is not permitted.

7.  Laundry work shall be done by the Tenant only in the rooms provided for such purpose at the Apartment Community. Washing machines, dryers and other laundry equipment shall only be used and operated in the rooms provided for such purpose. Tenant shall remove Tenant's belongings immediately after using the laundry equipment so as to enable other Tenants to use the equipment. Tenant shall leave all laundry equipment in a clean and neat fashion for use by the next Tenant.

8.  None of Management's equipment may be removed from the premises or any part of the building in the Apartment Community. All such equipment shall be permanently retained in its original location.

9.  Newspapers, cans garbage and other refuse must be placed in plastic bags and deposited in containers provided by Management for that purpose and the Tenant shall keep the container lid, if any, tightly closed at all times. Tenant shall comply with governmental regulations relating to disposal by Tenant of garbage and other refuse. No litter, ashtrays or any other refuse shall be dumped or disposed of in any parking areas or other common areas of the Apartment Community. The cleanup cost for items described in this paragraph shall be paid by Tenant upon receipt of bill from Management.

10. Tenant shall not store any kerosene, gasoline or other flammable or explosive material in the premises or Apartment Community.






Silver Oak Apartments

11. None of the Tenant's personal property, of any kind, shall be kept on the lawns, sidewalks, flower gardens or common areas.

12. Tenant shall only cook or bake in the kitchen of the premises, no barbeque (charcoal or gas) grills, smokers or any other type of open flame cooking or warming units are allowed.

13. Only those persons listed as occupants in the Tenant's application for residency shall be allowed as household occupants to occupy the premises without prior written consent of Management. Violation of this provision may cause guest(s) to be counted as household members, if qualified, or at Management's option, the tenancy may be terminated. Tenants shall not give accommodations to boarders, roomers or lodgers. Guests will not be allowed to stay more than one week within a three-month period.

14. No Tenant shall do or permit anything to be done in or about the premises, or bring or keep anything therein which will in any way increase the rate of fire insurance on the Apartment Community or on the property therein. No Tenant shall perform any act in violation of any insurance policy upon the buildings in the Apartment Community.

15. Tenant shall report immediately to Management and to the appropriate health authorities any case of infectious or contagious disease occurring within the premises.

16. In addition to the Crime Free Addendum signed by the Tenant, the following conduct by a Tenant shall be grounds for termination of residency, as permitted by law:

    a. Any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other Tenants; and

    b. Any criminal activity that threatens the health, safety or right to peaceful enjoyment of their residences of persons residing in the immediate vicinity of the Apartment Community; and

    c. Any criminal activity that threatens the health or safety of any on-site Management staff responsible for managing the Apartment Community; and

    d. Any drug related criminal activity on or near the Apartment Community, engaged in by a Tenant. Drug related criminal activity means drug abuse, alcohol abuse, the illegal manufacture, sale, distribution, use or possession with the intent to manufacture, sell, distribute or use of controlled substance as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802. The term "controlled substance" shall also have the meaning as described in MCLA 600.5714(b).

17. Tenant shall not abuse Management's agents, employees or other persons on the premises. "Abuse" includes but is not limited to assaulting, battering, unwanted touching, emotional harassment, vulgar language or excessive verbal abuse, or threats of assault, battery or harm.

18. Non-payment or repeated late payment of rent or default in any other financial obligation due under the Lease and these Rules & Regulations beyond any grace period constitutes material non-compliance with the Lease and is good cause for termination of residency.

19. Tenant shall be responsible for all actions of his/her guests while guests are on the premises whether in the Tenant's unit or while in the common areas. Any action of the Tenant's guests that would be material non-compliance with the Lease, if done by the Tenant will form the basis for the termination of the Tenant's residency.

20. Tenant shall immediately report to Management any accident, injury or damage to water pipes, toilets, drains, fixtures, electrical wiring or fixtures and any other property of Management. Tenant shall not make or cause any alterations to water pipes, toilets, drains, fixtures, electrical wiring or fixtures or other property of the Management.

21. No vehicle shall be operated at a speed in excess of fifteen (15) miles per hour on the driveways, parking areas or other parts of the Apartment Community.

22. All vehicles must be registered with Management identifying the owner of said vehicle, year, make, model and license plate number. All vehicles must be operable, registered and licensed. Management shall have the right to remove all inoperable or unregistered or unlicensed vehicles from the premises at the Tenant's sole expense and Tenant must reimburse Management for all costs incurred in removing the said vehicle. No






Silver Oak Apartments

vehicle shall be parked or driven on any landscaped surfaces, including lawns or gardens. All vehicles must display an Apartment Community parking sticker at all times.

23. No car or vehicle repairing, polishing or washing shall be done at any time in or about the Apartment Community. Tenant shall place cardboard or other protective material to protect the pavement from parked vehicles that leak oil or Management shall have the right, among others, to have the vehicle towed away and stored at the Tenant's sole expense in a lawful manner.

24. Trucks, commercial vehicles, trailers, mobile homes, recreational vehicles or boats shall not be parked in any parking space at the Apartment Community without the Management's prior written approval. If any vehicle is parked in the Apartment Community contrary to this provision, Management shall have the right, among others, to have the vehicle towed away and stored at the Tenant's sole expense in a lawful manner.

25. No riding of bicycles on the lawns, parking areas or planted areas shall be permitted. Bicycles shall be kept in front areas designated by Management for such purpose and at no time will bicycles be permitted in or about the front entrance or any building at the Apartment Community. No baby carriages, bicycles, velocipedes or other large articles shall be allowed in halls, passageways, stairways or any building or in any lawn or planted area in the Apartment Community. Use of skateboards, roller blades or similar equipment is specifically prohibited throughout the Apartment Community.

26. The use of firearms, BB guns, pellet guns, paintball guns, sling shots or arrows is prohibited in the Apartment Community. Use of any of these items is basis for immediate termination of the tenancy.

27. Nothing shall be done by the Tenant in or about any building in the Apartment Community which will interfere with the rights, physical health, safety, peaceful enjoyment, comfort or convenience of other Tenants. No musical instruments, radios, televisions or other device shall be operated and no cooking equipment shall be utilized in a manner that is disturbing or annoying to other Tenants nor shall any Tenant make any disturbing noises or created any annoying odors at any time. Tenants shall keep the entry door to their premises closed except during ingress and egress from the premises.

28. Tenant shall keep the Apartment unit clean, safe and sanitary both inside and outside including yards, which are defined as the lawn from the Apartment walls extended to the street and/or distance half way to the next building (not to exceed 50 feet). Boundary lines shall overlap by 3 feet.

29. The sidewalks, entrances, passages, courts, vestibules, stairways, doors, corridors and halls shall not be obstructed or blocked open or encumbered or used by Tenant for any purpose other than ingress and egress to and from the leased premises. All Tenant's boots, overshoes, throw rugs, umbrellas and other personal property shall be kept within the premises at all times.

30. No person shall play in any area other than those specifically provided for such purpose by Management. Playing in the halls, entrances, laundry rooms, dumpsters, stairways or basements of the buildings in the Apartment Community is expressly prohibited. Minors must be appropriately supervised at all times while playing in the area provided by Management.

31. Tenant shall not smoke any tobacco products in the entrances, passages, hallways, stairways, corridors, lobbies, laundry areas, community rooms, Tenant Manager's office or any other common area of the Apartment Community.

32. Tenant shall be responsible for and shall pay the cost of any loss or damage to any person or real property of other Tenants, Management or the Apartment Community caused by the Tenant's intentional or negligent conduct, including leakage from any approved waterbed maintained by the Tenant, and including conduct which caused any fire/emergency equipment to begin operating. The cost of the repair or replacement of damages as described in this paragraph shall be paid by Tenant upon receipt of bill from Management. If Tenant fails to pay the amount owed for repair of damages caused by Tenant, the Management may take legal action to collect the amount due. Substantial, repeated or intentional damage to the premises, property of others or any portion of the Apartment Community constitutes material non-compliance with the Lease and is good cause for the termination of the tenancy.



9
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

33. Tenant's personal property shall not be placed or stored in the windowsills. Tenant shall install no additional air conditioning units without the prior written approval of Management. No tablecloths, clothes, laundry, curtains, rugs or other personal property of the Tenant shall be shaken or hung from the windows or doors.

34. Tenant shall be responsible for and shall pay the cost of any loss or damage to any person or real property of other Tenants, Management or the Apartment Community caused by the Tenant's intentional or negligent conduct with window accessibility. Tenant shall take the necessary precautions to prevent their property, window treatments, debris, or persons from falling from the windows or doors of the premises. Tenant understands selected windows are accessible to open and may not be consistent throughout apartment unit or community. Tenant shall not sweep or throw from the premises any dirt or other substances into any of the corridors, halls, stairways, entrances, light shafts, ventilators or elsewhere in any building in the Apartment Community.

35. Tenant shall not cause substantial or repeated physical damage to the premises or any portion of the Apartment Community.

36. Tenant shall not cause substantial or repeated physical damage to the property of others.

37. No sign, illumination, advertisement, notice or other lettering or equipment shall be exhibited, inscribed, painted or affixed or exposed by Tenant on or at any window or on any part of the outside or inside of the premises or any building within the Apartment Community.

38. No shades, awning or any other projection including air conditioners or radio antennas or wiring shall be placed upon or attached to or extended from the outside walls or roof of the premises or any building at the Apartment Community without the Manager's prior written permission. No signs or medallions of any kind shall be installed in the balls, on the mailbox, or the doors or windows of the premises of any area outside of the premises.

39. Management shall retain a pass key to the premises. No Tenant shall add, remove or alter any lock or install a new lock or knocker on any door of the premises within the Apartment Community. Tenant shall be responsible for the replacement of any lost keys provided by Management. Tenant shall be charged a lock out fee of $50.00 if lockout is before or after normal business hours. The cost of a lockout as described in this paragraph shall be paid by Tenant upon receipt of a bill from Management. Lost keys and/or entry key cards will result in the following charges added onto their account:

Mailbox Keys - $15.00 to change lock and issue 1 new key
Entry Keys - $75 to change locks and issue 2 new keys
Key cards for Entry into Building - $25.00 per card

40. Furniture and personal property must be stored inside the Tenant apartment.

41. Window blinds are supplied by Management to the Tenant at move in at no cost. Blinds must remain in the windows at all times. Damaged blinds must be replaced by the Tenant at the Tenant's sole expense. Tenant may install draperies at Tenant's sole expense. At no time shall sheets be used as draperies on any window or doorways in the premises.

42. Tenant shall not tamper with, alter or deactivate the smoke alarm/detectors or the carbon monoxide alarms/detectors located in the common areas and individual units within the Apartment Community. Any such conduct constitutes material non-compliance with the lease and is cause for termination of the tenancy.

43. Tenant shall not tamper with, alter or deactivate the heating units or security cameras located in the common areas of the Apartment Community. Any such conduct constitutes material non-compliance with the lease and is cause for termination of tenancy.

44. Tenant shall not use waterbeds without Management's prior written consent. Management may deny a request by a Tenant to use a waterbed for any reason, including the lack or adequate renter's insurance. If the Tenant uses a waterbed, the Tenant shall obtain renter's insurance to cover any damages to the premises or property of other Tenants due to waterbed leakage. Tenant shall be responsible for all damage caused by use of waterbeds including, but not limited to leakage from a waterbed, water damage caused by draining a



10
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

waterbed or damage caused by the weight of a waterbed.  The cost of repair or replacement of damages as described in this paragraph shall be paid by Tenant upon receipt of a bill from Management.

45. Tenant shall be responsible for all damages beyond normal wear and tear to the premises, stairway, hallways and any part of the Apartment Community which may be caused by the Tenant, including but not limited to damages caused by moving furniture or other bulky articles and fire damage caused by Tenant.

46. No spikes, tacks, screws, hooks or nails shall be driven into the walls, ceiling, woodwork or doors of the premises except that Tenant may insert a reasonable number of small nails into the walls for the purpose of hanging pictures, mirrors and/or decorative accessories. Tenant shall not otherwise mar or deface the walls, ceiling or woodwork. Tenant shall not use Scotch tape, stickers, adhesive or picture hangers on the walls nor adhesive contact paper on the walls, shelves or in the drawers. Tenant shall only have a telephone installed at the pre-wired location in the premises.

47. The toilets, basins and other plumbing fixtures shall not be used for any other purpose than those for which they were designed; no sweeping or putting rubbish, rags, diapers, paper towels or other improper articles into any of them. The cost of replacement of damage and /or labor charges as described in this paragraph shall be paid by the Tenant upon receipt of a bill from Management.

48. Owner shall dispose of any items left in Apartment when the Tenant moves.

49. Owner is not responsible for personal property left with employees.

50. Tenant shall not loan out their keys or building entry key cards. Keys and building entry key cards are for the Tenant's use only.

51. All entry doors are to remain unobstructed and locked at all times. Anyone found to be tampering with the entry doors will be in direct violation of their lease agreement.

52. These Rules and Regulations are incorporated into and made a part of the Lease between the parties and may be updated or altered with notice to the Tenant at any time.

TENANT SHOULD READ EACH OF THE RULES & REGULATIONS CAREFULLY. TENANT'S SIGNATURE BELOW CERTIFIES THAT TENANT HAS READ, UNDERSTANDS AND AGREES (WHERE APPLICABLE) TO FOLLOW ALL THE RULES & REGULATIONS. TENANT UNDERSTANDS THAT VIOLATION OF ANY ONE OF THESE RULES & REGULATIONS IS GROUNDS FOR EVICTION.

| | |
|---|---|
| _____ | 1-22-20 |
| Tenant | Date |
| _Davin Taylor Jr_ | 1/22/20 |
| Tenant | Date |
| _____ | _____ |
| Tenant | Date |
| _____ | _____ |
| Tenant | Date |
| _Sharina Crosby_ | 1/22/2020 |
| Owner / Agent of Owner | Date |



11
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

### LEASE ADDENDUM – RENT COLLECTION POLICY

1.  Rent is due in full on the **FIRST (1ˢᵗ)** day of each month. Rent payments should be made payable as follows:

    **Silver Oak Apartments**
    **1281 Brockett Rd**

1.  The Lease allows a **FIVE (5) day GRACE PERIOD** after which an administration fee of **50.00** is charged. Resident will be charged $0 each day after the 6th  until rent is paid in full. All Residents with a delinquent balance after the **FIFTH (5ᵗʰ)** day of the month will receive a delinquency notice. Proceedings to terminate the residency will begin on the 16ᵗʰ day of the current outstanding month if rent has not been paid in full.
2.  Tenant delinquent in rental payments will be turned over to Legal Counsel for the purpose of initiating eviction proceedings ten (10) days after the Demand for Possession notice is mailed. **THE TENANT WILL BE RESPONSIBLE FOR ALL ALLOWABLE LEGAL FEES AND THEY MUST BE PAID IN FULL TO AVOID COURT PROCEEDINGS.** PERSONAL CHECKS ARE NOT ACCEPTED IF RECEIVED AFTER THE TEN (10) DAYS GIVEN IN THE DEMAND FOR POSSESSION. AFTER THAT DATE, YOU MUST PAY BY EITHER MONEY ORDER OR CASHIER'S CHECK.
3.  Silver Oak Apartments or other Owner's Representative reserves the right not to renew the Lease Agreement of any Tenant who has received three (3) delinquency notices within a twelve (12) month period.
4.  Silver Oak Apartments or other Owner's Representative reserves the right to immediately terminate the tenancy of any Tenant whose non-payment of rent has resulted in the filing of eviction proceedings on more than one (1) occasion.
5.  In the event that a Tenant's check is returned from the financial institution it is drawn on for any reason, Management will not redeposit the check. An Administration fee of $35.00 will be charged when a check is not honored for payment and the rent will be considered late and the appropriate fees will apply. In addition, a fee equal to the amount charged to Management by the financial institution will be imposed. If more than one (1) check is returned due to insufficient funds or for any other reason within a twelve (12) month period, the Tenant will be required to make all future rental payments by money order, certified check or cashier's check.
6.  Waiver: should Management waive any provisions of this policy, such waiver shall not be construed as a waiver of a further breach of such provisions or a waiver of any other provisions of this policy.

I **CERTIFY THAT I HAVE READ AND UNDERSTAND THIS ADDENDUM 1 TO THE LEASE AGREEMENT REGARDING THE RENT COLLECTION POLICY AND HAVE RECEIVED A COPY.**

| | |
|---|---|
| _____ | 1-22-20 |
| Tenant | Date |
| Davin Taylor Jr. | 1/22/20 |
| Tenant | Date |
| _____ | _____ |
| Tenant | Date |
| Sharon Crooks | 1/22/2020 |
| Owner / Agent of Owner | Date |



12
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

## CRIME FREE LEASE ADDENDUM

In consideration of the execution of a Lease Agreement between **Silver Oak Apartments** ("Owner") and Tenant, the Owner and Tenant agree as follows:

1. The Tenant shall agree not to engage personally in or permit any unlawful activities in the dwelling unit, in the common areas, on or off the project grounds. Such activities include, but are not limited to those items listed in paragraph 3 below.

2. The Tenant, any member of the Tenant's household or a guest or other person under the Tenant's control shall not engage in any act intended to facilitate criminal activities including drug related criminal activity and acts of violence or threats of violence, including, but not limited to, the unlawful discharge of firearms on or off the project premises. In addition, if Tenant allows a guest who has been banned and/or trespassed from the property inside their unit they will be in violation of their lease and subject to eviction.

3. The Tenant shall not knowingly permit any member of the Tenant's household, or a guest or other person under the Tenant's control to engage in unlawful activity, including criminal activity, in the unit, in the common areas, on or off project grounds. Unlawful activities include but are not limited to; acts of violence that damage or destroy the dwelling unit or disturb or injure other Tenants or anyone else in the unit, common areas or the project grounds. Drug related criminal activity include but are not limited to, illegal manufacture, sale, distribution, use or possession with the intent to manufacture, sell, distribute or use a controlled substance (as defined in Section 102 of the Controlled Substances Act 21. USC 802). Tenant further agrees and understands that this Apartment Community is designated a Drug Free Zone.

4. Violation of the above provisions shall be a material violation of the Lease Agreement and substantiate good cause for termination of tenancy. It is understood and agreed that a single violation of any provision of this addendum shall be deemed a serious violation and a material non-compliance with the Lease and is justifiable cause for termination of tenancy.

5. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by a preponderance of the evidence as determined by the Owner or their representative at their sole discretion.

6. In case of conflict between the provisions of this Crime Free Addendum and any other provisions of this Lease, the provisions of the Crime Free Addendum shall govern.

7. This Crime Free Addendum is incorporated into the Lease executed or renewed this day between the Owner and Tenant.

| | |
|---|---|
| _____ | 1-22-20 |
| **Tenant** | **Date** |
| Devin Taylor Jr. | 1/22/20 |
| **Tenant** | **Date** |
| _____ | _____ |
| **Tenant** | **Date** |
| _____ | _____ |
| **Tenant** | **Date** |
| Theresa Chealos | 1/22/2020 |
| **Owner / Agent of Owner** | **Date** |



13
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

### RENTER'S INSURANCE LEASE ADDENDUM

The most widespread misconception of renters is that personal property damaged by smoke, fire, explosion, weather, vehicles, vandalism, electrical/plumbing/HVAC mishaps, etc. will be covered by the Landlord's insurance policy. This is not accurate. The Landlord's insurance policy protects the Landlord's interest only.

Apartment building owners carry insurance on their buildings and their property within the building or rental unit, but not on your personal property. We strongly recommend obtaining renters insurance upon lease signing.

The Renter's Insurance Addendum serves as acknowledgement that **Silver Oak Apartments** has explained to you the importance of renter's insurance and that we will not be responsible for damages caused to you or your personal property.

_____
Tenant

Devin Taylor Jr.
Tenant

_____
Tenant

Theresa Crooks
Tenant

Owner / Agent of Owner

1-22-20
Date

1/22/20
Date

_____
Date

_____
Date

1/22/2020
Date






Silver Oak Apartments

### SMOKE ALARM LEASE ADDENDUM

Property functioning smoke alarms provide an early warning system and reduce the risk of potentially dangerous situations related to fire.

DO NOT DISABLE OR DISCONNECT YOUR SMOKE ALARM FOR ANY REASON

It is understandable that your alarm may signal due to cooking or even a hot shower, though these are not viable reasons to disable your alarm. Possible suggestions to preventing such false alarms range for making use of your exhaust fan to just opening a window. Removing the battery of your smoke alarm should never be a consideration.

It is important to make sure that your smoke alarm is in working condition. In order to treat the alarm, simply press and hold the red button on the outside of the alarm. If you hear the alarm sound, this means it is in proper working order. If it does not sound or you hear and intermittent beeping sound, please notify the office immediately for repair or replacement.

Fire extinguishers are provided in your unit and in the common hallways. You must inform Management within 24 hours if they have been discharged. Failure to do so could result in Lease termination.

*If it is reported to Management that the smoke alarm is not working properly, Management shall replace it free of charge. If it is discovered by Management that the smoke alarm has been disabled, disconnected or tampered with, there will be a charge to the Tenant for time and supplies to correct the problem.*

REMEMBER – SMOKE ALARMS SAVE LIVES AND PROPERTY

| | |
|---|---|
| _____ | 1-22-20 |
| Tenant | Date |
| Dwin Taylor Jr. | 1/22/20 |
| Tenant | Date |
| _____ | _____ |
| Tenant | Date |
| Shenica Crank | 1/22/2020 |
| Owner / Agent of Owner | Date |






Silver Oak Apartments

### MOLD PROVISIONS LEASE ADDENDUM

Tenant hereby acknowledges and agrees that Tenant is responsible for the prevention and/or control of mold growth within the leased premises that are under the Tenant's care, custody and/or control.

Accordingly, it is the Tenant's responsibility to maintain the leased premises in a clean and healthy manner, and to promptly report any and all instances of water damage, including but not limited to water leaks, broken seals, worn caulk and the like. Tenant's failure to report any instances of water damages to the Management within twenty-four (24) hours of Tenant's discovery of such damages will be deemed to be a breach of the Lease Agreement by Tenant.

Tenant further acknowledges and agrees that Tenant will be responsible for any and all damages, including, but not limited to damages to the property, including the leased premises and other apartments and common areas, loss of use, loss of value, personal injury, adverse health effects, loss of income, emotional distress, death and any and all other damages that may result, in whole or in part, from the Tenant's failure to comply with this Mold Provisions Addendum of the Lease Agreement.

_____    _____
Tenant                               Date        1-22-20

_____    _____
Tenant   Davin Taylor Jr.           Date        1/22/20

_____    _____
Tenant                               Date

_____    _____
Tenant                               Date
Owner / Agent of Owner               Date        1/22/2020



16
Davin Terrell
Revision Date: 04/2018



Silver Oak Apartments

## LEASE ADDENDUM FOR UNITS PARTICIPATING IN GOVERNMENT REGULATED AFFORDABLE HOUSING PROGRAMS (SECTION 42 LOW-INCOME HOUSING TAX CREDIT)

1. **ADDENDUM.** This is an addendum to the lease contract executed by **Davin Terrell** (LESSEE) and Silver Oak Apartments (LESSOR) for the dwelling located at ▮▮▮▮▮▮▮▮▮▮ #16-G Clarkston, GA 30021

2. **PARTICIPATION IN GOVERNMENT PROGRAM.** We, as the agents for the dwelling you are renting, are participating in a government regulated affordable housing program. This program requires both you and us to verify certain information and to agree to certain provisions contained in this addendum.

3. **ACCURATE INFORMATION IN APPLICATION.** By signing this addendum, you are certifying that the information provided in the supplemental rental application and on all other forms regarding your household annual income and assets is true and accurate.

4. **FUTURE REQUESTS FOR INFORMATION.** By signing this addendum, you agree that the annual income and other eligibility requirements for participation in this government regulated affordable housing program are substantial and material obligations under the Lease Contract. You agree to comply promptly with all requests for information regarding annual income and eligibility, including requests by the Owner/Agent and the appropriate government monitoring agency. These requests may be made to you now and at any time during the Lease Contract term or renewal period.

5. **INCOME INCREASES.** By signing this addendum, you understand that your income is allowed to increase up to 140% of the current applicable income limit and still remain income eligible. Further, if your state agency requires additional restrictions, your income may not increase above the current applicable income limit and remain income eligible. If your income increases above 140% of the maximum allowable income as governed by the Section 42 Low-Income Housing Tax Credit Program (or current income limit for stricter state specific requirements), management may increase your rent to the maximum allowable Housing Credit rent with a 30-day notice, and may later convert the unit into a market rate unit and/or a higher rent set aside.

6. **INACCURATE INFORMATION AS GROUNDS FOR EVICTION.** If you refuse to answer or if you do not provide accurate information in response to these requests, it will be considered a substantial violation of the Lease Contract and good cause for termination of tenancy through eviction or non-renewal of lease, regardless of whether the inaccuracy of the information you furnished was intentional or unintentional.

7. **HOUSEHOLD STUDENT STATUS.** Section 42 Low-Income Housing Tax Credit Program requirements state that households consisting entirely of full-time students must meet certain eligibility requirements to be program qualified. By signing this addendum, you agree that if any adult household member becomes a full-time student during the lease period or if the current student status of any household member changes, you must immediately notify management. At such time, your continuing eligibility according to program requirements will be reviewed. If it is determined that you no longer qualify for the program, management will issue a thirty (30) day notice to vacate the unit.

8. **ANNUAL INSPECTIONS.** By signing this addendum, you are agreeing to allow the Owner/Agent to conduct periodic inspections of your unit with prior 24-hour notice, except when emergency situations make such notices impossible. Additionally, your unit may be selected for inspection during periodic inspections by the appropriate government monitoring agency



17
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

_____          1 - 22 - 20
Tenant                                   Date

Devin Taylor Jr.                         1/22/70
_____          _____
Tenant                                   Date

_____          _____
Tenant                                   Date

_____          _____
Tenant                                   Date

Owner / Agent of Owner                   1/22/2020
                                         Date



18
Davin Terrell
Revision Date: 04/2018



Silver Oak Apartments

### BED BUG LEASE ADDENDUM

**PLEASE NOTE:** It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.

**1. PURPOSE:** This addendum modifies the Lease Contract and addresses situations related to bed bugs (cimex lectularius) which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

**2. INSPECTION:** You agree that you: (check one)

_☑_ Have inspected the dwelling prior to move in and that you did not observe any evidence of bed bugs or bed bug infestations; OR

____ Will inspect the dwelling within 48 hours after move-in and notify us of any bed bugs or bed bug infestation.

**3. INFESTATIONS:** You agree that you have read the information on page two of this addendum about bed bugs and:

_☑_ You are not aware of any infestation or presence of bed bugs in your current or previous apartment home or dwelling. You agree that you have not been subjected to conditions in which there was any bed bugs infestation or presence. OR

____ You agree that if you previously lived anywhere that had a bed bug infestation that all of your personal property (including, furniture, clothing and other belongings) has been treated by a licensed pest control professional. You agree that such items are free of further infestation. If you disclose a previous experience of bed bugs infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of beg bugs. You agree that any previous bed bug infestation which you may have experienced is disclosed here.

_____

_____

_____

_____

**4. ACCESS FOR INSPECTION AND PEST TREATMENT:** You must allow us and our pest control agent's access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guest, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the dwelling and building. We can select the method of treating the dwelling, building and common area for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. You are responsible for and must, at you own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treat the dwelling(s). If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for bed bug infestation on your own.

**5. NOTIFICATION:** You must promptly notify us:

* Of any known or suspected bed bug infestation or presence in the dwelling, or in any of the clothing, furniture or personal property.

* Of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.



19
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

- If you discover any conditions or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

**6. COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bedbugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleared as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed buds in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

**7. RESPONSIBLITIES:** You may be required to pay all reasonable cost of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestation in other dwellings. If you fail to pay us for any costs you are liable for, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract, and obtain immediate possession of the dwelling. If you fail to move out after your right of occupancy has been terminated, you will be liable for holdover rent under the Lease Contract.

**9. TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction.

### BED BUGS – A GUIDE FOR RENTAL HOUSING RESIDENTS

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals (their sole food source), the bugs assume a distinctly blood-red hue until digestion is complete.

**BED BUGS DON'T DISCRIMINATE:**

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

While bed bugs are by their very nature more attracted to clutter, they're certainly not discouraged by cleanliness. Bottom Line: bed bugs know no social and economic bounds; claims to the contrary are false.

**BED BUGS DON'T TRANSMIT DISEASE:**

There exists no scientific evidence that bed bugs carry disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease carrying pests. Again, claims associating bed bugs with disease are false.







Silver Oak Apartments

IDENTIFYING BED BUGS:

**Bed bugs can often be found in, around and between:**

- BEDDING
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams.
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wall paper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detection.

- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And because they shed, it's not uncommon for skin casts to be left behind in areas typically, frequented by bed bugs.

PREVENTING BED BUG ENCOUNTERS WHEN TRAVELING:

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States, is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guest are detected before the decision is made to unpack. Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

BED BUG DO'S AND DON'TS

- **Do not bring used furniture from unknown sources into your dwelling,** Countless bed bugs infestation have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainly that a piece of second-hand furniture is bed bug free, resident should assume that the reason a seemingly nice-looking leather couch, for example is sitting outside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bugs sightings immediately:**
  Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bugs infestation:**



21
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

ACKNOWLEDGEMENT OF RECEIPT OF FORM HUD-5380, "NOTICE OF RIGHTS UNDER THE VIOLENCE AGAINST WOMEN ACT" AND FORM HUD-5382 "CERTIFICATION OF DOMESTIC VIOLENCE, DATING VIOLENCE, SEXUAL ASSAULT, OR STALKING, AND ALTERNATE DOCUMENTATION"

I/We, Davin Terrell, have received a copy of the HUD- 5380 Form and the HUD-5382 Form.

Household adults: Davin Terrell,
Unit: 1281 Brockett Road #16-G

| | |
|---|---|
| _____ | 1-22-20 |
| Tenant | Date |
| Devin Taylor Jr. | 1/22/20 |
| Tenant | Date |
| _____ | _____ |
| Tenant | Date |
| _____ | 1/22/2020 |
| Owner / Agent of Owner | Date |

---

*For Management Only* (if necessary): We have attempted to obtain written acknowledgement of the receipt of the HUD-5380 and the HUD-5382, but acknowledgement could not be obtained because:

☐  Individual refused to sign

☐  Communications barrier prohibited obtaining the acknowledgement

☐  An emergency situation prevented us from obtaining acknowledgement

☐  Other (Please specify) _____



24
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

### DISCLOSURE OF INFORMATION
### ON LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**
Housing Built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, owners must disclose the presence of known lead-based paint and lead-based paint hazards in the dwelling. Residents must also receive a federally approved pamphlet on lead poisoning prevention.

**Owner's Disclosure (initial)**

_____(a) Presence of lead-based paint or lead-based paint hazards (Check one below):
_____ Known lead-based paint and/or lead-based paint hazards are present in the housing

_____ Owner has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) _____ Records and reports available to the Owner.
_____ Owner has provided the Resident with all available records and reports pertaining to lead-based pain and/or lead-based paint hazards in the housing. (Documents listed below.)

**Resident's Acknowledgement (initial)**
_____(c) Resident has received copies of all the information listed above.
_____ (d) Resident has received the pamphlet "Protect your family from Lead In Your Home".

**Agent's Acknowledgement (initial)**
_____ (e) Agent has informed the Owner and the Owner's obligations under 42 U.S.C 4582 (d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

_____        1-22-20
Tenant                                   Date

_____        1/22/20
Tenant                                   Date

_____        _____
Tenant                                   Date

_____        _____
Tenant                                   Date

_____        1/22/2020
Owner / Agent for Owner                  Date



25
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

Parking Sticker Assigned: _____

### VEHICLE REGISTRATION INFORMATION

Tenant understands the Rules & Regulations for Vehicles and that only one (1) vehicle registered and owned by the Tenant on the Lease are allowed to be parked in the parking areas of the Apartment Community. The Vehicle registered by the Tenant is as follows:

Vehicle_____

Make: _____

Model: _____

Year & Color: _____

License Plate: _____

Owned and Registered to: _____

Tenant understands that a valid parking sticker must be displayed on the windshield of the registered vehicle. *In the case of an accident where you will be driving a car temporarily or given a rental vehicle, please notify the office for a temporary parking sticker.

Tenant also understands that any other vehicles parked by the Tenants in the complex are subject to towing at the Owner's sole expense. Tenant also understands that any vehicle, including registered vehicles that are not operable will be towed at the Owner's sole expense.

_____    1-22-20
Tenant                               Date

Davin Taylor Jr                     1/22/20
Tenant                               Date

_____    _____
Tenant                               Date

_____    1/22/2020
Owner / Agent for Owner              Date



26
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of the traditional and non-traditional, chemical based insecticides and pesticides, poses too great a risk to you and your neighbors.

• **Do comply with eradication protocol:**

If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

_____    _____
Tenant                                          Date  1-22-20

_____    _____
Tenant  Dwin Taylor Jr.                Date  1/22/20

_____    _____
Tenant                                          Date

_____    _____
Tenant                                          Date
Owner / Agent of Owner            Date  1/22/2020





Silver Oak Apartments

## VIOLENCE AGAINST WOMEN AND JUSTICE DEPARTMENT REAUTHORIZATION ACT OF 2005 LEASE ADDENDUM

<u>TENANT:</u>

Terrell, Davin

<u>UNIT NO. & ADDRESS:</u>

▉▉▉▉▉▉ #16-G  Clarkston GA Unit G 30021

This lease addendum adds the following paragraphs to the Lease between the above referenced Tenant and Landlord.

- **Purpose of the Addendum**
  The lease for the above referenced unit is being amended to include the provisions of the Violence Against Women and Justice Department Reauthorization Act of 2005 (VAWA).

- **Conflicts with Other Provisions of the Lease**
  In case of any conflict between the provisions of this Addendum and other sections of the Lease, the provisions of this Addendum shall prevail.

- **Term of the Lease Addendum**
  The effective date of this Lease Addendum is 01/22/2020.  This Lease Addendum shall continue to be in effect until the Lease is terminated.

**VAWA Protections**

1. The Landlord may not consider incidents of domestic violence, dating violence or stalking as serious or repeated violations of the lease or other "good cause" for termination of assistance, tenancy or occupancy rights of the victim of abuse.

2. The Landlord may not consider criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of that abuse.

3. The Landlord may request in writing that the victim, or a family member on the victim's behalf, certify that the individual is a victim of abuse and that the Certification of Domestic Violence, Dating Violence or Stalking, Form HUD-91066, or other documentation as noted on the certification form, be completed and submitted within 14 business days, or an agreed upon extension date, to receive protection under the VAWA.  Failure to provide the certification or other supporting documentation within the specified timeframe may result in eviction.

---

Tenant _____      Date   1-22-20

Tenant   _Devin Taylor, Jr._____        Date   1/22/20

Tenant _____      Date

Owner / Agent of Owner _____      Date   1/22/2020



23
Davin Terrell
Revision Date: 04/2018





Silver Oak Apartments

__Parking Sticker Assigned:__ _____

### KEY-LESS ENTRY CARD REGISTRATION

Tenant understands that the building key-less entry card(s) assigned to them by Management remain the property of the Owner and must be returned should the residency terminate for any reason. Each Tenant will be issued one (1) building key-less entry card for each occupant over the age of sixteen (16) listed on the Lease agreement. Tenant further understands that these building key-less entry card(s) are for the sole use of those they are registered to.

Tenant: _____

Unit Number: _____

Number of Cards Issued: _____

Card Number: _____

Card Number: _____

Card Number: _____

Card Number: _____

I have read and understand that the building key-less entry card(s) listed above have been issued to me. I also understand that the replacement cost for these building key-less entry cards is twenty-five dollars ($25.00) per card due and payable before a replacement will be issued.

_____    1-22-20
Tenant                              Date

_Davin Taylor Jr._                  1/22/20
Tenant                              Date

_____    _____
Tenant                              Date

_____    1/22/2020
Tenant                              Date
Owner / Agent for Owner             Date





# TENANT HOUSEHOLD DATA FORM

Current name of housing development: Silver Oaks
Full name of head of household: DAvin Terrell
Street address: ▮▮▮▮▮▮
City: Clarkston Zip Code: 30021 Apt # 12-F
County: Dekalb

Unit Type:

SRO    Eff    1BR    (2BR)    3BR    4BR

Initial lease start date (original move-in date) 12 / 1 / 19    Current Lease expiration date: 12 / 1 / 2020
Total monthly rent charge: $ 842
Monthly utility allowance: $ 59    Monthly subsidy amount $ 0
Subsidy Type:    Rent paid by Tenant: $ 842

(None)    Section 8    Home TBA    Other

Race of the Head of Household:

White, not Hispanic    Black, not Hispanic    Hispanic
Native American    Asian/Pacific Islander

Anticipated gross income of all household members over 18 years of age for the next **12 months**, as defined and verified as set forth in the DCA HOME Manual: **Total Income $** ▮▮▮

1. $ ▮▮▮    2. $ 0    3. $ 0    4. $ 0

Total number of persons in the household, including the head of household: 4
List all household members by their ages. (Relationship to head of household should be listed as spouse, son, daughter, mother, grandson, nephew, etc. If a person is unrelated to head, enter "unrelated").

| Name and Relation to head of household | Age | Name and Relation to head of household | Age |
|---|---|---|---|
| 1. DAvin Terrell - Head of household | 30 | 5. | — |
| 2. ▮▮▮ | 10 | 6. | — |
| 3. ▮▮▮ | 7 | 7. | — |
| 4. Devin Taylor Jr. - friend | 22 | 8. | — |

Are all members of your household full-time students or has been a FT student **5** out of the last **12** months? Y / (N)

## Certification of Legal Residency in the United States

1. Individual. (Check one) I certify that I am:
✓ a citizen or national of the United States.
___ an alien lawfully present in the United States.

2. Family. (Check all that apply) I certify that there are ___ persons in my household and that:
✓ are citizens or nationals of the United States and ___ are aliens lawfully present in the United States.

Will any household members need special accommodations due to a handicap or disability? Y / (N)

Are there any pets in the home? No    Number of pets ___

Type/Breed ___    Weight ___
Type/Breed ___    Weight ___

By signing this form, I certify that I understand all of the questions on this form and that all of my answers are true and correct to he best of my knowledge.

Signed: _____
Head of Tenant Household    Date: 10 / 9 / 19

**WARNING:** Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to willfully falsify a material fact or make a false statement in any matter within the jurisdiction of the federal agency. Household anticipated income as stated above has been verified

## Calculation Worksheet

| Property Name | Silver oak | Resident Name | Terrell |
| --- | --- | --- | --- |
| Unit Number | 12-F 16-G | | |

### EMPLOYMENT INCOME BY EMPLOYMENT VERIFICATION

| Hourly/Salary Calculations | | | | YTD Calculations | |
| --- | --- | --- | --- | --- | --- |
| Employer | | | | Total Income | |
| Rate of pay | | | | Beginning Date | |
| Type of pay | | | | Ending Date | |
| Frequency | | | | Total Weeks | 0.00 |
| Units per period | | | | Income/Week | $0.00 |
| Periods per year | | | | Weeks/Year | |
| Annual Income | $0.00 | $0.00 | $0.00 | $0.00 Annual Income | $0.00 |

### EMPLOYMENT INCOME BY PAYSTUBS

| Paystub Calculations | | | YTD Calculations | | TIC Income |
| --- | --- | --- | --- | --- | --- |
| Pay End Date | Gross Pay | (Paystubs are considered third party employment verification.) | Total Income | $ ▮ | Higher of the |
| 10/18/2019 | $1,360.00 | | Beginning Date | 1/9/19 9/1/2019 | paystubs and |
| 10/4/2019 | $1,385.50 | | Ending Date | | YTD populates |
| 9/20/2019 | $1,360.00 | Pay Frequency | bi-weekly | 10/18/2019 | below. If using |
| 9/6/2019 | $1,360.00 | Total of Pays | $8,274.75 Total Weeks | | VOE, take into |
| 8/23/2019 | $1,449.25 | Average Pay | $1,379.13 Income/Week | | account the info |
| 8/9/2019 | $1,360.00 | # Pay Periods | 26 Weeks/Year | 52 | above. |
| | | Annual Income | $35,857.25 Annual Income | ▮ | ▮ |

### OTHER INCOME VERIFICATIONS

| Income Source | | | | | |
| --- | --- | --- | --- | --- | --- |
| Income Type | | | | | |
| Payment Rate | | | | | |
| Frequency | | | | | |
| Units Per Year | | | | | |
| Annual Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 $0.00 |

### ASSET INCOME

| Asset Type | Savings | Checking | | | |
| --- | --- | --- | --- | --- | --- |
| Cash Value | | | | | |
| Interest Rate | ▮ | | | | |
| Annual Income | ▮ | | $0.00 | $0.00 | $0.00 $0.00 |

### ASSETS: OVER $5000

| Checking Account | | Checking Account | | Real Estate | |
| --- | --- | --- | --- | --- | --- |
| Statement Date | Ending Balance | Statement Date | Ending Balance | | |
| | | | | Owner | |
| | | | | Address | |
| | | | | Address | |
| | | | | Market Value | |
| | | | | Cost to Sell | |
| Average Balance | #DIV/0! | Average Balance | #DIV/0! | Mortgage Owed | |
| | | | | Cash Value | $0.00 |

# TWG Rental Application

*Please complete all sections. If items do not apply, mark "N/A" for not applicable. All adults must complete their own application.*

## PERSONAL INFORMATION

**Full Name of Applicant**
Devin Terrell

**Date of Birth** 1989 | **Age** 30 | **Social Security #** ███ | **Gender (Circle One)** (Male) / Female

**Marital Status:** (check one) ☑Single ☐Married ☐Widowed ☐Separated ☐Divorced (# of times ___)

**Driver's License #** | **State Issued** GA | **Phone Number** 476-668-6005 | **Email Address** ███@icloud.com

**Race:** (check all that apply) ☐American Indian/Alaskan Native ☐Asian
☐White ☐Native Hawaiian/Other Pacific Islander ☐Other multi-race ☑Black/African American

**Ethnicity** (check one box) ☐Hispanic ☑Not-Hispanic ☐Prefer not to answer

**Are you a student?** ☐Yes ☑No   If yes: ☐Part Time ☐Full Time   **School Name:**

**List all others who will be occupying the apartment:**

| Full Name | Date of Birth | Relationship | Social Security # | Gender | Employed | Student |
|---|---|---|---|---|---|---|
| ███ | ███ | Son | ███ | M | Y or N | Y or N |
| ███ | ███ | Daughter | ███ | F | Y or N | Y or N |
| Devin Taylor Jr. | 3/26/1997 | Friend | ███ | M | Y or N | Y or N |
| | | | | | Y or N | Y or N |
| | | | | | Y or N | Y or N |
| | | | | | Y or N | Y or N |
| | | | | | Y or N | Y or N |

## HOUSING INFORMATION

**MUST LIST 2 YEARS OF CONTINUOUS HISTORY.**
*If additional space is needed, please attach a separate page.*

**Applicant's PRESENT Street Address** | **City** Clarkston | **State** GA | **Zip** 30021 | **Dates of Residency** (month/yr - month/yr) 4/1/16 - Present

**Present Landlord/Mortgage Company** TWG | **Landlord/Mortgage Company Phone #** 770-716-5717 | **Monthly Rent or Mortgage Amount** $ ███ | **Residency Status:** ☐Own Home ☑Apartment ☐Leased Home ☐Other:

**Landlord/Mortgage Company Address** ███ | **City** Clarkston | **State** GA | **Zip** 30021 | **Is landlord a relative?** ☐Yes ☑No  If yes, list relationship:

**Is your lease in any other name?** ☐Yes ☑No  If yes, please provide name and explain: | **What is your reason for moving?**

**Applicant's PRIOR Street Address** | **City** Norcross | **State** GA | **Zip** 30093 | **Dates of Residency** (month/yr - month/yr) 2/1/13 - 3/31/16

**Prior Landlord/Mortgage Company** Ground Luxe | **Landlord/Mortgage Company Phone #** 770-212-3376 | **Monthly Rent or Mortgage Amount** $ ███ | **Residency Status:** ☐Owned Home ☑Apartment ☐Leased Home ☐Other:

**Landlord/Mortgage Company Address** ███ | **City** Norcross | **State** GA | **Zip** 30093 | **Was landlord a relative?** ☐Yes ☑No  If yes, list relationship:

**Was your lease in any other name?** ☐Yes ☑No  If yes, please provide name and explain: | **What was your reason for moving?** Space

Page 1 of 3 (Rev. 10/17)

## EMPLOYMENT INFORMATION
*If you are not currently employed, complete N/A for present employer.*

**Applicant's PRESENT Employer**
TWG

| Employer's Phone # | Employer's Fax # | Present Employer's Address | City, State, Zip |
|---|---|---|---|
| 7.776.5717 | N/A | 1281 Brockett Rd | Clarkston, GA 30021 |

| Position/Job Title | Hourly Wage | Dates of Employment |
|---|---|---|
| maint. Tech | $ ▓▓ | 1/9/19 - present |

| Supervisor's Name and Title | Supervisor's Email Address | Is this job seasonal or temporary? |
|---|---|---|
| a White    pm | aWhite@ twgdev.com | ☐Yes ☒No |

**Applicant's PREVIOUS Employer**
Sunshine Window Cleaning

| Employer's Phone # | Employer's Fax # | Previous Employer's Address | City, State, Zip |
|---|---|---|---|
| N/A | N/A | 505 Cobb Industrial | Marietta GA |

| Position/Job Title | Hourly Wage | Dates of Employment |
|---|---|---|
| Crew leader | $ ▓▓ | 2016 - 2018 |

| Supervisor's Name and Title | Supervisor's Email Address | Reason for leaving this job: |
|---|---|---|
| N/A | N/A | Started HVAC School |

## OCCUPANCY REQUIREMENTS AND OTHER REQUIRED INFORMATION

Number of Bedrooms Needed: 2          Date apartment needed:

How did you hear about us?

| | | |
|---|---|---|
| Do you expect any additions to your household within the next 12 months? Explain: | | Do you receive Section 8? Y (N) Caseworker: |
| Are there any absent household members who would live with you under normal conditions? Explain: | | ☐Yes ☒No |
| Does anyone in your household have special needs? Explain: | | ☐Yes ☒No |
| Does your household have or anticipate having any pets other than those used as a service animal? Explain: | | ☐Yes ☒No |
| Does an adult of this household have primary physical custody of every child listed on the application? Explain: | | ☐Yes ☒No |
| Have you ever been evicted or asked to move from a rental unit of any type? Explain: | | ☒Yes ☐No |
| Have you or any one else on this application broken a rental agreement or lease contract? Explain: | | ☐Yes ☒No |
| Have you or any one else on this application had legal action taken against you for nonpayment of a bill or for property damages?  Explain: | | ☐Yes ☒No |
| Have you or anyone else on this application filed for bankruptcy? Explain: | | ☐Yes ☒No |
| Have you or any household member ever been convicted of a felony? Explain: | | ☐Yes ☒No |
| Have you or any household member been arrested/convicted of a drug related crime? Explain: | | ☐Yes ☒No |

## MISCELLANEOUS INFORMATION

**Emergency Contacts**

| Name: Debra Connally | Address: | Phone #: 7-292-918_ | Relationship: Mother |
|---|---|---|---|
| Name: | Address: | Phone #: | Relationship: |

In the event of serious illness or death of resident, the above persons ☐MAY or ☐MAY NOT enter, remove, and/or store all contents found in the dwelling, common areas, or mailbox.

Please list below the automobiles you will keep at this property.

| Make | Model | Year | Color | License # and State | Do you have a pet? (management approval required) ☐Yes ☐No  Number of Pets: |
|---|---|---|---|---|---|
| | | | | | Description of Pets: (include height and weight) |

## APPLICATION FEE AND SIGNATURE CLAUSE

Applicant has submitted the sum of $ 0 which is a non-refundable payment for a credit and processing charge, receipt of which is acknowledged by Management. Such sum is not a rental payment. In the event this application is disapproved by Management or cancelled by the applicant, this sum will be retained by Management to cover the cost of processing the application as furnished by the applicant. This application, along with an applicant questionnaire completed by each adult in the household, must be completed in total and signed before it will be processed by Management.

I certify that answers given herein are true and complete to the best of my knowledge. I authorize verification or investigation of all statements contained in this application via consumer credit reports, rental history reports, criminal history reports and other means. Such authorization does not require the owner or its agents to make verifications or investigations. Failure to answer any of the above inquires shall entitle owner to reject this application. False information given above shall entitle owner to (1) reject this application, (2) retain the application fee(s) and deposit(s) as liquidated damages for owner's time and expenses of processing this application, and (3) terminate resident's right of occupancy. Owner reserves the right to regularly and routinely furnish information to consumer reporting agencies about performance of lease obligations by residents. Such information may be reported at any time and may include both favorable and unfavorable information regarding a resident's compliance with the lease, rules, and financial obligations. Owner and/or Property Manager have no duty to provide emergency care or give notice of emergency to any person and shall not be liable to applicant, Resident, any occupant, or any guest for failure to do so.

You have applied to live in an apartment that is governed by the Low Income Housing Tax Credit program. This program requires us to certify all of your income, asset, and eligibility information as part of determining your household's eligibility. Program requirements state we must verify each income and asset source as well as other claims of eligibility. We must determine this prior to granting your eligibility, and if such eligibility is granted, each subsequent year you remain in the unit.

Management has reviewed documentation, including but not limited to: Driver's License, Social Security ID, etc., to form a reasonable belief that the identity of the applicant is the same to whom the credit report pertains to the best of management's knowledge.

Management Initials: _TC_

THIS APPLICATION IS NOT A RENTAL AGREEMENT, CONTRACT, OR LEASE. ALL APPLICATIONS ARE SUBJECT TO THE APPROVAL OF THE OWNER OR MANAGING AGENT.

_____
Signature of Applicant

10-9-19
_____
Date

_____
Signature of Management

10/9/19
_____
Date



We encourage and support the nation's affirmative housing program in which there are no barriers to obtaining housing because of race, color, religion, sex, national origin, handicap, or familial status.



Page 3 of 3 (Rev. 10/17)

## COVER SHEET / FAX TRANS.
### AUTHORIZATION TO RELEASE INFORMATION

Date: _____

Number of pages including cover sheet: _____

To be completed by property management office:

The undersigned individual(s) has applied for residency at _____. The property is operated under federal affordable housing regulations, which require that we obtain written confirmation of the eligibility of all applicants and household members. In order to comply with federal regulations, please complete the following form in full and return it to the sender at your earliest convenience.

Verifications and inquiries that may be requested include, but are not limited to:

| Credit and Criminal Activity | Identity and Marital Status | Previous Residences and Rental Activity |
|---|---|---|
| Employment, Income, and Assets | Medical Allowances | Student Status |

The groups or individuals that may be asked to release/verify the above information (depending on program requirements) include, but are not limited to:

| Courts and Post Offices | | |
|---|---|---|
| Law Enforcement Agencies | Past and Present Employers | Utility Companies |
| Medical Providers | State Unemployment Agencies | Credit Providers and Bureaus |
| Retirement Systems | Veterans Administration | Welfare Agencies |
| Banks and Other Financial Institutions | Social Security Administration | Internal Revenue Service |
| | Previous Landlords (Including PHA's) | |

To be completed by applicant/resident

I/we agree that a photocopy of this authorization may be used for the purposes stated above. The original signed copy of this authorization is on file in the management office and will stay in effect for two years from the date signed. I/we understand that I/we have a right to review my/our file and correct any information that can be proven incorrect. The undersigned hereby authorizes the release of any information requested in order to determine my/our eligibility for the federal affordable housing program.

| | |
|---|---|
| Applicant/Resident Name (Printed): | Davin Terrell |
| Last 4 Digits of Social Security Number: | ▆▆▆▆ |
| Authorizing Signature: | |
| Co-Applicant/Co-Resident Name (Printed): | |
| Last 4 Digits of Social Security Number: | |
| Authorizing Signature: | |
| Co-Applicant/Co-Resident Name (Printed): | |
| Last 4 Digits of Social Security Number: | |
| Authorizing Signature: | |
| Co-Applicant/Co-Resident Name (Printed): | |
| Last 4 Digits of Social Security Number: | |
| Authorizing Signature: | |



We encourage and support the nation's affirmative housing program in which there are no barriers to obtaining housing because of race, color, religion, sex, national origin, handicap or familial status.



Revised 2/1/15

# TENANT INCOME CERTIFICATION QUESTIONNAIRE

DT (*NOTE: A separate questionnaire must be completed by each adult member of the household)

NAME: David Terrell

X Initial Certification    ☐ Recertification    ☐ Addition of Household Member

| | YES | NO | | |
|---|---|---|---|---|
| 1. | ☐ | ☑ | I receive Section 8 rental assistance. If yes, list the housing authority below. | |

**INCOME INFORMATION**
Include all income sources, including unearned income of minors.

| | YES | NO | | Amount of monthly rental assistance $ |
|---|---|---|---|---|
| 2. | ☐ | ☑ | I am self employed. (List nature of self employment) | **MONTHLY GROSS INCOME** (use net income from business) $ |
| 3. | ☑ | ☐ | I have a job and receive wages, salary, overtime pay, commissions, fees, tips, bonuses, and/or other compensation: List the businesses and/or companies that pay you: | |
| | | | Name of Employer | |
| | | | 1) TWO | $ ▇▇▇▇ |
| | | | 2) | $ |
| | | | 3) | $ |
| 4. | ☐ | ☑ | I receive cash contributions of gifts including rent or utility payments, on an ongoing basis from persons not living with me. | $ |
| 5. | ☐ | ☑ | I receive unemployment benefits. | $ |
| 6. | ☐ | ☑ | I receive Veteran's Administration, GI Bill, or National Guard/Military benefits/income. | $ |
| 7. | ☐ | ☑ | I receive periodic social security payments. | $ |
| 8. | ☐ | ☑ | The household receives unearned income from family members age 17 or under (example: Social Security, Trust Fund disbursements, etc.). | $ |
| 9. | ☐ | ☑ | I receive Supplemental Security Income (SSI). | $ |
| 10. | ☐ | ☑ | I receive disability or death benefits other than Social Security. | $ |
| 11. | ☐ | ☑ | I receive Public Assistance Income (examples: TANF, AFDC) DO NOT INCLUDE FOOD STAMPS | $ |
| 12. | ☐ | ☑ | I am entitled to receive child support payments through court order or other agreement. If yes, how many orders/agreements do you have? If yes, from how many persons do you receive support? | $ $ $ |
| 13. | ☐ | ☑ | I am entitled to receive alimony/spousal maintenance payments | $ |
| 14. | ☐ | ☑ | I receive periodic payments from trusts, annuities, inheritance, retirement funds or pensions, insurance policies, or lottery winnings. If yes, list sources: 1) 2) | $ $ |
| 15. | ☐ | ☑ | I receive income from real or personal property. | $ |
| 16. | ☐ | ☑ | I receive student financial assistance (grants, scholarships, etc.) not including loans *NOTE: Count as income only if household receives Section 8 rental assistance. | (use net earned income) $ |
| 17. | ☐ | ☑ | I am claiming zero income. | $ _____ per semester |

Revised 2/1/15

**ASSET INFORMATION**
*Include all asset sources, including assets of minors.*

| | YES | NO | | INTEREST RATE | CASH VALUE |
|---|---|---|---|---|---|
| 18. | X | ☐ | I have a checking account(s).  # of accounts held ___ | | |
| | | | If yes, list bank(s) | | 6 MONTH AVERAGE BALANCE |
| | | | 1) Navy Federal | | |
| | | | 2) _____ | 0 % | $ ████ |
| | | | 3) _____ | ___ % | $ |
| 19. | X | ☐ | I have a savings account(s).  # of accounts held ___ | ___ % | $ |
| | | | If yes, list bank(s) | | |
| | | | 1) Navy Federal | | CURRENT BALANCE |
| | | | 2) _____ | .40 % ¼ DT | $ ████ |
| | | | 3) _____ | ___ % | $ |
| 20. DT | | | I have a debit card or paycard for direct deposit of benefits. | ___ % | $ |
| | | | # of cards held ___ | | |
| | | | 1) Navy Federal | | CURRENT BALANCE |
| | | | 2) _____ | | $ ████ |
| | | | 3) _____ | | $ |
| 21. | ☐ | | I have a revocable trust(s) | | $ |
| | | | If yes, list bank(s) | | |
| | | | 1) _____ | | |
| 22. | ☐ | X | I own real estate. | ___ % | $ |
| | | | If yes, provide description: | | |
| | | | _____ | | |
| | | | I intend to: | | $ |
| | | | ☐ Keep  ☐ Sell  ☐ Rent  ☐ Give Away  ☐ Foreclose | | |
| 23. | ☐ | X | I own stocks, bonds, or Treasury Bills | | |
| | | | If yes, list sources/bank names | | |
| | | | 1) _____ | | |
| | | | 2) _____ | ___ % | $ |
| | | | 3) _____ | ___ % | $ |
| 24. | ☐ | X | I have Certificates of Deposit (CD) or Money Market Account(s). | ___ % | $ |
| | | | # of accounts held ___ | | |
| | | | If yes, list sources/bank names | | |
| | | | 1) _____ | | |
| | | | 2) _____ | ___ % | $ |
| | | | 3) _____ | ___ % | $ |
| 25. | ☐ | X | I have an IRA/Lump Sum Pension/Keogh Account/401K. | ___ % | $ |
| | | | If yes, list bank(s) | | |
| | | | 1) _____ | | |
| | | | 2) _____ | ___ % | $ |
| 26. | ☐ | X | I have a whole life insurance policy. | ___ % | $ |
| | | | If yes, name of insurance company | | |
| | | | If yes, how many policies | | |
| 27. | ☐ | X | I have cash on hand. | | $ |
| 28. | ☐ | X | I have disposed of assets (i.e. gave away money/assets) for less than fair market value in the past 2 years. If yes, list items and date disposed: | | $ |
| | | | 1) _____ | | |
| | | | 2) _____ | | $ |
| | | | | | $ |

Revised 2/1/15

| | | | |
|---|---|---|---|
| 29. ☐ | I have a safe deposit box at a financial institution.<br>Name of institution: _____<br>Contents: _____<br>_____<br>_____<br>_____ | | $ _____ |
| 30. ☐ | I have other personal property held as an investment, other income<br>from assets or sources other than those listed above.<br>If yes, list type below:<br>1) _____<br>2) _____ | _____ %<br>_____ % | $ _____<br>$ _____ |

UNDER PENALTIES OF PERJURY, I CERTIFY THAT THE INFORMATION PRESENTED ON THIS FORM IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE. THE UNDERSIGNED FURTHER UNDERSTANDS THAT PROVIDING FALSE REPRESENTATIONS HEREIN CONSTITUTES AN ACT OF FRAUD. FALSE, MISLEADING OR INCOMPLETE INFORMATION WILL RESULT IN THE DENIAL OF APPLICATION OR TERMINATION OF THE LEASE AGREEMENT.

Davin Terrell

**PRINTED NAME OF APPLICANT/TENANT**      **SIGNATURE OF APPLICANT/TENANT**      10-9-19 **DATE**



We encourage and support the nation's affirmative housing program in which there are no barriers to obtaining
housing because of race, color, religion, sex, national origin, handicap or familial status.



Revised 2/1/15

## TENANT INCOME CERTIFICATION

| [X] Initial Certification | [ ] Recertification | [ ] Other_____ | Effective Date: | 01/22/2020 |
|---|---|---|---|---|
| | | | Move-in Date: (MM/DD/YYYY) | 01/22/2020 |

### PART I - DEVELOPMENT DATA

| Property Name: | Silver Oak Apartments | County: | DeKalb | BIN #: | GA-18-50916 |
|---|---|---|---|---|---|
| Address: | ████ 16-G  Clarkston GA 30021 | Unit | 16-G | # Bedrooms: | 2 |

### PART II.  HOUSEHOLD COMPOSITION

| HH Mbr # | Last Name | First Name & Middle Initial | Relationship to Head of Household | Date of Birth (MM/DD/YYYY) | F/T Student (Y or N) | Social Security or Alien Reg. No. |
|---|---|---|---|---|---|---|
| 1 | Terrell | Davin | HEAD | 03/05/1989 | No | ████ |
| 2 | Taylor Jr. | Devin | A - Adult co-tenant | 03/26/1997 | No | ████ |
| 3 | ████ | | C - Child | ████ | Yes | ████ |
| 4 | | | C - Child | | Yes | |

### PART III. GROSS ANNUAL INCOME (USE ANNUAL AMOUNTS)

| HH Mbr # | (A) Employment or Wages | (B) Soc. Security/Pensions | (C) Public Assistance | (D) Other Income |
|---|---|---|---|---|
| 1 | ████ | 0.00 | 0.00 | 0.00 |
| | | | | |
| TOTALS | $ ████ | $ 0.00 | $ 0.00 | $ 0.00 |

Add totals from (A) through (D), above          TOTAL INCOME (E):  $ ████

### PART IV. INCOME FROM ASSETS

| Hshld Mbr # | (F) Type of Asset | (G) C/I | (H) Cash Value of Asset | (I) Annual Income from Asset |
|---|---|---|---|---|
| 1 | Savings account - Navy Federal | C | | |
| 1 | Checking account - Navy Federal | C | ████ | ████ |
| | | | | |
| | | TOTALS: | $ ████ | |

Enter Column (H) Total          If over $5000    Passbook Rate    X  0.06%  =  (J) Imputed Income    $ 0.00

Enter the greater of the total of column I, or J: imputed income          TOTAL INCOME FROM ASSETS (K)    $ 0.12

| (L) Total Annual Household Income from all Sources [Add (E) + (K)] | $ ████ |
|---|---|

### HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine maximum income eligibility. I/We have provided for each person(s) set forth in Part II acceptable verification of current anticipated annual income. I/We agree to notify the landlord immediately upon any member of the household moving out of the unit or any new member moving in. I/We agree to notify the landlord immediately upon any member becoming a full time student.

Under penalties of perjury, I/We certify that the information presented in this Certification is true and accurate to the best of my/our knowledge and belief. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of the lease agreement.

| Signature | 1-22-20 (Date) | Signature | (Date) |
|---|---|---|---|
| Devin Taylor Jr. Signature | 1/22/20 (Date) | Signature | (Date) |

Tenant Income Certification (September 2000)
Page 1

## PART V. DETERMINATION OF INCOME ELIGIBILITY

TOTAL ANNUAL HOUSEHOLD INCOME
FROM ALL SOURCES:
From item (L) on page 1    $ ████

Current Income Limit per Family Size:    $ ████
Household Income at Move-in: _____

Household Meets
Income Restriction
at:
| 60% | ☐ | 50% | ☒ |
| 40% | ☐ | 30% | ☐ |
_____ %

**RECERTIFICATION ONLY:**
Current Income Limit x 140%:
$ _____
Household Income exceeds 140% at
recertification:
☐ Yes    ☐ No

Household Size at Move-in: _____

## PART VI. RENT

Tenant Paid Rent    $ ████

Utility Allowance    $ ████

GROSS RENT FOR UNIT:
(Tenant paid rent plus Utility Allowance &
other non-optional charges)    $ ████

Maximum Rent Limit for this unit:    $ ████

Rent Assistance:    $ 0.00

Other non-optional charges:    $ 0.00

Unit Meets Rent Restriction at:
☐ 60 %    ☒ 50 %    ☐ 40 %    ☐ 30 %    ☐ ____ %

## PART VII. STUDENT STATUS

ARE ALL OCCUPANTS FULL TIME STUDENTS?

☐ Yes    ☒ No

If yes, Enter student explanation*
(also attach documentation)

Enter
1-5

*Student Explanation:
1 TANF assistance
2 Job Training Program
3 Single parent/dependent child
4 Married/joint return
5 Previous foster care

## PART VIII. PROGRAM TYPE

Mark the program(s) listed below (a. through e.) for which this household's unit will be counted toward the property's occupancy requirements. Under each program marked, indicate the household's income status as established by this certification/recertification.

a. Tax Credit ☒    b. HOME ☐    c. Tax Exempt ☐    d. AHDP ☐    e. ☐

See Part V above

| | b. Income Status | c. Income Status | d. Income Status | e. (Name of Program) Income Status |
|---|---|---|---|---|
| <= 50% AMGI | ☐ 50% AMGI | ☐ 50% AMGI | ☐ | |
| <= 60% AMGI | ☐ 60% AMGI | ☐ 80% AMGI | ☐ | |
| <= 80% AMGI | ☐ 80% AMGI | | | |
| ☐ O  I** | ☐ O  I** | ☐ O  I** | ☐ O  I** | |

** Upon recertification, household was determined over-income (OI) according to eligibility requirements of the program(s) marked above.

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proofs and documentation required to be submitted, the individual(s) named in Part II of this Tenant Income Certification is/are eligible under the provisions of Section 42 of the Internal Revenue Code, as amended, and the Land Use Restriction Agreement (if applicable) to live in a unit in this Project.

_____
SIGNATURE OF OWNER/REPRESENTATIVE

1/22/20██
DATE

Tenant Income Certification (September 2000)
Page 2

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice

*paylocity*

Check Date
October 25, 2019

Voucher Number



DIRECT DEPOSIT VOUCHER

Direct Deposits   Type      Account      Amount
NAVY        C
FEDERAL
CREDIT

**Davin Terrell**

Total Direct Deposits

Clarkston, GA 30021

## Non Negotiable - This is not a check - Non Negotiable



**TWG Management LLC**

**Davin Terrell**

Employee ID
Location
Hourly

Fed Taxable Income
Fed Filing Status
State Filing Status

Check Date         October 25, 2019
Period Beginning   October 5, 2019
Period Ending      October 18, 2019

**Earnings Statement**

Voucher Number
Net Pay

| Earnings | Rate | Hours | Amount | YTD |
|---|---|---|---|---|
| 401K MAT | | | | |
| HOLIDAY | | | | |
| OVERTIM | | | | |
| Paid Time | | | | |
| REGULAR | | | | |
| Gross Earnings | | | | |

| Deductions | Amount | YTD |
|---|---|---|
| 401K | | |
| CHILD SUPT - EFT | | |
| LIFE INS | | |
| Short Term Dis-Post | | |
| Deductions | | |

| Taxes | | Amount | YTD |
|---|---|---|---|
| FITW | | | |
| GA | | | |
| MED | | | |
| SS | | | |
| Taxes | | | |

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| UNION | | | |
| Total Direct Deposits | | | |

1,196.19

| Time Off | Used | Availabl |
|---|---|---|
| PTO Full | | |

TWG Management LLC  | 333N Pennsylvania St Suite 100  Indianapolis, IN 46204 | FEIN: 26-3794348 | GA: 411200-09

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice

paylocity

Check Date
October 11, 2019

Voucher Number



DIRECT DEPOSIT VOUCHER

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| Total Direct Deposits | | | |

Davin Terrell

Clarkston, GA 30021

## Non Negotiable - This is not a check - Non Negotiable

**Davin Terrell**                    **TWG Management LLC**

| Employee ID | | Fed Taxable Income | |
| Location | | Fed Filing Status | |
| Hourly | | State Filing Status | |

Check Date          October 11, 2019
Period Beginning   September 21, 2019
Period Ending       October 4, 2019

**Earnings Statement**

Voucher Number
Net Pay



| Earnings | Rate | Hours | Amount | YTD |
|---|---|---|---|---|
| 401K MAT | | | | |
| HOLIDAY | | | | |
| OVERTIM | | | | |
| Paid Time | | | | |
| REGULAR | | | | |
| Gross Earnings | | | | |

| Deductions | Amount | YTD |
|---|---|---|
| 401K | | |
| CHILD SUPT - EFT | | |
| LIFE INS | | |
| Short Term Dis-Post | | |
| Deductions | | |

| Taxes | Amount | YTD |
|---|---|---|
| FITW | | |
| GA | | |
| MED | | |
| SS | | |
| Taxes | | |

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| UNION | | | |
| Total Direct Deposits | | | |

| Time Off | Used | Availabl |
|---|---|---|
| PTO Full | | |

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice



Check Date
September 27, 2019

Voucher Number

DIRECT DEPOSIT VOUCHER



| Direct Deposits  Type | | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| Total Direct Deposits | | | |

Davin Terrell
Clarkston, GA  30021

## Non Negotiable - This is not a check - Non Negotiable

**Davin Terrell**

**TWG Management LLC**

**Earnings Statement**



Employee ID
Location
Hourly

Fed Taxable Income
Fed Filing Status
State Filing Status

Check Date          September 27, 2019
Period Beginning  September 7, 2019
Period Ending      September 20, 2019

Voucher Number
Net Pay

| Earnings | Rate | Hours | Amount | YTD |
|---|---|---|---|---|
| 401K MAT | | | | |
| HOLIDAY | | | | |
| OVERTIM | | | | |
| Paid Time | | | | |
| REGULAR | | | | |
| Gross Earnings | | | | |

| Deductions | Amount | YTD |
|---|---|---|
| 401K | | |
| CHILD SUPT - EFT | | |
| LIFE INS | | |
| Short Term Dis-Post | | |
| Deductions | | |

| Taxes | Amount | YTD |
|---|---|---|
| FITW | | |
| GA | | |
| MED | | |
| SS | | |
| Taxes | | |

| Direct Deposits Type | | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| UNION | | | |
| Total Direct Deposits | | | |

| Time Off | Used | Availabl |
|---|---|---|
| PTO Full | | |

TWG Management LLC | 333N Pennsylvania St Suite 100  Indianapolis, IN 46204 | FEIN: 26-3794348 | GA: 411200-09

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice

paylocity

Check Date
September 13, 2019

Voucher Number



DIRECT DEPOSIT VOUCHER

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| Total Direct Deposits | | | |

Davin Terrell

Clarkston, GA  30021

## Non Negotiable - This is not a check - Non Negotiable

**Davin Terrell**                    **TWG Management LLC**

Employee ID
Location
Hourly

Fed Taxable Income
Fed Filing Status
State Filing Status

Check Date          September 13, 2019
Period Beginning  August 24, 2019
Period Ending      September 6, 2019

**Earnings Statement**

Voucher Number
Net Pay



| Earnings | Rate | Hours | Amount | YTD |
|---|---|---|---|---|
| 401K MAT | | | | |
| HOLIDAY | | | | |
| OVERTIM | | | | |
| Paid Time | | | | |
| REGULAR | | | | |
| Gross Earnings | | | | |

| Deductions | | Amount | YTD |
|---|---|---|---|
| 401K | | | |
| CHILD SUPT - EFT | | | |
| LIFE INS | | | |
| Short Term Dis-Post | | | |
| Deductions | | | |

| Taxes | | Amount | YTD |
|---|---|---|---|
| FITW | | | |
| GA | | | |
| MED | | | |
| SS | | | |
| Taxes | | | |

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| UNION | | | |
| Total Direct Deposits | | | |

| Time Off | Used | Avail | |
|---|---|---|---|
| PTO Full | | | |

TWG Management LLC | 333N Pennsylvania St Suite 100  Indianapolis, IN 46204 | FEIN: 26-3794348 | GA: 411200-09

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice



Check Date
August 30, 2019

Voucher Number

DIRECT DEPOSIT VOUCHER



Direct Deposits   Type
NAVY          C
FEDERAL
CREDIT
Total Direct Deposits

Davin Terrell

Clarkston, GA  30021

Account    Amount

## Non Negotiable - This is not a check - Non Negotiable

**Davin Terrell**                    **TWG Management LLC**



**Employee ID**         Fed Taxable Income      Check Date        August 30, 2019      **Earnings Statement**
**Location**            Fed Filing Status       Period Beginning  August 10, 2019
**Hourly**              State Filing Status     Period Ending     August 23, 2019      Voucher Number
                                                                                       Net Pay

**Earnings**    Rate    Hours    Amount        YTD        **Deductions**              Amount        YTD
401K MAT                                                  401K
HOLIDAY                                                   CHILD SUPT - EFT
OVERTIM                                                   LIFE INS
Paid Time                                                 Short Term Dis-Post
REGULAR                                                   Deductions
Gross Earnings

**Taxes**                              Amount    YTD      **Direct Deposits** Type        Account    Amount
FITW                                                      NAVY           C
GA                                                        FEDERAL
MED                                                       CREDIT
SS                                                        UNION
Taxes                                                     Total Direct Deposits

                                                         **Time Off**    Used  Availabl
                                                         PTO Full

TWG Management LLC | 333N Pennsylvania St Suite 100  Indianapolis, IN 46204 | FEIN: 26-3794348 | GA: 411200-09

**TWG Management LLC**
333N Pennsylvania St
Suite 100
Indianapolis, IN 46204

Direct Deposit Advice

paylocity

Check Date
August 16, 2019

Voucher Number



DIRECT DEPOSIT VOUCHER

Direct Deposits  Type

Account

Amount

NAVY        C
FEDERAL
CREDIT
Total Direct Deposits

Davin Terrell

Clarkston, GA  30021

## Non Negotiable - This is not a check - Non Negotiable

### TWG Management LLC

**Davin Terrell**

Employee ID
Location
Hourly

Fed Taxable Income
Fed Filing Status
State Filing Status

Check Date      August 16, 2019
Period Beginning  July 27, 2019
Period Ending    August 9, 2019

**Earnings Statement**

Voucher Number
Net Pay



| Earnings | Rate | Hours | Amount | YTD |
|---|---|---|---|---|
| 401K MAT | | | | |
| HOLIDAY | | | | |
| OVERTIM | | | | |
| Paid Time | | | | |
| REGULAR | | | | |
| Gross Earnings | | | | |

| Taxes | | Amount | YTD |
|---|---|---|---|
| FITW | | | |
| GA | | | |
| MED | | | |
| SS | | | |
| Taxes | | | |

| Deductions | Amount | YTD |
|---|---|---|
| 401K | | |
| CHILD SUPT - EFT | | |
| LIFE INS | | |
| Short Tem Dis-Post | | |
| Deductions | | |

| Direct Deposits | Type | Account | Amount |
|---|---|---|---|
| NAVY | C | | |
| FEDERAL | | | |
| CREDIT | | | |
| UNION | | | |
| Total Direct Deposits | | | |

| Time Off | Used | Availabl |
|---|---|---|
| PTO Full | | |

## 401k Account Asset Declaration

To be completed by all applicants/residents who have a 401k account.

Applicant's Name: DAvin Terrell          Unit #:  12-F

I have made an application to rent in a community that has a program that requires I disclose all of my income and assets in order to determine household eligibility. I hereby declare that (check one):

**Note:**
When the applicant is not currently employed OR the 401k account is not held by the current employer, the 401K account needs to be included as an asset. If the total value of all assets exceeds $5,000 OR the property has BOND/HOME, the account value and asset income will need to be third party verified.

**Employed Under 59 1/2 Years Old:**

☑ I am under the age of 59 ½ years old, my 401K is part of my current employment benefits, such is currently being held by my employer, and I (check one below)

      ☑ Do not have access to the funds without having to repay amounts withdrawn.

      ☐ Do have access to funds without having to repay amounts withdrawn.

**Employed Over 59 1/2 Years Old:**

☐ I am over the age of 59 ½ years old, my 401K is part of my benefits with my current employer, and I (check one below)

    ☐ I cannot access funds in my 401k account without retiring or terminating employment.  (Use "Investment Account 401K, IRA, Other Asset Verification" form to verify accessibility with the third-party)

    ☐ I am able to access funds in my 401k account prior to retiring or terminating employment, but any funds withdrawn are in the form of a loan and must be repaid.  (Use "Investment Account 401K, IRA, Other Asset Verification" form to verify accessibility with the third-party)

    ☐ I am able to access funds in my 401k account prior to retiring or terminating employment. (Please provide documentation of value of asset, so such can be counted for eligibility purposes)

    ☐ Other _____

Under penalty of perjury I hereby certify that all the above information is correct, and that I understand that failure to provide accurate information will result in denial of my application or immediate termination of my lease agreement.  Furthermore, I understand that the community for which application is being made is financed through a program governed by the Internal Revenue Services wherein qualification for occupancy requires that certain income and assets be included and verified.

Applicant's Signature: _____          Date:  11/2/19

Printed Name:          DAvin Terrell

**CERTIFICATE OF VITAL RECORD**

VERIFY PRESENCE OF WATERMARK    HOLD TO LIGHT TO VIEW

| STATE OF GEORGIA CERTIFICATE OF LIVE BIRTH | Death Number | Local File Number | 1 State File Number |
|---|---|---|---|

| 2 CHILD'S NAME FIRST    3 MIDDLE    4 LAST ████ | 5 JR JR ETC | 6 Sex (M or F) FEMALE | 7 DATE OF BIRTH (Mo., Day,Year) ████ |
|---|---|---|---|

| 8 TIME OF BIRTH    05:37    AM | 9 THIS BIRTH (Single, Twin, Triplet, Etc.) SINGLE | 10 IF NOT SINGLE SPECIFY BIRTH ORDER |
|---|---|---|

| 11 CITY TOWN, OR LOCATION OF BIRTH    ATLANTA | 12 HOSPITAL FACILITY NAME (If not Hospital give street and Number.)    GRADY HEALTH SYSTEM |
|---|---|

| 13 IF NOT HOSPITAL Specify    HOSPITAL | 14 COUNTY OF BIRTH    FULTON |
|---|---|

| 15 MOTHER'S NAME FIRST    16 MIDDLE    17 LAST | | | 18 MAIDEN (Last Name) |
|---|---|---|---|
| ROSARIO | GUADALUPE | SOTO-MANZO | SOTO-MANZO |

| 19 DATE OF BIRTH (Month, Day,Year) ████ | 20 STATE OF BIRTH (If not U.S.A. Name Country)    GEORGIA | 21 RESIDENCE - STATE    GEORGIA | 22 COUNTY    DEKALB |
|---|---|---|---|

| 23 CITY TOWN OR LOCATION    TUCKER | 24 STREET AND NUMBER OF RESIDENCE ████ APT J |
|---|---|

| 25 MOTHER'S MAILING ADDRESS    ████ APT J    TUCKER    GEORGIA    30084 | 26 RESIDENCE INSIDE CITY LIMITS? (Yes or No)    YES |
|---|---|

| 27 FATHER'S NAME FIRST    28 MIDDLE    29 LAST JR, ETC | | 30 DATE OF BIRTH (Mo,Day, Year) ████ | 31 STATE OF BIRTH (If not U.S.A. Name Country) |
|---|---|---|---|
| DAVIN | REBHON | TERRELL | | GEORGIA |

| 32a INFORMANT'S NAME (Type or Print)    ROSARIO GUADALUPE SOTO-MANZO | 32b RELATION TO CHILD    MOTHER | 33 PARENTS AUTHORIZE RELEASE OF INFORMATION TO SOCIAL SECURITY ADMINISTRATION TO ISSUE THIS CHILD A SOCIAL SECURITY NUMBER    (Yes or No)    YES |
|---|---|---|

| 34 I CERTIFY THAT THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE. (Signature) Electronically signed by    KEISHAUNTE REVERE | 35 DATE SIGNED (Mo,Day,Year)    11/29/2011 | 36 ATTENDANT AT BIRTH IF OTHER THAN CERTIFIER (Type or Print) (Name)    LETITIA F MOBLEY-MCDOWELL |
|---|---|---|

| 38 CERTIFIER (Type or Print) (Name) KEISHAUNTE REVERE | 39 PHYSICIAN'S MEDICAL LIC NO | 37 (Title)    MD |
|---|---|---|
| (Title)    BIRTH RECORD CLERK | | 40 CERTIFIER MAILING ADDRESS (Street or R F D No, City or Town,State, Zip) 80 JESSIE HILL JR DRIVE ATLANTA GA 30303 |

| 41 REGISTRAR (Signature) Electronically signed by    /s/ Deborah C. Aderhold | 42 DATE RECEIVED BY STATE REGISTRAR (Mo, Day Year)    11/29/2011 |
|---|---|

GEORGIA DEPARTMENT OF COMMUNITY HEALTH, VITAL RECORDS SERVICE

**Form 3901A (Rev. 7-1-92)**

THIS IS TO CERTIFY THAT THIS IS A TRUE REPRODUCTION OF THE ORIGINAL RECORD ON FILE WITH THE STATE OFFICE OF VITAL RECORDS, GEORGIA DEPARTMENT OF PUBLIC HEALTH. THIS CERTIFIED COPY IS ISSUED UNDER THE AUTHORITY OF CHAPTER 31-10, CODE OF GEORGIA AND 290-1-3, DPH RULES AND REGULATIONS.

BY    Deborah C. Aderhold    Registrar    FEB 1 8 2013

**WARNING:**

VOID IF ALTERED OR COPIED

VOID IF ALTERED OR ERASED

TYPE
OR PRINT
IN
PERMANENT
BLACK OR
BLUE-BLACK INK

**STATE OF GEORGIA CERTIFICATE OF LIVE BIRTH**

Death Number | Local File Number | 1. State File Number

| 2.CHILD'S NAME    FIRST | 3 MIDDLE | 4 LAST | 5 JR. III ETC | 6 Sex (M or F ) | 7 DATE OF BIRTH (Mo. Day Year ) |
|---|---|---|---|---|---|
| ▮▮▮ | | | | MALE | |

| 8 TIME OF BIRTH | 9. THIS BIRTH (Single Twin Triplet  Etc ) | 10 IF NOT SINGLE SPECIFY BIRTH ORDER |
|---|---|---|
| 12 23  PM | SINGLE | |

| 11 CITY TOWN OR LOCATION OF BIRTH | 12 HOSPITAL FACILITY NAME (If not Hospital give street and number ) |
|---|---|
| ATLANTA | GRADY MEMORIAL HOSPITAL |

| 13 IF NOT HOSPITAL Specify | 14. COUNTY OF BIRTH |
|---|---|
| HOSPITAL | FULTON |

| 15 MOTHER'S NAME    FIRST | 16 MIDDLE | 17 LAST | 18 MAIDEN (Last Name) |
|---|---|---|---|
| ROSARIO | GUADALUPE | SOTO-MANZO | SOTO-MANZO |

| 19.DATE OF BIRTH (Month  Day Year ) | 20 STATE OF BIRTH (If not U S A  Name Country) | 21 RESIDENCE - STATE | 32 COUNTY |
|---|---|---|---|
| ▮▮▮ | MEXICO | GEORGIA | DEKALB |

| 23  CITY TOWN OR LOCATION | 24 STREET AND NUMBER OF RESIDENCE |
|---|---|
| CHAMBLEE | ▮▮▮ C |

| 25 MOTHER'S MAILING ADDRESS | | | | 26 RESIDENCE INSIDE CITY LIMITS? (Yes or No) |
|---|---|---|---|---|
| ▮▮▮ C | CHAMBLEE | GEORGIA | 30341 | YES |

| 27 FATHER'S NAME FIRST | 28 MIDDLE | 29 LAST JR  ETC | | 30.DATE OF BIRTH (Mo  Day  Year ) | 31 STATE OF BIRTH(If not U S A  Name Country) |
|---|---|---|---|---|---|
| DAVIN | RESHON | TERRELL | SR | ▮▮▮ | GEORGIA |

| 32a. INFORMANT'S  NAME (Type or Print) | 32b  RELATION TO CHILD | 33 PARENTS AUTHORIZE RELEASE OF INFORMATION TO SOCIAL SECURITY ADMINISTRATION TO ISSUE THIS CHILD A SOCIAL SECURITY NUMBER |
|---|---|---|
| DAVIN  R  TERRELL SR | FATHER | (Yes or No)                    YES |

| 34 I CERTIFY THAT  THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE  (Signature) | 35  DATE SIGNED (Mo  Day Year ) | 36  ATTENDANT AT BIRTH IF OTHER THAN CERTIFIER (Type or Print) |
|---|---|---|
| Electronically signed by | | (Name)  CHIEMI  URA |
| SHANIKA  F  GARLINGTON | 10/11/2009 | 37 (Title)                    CNM |

| 38  CERTIFIER (Type or Print) | 39  PHYSICIAN'S MEDICAL LIC  NO | 40  CERTIFIER MAILING ADDRESS (Street or R F D No  City or Town State  Zip ) |
|---|---|---|
| (Name)  SHANIKA F  GARLINGTON | | 80 JESSE HILL JR DR SE ATLANTA, GA 30303 |
| (Title)  BIRTH RECORD CLERK | | |

| 41  REGISTRAR (Signature) | 42  DATE RECEIVED BY STATE REGISTRAR (Mo  Day Year ) |
|---|---|
| Electronically signed by | |
| /S/ Kenneth Bramlett | 10/21/2009 |

DEPARTMENT OF HUMAN RESOURCES,VITAL RECORDS SERVICE

Form 3901A
(Rev. 7-1-82)

## Marital Status Affidavit

Resident Name: _DAvin Terrell_

*Directions: Check the marital status option that applies to your present situation and complete all information in that section.*

___✓___ **Single:** Never married.

_____ **Married:** List full names of individuals married to each other:

_____

_____ **Widowed**

_____ **Separated:** Legal action **HAS NOT** been taken.
I have not taken legal action due to: _____
I anticipate taking legal action on: _____
_____ I do not intend to live with my spouse at any time in the next 12 months.
_____ I do not share any assets or income with my spouse. I understand that I must include any assets or income to which I have access to as part of my household income and assets.

_____ **Separated:** Legal action **HAS** been taken. (You must provide legal documentation.)
_____ I do not intend to live with my spouse at any time in the next 12 months.
_____ I do not share any assets or income with my spouse. I understand that I must include any assets or income to which I have access to as part of my household income and assets.

_____ **Divorced:** Divorced less than 2 years ago, or minor children of divorce residing in household, or income and/or assets received as a result of the divorce. (You must provide the divorce decree.)

_____ **Divorced:** More than 2 years ago and no minor children residing in household.
Date(s) of divorce: _____
Ex-Spouse's Name: _____
I have no court order to receive anything from the person(s) listed above for any purpose. I also certify that I do not have any jointly owned assets and that I do not plan to live with the person(s) listed anytime in the next 12 months. A copy of my divorce decree is not available, but my signature below certifies these statements.

I certify that all of the above information is complete, true, and correct, and that I will need to report any future changes to my household size or marital status immediately. I understand that providing false or misleading information will be a federal offense and will subject me to possible federal penalties.

Signature: _____    Date: _10-9-19_

We encourage and support the nation's affirmative housing program in which there are no barriers to obtaining housing because of race, color, religion, sex, national origin, handicap, or familial status.

TWG Management Marital Affidavit
Revised 9/2016

**Marital Status Affidavit**

Resident Name: Devin Taylor Jr

*Directions: Check the marital status option that applies to your present situation and complete all information in that section.*

___✓___ **Single:** Never married.

_____ **Married:** List full names of individuals married to each other:

_____

_____ **Widowed**

_____ **Separated:** Legal action **HAS NOT** been taken.
I have not taken legal action due to: _____
I anticipate taking legal action on: _____
____ I do not intend to live with my spouse at any time in the next 12 months.
____ I do not share any assets or income with my spouse. I understand that I must include any assets or income to which I have access to as part of my household income and assets.

_____ **Separated:** Legal action **HAS** been taken. (You must provide legal documentation.)
____ I do not intend to live with my spouse at any time in the next 12 months.
____ I do not share any assets or income with my spouse. I understand that I must include any assets or income to which I have access to as part of my household income and assets.

_____ **Divorced:** Divorced less than 2 years ago, or minor children of divorce residing in household, or income and/or assets received as a result of the divorce. (You must provide the divorce decree.)

_____ **Divorced:** More than 2 years ago and no minor children residing in household.
Date(s) of divorce: _____
Ex-Spouse's Name: _____
I have no court order to receive anything from the person(s) listed above for any purpose. I also certify that I do not have any jointly owned assets and that I do not plan to live with the person(s) listed anytime in the next 12 months. A copy of my divorce decree is not available, but my signature below certifies these statements.

I certify that all of the above information is complete, true, and correct, and that I will need to report any future changes to my household size or marital status immediately. I understand that providing false or misleading information will be a federal offense and will subject me to possible federal penalties.

Signature: Devin Taylor Jr          Date: 09-24-2024

We encourage and support the nation's affirmative housing program in which there are no barriers to obtaining housing because of race, color, religion, sex, national origin, handicap, or familial status.

TWG Management Marital Affidavit
Revised 9/2016



**INCIDENT REPORT FORM**

Property: Silver Oak

Name(s): Davin Terrell

Address: ███████████ Clarkston, GA 30021

Date of incident: 3/10/2022 – when we first heard of the incident

Time (approximately): 4pm

Involved Parties: (check which applies) ☐ Resident ☐ Employee ☒ Other: Not a resident

Were the police called? ☐ Yes ☐ No Unknown

Case Number: _____

Does the incident require physician/hospital visit? ☒ Yes ☐ No

Name of physician/hospital: _____

Summary: A resident stated a lady who appeared to be an investigator was looking for someone who may have a big white dog. She said the woman was walking the property asking people if they had saw the dog. The investigator never came to the leasing office. No large white dog is on file for any resident on property. However a previous employee who had a white dog and is known to visit people on property was contacted to see if the dog was his. It was discovered that

Reported by: T. CROOKS

Title: Property Manager

the dog did belong to Davin Terrell. He stated that the woman was bit by the dog but she reported that it did not take place on Silver Oak property. He stated he did not have the dog anymore.

10/04/18          Incident Report          1/1

His contact is (678) 521-3039.

PLAINTIFF'S EXHIBIT
5 Bretz
CW 9/17/24

IN THE STATE COURT OF GWINNETT COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| JENNIFER ARMISTEAD, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION FILE NO.: |
| | § | |
| v. | § | |
| | § | |
| DAVIN R. TERRELL and | § | |
| TWG DEVELOPMENT, LLC, | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF'S FIRST CONTINUING INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT TWG DEVELOPMENT, LLC

Comes now the Plaintiff, JENNIFER ARMISTEAD, (hereinafter referred to as "Plaintiff"), by and through counsel of record, Joseph A. Zdrilich of ZDRILICH INJURY LAW, LLC, and pursuant to O.C.G.A. §§ 9-11-26, 9-11-33, and 9-11-34 serve *Plaintiff's First Continuing Interrogatories and Request for Production of Documents to Defendant TWG Development, LLC* (hereinafter referred to as "Plaintiff's Interrogatories and Request") upon the Defendant, TWG DEVELOPMENT, LLC (hereinafter referred to as "Defendant TWG"), and request that the named Defendant respond to them fully, in writing, within the time prescribed by Georgia law. Plaintiff submits these Interrogatories to Defendant TWG and requires that they be answered under oath as required by O.C.G.A. § 9-11-33.

### I. INSTRUCTIONS

Each interrogatory shall be construed to include information within the Defendant's knowledge, possession, or control as of the date of the Defendant's responses to these interrogatories, as well as any supplemental information, knowledge, data,

communication responsive to these interrogatories which is subsequently generated, obtained, or discovered.

It is requested that the person responding to these interrogatories restate each interrogatory or sub-part immediately preceding each separate response to be furnished for the sake of clarity and to avoid possible misunderstanding.

Where an interrogatory requests information or knowledge in the Defendant's possession, such request includes any knowledge of any agent or representative or anyone else acting on the Defendant's behalf and, unless privileged, any attorney of the Defendant.

If you claim privilege as a ground for not fully answering any interrogatory, describe the factual basis for your claim of privilege in sufficient detail as to permit the court to adjudicate the validity of the claim. If the claim of privilege relates to identification of a document, also state the date the document was prepared, the identities (including job titles) of the persons who made and received the documents, those persons' employers and dates of employment, and the location of all copies thereof, and the subject matter with which each document is concerned.

If the response to any interrogatory consists in whole or in part of any objection relating to or including burden, then with respect to such response:

1. Provide such information as can be ascertained without undue burden;

2. State with particularity the basis for such objection including:

    (a) a description of the process or method required to obtain any facts responsive to the interrogatory; and

    (b) the estimated cost and time required to obtain any facts responsive to the interrogatory;

3. The nature and extent of the document(s) or other source(s), if any, from which any fact responsive to the interrogatory can be obtained; and

4. State whether documents or other sources will be made available for inspection and copying.

These interrogatories are deemed to be continuing such as to require the Defendants to file and to serve supplemental responses should the Defendants learn of additional information called for by these interrogatories between the time the Defendant's responses are filed and the time of trial. All supplemental responses are required to be served within a reasonable time after the discovery of such additional information.

Plaintiff specifies 9:00 a.m. on the same date that the Defendant's responses to *Plaintiff's First Continuing Interrogatories and Request for Production of Documents to Defendants* are due as the time for production of documents, at the offices of Zdrilich Injury Law, LLC, 3575 Koger Blvd., Suite 125, Duluth, Georgia 30096, or at such other location as is previously agreed upon, as the place thereof. Plaintiff specifies that the documents should be produced by the Defendant and that the documents shall then and there be inspected and copied by the Plaintiff, and further that the documents produced shall be labeled with exhibit numbers, which shall correspond to any written response to Plaintiff's Interrogatories and Request so that said response will accurately show the production of documents or absence thereof.

If, in response to any request, there are documents not produced because of a claim of privilege, or for any other reason, note such failure to produce as an objection to the request and comply with the request to the extent to which it is not subject to the objection. If the original of a document is within your possession, custody or control, produce it. If not, produce such copy of it as is in your possession, custody or control. Any copy of a document on which any notation,

addition, alteration or change has been made is to be treated as constituting an additional original document. If any document requested herein has been lost, discarded, transferred, or destroyed, it shall be identified as completely as possible, including but not limited to the following information: date of disposal, manner of disposal, reason for disposal, person authorizing disposal, and person conducting disposal.

Plaintiff's request for production are continuing in nature. Any documents that are secured after initial production, and which would have been included therein had such documents been previously known or available, shall be supplied by supplemental production.

## II. DEFINITIONS

The following definitions apply to each of the interrogatories, request for production, and request for admissions and are deemed to be incorporated therein.

### 1.

The term "documents" means any book, printed matter, or other tangible thing, including, but not limited to, the following items, whether printed, typed, recorded, contained on any computer disk, memory ore media, photographed, filmed or reproduced by any process, or written or produced by hand, and whether an original, master, duplicate or copy, namely: agreements; communications, whether interoffice, intra-office, e-mail or otherwise; letters, memoranda, summaries, minutes, records, sound recordings and transcriptions of telephone conversations, personal conversations, interviews, meetings, conferences, facts, conclusions, impressions and things similar to the foregoing: books, manuals, publications, notebooks, studies, and reports; charts; plans; photographs; reports and/or summaries of investigations; projections; opinions of counsel; opinions and reports of consultants; corporate records; agenda; notes and minutes of board

of directors, stockholders or committee meetings; desk calendars; appointment books; diaries; diary entries and notes; and any other information containing paper, writing or physical thing.

## 2.

The term "communication" means a transmittal of information, or request for information, document or otherwise, and includes without limitation any conversation in person, by telephone, or by any other means, as well as any utterance heard by another person, whether in person, by telephone, or otherwise.

## 3.

The term "person" means any individual, corporation, partnership, proprietorship, professional corporation, association, group, government agency, municipal corporation, state government, local government, political subdivision, or any other legal entity of any kind, including parents, subsidiaries, affiliates, predecessors, successors, assignors, assignees, officers, directors, agents, and controlling persons.

## 4.

The terms "identify" and "identity", when used herein in reference to a natural person, mean to state:

(a) his/him full name, the present or last known address of his/him residence, and his/him home telephone number;

(b) his/him present or last known business address and business telephone numbers, the name of the business with which he/he is affiliated, and his/him position therewith; and if any of the above information is not available, state any other available means of identifying such natural person.

**5.**

The terms "identify" and "identity", when used in reference to a person other than a natural person, mean to state:

(a) its full name;

(b) the nature of the organization, including the state under which it was organized;

(c) its address and telephone numbers; and

(d) its principal line of business.

If any of the above information is not available, state any other available means of identifying such organization.

**6.**

The terms "identify" and "identity", when used in reference to a document, mean to state its:

(a) date;

(b) author;

(c) type (i.e. letter, memorandum, receipt, photograph, tape recording, journal, etc.);

(d) present location, including name and address of person having custody of the document;

(e) contents; and

(f) present condition.

If any such document was, but no longer is in your possession, or subject to your control, or in existence, the terms "identify" and "identity", further require you to state whether it is:

(i) missing;

(ii) lost;

(iii) destroyed;

(iv) transmitted or transferred, voluntary or involuntary, to others, and to identify such others by name, address and title; or

(v) otherwise disposed of.

## 7.

The terms "identify" and "identity", when used in reference to communication, mean: if such communication was oral, identify the person spoken to; and state the date, place and mode of the communication and its substance, and if such communication was contained in a document, identify the document.

## 8.

The term 'relating to" means concerning, embodying, evidencing, memorializing, considering, mentioning, respecting, bearing on, referring to, addressing in whole or in part, or having any relationship to the subject matter that follows the term.

## 9.

The term "care and treatment" means daily and monthly grooming, shoeing, purchasing of equipment, veterinary bills and records, medications, feeding, and the like.

## 10.

The term "support" means substantiate, corroborate, advance or assist.

## 11.

The term "and/or" as used herein has both conjunctive and disjunctive meanings.

## 12.

The term "this lawsuit" means JENNIFER ARMISTEAD, Plaintiff vs. DAVIN R. TERRELL and TWG DEVELOPMENT, LLC, Defendants, in the State Court of Gwinnett County, Georgia; and all proceedings and pleadings concerning that action.

**13.**

The terms "you," "your," and "Defendants" mean DAVIN R. TERRELL and TWG DEVELOPMENT, LLC, the Defendants in this lawsuit.

**14.**

The term the "incident" means the events as set forth in the complaint which resulted in the Plaintiff's injuries.

**15.**

The term "insurance provider" means any insurance carried by you, your employer, your parents, spouse, or any other person or group, which covers any liability for your actions.

**16.**

The term "assets" means any cash holdings, whether held by you, a bank, an investment service, or any other entity; any tangible goods, such as car, house, musical instrument, or any other thing of value, excluding personal items not normally of value to others.

**III**

**INTERROGATORIES**

**INTERROGATORY NO. 1.**

State you're the full name, current address, telephone number, and present employment of any manager employed by Defendant TWG on January 31, 2022.

**INTERROGATORY NO. 2.**

State the name, current address, and telephone number of any potential party to this lawsuit not already a party

## INTERROGATORY NO. 3.

Describe in detail your version of how the incident described in the *Complaint* occurred and identify all documents relating to same.

## INTERROGATORY NO. 4

Do you contend that Plaintiff was guilty of any act(s) or failure(s) to act that played any part in causing the injuries or damages complained of? If so, state each specific act (or failure to act) by Plaintiff that you claim supports your contention.

## INTERROGATORY NO. 5.

Do you contend that any other person(s) not already a party to this lawsuit was guilty of any act(s) or failures to act that played any part in causing Plaintiff's injuries or damages complained of? If so, state each specific act (or failure to act) by each such person (giving the name, current address, and telephone number of the person) that you claim supports your contentions.

## INTERROGATORY NO. 6.

State the name, current address and telephone number of all other persons (excluding your attorney(s) and any expert) who to your knowledge, information or belief possess any knowledge concerning the incident or the cause(s) of the incident involved herein, one or more of Plaintiff's claims, or one or more of your defenses to Plaintiff's *Complaint*. For each such person, specify the subject matter(s) about which you know or believe that person to have knowledge and the basis of that person's knowledge.

## INTERROGATORY NO. 7.

State the name, current address and telephone number of all other persons (excluding your attorney(s) and any expert) who to your knowledge, information or belief possess any knowledge concerning the incident or the cause(s) of the incident involved herein, one or more of Plaintiff's

claims, or one or more of your defenses to Plaintiff's *Complaint*. For each such person, specify the subject matter(s) about which you know or believe that person to have knowledge and the basis of that person's knowledge.

### INTERROGATORY NO. 8.

To your knowledge, information or belief, has any statement or report been made or given by any person named in answer to Interrogatory No(s). 6 or 7? If so, describe each such statement or report, giving the date, the subject matter, the form (whether written, recorded or in stenographic form), the name and current address of each person present when given or made, and the name and current address of the person having custody and control thereof.

### INTERROGATORY NO. 9.

State the name, current address, telephone number, and occupation of each person who to your knowledge, information or belief has investigated either the incident-in-suit or the cause(s) of the same (excluding your attorney(s)).

### INTERROGATORY NO. 10.

State the name, current address, and telephone number of each person who to your knowledge, information or belief has been contacted by any individual named in the answer to Interrogatory No. 10.

### INTERROGATORY NO. 11.

State the content and substance of each written record containing information from the investigation undertaken by any individual named in the answer to Interrogatory No. 10, the date each record was prepared, and the name, current address and telephone number of the person(s) who prepared the record and the person who now has custody and control thereof (specifying which).

### INTERROGATORY NO. 12.

Please state whether you, your servant, employee, or agent saw or received notice of this incident from JENNIFER ARMISTEAD or from observing the event, and if so, state whether the notice was written or oral, and if written, the name and address of the person who now has custody of any recorded or written notice and attach a copy of each to your answers to these interrogatories.

### INTERROGATORY NO. 13.

State whether there are one or more policies of insurance extending coverage to you and/or your home, or whether you are a party to or beneficiary of any agreement or contract, by which any person is or may be obligated to satisfy all or part of any judgment which may be entered in this action, or to indemnify or reimburse any person for any cost, expense or payment made in connection with this action. If so, for each such policy of insurance, agreement or contract (specifying which), state the name and current address of each person who is a party or beneficiary (specifying which), the effective dates or date of execution, the substance and content, the applicable limits of liability coverage, and the name and current address of the person(s) having possession thereof.

### INTERROGATORY NO. 14.

With regard to each policy of insurance identified in answer to Interrogatory No. 13, state whether the insurer has undertaken to defend you in this action, whether the insurer has acknowledged or extended coverage with respect to the incident-in-suit, and whether the insurer has undertaken to defend you in this action under any reservation of rights or non-waiver agreement.

## INTERROGATORY NO. 15.

Please state whether you are aware of any other instances involving allegations of Defendant Terrell's dog, Kash, biting or attacking a person, or another animal, of which you are now aware and which occurred within the preceding seven (7) years of the incident forming the substance of the *Complaint* in this matter. If you are aware of any such incidents, please state the circumstances by which you received such notice by date, manner of notice, name and address of any individual(s) providing this notice.

## INTERROGATORY NO. 16.

For any such incidents identified in response to Interrogatory No. 15, please state the name, address, and telephone number of any witnesses to the incident, describe the incident in detail, identify whether you were aware of the incident prior to the incident forming the substance of this *Complaint,* and describe any remedial measures taken in response to it.

## INTERROGATORY NO. 17.

Please describe in detail what if anything you, or any of your employees observed, concerning Plaintiff JENNIFER ARMISTEAD, including where you (they) were, how far from the accident, and what, if any, actions you (they) took to try to prevent this accident.

## INTERROGATORY NO. 18.

Please identify any investigation of any report regarding Defendant Terrell's dog since the dog came onto the Silver Oak Premises.

## INTERROGATORY NO. 19.

Please describe in detail the substance of any instructions or warnings, given to Plaintiff, JENNIFER ARMISTEAD, verbally and/or by posting, concerning the dog, and its propensity to attack, bite, or respond aggressively, prior to Plaintiff being injured.

### INTERROGATORY NO. 20.

Please describe in detail the substance of any instructions or warnings, given to any other person other than Plaintiff, verbally and/or by posting, concerning the dog, and its propensity to attack, bite, or respond aggressively, prior to Plaintiff being injured; in responding to this interrogatory, please provide the name, last known address and phone number of any such individual(s).

### INTERROGATORY NO. 21.

State the substance of every utterance, whether or not reduced to writing, made by you or to you at the scene of the accident and identify the speaker and/or recipient by name, if known, or by any other facts which might lead to the discovery of the speaker's and/or recipient's identity. If known, please provide all addresses and phone numbers.

### INTERROGATORY NO. 22.

Identity all documents, e-mails, documents, pictures, recordings (video, digital, or audio) relating to the ownership, care, treatment, training, and discipline, concerning Defendant Terrell's dog, known to you, whether or not currently in your possession, and, for those documents not in your possession, identify the location of said documents.

### INTERROGATORY NO. 23.

Identity all documents, e-mails, computer files, pictures, recordings (video, digital, or audio) relating to the employment of Defendant Terrell, with Plaintiff known to you, whether or not currently in your possession, and, for those documents not in your possession, identify the location of said documents.

### INTERROGATORY NO. 24.

Identify all witnesses whom you will or may have present at trial, including expert and impeachment witnesses. For each lay witness, include a description of the issue(s) to which the witness' testimony will relate. For each expert witness, state the subject matter on which the expert is expected to testify, and a summary of the grounds for each opinion.

### INTERROGATORY NO. 25.

Please identify any recorded or written statements of which you have knowledge that relate in any way to this incident.

### INTERROGATORY NO. 26.

Have you ever been a party to a lawsuit of any kind other than this lawsuit? If so, state the following for each such lawsuit:

> (a) the identity of all other parties to the suit;
>
> (b) the county, state, and year in which the lawsuit was filed;
>
> (c) the civil action number or criminal action number of the lawsuit;
>
> (d) the nature of the lawsuit, including claims made therein;
>
> (e) whether they were/are Plaintiff or Defendants in the lawsuit;
>
> (f) the outcome or result of the lawsuit; and
>
> (g) the identity of all documents relating to same.

### INTERROGATORY NO. 27.

Please provide a detailed factual basis for the defense which you plan to claim at trial.

### INTERROGATORY NO. 28.

Describe in detail all statutes, codes, regulations, legal principles, standards and customs or usage, and illustrative law which you contend are applicable to this action.

IV

## REQUESTS FOR PRODUCTION

Pursuant to O.C.G.A. § 9-11-34, you are hereby requested to produce the following documents and other evidence for inspection and copying by counsel for Plaintiff, Joseph A. Zdrilich, Zdrilich Injury Law, LLC, 3575 Koger Blvd., Suite 125, Duluth, Georgia 30096, on the 46th day following service of this request upon you:

### REQUEST FOR PRODUCTION NO. 1

Any documents identified in response to any of the foregoing interrogatories.

### REQUEST FOR PRODUCTION NO. 2

Any documents, identification of which was requested in any of the foregoing interrogatories.

### REQUEST FOR PRODUCTION NO. 3

Any documents, books, magazines, instruction books, e-mails, computer files, pictures, recordings (video, digital, or audio) relating to the ownership, care, treatment, training, and discipline, concerning a canine, generally, and specifically as to the dog that was the aggressor in this action.

### REQUEST FOR PRODUCTION NO. 4

Any documents, e-mails, computer files, pictures, recordings (video, digital, or audio) relating to all lawsuits, claims, crimes, ordinance violations, or injuries having occurred as related to Defendant Terrell's dog other than this lawsuit.

## REQUEST FOR PRODUCTION NO. 5

Any photographs, audiotapes, digital recordings, videotapes, maps, models, drawings, or diagrams depicting the incident and/or any injuries or damages allegedly suffered by Plaintiff JENNIFER ARMISTEAD, as alleged in this lawsuit.

## REQUEST FOR PRODUCTION NO. 6

Any recorded or written statements which relate in any way to the Incident.

## REQUEST FOR PRODUCTION NO. 7.

Any documents, e-mails, computer files, pictures, recordings (video, digital, or audio) relating to the employment, retainer, payment, or consultation, with Plaintiff .

## REQUEST FOR PRODUCTION NO. 8.

Any documents, e-mails, computer files, pictures, recordings (video, digital, or audio) relating to your income, assets, debts, credit accounts, stocks, bonds, pension plans, retirement accounts, motor vehicles, and/or real estate holdings, for the past five (5) calendar years, concerning your finances.

## REQUEST FOR PRODUCTION NO. 9.

Please provide a diagram or floor plan of your premises, pictures of the interior of the residence, and if none is in your possession, please provide a date and time when an inspection can be made of your residence for these purposes.

## REQUEST FOR PRODUCTION NO. 10.

Please provide a copy of any insurance policies referenced in your response(s) to Interrogatories Number(s) 13 and 14 herein, including any declarations page, policy or addendum thereto, in place at the time of the incident giving rise to this action by Plaintiff or that has been in place at any point during the previous five (5) years.

Respectfully submitted this 26th day of June, 2023.

_____
JOSEPH A. ZDRILICH
Attorney for Plaintiff
State Bar of Georgia No.: 569248

ZDRILICH INJURY LAW, LLC
3575 Koger Blvd., Ste. 125
Duluth, Georgia 30096
Phone: (404) 888-1111
Facsimile: (770) 931-9610
E-mail: joe@zinjurylaw.com



SILVER OAK APARTMENTS
1281 BROCKETT ROAD
CITY OF CLARKSTON, DEKALB CO. GA

SITE MAP

NOT TO SCALE

EXHIBIT Def 41
WIT: Bretz
DATE: 9/17/24
Craig Williams, RPR, CMRS
